# EXHIBIT D

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

CHANNA NEWMAN,

        Plaintiff,

        v.

POINT PARK UNIVERSITY,

        Defendant.

CIVIL DIVISION

GD-19-016752

TYPE OF DOCUMENT:

**COMPLAINT IN CIVIL ACTION**

Filed on Behalf of:

Channa Newman,
Plaintiff.

Code and Classification:
Code:__

Counsel of Record for this Party:

James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
5528 Walnut Street
Pittsburgh, PA 15232
(412) 687-2231 (telephone)
(412) 687-3140 (fax)
Jlieber@lhhb-law.com

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

CHANNA NEWMAN,                                   CIVIL DIVISION

       Plaintiff,                                   GD-19-016752

       v.

POINT PARK UNIVERSITY,

       Defendant.

## NOTICE

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lawyer Referral Service
Allegheny County Bar Association
11th Floor Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
Telephone: (412) 261-5555

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| CHANNA NEWMAN, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | GD-19-016752 |
| | ) | |
| POINT PARK UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

<u>**COMPLAINT IN CIVIL ACTION**</u>

AND NOW comes Plaintiff, Channa Newman, Ph.D. (Dr. Newman), by and through

undersigned counsel, and files this Complaint in Civil Action stating claims under 42 U.S.C. § 1981,

Title VII (42 U.S.C. § 2000e), the Age Discrimination in Employment Act (ADEA) (29 U.S.C. § 621

et seq.), Title IX (20 U.S.C. § 1681 et seq.), and common law, stating as follows:

<u>**I.  PARTIES**</u>

1.      Dr. Newman is an adult residing in Allegheny County, Pennsylvania.

2.      Defendant Point Park University (Point Park or PPU) is a non-profit post-secondary

institution with its primary place of business at 201 Wood Street, Pittsburgh, PA 15222.

<u>**II.  JURISDICTION**</u>

3.      The jurisdiction of this Court over the matters set forth in this Complaint is founded

upon  42 U.S.C. § 2000e-5(f)(3).

<u>**III.  VENUE**</u>

4.      The facts set forth this Complaint occurred in Allegheny County, Pennsylvania,

therefore, jurisdiction is properly before this Court.

## IV.  ADMINISTRATIVE EXHAUSTION

5.      On February 20, 2019, Dr. Newman filed an administrative charge with the U.S. Equal Employment Opportunity Commission (EEOC) that stated claims for discrimination on the basis of race, sex, religion, national origin, and age; this charge further stated that Dr. Newman was the target of a hostile work environment.

6.      The aforementioned charge was docketed by the EEOC at 533-2019-00922.

7.      Dr. Newman dual-filed her charge with the Pennsylvania Human Relations Commission (PHRC).[1]

8.      On August 29, 2019, the EEOC issued a "Right to Sue" notice allowing her to bring her claims in federal court.

9.      On November 20, 2019, Dr. Newman through counsel dual-filed a new charge of discrimination and retaliation with the EEOC and the PHRC; she may move to amend/supplement her complaint at a later date with statutory claims once she has exhausted her administrative remedies.

## V.  FACTS

10.      Dr. Newman is employed by Point Park University as a full Professor of French and Cultural Studies.

11.      Dr. Newman is the Chair of the Department of Humanities & Social Sciences (HSS).

12.      Dr. Newman was hired by Point Park over 55 years ago in 1964.

---

[1]Plaintiff will move to amend to add companion discrimination and retaliation claims under the Pennsylvania Human Relations Act (PHRA), 43 P.S. § 951 *et seq.*, after the claims have been administratively exhausted.

13.     Dr. Newman is female, born in 1942 and of Jewish ancestry and ethnicity.

14.     Dr. Newman holds U.S., Israeli, and Czech citizenship.

15.     Dr. Newman is the sole Israeli faculty member at Point Park.

16.     Since at least 2016 Point Park has advertised on its website the national origin of its foreign faculty members including that Dr. Newman is from Israel and the Czech Republic.

17.     Dr. Newman is one of the oldest faculty members at Point Park.

18.     Dr. Newman was instrumental in the hirings of Robert Ross, Ph.D. (Dr. Ross) and J. Dwight Hines, Ph.D. (Dr. Hines) and initially had good relations with them.

19.     Dr. Ross used his position to promote highly anti-Zionist views and activities;  Dr. Hines supported Dr. Ross in these endeavors.

20.     Dr. Ross used his position to foster the Boycott, Divestment and Sanctions (BDS) movement against Israel.

21.     The militant version of the BDS that Dr. Ross promulgated included economic as well as the academic and cultural boycott of Israel and Israelis.

22.     According to the United States Department of State and United States Department of Education (which provides funds to Point Park and its students) virulent anti-Israel activity is anti-Semitic when it deligitimizes Israel by "denying the Jewish people their right to self-determination" and "applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation."

23.     Upon information and belief, Dr. Ross with Point Park support has advanced militant and hateful views against Israel and in favor of BDS that are anti-Semitic and lead to the creation of  a hostile work environment for Dr. Newman including shunning and disrespect by student

3

followers, and some faculty, administrators and alumni.

24.     Dr. Ross' tools have included teaching, speaking, social media, writing, and taking PPU students on trips including with substantial University support financially and/or with scheduling.

25.     Not long after his hiring, Dr. Ross told Dr. Newman who was his superior as the Coordinator of Global Cultural Studies (GCS) that he wanted to take students to the Palestinian refugee camps in Lebanon; Dr. Ross also asked for Point Park to hire a translator which struck Dr. Newman as strange since Dr. Ross represented at his interview that he spoke Arabic.

26.     Dr. Newman suggested that in order to give his students a fuller perspective that they should also visit Israel and Jordan.

27.     Dr. Ross declined stating that "my Hezbollah friends would disown me if I went to Israel."

28.     Hezbollah is a political, terrorist, paramilitary organization and Iran proxy dedicated to the destruction of Israel and to the preservation of Assad regime in Syria.

29.     Dr. Newman received information including reports from students and syllabi indicating that Dr. Ross was using his courses to promote a bias against Israel.

30.     Dr. Ross' course titled "Political Geography of the Middle East" actually is largely focused on the Israel Palestine controversy and contains required reading on BDS.

31.     Dr. Ross served as social media site administrator for the Facebook page of the Israel Palestine Mission Network (IPMN) that carries anti-Semitic, racist, and extremist content including posts that Zionist Jews control America, the media, and the government; that Zionist Jews are warmongers; that European Jews are not Semitic but descended from Khazars and have no ethnic

4

connection to Israel; that Zionism is racism; and that Israel/Zionism can be equated with Nazism and/or apartheid.

32.     In his course "Political Geography of South Africa," Dr. Ross gratuitously weaves in  Palestine and presents Israel as an "apartheid" state which is false, deeply offensive, and racist.

33.     Dr. Newman asked Dr. Ross if he would also present views which she felt to be more balanced either through herself or others and less biased in teaching the Middle East, but he declined.

34.     In or about 2015, Dr. Ross suddenly tried to introduce a core course entitled "Israel: A Settler State" for *all* Point Park first year students through the department then known as Humanities and Human Sciences (HHS) and chaired by Psychology Professor Brent Robbins.

35.     Professor Robbins is sympathetic to Dr. Ross' views on the Middle East and hostile to Dr. Newman.

36.     The debate in the Department was heated since "Settler State" is a virulently anti-Zionist theme that delitigitmizes Israel, and was also seen as anti-Semitic by some faculty.

37.     The course was supported by Dr. Robbins, but Dr. Ross later apparently withdrew it.

38.     Dr. Ross and Dr. Hines successfully pushed for Dr. Newman's removal as Coordinator of Global Cultural Studies (GCS) which was against PPU rules since this was an administrative appointment.

39.     Dr. Ross also sought to start a new program in Social Justice that Provost Karen McIntyre did not approve in part because it seemed too religious.

40.     Dr. Ross supports a form of Christian theology that is anti-Zionist and opposed to the

5

fundamental first Biblical position.

41.     Dr. Ross does not advocate the academic or cultural boycott of any other nation besides Israel.

42.     Dr. Ross does not recognize the legitimacy of Israel as a Jewish state.

43.     Dr. Ross does not criticize any ethnic or religious group in Israel besides Jews.

44.     Dr. Ross made efforts to expose Point Park students to anti-Zionist content including programs containing this theology.

45.     Students and faculty allied with Dr. Ross began to shun Dr. Newman, the sole Israeli on the faculty.

46.     Some students with the assent of the administration began evading required courses taught by Dr. Newman as well as avoiding having Dr. Newman as an advisor.

47.     Dr. Newman questioned whether Dr. Ross' publications were university grade academic material or whether they were activist BDS propaganda including in anti-Semitic and/or anti-Israel sources such as Mondoweiss, Electronic Initifada, and Friends of Sabeel instead of appearing in normal scholarly outlets.

48.     On November 9, 2015 at 2:40 p.m., Dr. Robbins convened a regular Departmental Meeting with an agenda item labeled "Kudos: Bob Ross Publications and Presentations."

49.     None of the other faculty members had their publications and presentations singled out or commented upon.

50.     Following the meeting on November 9, 2015 at 3:50 p.m., Dr. Robbins sent a memo to all Department faculty as a "follow-up" to "congratulate Bob Ross from (sic) his most recent publications and presentations," that appears below in pertinent part:

6

"From Brent Robbins:
Sent: Mon Nov 9, 2015 3:50 PM
To Newman, Channa; Russell, Julie;  Allen, Matthew, Bell, Kim, Fessler, Robert, Firestone, Nathan, Hines, J.Dwight,  Homayounfar, Bahman; McInerney, Robert, Meena, Edward, Olfmand, Sharna; Purcell, William; Reis, Jehnie; Ross, Robert; Schulz, Sarah
Subject: Re HHS Dept. Meeting Agenda

Dear HHS Faculty,

As a follow up to our meeting, as discussed, I would like to congratulate Bob Ross from (sic) his most recent publications and presentations, which are as follows:

Publications:

"One Year Later, Gaza Is Still in Crisis" Mondoweiss. Http://mondoweiss.net/2015/08/later-still-crisis.August 26, 2015

"An update on Gaza from IPMN's Chair of Advocacy, Bob Ross. "Israel/Palestine Mission Network of the Presbyterian Church (U.S.A.) . Http://us4.campaign-archive1.com/?u=5d6af22c768b84cc207e514bf&id=37c449c0e0&e=f8b84f c04b. August 26, 2015

"Letter to the Editor: BDS Distorted. " Pittsburgh Tribune-Review. June 23, 2015

"Letter to the editor: Criticism of Israel is not Anti-Semitism" Pittsburgh Post Gazette. April 16, 2015.

Presentations:

"Boycott, Divestment, Sanctions Workshop," with Tory Smith, Friends of Sabeel North America Pittsburgh Conference, Oct 2015.

"Building a BDS Campaign and Coalition: Lessons from the Past, Present and Future," with Sydney Levy, Nashiha Alam Amal Ali and Taher Herzallah, 2015 Gathering of the Interfaith Network for Justice in Palestine, Stony Point, NY Aug 2015.

"Understanding the Opposition: The Anti BDS Movement in the Presbyterian Church USA) and Beyond," International Conference of Critical Geography, Ramallah, Palestine, July 2015

"Academic Boycott Strategy Open Workshops" (Facilitator), International Conference of Critical Geography, Ramallah, Palestine, July 2015

"Successful Divestment Campaigns in the US Churches" Canadian Friends of Sabeel conference, Vancouver, BC, April 2015

"Critical Pedagogy in Geography: Teaching Israel/Palestine as Settler Colonialism" Annual Meeting of the Assoc. Of American Geographers, Chicago, April 2015.

Impressive!"

51.     In or about 2016, Psychology left the Humanities and Human Sciences Department to form a separate department with Dr. Brent Robbins as its Chair.

52.     The remaining department became known as Humanities and Social Sciences (HSS), a still substantial body with six degree programs: Global Cultural Studies, History, Political Science, Legal Studies, Liberal Arts, and Interdisciplinary Studies encompassing approximately sixty students who were majoring in and eligible to receive undergraduate degrees in these programs.

53.     The new HSS Department elected Dr. Newman as its chair with only Dr. Ross and Dr. Hines opposed to her leadership.

54.     Dr. Karen McIntyre was followed as Provost by Dr. John Pearson.

55.     Dr. Ross and Dr. Hines submitted a new version of the Social Justice program to Provost Pearson who backed it without consulting or informing Dr. Newman or her department (HSS).

56.     Dr. Newman went to Dr. Pearson, discussed that she was a Holocaust survivor who had seen the conflation of social activism with targeting of Jews and Israel, and said that "it's [the Social Justice program] a cover for anti-Semitism, and this is a very upsetting to me."

57.     Dr. Pearson responded, "I know. I'm sorry."

58.     Dr. Newman also protested similarly to PPU President Paul Hennigan; she had complained at other times to him of anti-Semitism and/or anti-Zionism, and he said that her concerns

8

were serious.

59.     Now, she further expressed words about the fewness of Jews and/or Israelis at Point Park, stated that Social Justice Studies (SJS) would not be good for the wider Jewish community, and asked how many Jewish people were on the Board of Trustees, to which he said none but that one woman member was the wife of a deceased Jewish man.

60.     Dr. Hennigan did not refute or dispute Dr. Newman's concerns.

61.     Dr. Newman complained many times to the administration about being shunned including by students evading requirements involving her with the administration's approval.

62.     The administration allowed Dr. Ross to form Social Justice Studies (SJS) and include Dr. Hines.

63.     Dr. Ross and Dr. Hines shunned Dr. Newman.

64.     Without consulting her or the HSS faculty and against ordinary procedures, they took SJS with them and joined another department, Literary Arts, which became known as Literary Arts and Social Justice under Chair Sara Perrier, who likewise excluded Dr. Newman from the transition process as did Dr. Robbins.

65.     Dr. Newman now was the sole remaining full-time Global Cultural Studies (GCS) faculty member in HSS.

66.     The Provost treated Dr. Newman unequally relative to other Chairs, indicating that he would give her a one year contract when they received three year appointments.

67.     However, she protested (as she often must to avoid prejudicial treatment), received a three-year contract and performed well according to the Provost who was her superior and evaluator.

68.     Recently, she was reappointed for another three year term.

69.     The Social Justice Studies program has not yet been a success as it apparently has attracted only one major.

70.     Nevertheless, Dr. Ross was made its Director and received course release time.

71.     Dr. Newman has no Directors in the Programs in her Department, including Interdisciplinary Studies, which has about seventeen majors and is being led by an overtaxed faculty member who needs and should have release time for organizational services.

72.     Dr. Ross and Dr. Hines were permitted to have small student populations in their classes, which adversely affected the GCS program.

73.     Dr. Ross' and Dr. Hines' activism persisted into 2018 as did their animosity towards Dr. Newman.

74.     In March 2018, Dr. Ross with the consent of the administration took Point Park students "on a trip to Israel/Palestine" that, identified as a Point Park professor, he co-lead under the sponsorship of the Pittsburgh Theological Seminary.

75.      Dr. Newman had raised questions to Provost Pearson and the Dean of Students about whether such a trip was in keeping with Point Parks nonsectarian academic mission, but Dr. Pearson did not agree.

76.     The trip affected the schedule and attendance of GCS students.

77.     In April 2018, with financial support from the Point Park administration, Dr. Ross took Global Cultural Studies students to the American Association of Geographers (AAG) Conference in New Orleans where he organized and chaired a panel as a representative of Point Park University including on "what does it mean to be Christian in solidarity with people in Palestine,

South Africa and elsewhere through theological and geographical limits."

78.     The other panelists included notorious Israel de-legitimizers including Hatem Bazian and Kali Rubail.

79.     In October 2018, Dr. Newman was falsely accused by a female student[2] of a Title IX violation and immediately suspended on an indefinite basis.

80.     Earlier, Dr. Newman had normal friendly relations with the female student who had taken several of her classes and regarded her teaching highly.

81.     The student also took Dr. Ross' classes on South Africa and the Middle East and became active in the BDS movement against Israel including the Academic and Cultural Boycott which attempts to exclude Israeli scholarly, academic, and artistic points of view from higher education.

82.     The student, an advisee of Dr. Hines, accused Dr. Newman of making an insensitive remark in class regarding the Me Too Movement causing the student to leave class early.

83.     The complaint was contrived, and there were no allegations (let alone any evidence) that Dr. Newman had discriminated, harassed, or stalked this student because of her gender so as to constitute a possible Title IX violation.

84.     Nevertheless, on October 16, 2018, Point Park placed Dr. Newman on indefinite suspension.

85.     This action was taken without ever discussing the matter with Dr. Newman or even bringing the complaint to her attention.

---

[2]The name of the student is being withheld at this time because she is an alleged victim of rape. Point Park knows the name of this particular student who announced the rape in class.

11

86.     No informal resolution was attempted.

87.     The first time she learned of this adverse action was when a student shocked Dr. Newman by showing her an email sent by Assistant Provost Jonas Prida, Ph.D., at 7:46 a.m. on October 16th informing all students in Dr. Newman's Global Cultural Studies class (GCS 175) that the class had been canceled.

88.     Point Park subsequently admitted that it should have informed Dr. Newman first of the adverse action prior to alerting her students of the class cancellation.

89.     As a consequence of the adverse action, Dr. Newman immediately was taken out of the classroom, her courses were canceled, she was stripped of teaching and Department Chair duties, told to leave campus, prohibited from returning, and her University email account became inaccessible to her.

90.     On the day of her removal, Dr. Newman asked Vice President of Human Resources Lisa Stefanko what had happened and what were the charges against her.

91.     Ms. Stefanko would say only that it was "something about Me Too" and some telephone calls.

92.     Dr. Newman told her it was a "set-up" and "you know who they are" in reference to Dr. Ross and Dr. Hines being involved as Ms. Stefanko seemed to understand.

93.     In an instant, Point Park separated Dr. Newman from her students and the work she had performed with care and dedication on behalf of the University for over five (5) decades.

94.     This unprecedented action caused Dr. Newman tremendous emotional distress, with serious physical manifestations.

95.     Plus it caused harm to her professional reputation among Point Park students, faculty,

12

and administrators.

96.     A week later, on October 23, 2018, Point Park for the first time sent to Dr. Newman written notification that it would conduct an investigation into an alleged Title IX complaint from a student.

97.     Under Point Park's Title IX policy an investigation should be completed within 30 days.

98.     For professional educational and reputational reasons it was vitally important to Dr. Newman to have a speedy investigation.

99.     Under the policy, if a delay is necessary, the University will notify all parties of the reason for the delay and the expected adjustment and time frames.

100.     Dr. Newman received no such notice, and the investigation lasted into December 2018.

101.     The allegations against Dr. Newman set forth in the October 23rd e-mail were vague and did not state (explicitly or otherwise) the verbal conduct attributed to Dr. Newman.

102.     For example, the email stated that on October 4, 2018 a female student "identified herself as a rape victim and [Dr. Newman's] response was to belittle her."

103.     The email added that according to the student "the conversation continued about the #MeToo movement and the comments to her were inappropriate," and that Dr. Newman "continued to engage with her on this topic."

104.     Dr. Newman categorically denied the accusations that she responded to the student by belittling her, that she ever made any inappropriate comments to the student regarding any matter, or that she engaged with her in an inappropriate manner.

13

105.    The accusations were false, inadequate, and a biased misrepresentation of actual events as might be expected given that Dr. Newman had not ever been consulted.

106.    In fact, on October 4, 2018, Dr. Newman in French Culture class mentioned the Me Too Movement, and noted that not everyone supports it fully, especially the French who see a focus on gender as less effective in bringing about social change than a focus on class.

107.    Towards the end of class, a female student spoke out and said "I disagree with you," to which Dr. Newman asked, "What do you mean?"

108.    The student responded that her hope was that the "Me Too Movement would develop, grow and be as strong as the anti-Apartheid movement in South Africa," to which Dr. Newman stated, "I don't think you can equate the two."

109.    The student then said, "I was raped" or "I'm a victim of rape," began to cry, gathered her belongings, and left class with a fellow student.

110.    After they left, Dr. Newman asked the class (to be sure she had heard correctly), "What did she say?"  The reply was that the student said she was raped, to which  Dr. Newman said, "That's terrible."

111.    Prior to October 4, 2018  the student had not participated, said anything, or turned in any assignments in French Culture.

112.    Like others in the Ross/Hines circle, she appeared to shun Dr. Newman.

113.    In previous classes with Dr. Newman the student had been normally participatory and interactive.

114.    Contrary to the allegations, Dr. Newman, never attacked, belittled or ridiculed this student.

14

115.    Dr. Newman never dismissed or discounted the student's statement that she was a victim of rape.

116.    Dr. Newman's statements which were about the Me Too movement and not about any particular student were protected under Point Park's Academic Freedom policy.

117.    Based on the events of October 4th, Dr. Newman naturally was concerned for the student's well-being.

118.     Dr. Newman reached out by telephone to check on the student, and left a voicemail message.

119.    The student returned the call, generally spoke in a normal tone, and did not complain in anyway about Dr. Newman's conduct or speech in the class.

120.    During the call, Dr. Newman inquired as to whether the student had sought help for the trauma from her rape.

121.    The student rejected the suggestions for help telling Dr. Newman it was "nobody's business."

122.    The student volunteered that she was calling from a pharmacy where she worked and described the benefits of her job.

123.    Dr. Newman mentioned that the student had not turned in any assignments.

124.    The student said that she would bring her homework to the next class.

125.    However, the student did not attend any more classes or submit any further assignments.

126.    The allegation of a Title IX violation against a scholar is especially frightening, serious, and can lead to a career-ending discharge even against a full professor with tenure such as

15

Dr. Newman.

127.    A Title IX accusation can result in extreme reputation damage and outcasting including stigmatizing a professor for sexual misconduct, predation, or perversity.

128.    Title IX arises under federal law (29.U.S.C.A. § 1681 et seq.) and applies to educational institutions receiving federal funds such as Point Park which must have internal regulations in keeping with the law.

129.    Ordinarily Title IX is charged by victims of grave sexual misconduct such as rape, assault, or the creation of a sexually hostile environment.

130.    As Dr. Newman with counsel informed the Point Park administration, including Ms. Stefanko, even in such grave cases professors normally are not removed from campus unless and until proven responsible for Title IX violations; rather, the faculty member and alleged victim are separated.

131.    Point Park did not deny that less restrictive alternatives than banning Dr. Newman were available.

132.    Israeli and Jewish students and scholars have been subjected to prejudice, shunning, exclusion, and discrimination on campuses by BDS proponents in this country and abroad.

133.     As Dr. Newman informed Point Park,  the October 2018 situation involving Dr. Newman marked the first known time in American history when a BDS proponent used Title IX against an Israeli and/or Jewish professor.

134.    Dr. Newman's plea for a less destructive alternative than removal fell on deaf administrative ears at Point Park which refused to consider allowing Dr. Newman to continue her duties while under investigation, but declined to explain why she could not remain in the classroom

and for the benefit of other students.

135.    Banning Dr. Newman on October 16, 2018 meant that three courses with approximately fifty students suddenly had to find new teachers.

136.    Dr. Newman's replacements in the classroom likely were less experienced than she which diminished the educational experience.

137.    Dr. Newman's replacements likely were not Israeli and/or not Jewish.

138.    Even assuming the allegations against Dr. Newman were true, which is denied, they clearly did not constitute a violation under Point Park's Title IX Policy ("Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking").

139.    The accusations that on one occasion Dr. Newman made a belittling response to a student, that on one occasion Dr. Newman made inappropriate comments about the Me Too Movement, and that on another occasion she "continued to engage" the student about the Me Too Movement, certainly do not constitute "Sexual Misconduct," "Relationship Violence," or "Stalking" prohibited by the Policy.

140.    Under Point Park's policy, "Sexual Misconduct" is defined as "sexual harassment, sexual assault, and any other non-consensual behavior of a sexual nature that is committed by force or intimidation, or that is otherwise unwelcome."

141.    There is no allegation of a sexual assault or behavior of a sexual nature committed by force or intimidation or otherwise was unwelcome.

142.    "Sexual harassment" is defined as (1) quid pro quo harassment and (2) sexually hostile environment.  Quid pro quo harassment is not at issue.

143.    The allegations against Dr. Newman undeniably do not rise to the level of a sexually

17

hostile environment.

144.     There is no allegation of any physical contact between Dr. Newman and the student.

145.     The allegations against Dr. Newman of verbal conduct – the alleged belittling response and alleged inappropriate Me Too comments – are not of the required "sexual nature."

146.     There is no allegation whatsoever of any sexually offensive or profane language, nor is there any allegation of name-calling or humiliating conduct based on the student's female gender.

147.     The allegations are not "sufficiently severe, persistent, or pervasive" either to limit the student's ability to participate in a Point Park education or to create a sexually hostile educational environment.

148.     The alleged verbal conduct was not pervasive but is alleged to have occurred only once in class and once on the phone when the student returned a concerned professor's call.

149.     A reasonable person in a similar situation would not have perceived Dr. Newman's alleged verbal conduct as objectively offensive.

150.     Dr. Newman contacted Molly McClelland in the office of Student Services by telephone twice to report that a student in the French Culture class had reported rape.

151.     Dr. Newman's calls apparently were ignored.

152.     Point Park's decision to charge Dr. Newman with a Title IX violation under these circumstances was a misapplication of the law, an overreaction, an effort to target her, an insult to valid Title IX claims and claimants, and a pretext to remove her.

153.     The immediate removal of Dr. Newman from the workplace thereby separating her from her students, her classes, her colleagues, her administrative duties, and the work she loves was

18

draconian and not warranted by the accusations against her.

154.    Under Point Park's Title IX policy, upon receipt of a complaint, the Title IX Coordinator, in consultation with the Deputy Title IX Coordinators, Director of Student Development, Dean of Student Life, and/or Assistant Vice-President of Public Safety, was to assess whether "any immediate risk of harm to an individual or the community exists," and to "implement any necessary interim measures to address those risks."

155.    No evidence was presented to Dr. Newman that such procedure was followed.

156.    The accusations against Dr. Newman did not involve any risk of harm to the student or the community, and were neither severe nor pervasive, nor did a rational assessment occur.

157.    Moreover, there were no allegations of any continuing effects on the student and there was little likelihood that the student would come into contact with Dr. Newman through daily activities.

158.    As a result, there was no need for Point Park to take any interim measures against Dr. Newman let alone the drastic step of complete separation from the entire campus.

159.    It is clear that Dr. Newman was not presumed innocent until proven guilty.

160.    To the contrary Point Park punished Dr. Newman without proof or even hearing her side.

161.    If it wanted to do so, Point Park certainly could have used less extreme measures than a complete ban to protect the safety of this student.

162.    As provided for in the Policy, Point Park can modify the student's class schedule so she no longer has Dr. Newman as her professor, and/or allow the student to withdraw from Dr. Newman's class "without academic or financial penalty."

19

163.    Out of an abundance of caution, Point Park could even initiate a no contact order prohibiting in-person or phone contact with the student.

164.    As  Dr. Newman made clear she had no desire or incentive to engage this student, who actually had chosen to return the professor's call.

165.    The indefinite suspension and outcasting served to prevent a faculty meeting scheduled for October 29, 2018 whose purpose was  to explain to students the difference between Social Sciences (*i.e.*, the scientific study of human society and social relationships) and "Social Justice" (an advocacy and activism program at Point Park led by Dr. Ross).

166.    On multiple occasions, Point Park continued to mishandle the complaint against Dr. Newman.

167.    On October 25, 2018, Dr. Newman's attorney requested in writing that Point Park immediately reinstate Dr. Newman to her full  position as University Professor in French and Cultural Studies and Chair of the Department of Humanities and Social Sciences, and to permit her to resume teaching all of the classes that she was leading at the time of separation.

168.    There was no rational explanation for continuing the work separation while the Title IX investigation against Dr. Newman was pending.

169.    The swift immediate reinstatement of Dr. Newman might have prevented further damage to Dr. Newman's emotional and physical well-being as well as to her professional reputation and educational efforts.

170.    Point Park refused the October 25th request to reinstate Dr. Newman and failed to provide a legitimate explanation.

171.    On October 30, 2018, Dr. Newman cooperated in an investigative interview

20

conducted by an outside attorney selected by Point Park.

172.   On November 2, 2018, Dr. Newman, through her attorney, renewed her request to be reinstated to her duties which request likewise was denied.

173.   Dr. Newman also requested access to her Point Park office because the investigator asked questions of Dr. Newman that pertained to materials in her office which she needed in order to mount her defense and supply answers.

174.   In late October or early November 2018, Professor Brent Robbins, Ph.D., was appointed by the administration to take over as interim Chair of the HSS Department without any consultation of the Department or Dr. Newman.

175.   Previously while Chair of Humanities and Human Sciences, Dr. Robbins had enabled Dr. Hines and Dr. Ross to disrespect Dr. Newman and to undermine her authority.

176.   While no adverse finding had been made against Dr. Newman that would continue her forced absence beyond the fall term, Dr. Robbins in his role as interim Chair in conjunction with Assistant Provost Jonas Prida permitted Dr. Ross to **cancel** Dr. Newman's Spring 2019 400-level course, a requirement for the degree in GCS, to substitute in its place a 100-level (lower level) course in Social Justice that was not a requirement for the degree in GCS, and to solicit the students already enrolled in Dr. Newman's spring course to sign up for Dr. Ross' section of the 100-level Social Justice course.

177.   On or about November 6, 2018, Dr. Newman through counsel again requested Point Park to allow her access to her office as well as her work email.

178.   Point Park eventually allowed Dr. Newman access to her office.

179.   On November 15, 2018, Dr. Newman (accompanied by counsel) was allowed to go

21

to her office but only under the watch of a uniformed security guard who then escorted her out of the building.

180.    This security measure was excessive, gave the defamatory appearance that Dr. Newman (a 50+ year employee in her mid-70's) was a safety threat on campus who had to be monitored by security, and was witnessed by Department colleagues thereby further jeopardizing Dr. Newman's professional reputation.

181.    While Dr. Newman was allowed to go to her office on November 15th, Point Park did not enable her to access her work email account as promised.

182.    On November 19, 2019, Dr. Newman through counsel alerted Point Park's outside counsel that the email account had not been turned back on which hampered Dr. Newman's efforts to defend herself.

183.    Point Park eventually allowed Dr. Newman to access her work email account.

184.    Upon finally regaining access to her email in late November 2018, Dr. Newman discovered for the first time an email from a courageous former student dated October 25, 2018 warning her that there was a Facebook group including Point Park students and former students trying to gather negative information against her and to get her in trouble.

185.    The Facebook group was initiated on October 16, 2018 by Lauren Gerlowski, an adult Point Park alumna who had graduated from Point Park with a GCS degree.

186.    Ms. Gerlowski had worked closely with Dr. Ross on her senior thesis, and accompanied him to conferences and trips including to Palestine.

187.    Ms. Gerlowski and others engaged in an on-line witch hunt against Dr. Newman and fostered a fishing expedition to get any dirt on Dr. Newman.

22

188.    Ms. Gerlowski loathed Dr. Newman's alleged "hatred of activism" and falsely claimed that Dr. Newman had "attack[ed] a current GCS student about rape being the woman's fault" and for "going after personal experiences."

189.    Ms. Gerlowski revealed  that "[n]ow Title IX is investigating Newman beyond this particular claim and looking into her total teachings."

190.    This statement reflects a breach of confidentiality in the Title IX process to the detriment of Dr. Newman.

191.    Ms. Gerlowski implored the Facebook group (12 mostly former students) to get involved in this Title IX proceeding in order to "bear witness to these claims against Newman," and to "bear witness to ANY of Newman's teaching styles and teachings."  (Emphasis in original.)

192.    The complaining student who made the Title IX charge was part of this chat room and stressed that, "It can be an example of when she abused her power as a professor and as the head of the Department."

193.    Ms. Gerlowski falsely stated that Dr. Newman was attacking a student "in and outside the classroom about emotional traumas ... and saying they are invalid."

194.    Ms. Gerlowski falsely stated that Dr. Newman "had far crossed a line" by "saying that women need to grow up and deal with their emotional baggage (referring to rape)."

195.    Ms. Gerlowski announced to the Facebook group that the October 4th in-class event had "led to a full investigation of Dr. Newman as a professor and as head of the humanities."

196.    This statement likewise demonstrates a breach of confidentiality in the Title IX process to the detriment of Dr. Newman as well as retaliation.

197.    Some of the ex-students including Gerlowski, Dawn ("Bunny") Columbine Karger,

and Samantha Lee were BDS and/or Palestine advocates.

198.    In a March 2018 blog Ms Gerlowski made plain the impact of Dr. Ross' course "Political Geography of the Middle East" upon her.

199.    She wrote: "As the course went on I learned much more about the conflicts in the Middle East. We focused most of the semester on the Israel/ Palestine conflict and the Syrian civil war. Learning what was happening to the Palestinians was heart-wrenching."

200.    The course was entitled "Political Geography of the Middle East," and was supposed to be about the entire region.

201.    A choreographer, she went on to describe a dance she created about the Palestinians: "Imagine a place that people openly walk around with automatic weapons and use them against you and your family. Imagine a place where bombs and rockets are shot at protestors (without weapons) daily. Imagine a place a place where the military openly shoot at schools to the point where the schools have to put cement blocks over their windows. Imagine a place under extreme military occupation where people cannot live their daily lives without fear. Because this place exists and needs to be known."

202.    Ms. Gerlowski previously had been in Dr. Newman's class on Central European history which dealt with the Holocaust.

203.    Ms. Gerlowski had smirked and showed no concern when that class addressed material regarding the round up of the Jews in Prague by the Gestapo.

204.    In modern anti-Semitism Jews and Israelis are seen as oppressors but not as victims.

205.    Ms. Gerlowski also made clear that the student rape victim was making a list of current and former students who would be willing to give *any evidence* against Dr. Newman for the

24

"Title IX person."

206.    In the same Facebook group, Samantha J. Lee, another adult former Point Park student who worked on BDS matters, falsely accused Dr. Newman of not believing a rape survivor.

207.    Ms. Lee disfavored the views of Dr. Newman claiming "she's got some f**ked up politics and has been very controlling in terms of GCS as a program."

208.    Ms. Karger, an adult former Point Park student, falsely claimed to the Facebook group that Dr. Newman was inappropriate in class, seemed confused, and that current and former Point Park students needed to believe the female student who claimed that Dr. Newman acted inappropriately.

209.    This group chat further revealed the bogus and thin nature of the allegations against Dr. Newman such that the complaining student and her graduated BDS allies in order to assist the Administration were reaching out to other current and former students on Facebook to try and drum up additional complaints against Dr. Newman that went beyond October 4, 2018 French Culture Class and Title IX student's complaint.

210.    The students and ex-students in short were being used to broaden the complaints and charges against Dr. Newman with no guidelines or limits.

211.    Dr. Newman immediately brought this Facebook group chat to Point Park's attention.

212.    The former Point Park students aided and abetted in the discrimination and retaliation against Dr. Newman, and in the effort to remove her.

213.    On November 26, 2018, Point Park provided Dr. Newman with redacted Findings of Fact from the investigation.

214.    The Findings revealed that the female student actually had consulted with both

Dr. Ross and Dr. Hines on October 9, and 10, 2018 before filing a "Title IX" complaint five days after October 4th incident.

215.    Dr. Ross and Dr. Hines assisted this student in bringing forth a complaint as part of their discriminatory and retaliatory campaign to discredit Dr. Newman and to remove her from the University.

216.    The University readily complied by suddenly removing Dr. Newman from the campus after fifty-five years of service.

217.    In violation of Title IX procedure which permits faculty to notify only the Title IX coordinator with student permission, Dr. Ross and Dr. Hines immediately publicized the student's false allegations against Dr. Newman to top Administrators including University Provost and Senior Vice President for Academic Affairs John H. Pearson, Associate Provost James H. Thomas (who would serve as the ultimate Adjudicator of Title IX claims), and Assistant Provost Jonas Prida.

218.    Dr. Hines relayed the student's complaint to Vice President of Human Resources and Interim Title IX Coordinator Lisa Stefanko, Provost Pearson, and Associate Provost Thomas via email on October 9, 2018.

219.    On October 10, 2018, Dr. Ross sent an email to Ms. Stefanko, Provost Pearson, and Assistant Provost Prida relaying the student's complaint against Dr. Newman, and also claimed that the evening before the student's academic advisor had been switched from Dr. Hines to Dr. Newman.

220.    Dr. Ross' accusation of an advising switch insinuated that Dr. Newman had done something wrong or targeted the student, which was false.

221.    Because Dr. Ross and Dr. Hines had left the Department, Dr. Newman was the

26

sole remaining Cultural Studies professor, and all of the Global Cultural Studies majors automatically became her advisees, although actual advising was done in the Center for Student Success by Catherine Houghton.

222.    Dr. Newman took absolutely no deliberate action to reassign the student as an advisee from Dr. Hines to herself, and any allegation that she did is completely false.

223.    For an urban northern university Point Park has extremely few Jewish faculty and students.

224.    Condoned by the Point Park Administration, the hateful attacks on Israel involve accusing it of apartheid, ethnic cleansing and crimes.

225.    The anti-Israel, anti-Zionist speech and actions of Dr. Ross and others with whom he associates fall within the U.S. Department of State's definition of "anti-Semitism."

226.    Anti-Semitism is defined as a "certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of anti-Semitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."

227.    Anti-Semitism may include "the targeting of the state of Israel, conceived as a Jewish collectivity."

228.    Contemporary examples of anti-Semitism in public life, the media, schools, the workplace, and in the religious sphere may include "[d]enying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor," and "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis."

229.    As the only Israeli, Dr. Newman feels frightened, alone and attacked at the school.

230.    The unique bombshell of the Title IX removal and investigation heightened her sense of fear and isolation.

231.    While Dr. Newman still was out on indefinite leave and under investigation, Dr. Ross and Point Park maneuvered to damage her further and take away her GCS students.

232.    On December 5, 2018, Dr. Ross sent out the cancellation email to Point Park students enrolled in Dr. Newman's Spring 2019 class, – GCS 402 Wealthy White Males, that concerned at least nine students.

233.    Dr. Ross and the administrators prematurely assumed and hoped that Dr. Newman was not coming back even though there had not yet been an adjudication.

234.    No one ever discussed the cancellation of her course with Dr. Newman; if anyone had, she would have objected as the particular 400-level course was a necessary requirement for students seeking to graduate with a degree in GCS.

235.    In addition to being a GCS requirement, Wealthy White Males is a well-regarded upper-level sociology course (analyzing America's top economic bloc) that President Hennigan admired, and that both his wife and administrative assistant had taken and liked.

236.    Dr. Ross then notified the students that in place of GCS 402 Wealthy White Males he was offering "a version of SJS 101 Foundations of Social Justice Studies."

237.    Dr. Ross stimulated the students to enroll in the particular section of SJS 101 that he would be teaching by writing that: "We encourage you to enroll in SJS 101 DB MW 1-2:30 (if DB doesn't fit for you, SJS 101 DA is acceptable as well), which I will be teaching, if you can fit it into your schedule."

238.    When Dr. Newman learned of the cancellation, she immediately objected to it in

writing including through counsel, but her objection was ignored by Point Park administrators.

239.    As a result of the behind-the-scenes maneuvers by Dr. Ross and others, Dr.
Newman's upper-level 400-level course was canceled.

240.    On December 7, 2018, just two days after canceling Dr. Newman's Spring 2019
course, Point Park Associate Provost James Thomas adjudicated that Dr. Newman was not guilty
of any Title IX violation.

241.    There was no evidence whatsoever of sexual harassment or stalking under Title IX.

242.    The charge was odd, thin, and questionable from the outset.

243.    The great pain, reputation loss, and dislocation caused to Dr. Newman was entirely
unnecessary.

244.    The position and statements of a non-Jewish, non-Zionist undergraduate in her
twenties had been credited over those of an Israeli Jewish professor with 55 years of meritorious
service who was well known at Point Park.

245.    During the investigation, Dr. Newman complained to Point Park that she had been
subjected to a hostile environment and discriminated against by Dr. Ross and Dr. Hines because of
her religion and national origin.

246.    By letter dated December 10, 2018, Ms. Stefanko informed Dr. Newman that "the
University will be conducting an investigation into the allegations brought forth in your response to
the findings of fact, including the discrimination and hostile work environment based on religion and
national origin."

247.    Ms. Stefanko further indicated that "[a]n outcome as to this investigation will be
provided to you in compliance with the terms of the University's anti-discrimination and equal

opportunity policies."

248.    No timely investigation was conducted.

249.    In April 2019, Dr. Newman complained that Point Park failed to follow up on the promise it made in December 2018 to investigate her complaints of national origin and religious discrimination.

250.    More than six months after the initial complaint, Point Park hired an outside defense employment law firm to conduct an investigation.

251.    Dr. Newman was not even interviewed until September 2019 by which time the complaining student had graduated as had others in the BDS circle who no longer were under the control of the University.

252.    On November 21, 2019, Dr. Newman received a short letter lacking any proof or evidence from that firm informing her that her complaints could not be substantiated.

253.    Charging, removing, banning, and punishing Dr. Newman under the Title IX Policy reflects inadequacy and negligence in training and administration regarding Title IX, and forms of discrimination to which she was and is subjected including anti-Semitism, anti-Israel national origin discrimination and sex and/or age discrimination.

254.    Dr. Newman's reputation suffered grievously as a result of following the sanction and ban.

255.    For example, an anonymous student from one of her canceled classes posted a racist and sexist Rate My Professor message that falsely stated that Dr. Newman "showed videos calling Muslims savages who are destroying western civilization in a language class to educate us."

256.    The administration took no steps to repair or protect the reputation of Dr. Newman

but aggravated the situation including by not timely telling students that she had been re-instated and cleared, and by continuing to speak against her.

257.    On January 8, 2019, *The Globe* (Point Park's student newspaper) ran an article highly critical of Dr. Newman citing an unnamed student who complained falsely that Dr. Newman had promoted her own personal beliefs and agenda in class.

258.    The student gave an inaccurate description of the event giving rise to the "Title IX" complaint.

259.    The article, entitled "Professor Reinstated Following Closed Title IX Investigation," also quoted Assistant Provost Prida who gave credence to the false allegations against Dr. Newman, including that after the complaint the University had no idea when Dr. Newman was going to return after she was put on leave and, as a result, canceled her Spring 2019 required GCS course.

260.    Dr. Prida offered no justification for notifying students before notifying Dr. Newman of the course stoppage. In the article, Dr. Prida addressed Dr. Newman as "Newman" only without providing her title as "professor" or "doctor."  According to Dr. Prida, "I was asked to cover the courses to the best of my ability when she was put on leave."

261.    The substitutes likely were less qualified than Dr. Newman, and neither they nor Dr Prida contacted much less consulted her about handling her classes in mid-stream or providing continuity.

262.    In the article Dr. Newman was blamed and scapegoated for the adverse educational experience.

263.    The anonymous students also complained about being cheated financially, a charge echoed by Dr. Prida that a jury may find to be an anti-Semitic trope.

31

264.     After Dr. Newman returned to campus, Dr. Ross and Dr. Hines absorbed responsibilities for advising students enrolled in the GCS program.

265.     Dr. Newman has become isolated within the well-regarded GCS program that she created in 2003.

266.     On January 9, 2019, Point Park per Ms. Stefanko informed Dr. Newman that the student complainant appealed the decision of no violation of Title IX and that Dr. Newman would be notified when the appellate process was complete.

267.     The appeal was not processed timely under University policy in that the students's appeal was received beyond the ten days allotted from the determination date, and the University did not complete the review within the next fifteen business days (on or about January 31, 2019) but apparently on or by February 11, 2019.

268.     By email dated February 11, 2019, Point Park's then outside attorney stated that Dr. Newman had been copied on the outcome letter indicating that there was not a change in the decision; however, neither Dr. Newman nor her counsel received a copy of that letter.

269.     On February 19, 2019, Dr. Newman amazingly received news that she was falsely accused of a new Title IX-type violation.

270.     According to an email sent to Dr. Newman by new Title IX Coordinator Vanessa Love, Esq., with a copy to Ms. Stefanko, "students have come forward alleging that you may have violated, Point Park University's Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking. These allegations will be investigated by an outside investigator, Lindsey Kennedy, Esquire. You will be hearing from Ms. Kennedy as she will request an interview with you."

271.     Faculty and staff who have known Dr. Newman for decades understand that she does

not commit sexual misconduct, relationship violence, or stalking.

272.     Contrary to Ms. Love's representation, neither Ms. Kennedy nor anyone else ever contacted Dr. Newman for an interview; nor did Point Park ever provide notice to Dr. Newman of the student allegations or any opportunity to respond.

273.     Ms. Love told Dr. Newman that "three or four students" had complained but incredibly said that she did not know their names.

274.     Subsequently, Dr. Newman learned through communications with yet another outside counsel that the February charges actually might not involve Title IX but some statements that Dr. Newman made in class which suggests that Dr. Newman does not have the same academic freedom as other professors and/or that she is under excessive scrutiny which seems highly discriminatory and reflective of targeting.

275.     Plus, at Point Park students are expected to go to their professors with complaints to see if they can be resolved informally before official investigations commence.

276.     To Dr. Newman's knowledge no students came to her with such complaints.

277.     To Dr. Newman's knowledge Ms. Love's Title IX charge never was withdrawn.

278.     These repeated vague accusations of sexual wrongdoing and constant misconduct investigations are terrifying to Dr. Newman as they would be to anyone in her position.

279.     Title IX is being repeatedly distorted, misapplied, and misused against her.

280.     The repeated false allegations together with the other mistreatment Dr. Newman has endured have created a hostile working environment, including excessive scrutiny apparently designed to make her leave her job.

281.     Individuals outside of Dr. Newman's protected classes have been able to attack her

and misapply Title IX with impunity.

282.    Also following Dr. Newman's complaints of religious and national origin discrimination, she has suffered materially adverse actions including having her class canceled, removal from the classroom, displacement as Chair, stripping of duties, being isolated and shunned within the workplace, enduring interference with a scheduled faculty meeting, the curtailing of access to her office and email account, being escorted to and from her office by a security guard, and falsely accused yet again of a Title IX violation but never being provided the names of the accusers nor any details of the allegations against her.

283.    Dr. Newman has been targeted for adverse treatment on account of Jewish religion, ancestry, and ethnicity and Israeli national origin.

284.    When Dr. Newman became Chair, Provost Pearson expressed concern that the young faculty including Professors Ross, Hines, and Jehnie Burns would not be paid attention by her.

285.    During a faculty search in or about 2014 Dr. Hines used some inappropriate sexist language about which Dr. Newman complained to the administration; and after which Dr. Hines was hostile to Dr. Newman.

286.    Dr. Newman also was treated less favorably on account of her gender and age.

287.    Dr. Newman also was singled out for retaliatory treatment because she previously raised discrimination on the part of Dr. Ross and Dr. Hines as well as complained recently of a hostile work environment and discrimination based on her religion and national origin, and because she exercised her protected right to defend against baseless Title IX charges.

288.    Point Park administrators were aware of Dr. Newman's complaints regarding gender, racial, and anti-Semitic discrimination, including her complaints against Dr. Ross and Dr. Hines.

34

289.    On February 20, 2019, Dr. Newman filed a charge of discrimination and retaliation with the EEOC and the PHRC.

290.    After Dr. Newman's return to her position as Chair she continues to be undermined by the Administration and shunned by some students and faculty.

291.    She now has lost control over the majoring students in her Department, and her scheduling and the direction of the curriculum continue to be undermined.

292.    In April 2019, Dr. Newman sent a letter to Assistant Provost Prida reiterating a number of issues including that faculty improperly had gone around her as Department Chair to have substitutions approved for required courses, that GCS students associated with the Social Justice program of Dr. Ross and Dr. Hines have exhibited shunning behavior towards her, which appears coordinated, including that they have avoided taking her classes or were rude and disrespectful during her reinstated Spring 2019 Wealthy White Males course.

293.    The hostile behavior seems coupled with activism.

294.    For instance the student who raised the Title IX violation related to the October 4, 2018 class participated in a BDS demonstration on or about October 25, 2018 in downtown Pittsburgh carrying a sign for USCABI (United States Cultural and Academic Boycott of Israel).

295.    She was accompanied by another Point Park student hostile to Dr. Newman.

296.    Photographs of the demonstration were posted on social media.

297.    Dr. Newman also asked Dr. Pearson to call a meeting where the students who may have been encouraged to act against her would have an opportunity to explain, without fear of any sort of retaliation, their acts and attitudes.

298.    She sought to have an open discussion about the students' concerns and how best to

35

resolve them.

299.     On August 23, 2019, Associate Provost Thomas visited Dr. Newman and informed her that Provost Pearson would allow a particular GCS major to have all scheduling and course substitutions go through the Provost's office rather than through Dr. Newman as the Department Chair.

300.     Associate Provost Thomas stated he did not know the reason why the student wanted to go around Dr. Newman.

301.     Dr. Newman objected because it was inappropriate academically, and demeaning to her personally.

302.      The student shunning Dr. Newman is close to Dr. Hines, and that student like all students must fulfill GCS requirements in order to obtain the degree or otherwise change her major.

303.     Associate Provost Thomas seemed sympathetic and said he would take Dr. Newman's concerns to Provost Pearson.

304.     Within minutes, Provost Pearson came to Dr. Newman's office, where she repeated her objections to permitting the student to go around her to complete the degree, and she requested a meeting with the student to discuss the issue.

305.     The Provost  told her that he wanted to help, that he does not know what to do, and that he had "wanted to quit over all this" or words to that effect.

306.     Dr. Newman brought up the fact that last December Dr. Ross had canceled her required course before the outcome of the Title IX investigation and that four students who were enrolled (including the student they had been discussing who wanted to go around Dr. Newman for scheduling and course substitution) did not take her 400 level after it was reinstated.

36

307.    Dr. Newman asked the Provost if he realized what pain all this has caused her.

308.    Dr. Newman said that Dr. Ross was a missionary with a cause (BDS) who does not believe in dialogue.

309.    Provost Pearson nodded in assent to that statement, and he added "no compromise" meaning that Dr. Ross does not compromise; the Provost then said to Dr. Newman, "I am sorry."

310.    During the Spring and Summer of 2019, Dr. Newman and Point Park University entered into a private mediation process to resolve their differences and hopefully to provide a safe, protected work situation for Dr. Newman that would be beneficial to both parties.

311.    This process involved engaging a private mediator which was costly to both parties who also were represented by their attorneys.

312.    At the final session on September 25, 2019, Point Park ceased to negotiate, then disclosed the fact that Dr. Newman now was under yet a third new investigation though nothing about it was defined or revealed to Dr. Newman against whom a second vague, undefined investigation had been started in the February 2019 time period.

313.    The cessation of the mediation session under the circumstances was retaliatory, and the reliance on the purported new investigation is a pretext.

314.    Dr. Newman has been under investigations constantly since the unsustained charges under Title IX were levied against her in October, 2018.

315.    Being subjected to constant investigations constitutes discrimination and further retaliation.

316.    Dr. Newman does not know the nature of the investigation against her.

317.    Recently, Dr. Newman learned circumstantially that a new investigation possibly

related to the cessation of the negotiations was stimulated in whole or in part by an allegation of Dr. Ross.

318.    Dr. Ross, who has been prominent in the faculty union, filed a grievance against Dr. Newman because of course allocation (as a chair Dr. Newman is in management).

319.    Dr. Ross via the faculty union apparently claimed that Dr. Newman violated the collective bargaining agreement when she failed to assign him to teach a 100-level Sociology course.

320.    Any wrongdoing or contract violation is disputed by Dr. Newman who properly assigned the 100-level Sociology course to qualified adjunct faculty who had the required master's degree in sociology.

321.    The master's degree requirement is in keeping with long-standing department practice, utilized at peer institutions, and based on common sense.

322.    Dr. Ross does not have the required master's degree in sociology to teach this 100-level course; moreover, the course resides the HSS Department of which Dr. Ross is not a member.

323.    Plus Dr. Newman offered him the opportunity to teach courses within his own discipline, geography, but he apparently refused.

324.    Based on information and belief, Dr. Ross's grievance was brought in bad faith and in order to further harass Dr. Newman.

325.    Dr. Newman received an email from Ms. Stefanko on November 11, 2019 informing her of Point Park's response to the grievance.

326.    Incredibly, Point Park simply sided with the Grievant (Dr. Ross) and against Dr. Newman in her managerial role as Department Chair.

327.    Ms. Stefanko falsely accused Dr. Newman of announcing new "modified instructor

38

qualifications" in violation of the collective bargaining agreement.

328.    Dr. Newman never announced anything let alone any new "modified instructor qualifications;" rather, in keeping with long-standing Department procedure and her prior experiences, she simply assigned the faculty member who had a master's degree in sociology to teach the 100-level sociology course as she had in previous semesters without incident.

329.    Dr. Newman is properly concerned that the adjunct faculty union would prevail on a grievance if she displaced its teachers in favor of less-well qualified faculty lacking an advanced degree.

330.    According to Ms. Stefanko, Point Park and the faculty union met and "agreed that the University will take into account a full-time faculty member's successful teaching of courses in previous academic years."

331.    As a result, Ms. Stefanko continued, "the modified instructor qualifications that you announced will no longer be in effect, as it does not give consideration to the teaching history of full-time faculty members."

332.    Ms. Stefanko concluded with a veiled threat to Dr. Newman that "[her] cooperation is expected and will be appreciated."

333.    Dr. Newman will comply but her academic freedom has been reduced.

334.    Article 32 of the collective bargaining agreement entitled "MANAGEMENT RIGHTS" states in Section 1 that the "Union recognizes the right of the University to operate and manage the University."

335.    Those rights provide management with the flexibility, among other things, to determine "policy regarding the conduct of courses and the maintenance of academic standards," to

39

determine "the composition and qualifications of faculty," and to designate "the number and assignment of faculty."

336.    Section 2 specifically states that "[d]ecisions regarding. . . who does the teaching . . . shall be made at the sole discretion of the University."

337.    Thus, decisions regarding who teaches courses (whether in Sociology, History, Political Science, etc.) lie within the "sole discretion of the University" and are not subject to challenge via the grievance procedure.

338.    As a result of Point Park's reservation of rights to decide who does the teaching, the University's agreement in favor of Dr. Ross as the Grievant and against Dr. Newman as Department Chair was contrary to the terms of the collective bargaining agreement and normal operations.

339.    Based on information and belief, Point Park's actions in this matter were discriminatory and/or retaliatory against Dr. Newman as well complicit with Dr. Ross and his ideological mission and pattern of attempts to diminish Dr. Newman's role at Point Park.

340.    Dr. Newman made a reasonable judgement that the choice to continue with the degreed experienced adjunct instructor was better for students and educational quality.

341.    Dr. Newman believes that Dr. Ross' courses had low enrollments.

342.    Dr. Newman offered Dr. Ross a course for which he was qualified but declined.

343.    Dr. Newman offered Dr. Hines a course for which he was qualified and accepted.

344.    Dr. Newman informed President Hennigan that the administration's concession of the grievance to Dr. Ross was questionable, wrongful, and asked him to take it to final arbitration.

345.    Dr. Hennigan did not reply.

346.    Dr. Newman raised to Dr. Hennigan that she is the only professor on campus who has

40

been under investigation for a year which he did not refute.

347.    To outside counsel Dr Newman's counsel asked in 2019 if she was safe from further career damage at Point Park.

348.    Outside counsel said yes, but this was inaccurate.

349.    Dr. Newman remains prey to unsubstantiated charges, endless investigations, career damage, degradation of her faculty and chair roles, excessive scrutiny, and attacks on her academic freedom.

350.    As Point Park understands this situation began following the rise of a virulent professor-led BDS movement condoned by management and targeted against her, but the University will do nothing about it.

351.    The shunning persists with BDS-oriented students being able to evade GCS requirements including Dr. Newman's courses, and graduate, all with administrative assent.

352.    In 2018, the Jewish Federation of Pittsburgh severed ties with the Pittsburgh Theological Seminary (PTS) for a time over the latter's invitation to bring the head of Sabeel, Reverend Naim Ateek, to speak in Pittsburgh.

353.    Reverend Ateek uses anti-Semitic language in his anti-Zionism such as calling Israelis modern Herods and likening the treatment of Palestinians to crucifixions.

354.    Dr. Ross championed Reverend Ateek and posted about criticism of the Sabeel leader as "the libelous smears from the Jewish Federation."

355.    In 2019, Dr. Newman attempted to introduce a new course entitled "Prejudice: Women, Jews, Blacks" that would include the three historically highly victimized groups internationally.

41

356.    The administration told her that she would have to change the title to eliminate the names of the groups or the course would be cancelled.

357.    Provost Pearson said he had received a complaint about the title but would not reveal the source.

358.    He alluded to the term "Blacks" being offensive.

359.    But that was pretextual considering the course was dealing with a global problem not simply one in this country.

360.    Further, Point Park has a Black Student Union, and uses the term Black in employment applications.

361.    The term "Women" likewise would not be offensive at Point Park since it is used widely including in another course that Dr. Newman teaches called "Women in Global Perspective."

362.    Circumstantially, it appears that the word "Jews" was problematic at Point Park, particularly in a current context where Jews must not be seen as historical victims rather than oppressors.

363.    In 2019, Point Park was preparing to present the musical "Parade" a play about the trials and 1913 lynching of Leo Frank, a Jewish Georgia factory manager falsely accused of raping and murdering a thirteen year old girl.

364.    Point Park had engaged distinguished alumnus Rob Ashford, a Tony and Emmy award winning Broadway director-choreographer, to present the play.

365.    In an astonishing piece of artistic cowardice, Point Park announced that it "postponed indefinitely" the play, allegedly because it made some students uncomfortable.

366.    In 2009 Point Park presented "Parade" at its Playhouse Theatre.

42

367.     In or about 2009 before BDS and Social Justice Studies took hold on campus, Point Park presented "Parade".

368.     At Point Park, in the current context of anti-Semitism and anti-Zionism it is not possible to present a Jew as the victim.

369.     Point Park readily presented Lauren Gerlowski's dance performance of "Shock and Awe" dramatizing Palestinians being victimized by Israelis.

370.     The Frank case was perhaps the most horrific act of anti-Jewish violence in America before the recent spate of shootings and slashings of Jews beginning in 2018 at Tree of Life in Pittsburgh.

371.     Such acts also previously have occurred in Europe, Asia and South America causing Jews to see the necessity for the Jewish state of Israel.

372.     Elements at Point Park with the assent of the administration have sought to delegitimatize Israel which constitutes anti-Semitism as the federal government repeatedly has indicated.

373.     There appears to be no training at Point Park against anti-Semitism and anti-Zionism.

374.     Regrettably members of the faculty and Administration appear unwilling to take action against these forms of discrimination.

375.     As a result of Defendants' actions, Dr. Newman has suffered damages including, but not limited to, serious emotional distress, physical manifestations of emotional distress, reputation harm, and out of pocket costs.  Dr. Newman seeks all remedies and damages permitted under federal and state law.

376.     Plaintiff requests a jury trial.

43

## VI.  COUNTS

### COUNT I: RETALIATION
**Plaintiff v. Point Park University**
**Violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e et seq.**

377.    The preceding paragraphs are incorporated as if set forth at length herein.

378.    Dr. Newman engaged in activity protected under Title VII and 42 U.S.C. § 1981.

379.    In the recent past, Dr. Newman raised complaints to the Administration against two faculty members – Dr. Ross and Dr. Hines.

380.    Dr. Newman complained to Point Park that Dr. Ross' teaching scholarship are improper including, but not limited to, those that are anti-Israel and anti-Semitic.

381.    Dr. Newman also complained that Dr. Hines made sexist remarks to students.

382.    Dr. Newman complained to Point Park that she was the victim of national origin and religious discrimination including in the work environment which became hostile.

383.    Dr. Newman dual-filed a charge of discrimination  on the basis of race, sex, religion, national origin, and age and retaliation with the EEOC and PHRC.

384.    Following these activities, Point Park took materially adverse actions against her.

385.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or any opportunity to respond.

386.    The materially adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email,

interfered with her assignment of courses in the Department, preempted a scheduled faculty meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper justification, subjected her to repeated workplace investigations and increased scrutiny, failed to conduct a timely investigation of her discrimination complaints even though it promised to do so, and apparently sanctioned her for not assigning Dr. Ross to teach a 100-level sociology course even though he was less-qualified to teach that course than the faculty assigned by Dr. Newman.

387.    A causal connection exists between the protected activity and the adverse action.

388.    The causal connection is based on the close temporal proximity between the protected activities and the adverse actions, the intervening period of antagonism against Dr. Newman, and the pretextual nature of the justifications offered for these actions.

389.    As a result of Point Park's retaliation, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

390.    Dr. Newman seeks all remedies and damages permitted under Title VII and Section 1981 including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

**COUNT II: DISCRIMINATION ON THE BASIS OF RACE/NATIONAL ORIGIN**
**Plaintiff v. Point Park University**
**Violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e et seq.**

391.    The preceding paragraphs are incorporated as if set forth at length herein.

392.    Dr. Newman is of Israeli and Czech national origin, Jewish, and of Jewish ancestry or ethnicity; as such, she is a member of a protected class.

45

393.    Dr. Newman is qualified for her position at Point Park.

394.    Dr. Newman suffered adverse employment actions.

395.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or an opportunity to respond.

396.    The adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled faculty meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper justification, subjected her to repeated workplace investigations and increased scrutiny, failed to conduct a timely investigation of her discrimination complaints even though it promised to do so, abruptly ended negotiations in bad faith based on some undisclosed complaint against Dr. Newman, and sanctioned her for not assigning Dr. Ross to teach a 100-level sociology course even though he was less-qualified to teach that course than the faculty assigned by Dr. Newman.

397.    There is an inference of discrimination.

398.    For example, Point Park treated more favorably individuals outside of her protected class.

399.    Point Park favored Dr. Ross' religion and theology including to her detriment.

400.    Point Park's justifications for the adverse actions are pretextual.

401. As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

402. Dr. Newman seeks all remedies and damages permitted under Title VII and Section 1981 including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

**COUNT III: HOSTILE WORK ENVIRONMENT
ON THE BASIS OF RACE/NATIONAL ORIGIN
Plaintiff v. Point Park University
Violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e et seq.**

403. The preceding paragraphs are incorporated as if set forth at length herein.

404. Dr. Newman was subjected to a hostile work environment at Point Park.

405. Dr. Newman is a member of a protected class.

406. Dr. Newman was subject to unwelcome harassment.

407. The harassment was based on her race and/or national origin.

408. The harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

409. Point Park knew or should have known of the harassment and failed to take prompt, effective remedial action.

410. As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

411. Dr. Newman seeks all remedies and damages permitted under Title VII and Section 1981 including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

### COUNT IV: DISCRIMINATION ON THE BASIS OF SEX
### Plaintiff v. Point Park University
### Violation of Title VII, 42 U.S.C. § 2000e et seq.

412.    The preceding paragraphs are incorporated as if set forth at length herein.

413.    Dr. Newman is female and a member of a protected class.

414.    Dr. Newman is qualified for her position at Point Park.

415.    Dr. Newman suffered adverse employment actions.

416.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or any opportunity to respond.

417.    The adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled faculty meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper justification, subjecting her to repeated workplace investigations and increased scrutiny, failed to conduct a timely investigation of her discrimination complaints even though it promised to do so, abruptly ended negotiations in bad faith based on some undisclosed complaint against Dr. Newman, and sanctioned her for not assigning Dr. Ross to teach a 100-level sociology course even though he was less-qualified to teach that course than the faculty assigned by Dr. Newman.

418.    There is an inference of discrimination.

48

419.    For example, Point Park treated more favorably individuals outside of her protected class.

420.    Point Park's justifications for the adverse actions are pretextual.

421.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

422.    Dr. Newman seeks all remedies and damages permitted under Title VII including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

### COUNT V: HOSTILE WORK ENVIRONMENT
### ON THE BASIS OF SEX
### Plaintiff v. Point Park University
### Violation of Title VII, 42 U.S.C. § 2000e et seq.

423.    The preceding paragraphs are incorporated as if set forth at length herein.

424.    Dr. Newman was subjected to a hostile work environment at Point Park.

425.    Dr. Newman is a member of a protected class.

426.    Dr. Newman was subject to unwelcome harassment.

427.    The harassment was based on her sex.

428.    The harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

429.    Point Park knew or should have known of the harassment and failed to take prompt, effective remedial action.

430.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

49

431.    Dr. Newman seeks all remedies and damages permitted under Title VII including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

## COUNT VI: DISCRIMINATION ON THE BASIS OF RELIGION
### Plaintiff v. Point Park University
### Violation of Title VII, 42 U.S.C. § 2000e et seq.

432.    The preceding paragraphs are incorporated as if set forth at length herein.

433.    Dr. Newman is Jewish and a member of a protected class.

434.    Dr. Newman is qualified for her position at Point Park.

435.    Dr. Newman suffered adverse employment actions.

436.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or any opportunity to respond.

437.    The adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled faculty meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper justification, subjecting her to repeated workplace investigations and increased scrutiny, failed to conduct a timely investigation of her discrimination complaints even though it promised to do so, abruptly ended negotiations in bad faith based on some undisclosed complaint against Dr. Newman,

50

and sanctioned her for not assigning Dr. Ross to teach a 100-level sociology course even though he was less-qualified to teach that course than the faculty assigned by Dr. Newman.

438.     There is an inference of discrimination.

439.     For example, Point Park treated more favorably individuals outside of her protected class.

440.     Point Park favored Dr. Ross' religion and theology including to her detriment.

441.     Point Park's justifications for the adverse actions are pretextual.

442.     As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

443.     Dr. Newman seeks all remedies and damages permitted under Title VII including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

**COUNT VII: HOSTILE WORK ENVIRONMENT
ON THE BASIS OF RELIGION
Plaintiff v. Point Park University
Violation of Title VII, 42 U.S.C. § 2000e et seq.**

444.     The preceding paragraphs are incorporated as if set forth at length herein.

445.     Dr. Newman was subjected to a hostile work environment at Point Park.

446.     Dr. Newman is a member of a protected class.

447.     Dr. Newman was subject to unwelcome harassment.

448.     The harassment was based on her religion.

449.     The harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

450.    Point Park knew or should have known of the harassment and failed to take prompt, effective remedial action.

451.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

452.    Dr. Newman seeks all remedies and damages permitted under Title VII including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

## COUNT VIII: DISCRIMINATION ON THE BASIS OF SEX
### Plaintiff Channa Newman v. Defendant Point Park University
### Violation of Title IX, 20 U.S.C. § 1681 et eq.

453.    The preceding paragraphs are incorporated as if set forth at length herein.

454.    Dr. Newman is a woman and, as such, is a member of a protected class.

455.    Dr. Newman is qualified for her position at Point Park.

456.    Title IX prohibits sex discrimination in educational institutions that receive funding from the federal government.

457.    Point Park is an educational institution that receives funding from the federal government.

458.    Dr. Newman suffered adverse actions.

459.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or any opportunity to respond.

460.    The adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled

her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled faculty meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper justification, subjecting her to repeated workplace investigations and increased scrutiny, failed to conduct a timely investigation of her discrimination complaints even though it promised to do so, abruptly ended negotiations in bad faith based on some undisclosed complaint against Dr. Newman, and sanctioned her for not assigning Dr. Ross to teach a 100-level sociology course even though he was less-qualified to teach that course than the faculty assigned by Dr. Newman.

461.    Point Park misused the Title IX investigation policy and procedure against Dr. Newman because of her gender.

462.    Similarly situated males were treated more favorably.

463.    Point Park administrators were aware of the discriminatory conduct taken against Dr. Newman.

464.    Point Park's justifications for the adverse actions are pretextual.

465.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

466.    Dr. Newman seeks all remedies and damages permitted under Title IX including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

53

**COUNT IX: HOSTILE WORK ENVIRONMENT ON THE BASIS OF SEX**
**Plaintiff Channa Newman v. Defendant Point Park University**
**Violation of Title IX, 20 U.S.C. § 1681 et seq.**

467.     The preceding paragraphs are incorporated as if set forth at length herein.

468.     Dr. Newman was subjected to a hostile work environment at Point Park.

469.     Dr. Newman is a member of a protected class.

470.     Dr. Newman was subject to unwelcome harassment.

471.     The harassment was based on her gender.

472.     The harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

473.     Point Park knew or should have known of the harassment and failed to take prompt, effective remedial action.

474.     As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

475.     Dr. Newman seeks all remedies and damages permitted under Title IX including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

**COUNT X: RETALIATION**
**Plaintiff Channa Newman v. Defendant Point Park University**
**Violation of Title IX, 20 U.S.C. § 1681 et seq.**

476.     The preceding paragraphs are incorporated as if set forth at length herein.

477.     Title IX prohibits sex discrimination in educational institutions that receive funding from the federal government.

478.     Point Park is an educational institution that receives funding from the federal

54

government.

479.    Dr. Newman engaged in activity protected under Title IX

480.    Dr. Newman complained that Dr. Hines made sexist remarks in an educational setting.

481.    Dr. Newman dual-filed a charge of discrimination on the basis of sex with the EEOC and PHRC.

482.    Point Park University falsely and inaccurately charged and processed charges under Title IX against her.

483.    Following these activities, Point Park took materially adverse actions against her.

484.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or any opportunity to respond.

485.    The materially adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled faculty meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper justification, subjecting her to repeated workplace investigations and increased scrutiny, failed to conduct a timely investigation of her discrimination complaints even though it promised to do so, abruptly ended negotiations in bad faith based on some undisclosed complaint against Dr. Newman,

55

and sanctioned her for not assigning Dr. Ross to teach a 100-level sociology course even though he was less-qualified to teach that course than the faculty assigned by Dr. Newman.

486.    A causal connection exists between the protected activity and the adverse action.

487.    The causal connection is based on the close temporal proximity between the protected activities and the adverse actions, the intervening period of antagonism against Dr. Newman, and the pretextual nature of the justifications offered for these actions.

488.    As a result of Point Park's retaliation, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

489.    Dr. Newman seeks all remedies and damages permitted under Title IX including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

### COUNT XI: DISCRIMINATION ON THE BASIS OF AGE
### Plaintiff Channa Newman v. Defendant Point Park University
### Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621

490.    The preceding paragraphs are incorporated as if set forth at length herein.

491.    Dr. Newman is over forty years of age and, as such, is a member of a class protected by the ADEA.

492.    Dr. Newman is qualified for her position at Point Park.

493.    Dr. Newman suffered adverse employment actions including, but not limited to, a spurious investigation, indefinite suspension from her position, a forced lock-out from her office, and the cancellation of one of her classes.

494.    There was no justification for the actions taken against her, and any justification provided for these actions are pretext for discrimination.

495.    Colleagues of Dr. Newman who were significantly younger than she were not subjected to similar treatment.

496.    Because her aforementioned colleagues were not subjected to similar treatment, an inference arises that Dr. Newman was subjected to discrimination on the basis of her race/national origin.

497.    As a result of the aforementioned discrimination, Dr. Newman suffered damages, including reputational harm and emotional distress.

498.    Dr. Newman seeks all remedies and damages permitted under the ADEA including, but not limited to, back pay, front pay, liquidated damages, puntive damages, attorney's fees, costs, and interest.

### COUNT XII: HOSTILE WORK ENVIRONMENT ON THE BASIS OF AGE
### Plaintiff Channa Newman v. Defendant Point Park University
### Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621

499.    The preceding paragraphs are incorporated as if set forth at length herein.

500.    Dr. Newman was subjected to a hostile work environment at Point Park.

501.    Dr. Newman is a member of a protected class.

502.    Dr. Newman was subject to unwelcome harassment.

503.    The harassment was based on her age.

504.    The harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

505.    Point Park knew or should have known of the harassment and failed to take prompt, effective remedial action.

506.    As a result of Point Park's discrimination, Dr. Newman suffered damages including,

but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

507.    Dr. Newman seeks all remedies and damages permitted under the ADEA including, but not limited to, back pay, front pay, liquidated damages, punitive damages, attorney's fees, costs, and interest.

## COUNT XIII: BREACH OF CONTRACT
### Plaintiff Channa Newman v. Defendant Point Park University

508.    The preceding paragraphs are incorporated as if set forth at length herein.

509.    Under Pennsylvania law, provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties.

510.    In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms.

511.    In this case, Point Park communicated to Dr. Newman certain rights, policies, and procedures which she accepted by continuing performance of her duties.

512.    Among those rights, policies, and procedures was Point Park's Title IX policy.

513.    Both Dr. Newman and Point Park agreed that Point Park would follow the Title IX policy.

514.    Dr. Newman was entitled to the protections and procedures set forth in the Title IX policy.

515.    Point Park breached its contract with Dr. Newman when it failed to follow various portions of the Title IX policy.

516.    Point Park's breaches include, but are not limited to, that the allegations against Dr.

Newman did not constitute a Title IX violation under Point Park's policy as Point Park knew, the allegations were false and misleading, Dr. Newman did not receive adequate notice and was not provided an opportunity to respond before Point Park separated her from the work site, Point Park breached confidentiality during the process and afterwards including in statements to the student newspaper, there was no evaluation of whether Newman posed a risk of harm to students, Dr. Ross and Dr. Hines breached the policy by publicizing the complaint beyond the individuals with a need to know listed in the policy, the draconian "interim" measures (including complete separation, cancellation of her class, interference with her Department Chair duties, etc.) were unwarranted and impermissible under the policy and reflect a lack of good faith and fair dealing, and Point Park failed to inform Dr. Newman of the nature of the allegations against her or the identity of the complainant in the February 2019 Title IX complaint against her, and time limits were not observed.

517.    As a result of Point Park's breach of contract, Dr. Newman suffered damages including, but not limited to, out of pocket losses and expenses.

518.    Dr. Newman seek all damages available under Pennsylvania law in excess of $75,000.

## COUNT XIV: BREACH OF CONTRACT
### Plaintiff Channa Newman v. Defendant Point Park University

519.    The preceding paragraphs are incorporated as if set forth at length herein.

520.    Under Pennsylvania law, provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties.

521.    In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms.

59

522.    In this case, Point Park communicated to Dr. Newman certain rights, policies, and procedures which she accepted by continuing performance of her duties.

523.    Among those rights, policies, and procedures was Point Park's Academic Freedom policy.

524.    Both Dr. Newman and Point Park agreed that Point Park would follow the Academic Freedom policy.

525.    Dr. Newman was entitled to the protections and procedures set forth in the Academic Freedom policy.

526.    Point Park breached its contract with Dr. Newman when it failed to follow various portions of the Academic Freedom policy.

527.    Point Park's breaches include, but are not limited to, its discipline and sanction of Dr. Newman based on statements she made in class including, but not limited to, about the Me Too Movement, and on statements she made outside the class including, but not limited to, that Dr. Ross' teaching and scholarship constituted improper advocacy and was not scholarly, and that it was anti-Israel and anti-Semitic.

528.    Point Park unduly interfered with Dr. Newman's ability to educate, advise, credential and follow and observe standards.

529.    As a result of Point Park's breach of contract, Dr. Newman suffered damages including, but not limited to, out of pocket losses and expenses.

530.    Dr. Newman seek all damages available under Pennsylvania law in excess of $75,000.

## COUNT XV: BREACH OF CONTRACT
**Plaintiff Channa Newman v. Defendant Point Park University**

531.    The preceding paragraphs are incorporated as if set forth at length herein.

532.    Under Pennsylvania law, provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties.

533.    In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms.

534.    In this case, Point Park communicated to Dr. Newman certain rights, policies, and procedures which she accepted by continuing performance of her duties.

535.    Among those rights, policies, and procedures was Point Park's due process policy and its anti-discriminatory policy.

536.    Both Dr. Newman and Point Park agreed that Point Park would follow the due process policy and anti-discrimination policy.

537.    Dr. Newman was entitled to the protections and procedures set forth in those policies.

538.    Point Park breached its contract with Dr. Newman when it failed to follow various portions of the due process policy.

539.    Point Park's breaches include, but are not limited to, failure to timely notify Dr. Newman of the charges against her and failure to conduct the investigation in a confidential manner as demonstrated by the knowledge of the investigation against Dr. Newman circulated by the former students on Facebook and subsequent comments made by the Administration to the student newspaper, and a failure to timely or adequately investigate her discrimination claims and protect

61

her from further discrimination and retaliation.

540.    As a result of Point Park's breach of contract, Dr. Newman suffered damages including, but not limited to, out of pocket losses and expenses.

541.    Dr. Newman seek all damages available under Pennsylvania law in excess of $75,000.

## COUNT XVI: BREACH OF CONTRACT
### Plaintiff Channa Newman v. Defendant Point Park University

542.    The preceding paragraphs are incorporated as if set forth at length herein.

543.    At Point Park, complaints regarding investigations into Title IX sexual harassment complaints are governed by the University's *Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking*.[3]

544.    Under the aforementioned policy, all investigations must be completed within thirty days, and all appeals of any determination must be taken within ten business days of the date of the determination, with the resolution of the appeal being rendered within fifteen business days of the date of the appeal.

545.    Furthermore, the respondent to any investigation has "[t]he right to be fully informed of the nature, rules and procedures of the investigation and resolution process."

546.    Even though the student made her complaint October 9, 2019, the subsequent investigation was not concluded until December 7, 2018; the investigation thus took approximately twice as long to complete than the time period prescribed by the regulations.

547.    Moreover, the appeal was  filed by the complaining students was unresolved as of until or about  February 11, 2019, which was more than fifteen business days after the date Dr.

---

[3]  A copy of these procedures have been attached to this Complaint as "Exhibit A."

Newman received notice of the appeal (January 9, 2019).

548.    Dr. Newman would later learn that there were multiple Title IX complaints filed against her; however, she did not receive any information regarding the substance of these complaints.

549.    By failing to resolve the investigation and appeal process in a timely fashion, Point Park violated the terms of its own policy, thereby breaching its contract with Dr. Newman.

550.    Moreover, by failing to provide Dr. Newman with substantive information regarding the pending Title IX complaints, Point Park violated the terms of its own policy, thereby breaching its contract with Dr. Newman.

551.    The damages suffered by Dr. Newman arose from Point Park's failure to adhere to its own internal policies.

WHEREFORE, Dr. Newman seeks all damages available under Pennsylvania law in excess of $75,000.

## COUNT XVII: NEGLIGENT SUPERVISION
### Plaintiff Channa Newman v. Defendant Point Park University

552.    The preceding paragraphs are incorporated as if set forth at length herein.

553.    Point Park failed to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his or her employment.

554.    The harm was committed on Point Park's premises.

555.    Point Park knew or had to reason to know of the necessity and ability to control the employee.

556.    Dr. Newman notified her supervisors of the misconduct of other employees which

63

were outside the scope of their employment.

557.    Point Park failed to act to prevent further negative treatment.

558.    All negative actions taken against her occurred on Point Park's premises.

559.    Point Park was notified of the negative actions taken against Dr. Newman by Point Park employees, but Point Park failed to take any disciplinary action against them.

560.    The negative actions against Dr. Newman continued.

561.    Dr. Newman suffered harm as a result including, but not limited to, harm to her reputation, emotional distress, and out-of-pocket costs.

562.    Dr. Newman seeks all remedies and damages permitted under law.

### COUNT XVIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Plaintiff Channa Newman v. Defendant Point Park University

563.    The preceding paragraphs are incorporated as if set forth at length herein.

564.    Point Park acted intentionally or recklessly.

565.    Point Park's actions taken against Dr. Newman under the circumstances were extreme and outrageous.

566.    Dr. Newman suffered severe emotional distress including, but not limited to, fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry.

567.    Dr. Newman's severe emotional distress was a result of Point Park's conduct.

568.    Dr. Newman seeks all remedies and damages permitted under law.

Respectfully Submitted,

LIEBER HAMMER HUBER & PAUL, P.C.


s/James B. Lieber
James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
5528 Walnut Street
Pittsburgh, PA 15232
(412) 687-2231 (telephone)
(412) 687-3140 (fax)

## <u>VERIFICATION</u>

I verify that the facts set forth in this complaint are true and correct to the best of my knowledge, information, and belief.  I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Date: _Jan. 6, 2020_

Channa Newman

# POINT PARK
# UNIVERSITY

ADMIN 001

# Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking

## Policy Statement & Purpose

Point Park University prohibits all forms of discrimination based on sex or gender, including sexual misconduct, sexual harassment, sexual assault, domestic violence, dating violence, and stalking (collectively, "Sexual Misconduct"). Sexual Misconduct is inconsistent with the University's values and will not be tolerated. Title IX of the Education Amendments of 1972 ("Title IX") prohibits all forms of sex based discrimination, including sexual harassment, sexual violence, and other forms of sexual misconduct. The Violence Against Women Reauthorization Act ("VAWA") of 2013 includes additional requirements about how colleges and universities must respond to and address certain acts of violence, including sexual assault, domestic violence, dating violence, and stalking. Point Park complies with Title IX and VAWA and is committed to providing an educational and employment environment that is free of all forms of sex discrimination and sexual violence. All members of the Point Park community share in the responsibility to maintain the University's environment that supports the safety and dignity of each member of the community.

## Scope of Policy

This policy applies to conduct committed by students, faculty, (union and non-union) employees, administrators, volunteers, independent contractors, and visitors. This policy prohibits Sexual Misconduct towards University community members of any sex, gender identity, gender expression, or sexual orientation.

## Policy Prohibitions

A. Prohibition of Sexual Misconduct

This policy prohibits sexual misconduct, that takes place on the campus, at University-sponsored events and to off-campus and online conduct when the Title IX Coordinator or Deputy Title IX Coordinator determines that the off-campus and/or online conduct could

have an on-campus impact or an impact on the educational mission of the University, including:

    a. Any action that constitutes criminal offense as defined by federal or Pennsylvania state law. This includes, but is not limited to, single or repeat violations of any local, state or federal law;

    b. Any situation where it appears that the accused individual may present a danger or threat to the health or safety of self or others;

    c. Any action that creates or could create a hostile environment on campus;

    d. Any situation that significantly impinges upon the rights, property or achievements of others or significantly breaches the peace and/or causes social disorder;

    e. Any situation that is detrimental to the educational interests of Point Park University or members of the Point Park community; and/or

    f. Off-campus discriminatory or harassing speech by employees when such speech is made in an employee's official or work-related capacity.

B. Prohibition of Gender-Based Harassment

This policy prohibits unwelcome conduct that is nonsexual in nature and based upon a person's actual or perceived sex, gender identity, gender expression, or nonconformity with gender stereotypes.

C. Prohibition of Retaliation

The University does not tolerate retaliation and will pursue actions against those who take retaliatory measures against reporting individuals or witnesses.

D. Prohibited Consensual Relationships

No employee shall enter into a consensual romantic and/or sexual relationship with any student, whether the relationship is long-term or short-term or deemed serious or casual.

Employees may not accept authority over a student with whom they have had a previous consensual romantic and/or sexual relationship without first disclosing the relationship and obtaining prior agreement from their supervisor. Situations of authority can exist, but are not limited to, a student taking a course taught by the employee, a student who is the advisee of the employee, or a student in an employment position or Graduate Assistantship with the employee.

In such instances, the employee and student must disclose the prior relationship to the employee's supervisor and obtain approval for the authoritative situation. *Written notice of this approval must be provided to the Provost and Vice President of Human Resources by the appropriate supervisor.*

Determination of whether an individual is considered an "employee" or a "student" will be based upon the person's primary role at the University. For example, a full-time employee who is taking a course would be considered an employee for purposes of this prohibition, and a full-time student who is a part-time employee would be considered a student for purposes of this prohibition.

Examples of Prohibited Relationships

The following examples are intended for illustrative purposes only. This is not, and is not meant to be, an exhaustive list of instances where this policy applies.

- Professor A in Department Z and undergraduate Student B in Department Y meet at a social event sponsored by the University. This policy prohibits a romantic or sexual relationship between the two parties until either Professor A is no longer an employee at Point Park or Student B is no longer enrolled as a student at Point Park University.

- A romantic relationship develops between Assistant Coach A and graduate Athlete B. This relationship is prohibited by this policy because an instructive relationship exists between the parties. Assistant Coach A is required to disclose the relationship to his or her supervisor and terminate all instruction and supervision of graduate Athlete B.

Exceptions to the Prohibition of Consensual Relationships

1. In some instances, exceptions to prohibited consensual relationships may exist or be created. This prohibition will not apply to situations of "Pre-Existing Relationships." A "Pre-Existing Relationship" is a Relationship between an employee and a Point Park student that existed (a) before the student enrolled at Point Park or (b) before the employee became employed by Point Park. Pre-Existing Relationships must be disclosed promptly to the Vice President of Human Resources and to the Provost. In these situations, employees should review the University's Nepotism Policy (Section 1.12) to avoid conflicts with University policy.

2. Consensual relationships between graduate students and undergraduate students are not prohibited by this policy. However, graduate students who become employed by the University, such as through a teaching role or as a Graduate Assistant, must take measures to avoid or terminate any instructive or supervisory roles with undergraduate students where a relationship exists or develops.

3. Undergraduate students who also hold student-only employment positions at Point Park are excluded from this policy. Some examples of these excluded positions are Resident Educators, Office Assistants, and Apprenticeships.

The University reserves the right to intervene if any relationship between an employee and a student has the potential to compromise the University's academic or professional integrity. Any questions about the applicability of this Policy to a particular relationship should be addressed to the Title IX Coordinator, Provost, or the Vice President for Human Resources.

## Definitions[1]

Complainant—the person(s) alleged to have been subjected to conduct in violation of this policy. The University reserves the right to act as the Complainant in a case where an individual is unwilling or unable to pursue a report of misconduct.

Respondent—the person(s) accused of conduct that might be in violation of this policy.

Reporter—the person(s) reporting alleged conduct prohibited by this policy. The Reporter may be the Complainant or any other person (but not a responsible employee).

Sexual Misconduct is a broad term encompassing sexual harassment, sexual assault, and any other non-consensual behavior of a sexual nature that is committed by force or intimidation, or that is otherwise unwelcome. Sexual misconduct may vary in its severity and consists of a range of behavior or attempted behavior.

Sexual misconduct can occur between strangers or acquaintances, including people involved in an intimate or sexual relationship. It can also occur between members of the same or different sex and can occur while individuals are fully clothed.

Sexual Assault is non-consensual sexual contact or non-consensual sexual intercourse (as defined below). Sexual assault includes sexual contact or sexual intercourse achieved by the use or threat of force or violence, coercion or intimidation, without consent, or where an individual is incapacitated.

      i. **Non-consensual sexual contact** is any sexual touching, however slight, with any part of a person or an object, by any person upon another without consent (as defined below), or by forcing any person to touch you or his/herself in a sexual manner. Non-consensual contact includes improper touching of intimate body parts, non-consensual removal of another's clothing, indecent contact (i.e. the unwanted touching of intimate body parts including, but not limited to, genitals, buttocks, groin, or breasts), or causing another to have indecent contact with those intimate body parts.

---

[1] See Appendix A for Pennsylvania Crimes Code Definitions of Rape, Rape of a Child, Statutory Sexual Assault, Involuntary Deviate Sexual Intercourse, Sexual Assault, Aggravated Indecent Assault, Indecent Assault, and Incest; Appendix B for Pennsylvania's Standard for Probable Cause; and Appendix C for Pennsylvania Crimes Code Definition of Stalking.

    ii. **Non-consensual sexual intercourse** is any sexual intercourse by any person upon another without consent (as defined below). It includes oral, anal and vaginal penetration, to any degree, with any part of the body or any object. Non-consensual intercourse may be accomplished  by expressly or implicitly forcing or coercing another person to have intercourse against that person's will, including the use or threat of physical force, or any behavior that is designed to intimidate and induce fear in another person. Non-consensual sexual intercourse can also occur when another person is incapable of denying or giving consent.

Sexual Harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, graphic or physical conduct of a sexual or gender-based nature, when: (1) submission to or rejection of such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing or is used as the basis for employment decisions or for academic evaluation, grades, or advancement (i.e. quid pro quo); or (2) such conduct creates a hostile environment (defined below). Sexual harassment may be found in a single episode, as well as in persistent behavior.

Sexual harassment is a matter of particular concern to an academic community in which students, faculty and staff are related by strong bonds of intellectual dependence and trust.

Hostile Environment Unwelcome verbal or physical conduct of a sexual nature creates a hostile environment when it (1) is sufficiently severe, persistent, or pervasive to limit a student's ability to participate in or benefit from an education program or creates a hostile or abusive educational environment; or (2) explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive environment.

In determining whether harassment has created a hostile environment, consideration will be given not only to whether the conduct was unwelcome to the person who feels harassed, but also to whether a reasonable person in a similar situation would have perceived the conduct as objectively offensive.

Domestic Violence is a felony or misdemeanor crime of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the Commonwealth of Pennsylvania, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the Commonwealth of Pennsylvania.

Dating violence is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim. The existence of such a relationship shall be determined based on the reporting party's statement, taking into consideration of the following factors:

> (i) The length of the relationship;

> (ii) The type of relationship; and

> (iii) The frequency of interaction between the persons involved in the relationship.

Dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence, for purposes of this policy, does not include emotional abuse.

Relationship Violence includes domestic violence and dating violence (as those terms are defined above).

Sexual Exploitation involves:

> 1.       electronically recording, photographing, or transmitting intimate or sexual utterances, sounds, or images without the knowledge and consent of all parties involved;

> 2.       voyeurism (spying on others who are in intimate or sexual situations); or

> 3.       distributing intimate or sexual information about another person without that person's consent.

Stalking means to engage in a course of conduct directed at a specific person that would cause a reasonable person to—

> (A) fear for his or her safety or the safety of others; or

> (B) suffer substantial emotional distress.

One engages in an impermissible course of conduct if one engages in two or more acts that include, but are not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person in a way prohibited as described above or interferes with a person's property.

Retaliation is action taken by an accused individual or an action taken by a third party against any person because that person has opposed any practices forbidden under this policy or because that person has filed a complaint, testified, assisted, or participated in any manner in an investigation or proceeding under this policy. This includes action

taken against a bystander who intervened to stop or attempted to stop sexual misconduct. Retaliation includes intimidating, threatening, coercing, or in any way discriminating against an individual because of the individual's complaint or participation. Action is generally deemed retaliatory if it would deter a reasonable person in the same circumstances from opposing practices prohibited by this policy.

Sexual Intimidation is sexual misconduct that occurs when a person takes unjust or abusive sexual advantage of another for his or her own advantage or benefit or for the benefit or advantage of anyone other than the exploited party; and that behavior does not otherwise constitute sexual assault.

Consent is knowing, voluntary and clear permission by word or action, to engage in mutually agreed upon sexual activity. Since individuals may experience the same interaction in different ways, it is the responsibility of each party to make certain that the other has consented before engaging in the activity. For consent to be valid, there must be a clear expression in words or actions that the other individual consented to that specific sexual conduct.

A person cannot consent if he or she is unable to understand what is happening or is disoriented, helpless, asleep or unconscious for any reason, including due to alcohol or other drugs. An individual who engages in sexual activity when the individual knows, or should know, that the other person is physically or mentally incapacitated has violated this policy.

It is not an excuse that the individual accused of sexual misconduct was intoxicated and, therefore, did not realize the incapacity of the other.

Consent to some sexual contact (such as kissing or fondling) cannot be presumed to be consent for other sexual activity (such as intercourse). A current or previous dating relationship is not sufficient to constitute consent. The existence of consent is based on the totality of the circumstances, including the context in which the alleged incident occurred and any similar previous patterns that may be evidenced. Silence or the absence of resistance alone is not consent. A person can withdraw consent at any time during sexual activity by expressing in words or actions that he or she no longer wants the act to continue, and, if that happens, the other person must stop immediately.

In Pennsylvania, a minor (meaning a person under the age of 16 years) cannot consent to sexual activity. This means that sexual contact by an adult with a person younger than 16 years old is a crime, as well as a violation of this policy, even if the minor wanted to engage in the act.

Incapacitation is the inability, temporarily or permanently, to give consent because the individual is mentally and/or physically helpless, asleep, unconscious, or unaware that

sexual activity is occurring. Incapacity may result from mental disability, involuntary physical restraint and/or from the use of alcohol or drugs. Intoxication is not necessarily the same thing as incapacitation, unless one is so intoxicated as to be incapacitated. Incapacitation of the alleged perpetrator does not excuse otherwise prohibited conduct.

Student is any person enrolled in a course, including on-line and hybrid courses, at Point Park University at the time of the alleged incident and/or the time the report of the alleged incident is made.

Employee is anyone currently employed by Point Park University as faculty or staff, full-time or part-time. Individuals currently on sabbatical, leaves of absence, serving in visiting posts, or who work from a remote location are considered employees.

Responsible Employee is any administrator, faculty, or staff member employed by the University who has not otherwise been specifically identified as confidential reporting locations.

Consensual Relationship is any romantic, dating or sexual relationship between a student and an employee that is willingly undertaken by the parties. This includes relationships that occur only once, intermittent relationships, and/or relationships based on-line.

Investigator is a person appointed by the Title IX Coordinator to conduct a fact-finding investigation into a report of possible violation of this policy. Investigators receive annual training on the University's policy and best-practices for conducting investigations which may involve sexual misconduct, relationship violence or stalking.

Deputy Title IX Coordinator is an administrator appointed by the Title IX Coordinator to review and determine the outcome of cases under this policy. The Deputy Title IX Coordinator also determines any sanctions or remedies to be imposed on the parties for each case, where applicable. Each Deputy Title IX Coordinator receives annual training on the University's policy and best practices for adjudicating cases which may involve sexual misconduct, relationship violence or stalking.

Unwelcome Conduct occurs when the target of the conduct did not request or invite it and considered the conduct to be undesirable or offensive. Unwelcome Conduct may take various forms, including, name-calling, graphic or written statements (including the use of cell phone or the Internet), or other conduct that may be physically threatening, harmful, or humiliating. Unwelcome Conduct does not have to include intent to harm, be directed at a specific target, or involve repeated incidents. Unwelcome Conduct can involve persons of the same or opposite sex. Participation in the conduct or the failure to complain does not always mean that the conduct was welcome. The fact that an individual may have welcomed some conduct does not necessarily mean that the individual welcomed other conduct. Also, the fact that an individual requested or invited

conduct on one occasion does not mean that the conduct is welcome on a subsequent occasion.

## Options for Assistance

### FOLLOWING AN INCIDENT OF SEXUAL MISCONDUCT

Any Point Park student, faculty, or staff member who has experienced or who is aware of conduct that constitutes sexual misconduct, relationship violence, or stalking is strongly encouraged to **seek immediate medical assistance, to call 911 or the University's Police Department at 412.392.3960, and to preserve pertinent information and tangible materials, such as text messages, photos and clothing.**

To report any non-emergency sexual misconduct, please contact Elizabeth Rosemeyer, Title IX Coordinator, at 412.392.3980, erosemeyer@pointpark.edu, or 201 Wood Street, 800 Academic Hall, Pittsburgh, PA 15222. Reports may also be made to a Deputy Title IX Coordinator, Student Life staff, faculty member, or any other University official.

### A. On-line reports

On-line reports may be submitted, anonymously if so desired, at www.pointpark.edu/incidentreport.

### B. Emergency Contact Information

In the event of a sexual assault or relationship violence, visiting a hospital emergency room will ensure treatment is provided for possible injuries, pregnancy, or sexually transmitted disease. Additionally, a Sexual Assault Nurse Examiner (SANE) can obtain forensic evidence of an assault up to ten days after the incident. This can be important if legal options are pursued later, including obtaining a protection order. There is a limited window of time (up to 10 days) following an incident of sexual assault to preserve physical and other forms of evidence. Taking the step to gather evidence immediately does not commit an individual to any course of action. The decision to seek medical attention and to gather any evidence will remain confidential and will preserve the full range of options to seek resolution through the University's complaint processes and/or criminal action. Additionally, in Pennsylvania, an individual can submit to a medical exam anonymously.

.

University staff can assist in obtaining medical or mental health care, and notifying law enforcement in the proper jurisdiction if the complainant desires. Also, Pittsburgh Action Against Rape will be notified of all reported assaults so that trained crisis counselors can accompany a victim to the hospital 24 hours a day, if the complainant desires The University will work with the complainant and law enforcement to implement any needed protective measures including No Contact Orders issued by the University and/or lawful orders issued by

criminal, civil, or tribal court.

Complainants have the right to decline notification to law enforcement. This choice does not remove availability of any medical treatment and assistance from the University.

| EMERGENCY RESPONSE | MEDICAL CARE | COUNSELING |
|---|---|---|
| Point Park Police<br>Contact any Police Officer or<br>call 412.392.3960 | Student Health Center<br>203 Thayer Hall<br>412.392.3800 | Student Counseling Center<br>5th floor, Lawrence Hall<br>412.392.3959 (during normal<br>University office hours) |
| Pittsburgh Police Department<br>Call 911 | Magee-Womens Hospital<br>412.641.4933 | Pittsburgh   Action   Against<br>Rape (PAAR)<br>1.866.END.RAPE (363.7273)<br>www.paar.net |
| | UPMC Mercy Hospital<br>412.232.8222 | Women's Center and Shelter<br>of Greater Pittsburgh<br>412.687.8005<br>www.wcspittsburgh.org |
| | | Persad Center<br>1.888.873.7723<br>www.persadcenter.org |

C. Confidential Reporting and Resources

The University encourages individuals who experience any form of sexual misconduct, to talk to someone about what happened—so they can get the support they need, and so the University can respond appropriately. Different employees on campus have different abilities to maintain a victim's confidentiality. Please review the information below to find the resource with which you are most comfortable. All resources below are free to enrolled students.

1. Completely Confidential Reporting Location

Resources in this category are required by law and professional ethics standards to maintain complete confidentiality, except in extreme circumstances. Unless a professional licensed counselor believes there is an imminent threat, those licensed

counselors who provide mental-health counseling to members of the University community will not report any information about an incident to the Title IX Coordinator without first obtaining the victim's permission.

*Students may obtain these services on campus from:*

Student Counseling Center
5th floor, Lawrence Hall
412.392.3959

### 2. Mostly Confidential Reporting Location

Resources in this category will keep reports as confidential as possible, but are required to share de-identified information with a Title IX Coordinator. Specifically, resources in this category must report to the Title IX Coordinator the nature, location, time, date, and other general information regarding the reported incident, but will not report the identity of the parties involved.

*Students may obtain these services on campus from:*

Student Health Center
2nd Floor, Thayer Hall
412.392.3800
hcapo@pointpark.edu

### 3. Off-Campus Resources

The following are off-campus resources. While off-campus counselors and advocates may maintain confidentiality vis-à-vis the University, they may have reporting or other obligations under state or federal law. You should inquire of each as to the level of confidentiality they can provide.

*Students and all employees may obtain services off-campus from:*

Pittsburgh Action Against Rape (PAAR)
24 Hour Hotline: 1.866.END. RAPE (363-7273)
www.paar.net

Center for Victims
24 Hour Crisis Hotline: 1.866.644.2882
www.centerforvictims.org

Women's Center and Shelter of Greater Pittsburgh
412.687.8005

www.wcspittsburgh.org

Persad
1.888.873.7723
www.persadcenter.org

4. Exceptions to Confidentiality

In some instances, confidential resources will be required by state law to report certain information. In Pennsylvania, incidents involving minors must be reported to Childline at (800) 932-0313. Additionally, if information indicates the safety of the victim or other campus members is in jeopardy, the resource may be required to break confidentiality. Finally, in rare instances, there may be occasion where a resource is required to testify in a criminal proceeding.

*Timely Warnings*
The University is required to give a timely warning of any alleged perpetrators who commit a crime on or adjacent to campus and pose a serious and immediate threat to the campus community. In such an event, the Point Park University Police Department will issue a warning through its PointALERT system after consultation with University Administration as reasonable under the circumstances.

5. Anonymous Reporting

A reporter may report sexual misconduct anonymously through the University's Title IX web page. A link can be found at: www.pointpark.edu/incidentreport

6. Private Reporting

Unlike confidential resources, most staff, including athletic coaches, and all faculty at Point Park University are considered "Responsible Employees" and are required to report incidents of sexual misconduct to the Title IX Coordinator. This report to the Title IX Coordinator should include any relevant details about the alleged sexual misconduct and will trigger the University's investigation process. Information in the Responsible Employee's Incident Report will be shared with only those people necessary to carry out a thorough, reliable and impartial investigation. Personally identifiable information will not be shared with law enforcement without the Complainant's consent.

When a Complainant (or third party reporter) tells a Responsible Employee about an incident of sexual misconduct the Complainant has the right to expect the University to take immediate and appropriate steps to investigate what happened and to resolve the matter promptly and equitably.

If a Complainant begins to share information with a responsible employee, the employee should clarify to the Complainant that the employee is obligated to report the information to the Title IX Coordinator. If the Complainant would like to maintain confidentiality, the

Responsible Employee should direct the victim to confidential resources, such as the Student Counseling Center or Pittsburgh Action Against Rape. Employees should not pressure Complainants to seek confidential resources or, conversely, pressure Complainants to fully disclose information before the Complainant is ready. Essentially, employees should identify their reporting obligations to the Complainant and then listen to the Complainant's information.

In cases where a Complainant would like to maintain confidentiality, but wants to share information about an incident with the employee, then the employee should communicate the desire for confidentiality to the Title IX Coordinator. The University will honor this request to the extent possible.

7. University Response to Requests for Confidentiality

Whenever possible and to the greatest extent possible, the University will honor requests for confidentiality and do its best to maintain the privacy of all reporters and Complainants (if different).

In cases where a reporter discloses an incident to a Responsible Employee but that reporter, or the Complainant, if different, expresses a desire to maintain confidentiality or requests that no investigation into a particular incident be conducted or disciplinary action taken, the University must weigh that desire and request against its obligation to provide a safe, non-discriminatory environment for all students, including the reporter and Complainant.

If the University honors the request for confidentiality, a reporter and Complainant must understand that the University's ability to meaningfully investigate the incident and pursue disciplinary action against the alleged perpetrator(s) may be limited.

Although rare, there are times when the University may not be able to honor a reporter or Complainant's request in order to provide a safe, non-discriminatory environment for all students. In this instance, the following individual(s) may evaluate the request for confidentiality:

- Elizabeth Rosemeyer, Title IX Coordinator
- Lisa Stefanko, Vice President of Human Resources and Deputy Title IX Coordinator
- James Thomas, Associate Provost and Deputy Title IX Coordinator
- Jeff Besong, Chief of Police and Assistant Vice President of Public Safety
- Michael Gieseke, Dean of Student Life

When evaluating a reporter or Complainant's request for confidentiality or that no investigation or discipline be pursued, the University will consider a range of factors, including the following:

- The increased risk that the alleged perpetrator will commit additional acts of sexual or other violence, such as:
  - o   whether there have been other sexual violence complaints about the same alleged perpetrator;
  - o   whether the alleged perpetrator has a history of arrests or records from a prior school indicating a history of violence;
  - o   whether the alleged perpetrator threatened further sexual violence or other violence against the Complainant or others;
  - o   whether the sexual violence was committed by multiple perpetrators;
- whether the sexual violence was perpetrated with a weapon;
- whether the Complainant is a minor;
- whether the University possesses other means to obtain relevant evidence of the sexual violence (e.g., security cameras or personnel, physical evidence);
- whether the reporter's report reveals a pattern of perpetration (e.g., via illicit use of drugs or alcohol) at a given location or by a particular individual or group.

The presence of one or more of these factors could lead the University to investigate and, if appropriate, pursue disciplinary action. If none of these factors is present, the University will likely respect the request for confidentiality.

In the event the University determines that it cannot maintain a reporter or Complainant's confidentiality, the University will inform the reporter or Complainant prior to starting an investigation and will, to the extent possible, only share information with people responsible for handling the investigation and resolution response.

The University will work diligently to assist the Complainant, and will take ongoing steps to protect the reporter and Complainant (if different from the reporter) from retaliation or harm. Retaliation against the reporter and/or Complainant, whether by students or University employees, will not be tolerated. Further, the University will not require a reporter/Complainant to participate in any investigation or disciplinary proceeding.

## REPORTING POLICIES AND PROTOCOLS

### A.      Direct Reporting Options

A reporter may report sexual misconduct by instituting either a criminal process and/or an institutional process. The criminal process begins by calling the local police department  or University police department. The institutional process may be instituted by calling

Elizabeth Rosemeyer, Title IX Coordinator at 412.392.3980 or at 201 Wood Street, 800 Academic Hall, Pittsburgh, PA 15222, contacting any Deputy Title IX Coordinator, Responsible Employee, or by completing an Incident Report, which may be submitted anonymously if desired, located on the University website at www.pointpark.edu/incidentreport.

B.      **Indirect Reporting**

Any University official who receives notice of a violation of this policy and is not listed as a confidential resource elsewhere in this policy is obligated to report that violation to the Title IX Coordinator or any Deputy Title IX Coordinator.

C.      **Protecting Complainants, Reporters and Witnesses**

   1.      Retaliation

        The University does not tolerate retaliation and will pursue actions against those who take retaliatory measures against reporting individuals or witnesses. When an individual reports sexual misconduct to any campus resource, that resource will work with the Title IX Coordinator or the appropriate Deputy Title IX Coordinator to ensure that the Complainant and reporter are protected from further misconduct and from retaliation for making the report. The Title IX Coordinator or her/his designee will consult with the Complainant regarding protective measures such as changes to University housing and/or academic schedules, changing office locations, removing the reporting individual's information from the Campus directory, and/or issuing a "no contact order." Protective measures applicable to students will be enforced under the Student Code of Conduct by the Associate Vice-President of Student Affairs. Protective measures applicable to staff will be enforced by the Vice-President of Human Resources. Protective measures applicable to faculty will be enforced by the Senior Vice President for Academic and Student Affairs.

   2.      Amnesty

        Assisting students who are reporting sexual misconduct is the University's primary interest. In order to facilitate reporting, the Vice-President of Student Affairs may choose not to charge students who report sexual misconduct and any material witnesses with Student Code of Conduct violations for behavior that would otherwise be considered violations (for example, consuming alcohol underage or consuming illegal drugs).

3.     False Accusations

Deliberately false and/or malicious accusations of sexual misconduct, as opposed to complaints which, even if erroneous, are made in good faith, are just as serious as sexual misconduct and will be subject to appropriate disciplinary action.

# INVESTIGATION PROCEDURES AND PROTOCOLS

## A. Assessment and Timeline

The University strives to investigate and resolve all reports of possible violations of the Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking within sixty (60) days.

Receipt of an Incident Report which includes allegations of sex or gender discrimination, including sexual misconduct, will trigger an initial Title IX/VAWA assessment. This assessment will be conducted by the Title IX Coordinator, in consultation with one or more of the following: Deputy Title IX Coordinators, Director of Student Development, Dean of Student Life, and/or Assistant Vice-President of Public Safety. The assessment will determine if any immediate risk of harm to an individual or the community exists, and will implement any necessary interim measures to address those risks, as well as whether the conduct as reported, if true, would constitute a violation of this policy.

If the initial assessment finds that it is plausible that a violation of this Policy may have occurred, and the complainant wants to pursue an investigation, the University will appoint an investigator of its choosing and initiate an investigation. The extent and depth of the investigation will depend upon such factors as the Complainant's desire to pursue disciplinary action, the risk posed to the community, and the nature of the alleged behavior. If the Complainant chooses to pursue criminal charges, the University Police Department will work with the Complainant to connect him/her with the appropriate local police department (if the reported incident occurred off campus) or community resource.

If a Complainant refuses to participate in the process, the University may determine that even so, it is appropriate to move forward with an investigation and the protocols set forth in this Policy.

## B. Measures & Remedies

The University's primary goal is to ensure that any victim of sexual misconduct is safe. Regardless of whether a Complainant chooses to pursue disciplinary action, the University will take interim measures to protect the party(ies) involved and ensure that all safety, emotional, and physical well-being concerns are met, stop the discriminatory behavior, and ensure that the behavior does not reoccur.

Upon receiving a report of sexual misconduct, the University will provide the victim and all relevant parties written notification of services available to them. These services include, but are not limited to counseling, medical care, mental health care, legal assistance, victim advocacy, visa and immigration assistance, student financial aid, including information about current scholarships. Additionally, the University will notify victims of and make available to victims assistance with academic, living, transportation, working situations and on-campus protective measures. Some examples of these situations are changing class schedules, providing alternate housing arrangements, allowing withdrawal from a course without financial penalty, and/or changing a supervisor at a work study position.

These resources remain available to complainants regardless of whether the victim chooses to report the crime to campus police or law enforcement, or pursue the University's resolution process. The University will work with each complainant to ensure protective measures remain in place on an as-needed or permanent basis to prevent the reported discriminatory behavior from recurring even after the disciplinary process concludes.

Interim measures to protect the safety of the Complainant will be determined on a case-by-case basis. In making the determination, the University will consider, at a minimum, the Complainant's expressed need, the severity or pervasiveness of the allegations, the continuing effects on the Complainant, the likelihood that the Complainant will come into contact with the Respondent through daily activities, and whether any legal steps have been taken to protect the Complainant.

The University will also consider, as appropriate, whether and what interim measures and remedies should be provided or offered to the Respondent.

*Student Remedies:*

Some examples of immediate remedies the University may provide to a student include modifying class schedules, workplace schedules, and/or extracurricular activities; changing housing arrangements; providing counseling and academic support services; providing a Support Advocate; offering extra time to complete, re-take or withdraw from a class without academic or financial penalty; and providing escort services on campus from the campus police. If an investigation against a named Respondent occurs, the University may also initiate a no contact order, alter the housing accommodations of the Respondent; and alter the class, work or extracurricular schedule of the Respondent. Where it is deemed appropriate, the University may issue an interim suspension for a student-Respondent.

Remedies remain available to complainants for the duration of the time they are enrolled as students. The University will work with each complainant if additional remedial measures are needed or need to be altered for the complainant to continue their education.

*Staff Remedies:*

Some examples of immediate remedies the University may provide to a staff member include: modifying work schedule or shift, workplace department or location, supervisor or direct reports if Complainant is a supervisor; providing a Support Advocate; assisting in obtaining counseling services through the Employee Assistance Plan or otherwise; providing escort services on campus and increasing security around Complainant. If an investigation against a named Respondent occurs, the University may initiate a no- contact order, issue a *persona non grata* order to prevent a person from coming on campus, and/or alter the assigned department, work schedule or work location, or the supervisory reporting structure of the Respondent.

Remedies remain available to complainants on an as-needed basis. The University will work with each complainant if additional remedial measures are needed or need to be altered for the complainant to continue their employment.

*Faculty Remedies:*

Some examples of immediate remedies the University may provide to a faculty member include: modifying teaching schedule, workplace schedule, and/or extracurricular schedule; providing a Support Advocate; assisting in obtaining counseling services through the Employee Assistance Plan or otherwise; providing escort services on campus and increasing security around the Complainant. If an investigation against a named Respondent occurs, the University may initiate a no-contact order, issue a *persona non grata* order to prevent a person from coming on campus, and/or alter the class or work schedule of the Respondent.

Remedies remain available to complainants on an as-needed basis. The University will work with each complainant if additional remedial measures are needed or need to be altered for the complainant to continue their employment.

## C.    Investigation Process

Investigations into allegations of sexual misconduct will usually include interviews with the Complainant, Respondent, and all relevant witnesses. A thorough review of pertinent physical and documentary evidence, such as, photographs, security videos, electronic messages, including text messages, social media postings, and any other relevant resource will also occur. Complainants and Respondents will have the opportunity to present additional evidence to the investigator, and to suggest other fact witnesses that the investigator may wish to interview. Character witnesses will not be heard.

1.  Advisors

    In addition to the Support Advocates offered to the Complainant and Respondent, individuals may choose an advisor of their choice to accompany them during the investigative process or any related meeting that is part of the Title IX proceedings. An advisor is any individual who provides the Complainant or Respondent support, guidance, or advice. This advisor may be a parent, a community advocate, or any other person (including an attorney). The advisor's role is purely supportive; the advisor may not speak on behalf of the Complainant or Respondent or otherwise directly participate in the investigation process.

2.  Time Line of Investigation

    The University aims to complete investigations under this Policy within thirty (30) days. In some circumstances, an extension of this timeframe may be required. Possible conditions that would extend the time needed to complete an investigation include, but are not limited to, the complexity of the reported incident, the number of witnesses involved, related and on-going criminal investigations, school breaks and vacations or unforeseen circumstances. If a delay is necessary, the University will notify all parties of the reasons for the delay and the expected adjustment in timeframes. In all cases, the University will employ a process which balances principles of thoroughness and equity with promptness.

3.  Findings of Fact Report and Opportunity to Respond

    Upon completion of the investigation, the appointed investigators will submit a Findings of Fact Report to the Title IX Coordinator. The Findings of Fact Report will include the nature of the allegations reported, a summary of the information gathered from interviews, including statements by all parties, and any physical or documentary evidence reviewed. The Complainant(s) and Respondent(s) will have the opportunity to review a redacted version (to preserve the confidentiality of witnesses) of the Findings of Fact Report. Each party may provide a written response to the report within five (5) days to the Title IX Coordinator.

    The Title IX Coordinator will forward the Findings of Fact Report, any response provided by the Complainant or Respondent, and all other materials to the appropriate Deputy Title IX Coordinator. All parties will be notified that the investigation is complete and provided information about next steps in the resolution process.

## RESOLUTION PROCESS

Members of the Point Park community may choose an Informal or Formal Resolution process for resolving complaints. The Informal Resolution process is available only for reports of incidents where the reported behavior could **not** constitute a crime. Reports that could include crimes such as, sexual assault, dating or domestic violence, or stalking cannot be resolved informally.

A Formal Resolution process may be used for any report of behavior that may violate this policy, including reports that may involve behavior that could constitute a crime. A Formal Resolution involves a full investigation and will be adjudicated by the appropriate Deputy Title IX Coordinator. The relationship of the Respondent to the University (i.e., student, faculty or staff) will determine which Deputy Title IX Coordinator reviews the case and applies sanctions and/or remedies.

Regardless of the resolution process chosen by the complainant, the University commits to providing all parties with a prompt, fair and impartial process from the initial investigation to the final result. This includes receiving timely notice, equal opportunities to be heard, and equal opportunities to respond to the reported behavior.

### A.    Informal Resolution

An informal resolution is a mechanism for achieving resolution between parties without a formal investigation. This process may not be used in incidents where the reported behavior could constitute a crime, such as sexual assault, relationship violence or stalking. Complainants choosing this path of resolution do not forego access to remedies needed to continue their education. Either the party may choose to end an informal resolution and begin a formal investigation at any time prior to final determination.

Through the informal resolution process, Complainants are choosing to have their report of misconduct shared with the Respondent(s). The Title IX Coordinator will meet with the Respondent(s) to inform him or her of the reported misconduct. The Respondent(s) will have the opportunity to accept or deny responsibility for the accused misconduct. If the Respondent(s) accepts responsibility for their action, appropriate disciplinary actions will be imposed by the appropriate Deputy Title IX Coordinator.

The Complainant will be notified of the Respondents' acceptance of responsibility and that the case has been resolved. Neither the Complainant nor the Respondent may appeal from an informal resolution.

### B.  Formal Resolution

Once an investigation is conducted and a Findings of Fact Report of the investigation is submitted to the Title IX Coordinator, the resolution process will begin. The University

aims to complete the resolution process, including notifying all parties of the outcome of the investigation, within 30 days.

A Deputy Title IX Coordinator is responsible for reviewing the Findings of Fact Report and determining whether a violation of the University's Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking has occurred. This determination will include a full review of all relevant information and be based on a preponderance of the evidence standard (i.e., whether it is more likely than not that a violation occurred).

Upon making a decision on whether a violation has occurred, the Deputy Title IX Coordinator will issue an Outcome Letter outlining the decision made, and will also explain the imposed sanctions and remedies. This information will be provided in writing to the Complainant and the Respondent, taking into account any applicable privacy issues.

Possible sanctions that may be imposed upon a Respondent found in violation of the University's policy may include the following:

- a warning letter,
- required prevention education,
- removal from a student program,
- restrictions on access to certain University facilities, such as a residence hall,
- No Contact Order,
- restrictions on future class scheduling to avoid classes with a complainant,
- limits on employment at the University,
- suspension for one to four semesters,
- suspension for the remainder of an academic year,
- or expulsion.

The Deputy Title IX Coordinator will review the Outcome Letter with the Complainant and Respondent separately to ensure the reasoning of the decision is fully understood and to inform the Complainant and Respondent of the right to appeal. Upon request, the University will disclose results of the investigation and resolution to the next of kin, if the complainant is deceased. *Note, however, that a Complainant or Respondent who has refused to participate in the investigation process has no right to appeal.*

If it is determined that a violation of the Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking did not occur, but the reported behavior would

violate a different University policy, such as the Student Code of Conduct, the case may be referred to the appropriate office for resolution.

## C.     Right to Appeal

Except as noted above, both the Complainant and the Respondent have the right to appeal the decision of the Deputy Title IX Coordinator. Parties to the case are informed of their right to appeal through the University's Policy Prohibiting Sexual Misconduct, Relationship Violence, and Stalking in writing and electronically. Further, the Complainant and Respondent receive written notice of their right to appeal in their Outcome Letters which provides the determination whether the University's policy has been violated.

An appeal must be filed within ten (10) business days of the date of the Outcome Letter. An appeal may only be filed on three bases: 1) the appealing party has new information that was not included in the investigation Findings of Fact Report and could not have been provided earlier, 2) the appealing party believes the sanction was not proportionate to the offense, or 3) the appealing party believes the University did not follow its investigation and/or resolution process.

The appeal should be submitted in writing to the University Title IX Coordinator. The Title IX Coordinator will forward the appeal and all materials from the investigation to a Deputy Title IX Coordinator not involved in the original investigation or the Provost ("Appeal Officer"). The choice of the Appeal Officer is at the sole discretion of the University.

The Appeal Officer will review the Findings of Fact Report and related evidence, the decision by the Deputy Title IX Coordinator, and the information provided in the appeal documents in making a determination whether a violation occurred. Using a preponderance of the evidence standard, the Appeal Officer will issue an Outcome Letter to the appealing party detailing the decision and any applicable sanctions or remedies. Absent extenuating circumstances, the Appeal Officer will issue the Outcome Letter within fifteen (15) business days of the date the appeal is filed with the Title IX Coordinator. If any changes occur to the original decision, the non-appealing party will be made aware of the change. The decision is final with no further appeal process.

## RIGHTS OF THE COMPLAINANT AND RESPONDENT

The University commits to providing a fair and equitable process for resolving complaints of sexual misconduct which includes the following:

The right to prompt investigation and appropriate resolution of all credible complaints of sexual misconduct.

The right to be treated with respect by University officials.

The right to be informed of and have access to campus resources for medical, counseling, and advisory services where indicated.

The right to be fully informed of the nature, rules and procedures of the investigation and resolution process, and to timely written notice of the alleged violations within the complaint, including the nature of the violations.

The right not to have irrelevant prior sexual history admitted as evidence in the Findings of Fact report.

The right to appeal sanction(s) imposed, in accordance with the standards for appeal established by the University's Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking.

The right to an investigation and resolution process that is closed to the public.

The right to petition that the Deputy Title IX Coordinator be removed on the basis of demonstrated bias.

The right to have complaints and appeals heard by a Deputy Title IX Coordinator, Title IX Coordinator, or other designated University official who have received annual sexual misconduct, adjudication training.

The right to be accompanied and assisted by an advisor during the investigation process. This advisor can be anyone, including an attorney provided at the Complainant's/Respondent's own cost, but the advisor may not take part directly in the interview or investigation itself, though they may communicate with the Complainant/Respondent as necessary.

The right to an outcome based solely on evidence presented during the investigation process. Such evidence shall be credible, relevant, based in fact, and without prejudice.

The right to timely written notice of the outcome and sanction(s).

## PREVENTION AND AWARENESS

Point Park University believes that educating its community about sexual misconduct is the most effective way to create a learning environment free of sexual misconduct. To that end, the University employs a variety of active (e.g., interactive programs) and passive (e.g., poster campaigns) strategies to inform the community about how to prevent sexual misconduct, what to do in the event misconduct occurs, and how to keep sexual misconduct from reoccurring.

Each year the University will consider the current campus atmosphere and indicators, as well as prior instances of sexual misconduct, to design and implement a campaign or activities which address campus specific issues related to sexual misconduct. The University may utilize outside

resources for community-wide campaigns and/or secure programmatic services from local rape and trauma victim centers. Programs may focus on, but are not exclusive to, specific topics such as bystander training, the relationship between alcohol and sexual misconduct, definitions of consent, or relationship violence. Educational activities will also include information on how to report sexual misconduct, the University investigation process, and support resources available on- or off-campus to those affected by sexual misconduct.

Program implementation occurs throughout the academic year in a variety of forms for all members of the community, which includes undergraduate, graduate, and on-line students, staff, and faculty. Campus members will have multiple opportunities to participate in prevention and awareness activities through social events, on-line trainings, small-group discussions, and annual awareness events. Employees also have opportunities to participate in "Lunch and Learn" sessions where they may gain knowledge about how to respond to an individual who has experienced sexual misconduct, how to report sexual misconduct, and their rights under federal and state law to work in an environment free of sexual misconduct.

Finally, the University makes every effort to make its Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking easily accessible and available to all campus members. The policy is regularly distributed to students in the fall, and new hires for staff or faculty. It is included in the annual student planner and the Administrative and Staff Handbook and Policies Manual. It is also available on the Point Park University website at www.pointpark.edu/sexual- misconduct-policy.

## TRAINING OF EMPLOYEES

The University takes its responsibility to train its staff, faculty and student-workers on the University's Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking very seriously. The amount of training required of an individual will depend on the level of involvement an individual may have in the reporting, investigating, and resolution process of reported sexual misconduct.

All employees who interact with students, whether directly or indirectly, will receive annual training on the definition of sexual misconduct and the University's reporting procedures for sexual misconduct.

Any employee potentially involved in investigating or adjudicating a report of sexual misconduct will receive additional training to include, at a minimum, best practices for conducting an investigation, trauma-centered sexual assault training, and training specific to the University's reporting, investigation and resolution policies, which adhere to all legal obligations under Title IX of the Education Amendments of 1972. The University utilizes external consultants, legal counsel and local rape and trauma victim centers to bolster its training. Additionally, all investigators and adjudicators receive training related to interviewing techniques, unconscious

bias, planning an investigation and writing reports on the information gathered during an investigation. Investigators and adjudicators provide regular updates to the Title IX Coordinator to ensure timeliness of the investigation and/or resolution, and that all relevant parties or witnesses are allowed the opportunity to be heard.

## TITLE IX of the Education Amendments of 1972

Title IX prohibits discrimination on the basis of sex in any federally funded education program or activity. Sexual misconduct is a form of sex discrimination and therefore violates Title IX.

Point Park University has appointed several trained individuals to oversee the implementation of all Title IX obligations, including prevention and awareness programs, training employees on their rights and duties under Title IX, investigating any reports of possible sexual misconduct, and providing resolution for all violations of Title IX.

For information about Title IX compliance, please contact the University's Title IX Coordinator, Elizabeth H. Rosemeyer at 412.392.3980, erosemeyer@pointpark.edu, or at 201 Wood Street, 800 Academic Hall, Pittsburgh, PA 15222. You may also contact any Deputy Title IX Coordinator, listed below.

### Title IX Coordinator and Deputy Coordinators

The Title IX Coordinator oversees the University's overall response to sexual misconduct. The Coordinator, along with the Deputy Coordinators, can accept reports of sexual misconduct and will take actions necessary to end any reported discrimination and to prevent its recurrence. The Coordinators also serve as decision makers regarding any sanctions or remedies imposed in the event a violation of the Policy Prohibiting Sexual Misconduct, Relationship Violence, and Stalking has occurred.

> **Elizabeth H. Rosemeyer, Title IX Coordinator**: erosemeyer@pointpark.edu; 412.392.3980; 201 Wood Street, 800 Academic Hall, Pittsburgh, PA 15222
>
> **Lisa Stefanko, Vice President of Human Resources** and Deputy Title IX Coordinator lstefanko@pointpark.edu; 412.392.4727; 100 Wood Street, 7th Floor Frontier Hall, Pittsburgh, PA 15222
>
> **James Thomas, Associate Provost** and Deputy Title IX Coordinator jhthomas@pointpark.edu; 412.392.3983; 201 Wood Street, 820 Academic Hall, Pittsburgh, PA 12555

Inquiries regarding the application of Title IX may be made externally to:

> Philadelphia Office
> Office for Civil Rights

U.S. Department of Education
The Wanamaker Building
100 Penn Square East, Suite 515
Philadelphia, PA 19107-3323
Main Line: (215) 656-8541
Fax: (215) 656-8605
E-Mail:        ocr.philadelphia@ed.gov
Link to Complaint form at Dept. Of Education


Equal Employment Opportunity Commission (EEOC)
Contact: EEOC contact link

## VIOLENCE AGAINST WOMEN ACT (VAWA)

Under VAWA, the University is required to:

1.   Report domestic violence, dating violence, and stalking in addition to crimes required to
     be reported by all universities under the Clery Act;
2.   Adopt certain student discipline procedures, such as for notifying individuals who report
     being subject to sexual misconduct of their rights; and
3.   Adopt certain policies to address and prevent campus sexual violence, including training
     of students and personnel.

**Appendix A**

Sexual Assault under Pennsylvania Crimes Code

*In addition to the definitions identified above in Section Definitions, the following definitions are applicable to this Policy. The conduct described in each definition below is prohibited by this Policy as a form of Sexual Assault.*

Each definition is pulled directly from Title 18 of the Pennsylvania Crimes Code; the section number (e.g., § 3121, § 3122, etc.) is also pulled directly from the Pennsylvania Crimes Code. The pertinent definitions are:

**§ 3121. Rape**.

  *(a) Offense defined.--A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant:*

    *(1) By forcible compulsion.*

    *(2) By threat of forcible compulsion that would prevent resistance by a person of reasonable resolution.*

    *(3) Who is unconscious or where the person knows that the complainant is unaware that the sexual intercourse is occurring.*

    *(4) Where the person has substantially impaired the complainant's power to appraise or control his or her conduct by administering or employing, without the knowledge of the complainant, drugs, intoxicants or other means for the purpose of preventing resistance.*

    *(5) Who suffers from a mental disability which renders the complainant incapable of consent.*

  *(c) **Rape of a child**.--A person commits the offense of rape of a child, a felony of the first degree, when the person engages in sexual intercourse with a complainant who is less than 13 years of age.*

  *(d) Rape of a child with serious bodily injury.--A person commits the offense of rape of a child resulting in serious bodily injury, a felony of the first degree, when the person violates this section and the complainant is under 13 years of age and suffers serious bodily injury in the course of the offense.*

    *Link:*
    http://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?txtType=HTM&ttl=18&div=0&chpt=31&sctn=21&subsctn=0

**§ 3122.1. Statutory sexual assault.**

(a)  *Felony of the second degree.--Except as provided in section 3121 (relating to rape), a person commits a felony of the second degree when that person engages in sexual intercourse with a complainant to whom the person is not married who is under the age of 16 years and that person is either:*

(1) *four years older but less than eight years older than the complainant; or*

(2) *eight years older but less than 11 years older than the complainant.*

(b)  *Felony of the first degree.--A person commits a felony of the first degree when that person engages in sexual intercourse with a complainant under the age of 16 years and that person is 11 or more years older than the complainant and the complainant and the person are not married to each other.*

Link:

http://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?txtType=HTM&ttl=18&div=0&chpt=31&sctn=22&subsctn=1

**§ 3123. Involuntary deviate sexual intercourse.**

(a)  *Offense defined.--A person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant:*

(1) *by forcible compulsion;*

(2) *by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;*

(3) *who is unconscious or where the person knows that the complainant is unaware that the sexual intercourse is occurring;*

(4) *where the person has substantially impaired the complainant's power to appraise or control his or her conduct by administering or employing, without the knowledge of the complainant, drugs, intoxicants or other means for the purpose of preventing resistance;*

(5)  *who suffers from a mental disability which renders him or her incapable of consent; or*

(6) *(Deleted by amendment).*

(7) who is less than 16 years of age and the person is four or more years older than the complainant and the complainant and person are not married to each other.

(b) *Involuntary deviate sexual intercourse with a child.*--A person commits involuntary deviate sexual intercourse with a child, a felony of the first degree, when the person engages in deviate sexual intercourse with a complainant who is less than 13 years of age.

(c) *Involuntary deviate sexual intercourse with a child with serious bodily injury.*--A person commits an offense under this section with a child resulting in serious bodily injury, a felony of the first degree, when the person violates this section and the complainant is less than 13 years of age and the complainant suffers serious bodily injury in the course of the offense.

> Link:
> http://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?txtType=HTM&ttl=18&div=0&chpt=31&sctn=23&subsctn=0

## § 3124.1. Sexual assault.

Except as provided in section 3121 (relating to rape) or 3123 (relating to involuntary deviate sexual intercourse), a person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent.

> Link:
> http://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?txtType=HTM&ttl=18&div=0&chpt=31&sctn=24&subsctn=1

## § 3125. Aggravated indecent assault.

(a) *Offenses defined.*--Except as provided in sections 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse) and 3124.1 (relating to sexual assault), a person who engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault if:

(1) the person does so without the complainant's consent;

(2) the person does so by forcible compulsion;

(3)  the person does so by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(4)  the complainant is unconscious or the person knows that the complainant is unaware that the penetration is occurring;

(5)  the person has substantially impaired the complainant's power to appraise or control his or her conduct by administering or employing, without the knowledge of the complainant, drugs, intoxicants or other means for the purpose of preventing resistance;

(6)  the complainant suffers from a mental disability which renders him or her incapable of consent;

(7)  the complainant is less than 13 years of age; or

(8)  the complainant is less than 16 years of age and the person is four or more years older than the complainant and the complainant and the person are not married to each other.

(b)  Aggravated indecent assault of a child.--A person commits aggravated indecent assault of a child when the person violates subsection (a)(1), (2), (3), (4), (5) or (6) and the complainant is less than 13 years of age.

Link:

http://www.legis.state.pa.us/WU01/LI/LI/CT/HTM/18/00.031..HTM

§ 3126. Indecent assault.

(a)  Offense defined.--A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:

(1) the person does so without the complainant's consent;

(2) the person does so by forcible compulsion;

(3) the person does so by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution;

(4)  the complainant is unconscious or the person knows that the complainant is unaware that the indecent contact is occurring;

(5)  the person has substantially impaired the complainant's power to appraise or control his or her conduct by administering or employing,

*without the knowledge of the complainant, drugs, intoxicants or other means for the purpose of preventing resistance;*

*(6) the complainant suffers from a mental disability which renders the complainant incapable of consent;*

*(7) the complainant is less than 13 years of age; or*

*(8) the complainant is less than 16 years of age and the person is four or more years older than the complainant and the complainant and the person are not married to each other.*

**Link:**

*http://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?txtType=HTM&ttl=18&div=0&chpt=31&sctn=26&subsctn=0*

**§ 4302. Incest.**

*(a) General rule.--Except as provided under subsection (b), a person is guilty of incest, a felony of the second degree, if that person knowingly marries or cohabits or has sexual intercourse with an ancestor or descendant, a brother or sister of the whole or half blood or an uncle, aunt, nephew or niece of the whole blood.*

*(b) Incest of a minor.--A person is guilty of incest of a minor, a felony of the second degree, if that person knowingly marries, cohabits with or has sexual intercourse with a complainant who is an ancestor or descendant, a brother or sister of the whole or half blood or an uncle, aunt, nephew or niece of the whole blood and:*

*(1) is under the age of 13 years; or*

*(2) is 13 to 18 years of age and the person is four or more years older than the complainant.*

*(c) Relationships.--The relationships referred to in this section include blood relationships without regard to legitimacy, and relationship of parent and child by adoption.*

**Link:**
*http://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?txtType=HTM&ttl=18&div=0&chpt=43&sctn=2&subsctn=0*

**Appendix B**

Standard for Probable Cause under Pennsylvania Crimes Code

*While there is no distinct definition of "Domestic Violence" under the Pennsylvania Crimes Code, it should be noted that if a criminal complaint is made to law enforcement outside of the University, the following standard of probable cause will apply. NOTE: This is being provided for informational purposes only. This standard is different from the procedures that apply to on-campus disciplinary matters, as set forth in this Policy.*

*§ 2711. Probable cause arrests in domestic violence cases.*

*(a) General rule.--A police officer shall have the same right of arrest without a warrant as in a felony whenever he has probable cause to believe the defendant has violated section 2504 (relating to involuntary manslaughter), 2701 (relating to simple assault), 2702(a)(3), (4) and (5) (relating to aggravated assault), 2705 (relating to recklessly endangering another person), 2706 (relating to terroristic threats) or 2709.1 (relating to stalking) against a family or household member although the offense did not take place in the presence of the police officer. A police officer may not arrest a person pursuant to this section without first observing recent physical injury to the victim or other corroborative evidence. For the purposes of this subsection, the term "family or household member" has the meaning given that term in 23 Pa.C.S. § 6102 (relating to definitions).*

*Link:*

*http://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?txtType=HTM&ttl=18&div=0&chpt=27&sctn=11&subsctn=0*

**Appendix C**

Stalking under Pennsylvania Crimes Code

***In addition to the definitions identified above in Definitions, the following definitions are applicable to this Policy. The conduct described below is prohibited by this Policy as a form of Stalking.***

This definition is pulled directly from Title 18 of the Pennsylvania Crimes Code, section 2709.1.

*§ 2709.1. Stalking.*

> *(a) Offense defined --A person commits the crime of stalking when the person either:*
>
>> *(1) engages in a course of conduct or repeatedly commits acts toward another person, including following the person without proper authority, under circumstances which demonstrate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person; or*
>>
>> *(2) engages in a course of conduct or repeatedly communicates to another person under circumstances which demonstrate or communicate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person.*
>
> *(b) Venue —*
>
>> *(1) An offense committed under this section may be deemed to have been committed at either the place at which the communication or communications were made or at the place where the communication or communications were received.*
>>
>> *(2) Acts indicating a course of conduct which occur in more than one jurisdiction may be used by any other jurisdiction in which an act occurred as evidence of a continuing pattern of conduct or a course of conduct.*
>
> *(c) Grading --*
>
>> *(1) Except as otherwise provided for in paragraph (2), a first offense under this section shall constitute a misdemeanor of the first degree.*
>>
>> *(2) A second or subsequent offense under this section or a first offense under subsection (a) if the person has been previously convicted of a crime of violence involving the same victim, family or household member, including, but not limited to, a violation of section 2701 (relating to simple assault), 2702 (relating to*

.

*aggravated assault), 2705 (relating to recklessly endangering another person),
2901 (relating to kidnapping), 3121 (relating to rape) or 3123 (relating to
involuntary deviate sexual intercourse), an order issued under section 4954
(relating to protective orders) or an order issued under 23 Pa.C.S. § 6108 (relating
to relief) shall constitute a felony of the third degree.*

*(d) False reports --A person who knowingly gives false information to any law
enforcement officer with the intent to implicate another under this section commits an
offense under section 4906 (relating to false reports to law enforcement authorities).*

*(e) Application of section --This section shall not apply to constitutionally protected
activity.*

*(f) Definitions.--As used in this section, the following words and phrases shall have the
meanings given to them in this subsection:*

> *"Communicates." To convey a message without intent of legitimate communication
> or address by oral, nonverbal, written or electronic means, including telephone,
> electronic mail, Internet, facsimile, telex, wireless communication or similar
> transmission.*
>
> *"Course of conduct." A pattern of actions composed of more than one act over a
> period of time, however short, evidencing a continuity of conduct. The term includes
> lewd, lascivious, threatening or obscene words, language, drawings, caricatures
> or actions, either in person or anonymously. Acts indicating a course of conduct
> which occur in more than one jurisdiction may be used by any other jurisdiction in
> which an act occurred as evidence of a continuing pattern of conduct or a course
> of conduct.*
>
> *"Emotional distress." A temporary or permanent state of mental anguish.*
>
> *"Family or household member." Spouses or persons who have been spouses,
> persons living as spouses or who lived as spouses, parents and children, other
> persons related by consanguinity or affinity, current or former sexual or intimate
> partners or persons who share biological parenthood.*
>
> SLink:
> **http://www.legis.state.pa.us/cfdocs/legis/LI/consCheck.cfm?txtType=HTM&t
> tl=18&div=0&chpt=27&sctn=9&subsctn=1**

Policy Owner:          Title IX Coordinator
Effective Date:        November 9, 2016
Date of Approval:      November 9, 2016
Date of Publication:   November 9, 2016

Revision History (and effective dates):

- June 12, 2018

- November 9, 2016

- August 2016

- August 11, 2015 – Revised Policy

- August 2014 – New Policy


**POINT PARK**
U N I V E R S I T Y

← Student Life (../index)

Title IX

# Title IX

(../../index)

**ABOUT US**
(../../ABOUT/INDEX)

**ACADEMICS**
(../../ACADEMICS/INDEX)

**ADMISSIONS &
FINANCIAL AID**
(../../ADMISSIONS/INDEX)

**CAREER-READY**
(../../CAREERREADY/INDEX)

**STUDENT LIFE**
(../INDEX)

Search 🔍

Title IX: Annual Campus
Crime Report
(AnnualCampusCrimeReport)

Title IX: Frequently Asked
Questions (TitleIXFAQ)

Title IX: If You Are
Supporting a Friend
(SupportingAFriend)

Title IX Notice of
Nondiscrimination
(TitleIXNoticeofNondiscrimination)

Title IX: Policy Prohibiting
Sexual Misconduct,
Relationship Violence and
Stalking
(SexualMisconductPolicy/index)

## Title IX Notice of Nondiscrimination

Point Park University does not discriminate on the basis of sex in its education programs, activities
employment practices. Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 e
seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of s
in education programs or activities operated by recipients of Federal financial assistance.

Sexual harassment, which includes acts of sexual violence, is a form of sex discrimination prohibit
by Title IX. Sexual harassment includes unwelcome sexual advances, requests for sexual favors, ar
other verbal, nonverbal or physical conduct of a sexual nature. Sexual violence refers to physical
sexual acts perpetrated against a person's will or where a person is incapable of giving consent du
to the victim's use of drugs or alcohol, age or disability.  Conduct that may be considered sexual
harassment includes:

+ Uninvited touching, hugging, or patting

+ Pressure for sexual favors for rewards related to school or work

+ Obscene phone calls, texts, pictures, gestures or emails

Any inquiries or complaints related to Title IX can be made by contacting, Vanessa Love, Director c
Title IX and Diversity at 412-392-3980, vlove@pointpark.edu (mailto:%20vlove@pointpark.edu), or
Wood Street, 703 Student Center, Pittsburgh, PA 15222.

## Title IX Contacts

| | |
|---|---|
| Vanessa Love, Director of Title IX and Diversity Title IX Coordinator | vlove@pointpark.edu (mailto:%20vlove@pointpark.edu) 412-392-3980 |
| Lisa Stefanko, Vice President of Human Resources Deputy Title IX Coordinator | lstefanko@pointpark.edu (mailto:lstefanko@pointpark.edu) 412-392-4727 |
| James Thomas, Associate Provost Deputy Title IX Coordinator | jhthomas@pointpark.edu (mailto:jhthomas@pointpark.edu) 412-392-3983 |

**Apply**
(../../apply)

**Request Info**
(../../Admissions/Request-
Info-Form)

**A-Z Quicklinks**
(../../Quicklinks)

**My Point Park**
(../../myPointPark/index)

📄 **Contact Us**
(../../contact)

## Confidential Support Resources

| | |
|---|---|
| Point Park Counseling Center | 412-392-3959, 5th Floor, Lawrence Hall |
| Point Park Health Center | 412-392-3800, 203 Thayer Hall |
| Pittsburgh Action Against Rape | 1-866-END-RAPE (1-866-363-7273) |
| Center for Victims | 24-hour Helpline, 412-392-8582 |
| Women's Center & Shelter of Greater Pittsburgh | 24-Hour Hotline: 412-687-8005 |
| Persad Center | 1-888-873-7723 |



← Student Life (../index)

### Title IX

| | |
|---|---|
| Magee-Womens Hospital of UPMC | 412-641-4933 |
| UPMC Mercy Hospital | 412-232-8222 |
| Point Park Support Advocate | Vanessa Love, Director of Title IX and Diversity, 412 392-3980 |

( ../index)

**ABOUT US**
**(../../ABOUT/INDEX)**

Title IX: Annual Campus
Crime Report
(AnnualCampusCrimeReport)

**ACADEMICS**
**(../../ACADEMICS/INDEX)**

Title IX: Frequently Asked
Questions (TitleIXFAQ)

**ADMISSIONS &**
**FINANCIAL AID**
**(../../ADMISSIONS/INDEX)**

Title IX: If You Are
Supporting a Friend
(SupportingAFriend)

**CAREER-READY**
**(../../CAREERREADY/INDEX)**

Title IX Notice of
Nondiscrimination
(TitleIXNoticeofNondiscrimination)

**STUDENT LIFE**
**(../INDEX)**

Title IX: Policy Prohibiting
Sexual Misconduct,
Relationship Violence and
Stalking
(SexualMisconductPolicy/index)

Search 🔍

## To report a crime

✛ Call Point Park Police: 412-392-3960

✛ Call 911

## If you are in crisis

✛ **Pittsburgh Action Against Rape:** 24-Hour Free Confidential Hotline: 1-866-END-RAPE (1-8(
363-7273)

Call anytime to speak with a trained counselor.

http://paar.net (http://paar.net/)

✛ **Resolve Crisis Hotline:** 1-888-7-YOU-CAN (1-888-796-8226)

## If you are supporting a friend

Consult these suggestions for supporting a friend or family member (SupportingAFriend) who has
experienced sexual misconduct.

## If you want to report sexual misconduct

You may contact any of the Title IX contacts listed on the right of this page, under the Title IX Cont
heading, to make a report or you can complete an Online Incident Report
(https://publicdocs.maxient.com/incidentreport.php?PointParkUniv). This report may be complete
by a victim, a third party or anonymously.

### Get informed

*Dealing with Decisions that Matter*
*(https://www.pointpark.edu/StudentLife/TitleIX/media/Dealing_with_Decisions_That_Matter_2019.*
*(PDF)* is a guide that offers information and resources at Point Park for incidents involving sexual
misconduct, relationship violence and stalking.



It's on Us

Learn more:

✛ Center for Changing Our Campus Culture (http://changingourcampus.org/)

✛ Rape, Incest, Abuse National Network (https://rainn.org/)

✛ Love Is Respect (http://loveisrespect.org/)

**Apply**
**(../../apply)**

**Request Info**
**(../../Admissions/Request-**
**Info-Form)**

**A-Z Quicklinks**
**(../../Quicklinks)**

**My Point Park**
**(../../myPointPark/index)**

📰 **Contact Us**
**(../../contact)**



← Student Life (../index)

Stalking Resource Center (http://www.victimsofcrime.org/our-programs/stalking-resource-center)

✛ The Trevor Project (http://www.thetrevorproject.org/)

## Title IX

(../../index)

**ABOUT US**
(../../ABOUT/INDEX)

**ACADEMICS**
(../../ACADEMICS/INDEX)

**ADMISSIONS &
FINANCIAL AID**
(../../ADMISSIONS/INDEX)

**CAREER-READY**
(../../CAREERREADY/INDEX)

**STUDENT LIFE**
(../INDEX)

Search 🔍

**Title IX: Annual Campus
Crime Report
(AnnualCampusCrimeReport)**

**Title IX: Frequently Asked
Questions (TitleIXFAQ)**

**Title IX: If You Are
Supporting a Friend
(SupportingAFriend)**

**Title IX Notice of
Nondiscrimination
(TitleIXNoticeofNondiscrimination)**

**Title IX: Policy Prohibiting
Sexual Misconduct,
Relationship Violence and
Stalking
(SexualMisconductPolicy/index)**

## All-gender bathrooms at Point Park

All gender bathrooms are available in multiple buildings around campus. All students, staff, faculty and visitors are welcome to use these facilities or any bathroom that corresponds to the gender with which they identify.



**Apply**
(../../apply)

**Request Info**
(../../Admissions/Request-
Info-Form)

**A-Z Quicklinks**
(../../Quicklinks)

**My Point Park**
(../../myPointPark/index)

📧 **Contact Us**
(../../contact)



← **Employment Listings (index)**

([../../index](../../index))

**ABOUT US
(../../ABOUT/INDEX)**

**ACADEMICS
(../../ACADEMICS/INDEX)**

**ADMISSIONS &
FINANCIAL AID
(../../ADMISSIONS/INDEX)**

**CAREER-READY
(../../CAREERREADY/INDEX)**

**STUDENT LIFE
(../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply
(../../apply)**

**Request Info
(../../Admissions/Request-Info-Form)**

**A-Z Quicklinks
(../../Quicklinks)**

**My Point Park
(../../myPointPark/index)**

🖷 **Contact Us
(../../contact)**

## Nondiscrimination Statement

# Nondiscrimination Statement

## Nondiscrimination, Equal Opportunity and Diversity Initiatives

This policy affirms Point Park University's commitment to nondiscrimination, equal opportunity and the pursuit of diversity. Point Park University does not discriminate on the basis of: sex, race, ethnicity, religion, color, national origin, age (40 years and over), ancestry, individuals with disabilities, veteran status, sexual orientation, gender, gender identity, height, weight, genetic information, marital status, caregiver status or familial status, in the administration of any of its educational programs, activities or with respect to employment or admission to the University's educational programs and activities.

This policy is in accord with local, state and federal laws, including Title VI of the Civil Rights Act of 1964, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, Age Discrimination Act of 1975 and the Pittsburgh Human Relations Act. Inquiries regarding these regulations and policies, or complaints of discrimination, should be referred to the vice president of human resources, phone number 412-392-3952. Inquiries regarding Title IX and the



U N I V E R S I T Y

← **Employment Listings (index)**

# Nondiscrimination Statement

(../../index)

**ABOUT US (../../ABOUT/INDEX)**

**ACADEMICS (../../ACADEMICS/INDEX)**

**ADMISSIONS & FINANCIAL AID (../../ADMISSIONS/INDEX)**

**CAREER-READY (../../CAREERREADY/INDEX)**

**STUDENT LIFE (../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply (../../apply)**

**Request Info (../../Admissions/Request-Info-Form)**

**A-Z Quicklinks (../../Quicklinks)**

**My Point Park (../../myPointPark/index)**

💬 **Contact Us (../../contact)**

Title IX regulations should also be referred to the Title IX coordinator or to the deputy Title IX coordinators.

The **Title IX Coordinator, Vanessa Love**, may be reached at vlove@pointpark.edu (mailto:%20vlove@pointpark.edu), 412-392-3980, or 201 Wood Street, 703 Student Center.

Find Point Park's Title IX (../../StudentLife/TitleIX/index) information resources, including the Notice of Nondiscrimination and Sexual Misconduct Policy.



← **Employment Listings (index)**

## Code of Conduct

(../../index)

**ABOUT US**
**(../../ABOUT/INDEX)**

**ACADEMICS**
**(../../ACADEMICS/INDEX)**

**ADMISSIONS & FINANCIAL AID**
**(../../ADMISSIONS/INDEX)**

**CAREER-READY**
**(../../CAREERREADY/INDEX)**

**STUDENT LIFE**
**(../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply**
**(../../apply)**

**Request Info**
**(../../Admissions/Request-Info-Form)**

**A-Z Quicklinks**
**(../../Quicklinks)**

**My Point Park**
**(../../myPointPark/index)**

🖥 **Contact Us**
**(../../contact)**

# Code of Conduct

### CODE OF CONDUCT

**Application**

This Code of Conduct Policy (the "Code ") applies to all staff (hereinafter referred to as "employees") of Point Park University (the "University"). The Code applies to all employee decisions and activities within the scope of employment, or when representing the University in any capacity. A copy of the Code will be provided at orientations for new employees. Existing employees will be asked to review the Code each time it is amended, or at least annually. All University supervisors should be familiar with the requirements of the Code, and should encourage employees to apply the Code to their daily activities and decisions, and to seek guidance from the appropriate individuals when additional information or explanation is needed.

Copies of the Code may be obtained from the Assistant Vice President of Human Resources. The Code will also be referenced in any staff handbooks and can be found on the University's website.

**Purpose and Principles**

As members of the Point Park University community, employees are responsible for sustaining the highest ethical



← **Employment Listings (index)**

# Code of Conduct

(../../index)

**ABOUT US**
**(../../ABOUT/INDEX)**

**ACADEMICS**
**(../../ACADEMICS/INDEX)**

**ADMISSIONS &**
**FINANCIAL AID**
**(../../ADMISSIONS/INDEX)**

**CAREER-READY**
**(../../CAREERREADY/INDEX)**

**STUDENT LIFE**
**(../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply**
**(../../apply)**

**Request Info**
**(../../Admissions/Request-Info-Form)**

**A-Z Quicklinks**
**(../../Quicklinks)**

**My Point Park**
**(../../myPointPark/index)**

🗐 **Contact Us**
**(../../contact)**

standards of this institution, and of the broader community in which we operate. Individuals acting on behalf of the University have a general duty to (i) conduct themselves in a manner that will maintain and strengthen the public's trust and confidence in the integrity of the University, (ii) take no actions incompatible with their obligations to the University, and (iii) conduct themselves in accordance with the principles set forth herein.

Each University employee shall:

1. Engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal interests and the interests of the University.

2. Maintain an ongoing commitment to honesty, trustworthiness and responsibility by acting in a reliable and dependable manner, and by treating others with impartiality

3. Act as stewards of University property and resources by exercising custodial responsibility and appropriate care and maintenance over such property.

4. Provide fair, accurate, timely, and understandable information in any report, press release, marketing and advertising materials, or any other materials shared with the general public, governmental agencies or other persons or entities with which the University has dealings.



← **Employment Listings (index)**

# Code of Conduct

(../../index)

**ABOUT US**
(../../ABOUT/INDEX)

**ACADEMICS**
(../../ACADEMICS/INDEX)

**ADMISSIONS & FINANCIAL AID**
(../../ADMISSIONS/INDEX)

**CAREER-READY**
(../../CAREERREADY/INDEX)

**STUDENT LIFE**
(../../STUDENTLIFE/INDEX)

Search 🔍

**Apply**
(../../apply)

**Request Info**
(../../Admissions/Request-Info-Form)

**A-Z Quicklinks**
(../../Quicklinks)

**My Point Park**
(../../myPointPark/index)

🖿 **Contact Us**
(../../contact)

5. Comply with the laws of federal, state and local governments that are applicable to the University, and the rules and regulations of private and public regulatory agencies that have jurisdiction over the University.

6. Protect the confidentiality of non-public information about the University and its students, including, but not limited to, student records, employee personal or medical files, and contracts and agreements with third parties, in order to prevent the unauthorized disclosure of such information. This does not prohibit employees from disclosing and discussing their own or other employees' terms and conditions of employment.

7. Promptly report any suspected violation of this Code to the University's Assistant Vice President of Human Resources, or as otherwise provided for herein.

**Ethical Standards**

High ethical standards depend ultimately on a climate that encourages them. An abiding spirit of high ethical standards never can be supplied by a piece of paper. The University takes pride in the ethical spirit of its employees and continues to rely upon the actions of the employees to make the University a trusted and respected member of the community. The mere appearance of misconduct or impropriety can be damaging to the University, therefore,



← **Employment Listings (index)**

## Code of Conduct

(../../index)

**ABOUT US (../../ABOUT/INDEX)**

**ACADEMICS (../../ACADEMICS/INDEX)**

**ADMISSIONS & FINANCIAL AID (../../ADMISSIONS/INDEX)**

**CAREER-READY (../../CAREERREADY/INDEX)**

**STUDENT LIFE (../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply (../../apply)**

**Request Info (../../Admissions/Request-Info-Form)**

**A-Z Quicklinks (../../Quicklinks)**

**My Point Park (../../myPointPark/index)**

🗒 **Contact Us (../../contact)**

the University and its employees must strive at all times to maintain the highest standards of quality and integrity.

University employees must conduct all business on behalf of the University in a professional, honest and ethical manner and must adhere to these standards when dealing with the University's students, parents, vendors, and each other. University members must not make false or misleading statements to any entity doing business with the University, or to any student, employee, law enforcement personnel or representative of any governmental or quasi-governmental entity.

**Confidential and Proprietary Information**

Community members receive and generate on behalf of the University various types of confidential, proprietary and private information, including, but not limited to, student records, employee personnel and medical files, contracts and agreements with third parties, business plans, University policies and procedures, security, methods of doing business, computer software and databases, trade secrets, research, inventions and other intellectual property interests of the University or its employees or students. This information is not to be disclosed to anyone outside of the University or used directly or indirectly for personal benefit or for the benefit of any third party who is not entitled to such information. Moreover, it is essential for the operation of the



← **Employment Listings (index)**

# Code of Conduct

(../../index)

**ABOUT US
(../../ABOUT/INDEX)**

**ACADEMICS
(../../ACADEMICS/INDEX)**

**ADMISSIONS &
FINANCIAL AID
(../../ADMISSIONS/INDEX)**

**CAREER-READY
(../../CAREERREADY/INDEX)**

**STUDENT LIFE
(../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply
(../../apply)**

**Request Info
(../../Admissions/Request-
Info-Form)**

**A-Z Quicklinks
(../../Quicklinks)**

**My Point Park
(../../myPointPark/index)**

📑 **Contact Us
(../../contact)**

University that each University employee comply with all federal laws, agreements with third parties, and University policies and principles pertaining to the use, protection and disclosure of such information, and such obligations shall apply even after the University employee's relationship with the University ends. Nothing in this policy prohibits employees from disclosing and discussing their own or other employees' terms and conditions of employment.

In accordance with the Family Educational Rights and Privacy Act (FERPA) student information contained in educational records is generally prohibited from being released to third parties without the student's written consent.

University employees shall treat as confidential all personal files, payroll records, disciplinary records and all other similar information relating to its employees. This information will not intentionally be shared with anyone, except with those who need access to such information to perform their job responsibilities.

University employees shall treat as confidential and protect personally identifying information of students, potential students and their families, including social security numbers, birth dates, credit card numbers, bank account locations and other similar financial information. University employees shall comply with all federal, state and local



← **Employment Listings (index)**

# Code of Conduct

(../../index)

**ABOUT US**
**(../../ABOUT/INDEX)**

**ACADEMICS**
**(../../ACADEMICS/INDEX)**

**ADMISSIONS &**
**FINANCIAL AID**
**(../../ADMISSIONS/INDEX)**

**CAREER-READY**
**(../../CAREERREADY/INDEX)**

**STUDENT LIFE**
**(../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply**
**(../../apply)**

**Request Info**
**(../../Admissions/Request-**
**Info-Form)**

**A-Z Quicklinks**
**(../../Quicklinks)**

**My Point Park**
**(../../myPointPark/index)**

🖳 **Contact Us**
**(../../contact)**

laws in connection with this obligation (including, but not limited, the Gramm Leach Bliley Act, as applicable).

## Conflict of Interest

As an institution, the University is judged not only on the collective actions of University employees, but on their individual actions as well. Accordingly, each University employee must manage his or her personal and business affairs legally and ethically, and so as to avoid situations that might lead to a conflict or the suspicion of a conflict between his or her self-interest and his or her duty to the University, our students and the public in general. University employees' primary professional allegiance shall be to the University and its mission to promote education, research and scholarship. A potential or actual conflict of interest exists when a University employee's obligations to the University may be compromised by their other interests or commitments, especially economic, and specifically when those interests or commitments are not disclosed. Although not all conflicting interests are prohibited, those involving the potential for self-gain or gain by a third party to whom the University employee is related can undermine the judgment or objectivity of the University employee, resulting in compromise to the primary obligation to the University. In addition, bias or the appearance of bias may undermine community trust in the University.



← **Employment Listings (index)**

# Code of Conduct

(../../index)

**ABOUT US
(../../ABOUT/INDEX)**

**ACADEMICS
(../../ACADEMICS/INDEX)**

**ADMISSIONS &
FINANCIAL AID
(../../ADMISSIONS/INDEX)**

**CAREER-READY
(../../CAREERREADY/INDEX)**

**STUDENT LIFE
(../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply
(../../apply)**

**Request Info
(../../Admissions/Request-
Info-Form)**

**A-Z Quicklinks
(../../Quicklinks)**

**My Point Park
(../../myPointPark/index)**

🖳 **Contact Us
(../../contact)**

Full-time University employees shall not, without approval of the President perform or render services to any competitor of the University, or with any entity with which the University conducts business or seeks to conduct business, which may conflict with the employee's obligations and responsibilities to the University. All University employees must obtain permission from the President before they may take a position on the Board of Trustees or Directors of any entity whose interest may conflict with the University.

University employees are prohibited from accepting, from third parties (including staff, faculty or students) gifts, favors, services or anything of value in a situation where decision-making or actions affecting the University may be influenced. University employees are prohibited from providing, to third parties (including staff, faculty or students) gifts, favors, services or anything of value in a situation where decision-making or actions affecting the third party recipient may be influenced. Notwithstanding the previous, gifts of nominal value, or gifts customarily given and generally viewed as appropriate in the business, may be accepted without violation of this provision. University employees shall exercise good judgment in making this determination, and should seek additional guidance in the event there is any question as to whether a particular gift violates this policy.



← **Employment Listings (index)**

# Code of Conduct

(../../index)

**ABOUT US**
(../../ABOUT/INDEX)

**ACADEMICS**
(../../ACADEMICS/INDEX)

**ADMISSIONS & FINANCIAL AID**
(../../ADMISSIONS/INDEX)

**CAREER-READY**
(../../CAREERREADY/INDEX)

**STUDENT LIFE**
(../../STUDENTLIFE/INDEX)

Search 🔍

**Apply**
(../../apply)

**Request Info**
(../../Admissions/Request-Info-Form)

**A-Z Quicklinks**
(../../Quicklinks)

**My Point Park**
(../../myPointPark/index)

🗐 **Contact Us**
(../../contact)

In order to protect the University mission, University employees with other professional or financial interests shall disclose them. The University strongly encourages employees to disclose to the appropriate dean or department head, VP or department director, their outside commitments on a regular basis (e.g., during annual departmental reviews, evaluations, or whenever those commitments undergo significant change.) In the event that potential conflicts cannot be resolved at this level, they should be referred to the Assistant Vice President of Human Resources.

**Financial Reporting**

All University accounts, financial reports, tax returns, expense reimbursements, time sheets and other documents, including those submitted to governmental agencies, must be accurate, clear and complete. All entries in University books and records, including departmental accounts and individual expense reports, must accurately reflect each transaction. All University employees shall fully comply with any and all guidelines and best business practices implemented by the Audit Committee from time to time. University employees are prohibited from directly or indirectly taking any action to fraudulently influence, coerce, manipulate or mislead the University's independent public auditors for the purpose of causing the financial statements of the University to be misleading.



← **Employment Listings (index)**

# Code of Conduct

(../../index)

**ABOUT US**
**(../../ABOUT/INDEX)**

**ACADEMICS**
**(../../ACADEMICS/INDEX)**

**ADMISSIONS & FINANCIAL AID**
**(../../ADMISSIONS/INDEX)**

**CAREER-READY**
**(../../CAREERREADY/INDEX)**

**STUDENT LIFE**
**(../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply**
**(../../apply)**

**Request Info**
**(../../Admissions/Request-Info-Form)**

**A-Z Quicklinks**
**(../../Quicklinks)**

**My Point Park**
**(../../myPointPark/index)**

💬 **Contact Us**
**(../../contact)**

## Compliance with Laws

All University employees must transact University business in compliance with applicable federal, state and local laws, regulations, and University policy and procedure. Only individuals who have authority delegated by an appropriate University official are authorized to enter into agreements on behalf of the University that create binding legal obligations on the University. University employees must adhere to good health and safety practices and ensure compliance with all environmental health and safety laws and regulations. University employees must not engage in criminal activities.

University employees must refrain from activities that might endanger the University tax-exempt status, including lobbying and political activities. University employees, as private citizens, may participate or contribute to political campaigns or organizations, but must do so as individuals and not as representatives of the University.

University employees must conduct all business with government bodies in an ethical and professional manner, and in accordance with all federal, state and local laws. Any attempt by a University employee to influence a governmental entity in an unlawful manner, whether by an offer of any benefit, or otherwise, is strictly prohibited.

### Discrimination



Employment Listings (index)

# Code of Conduct

(../../index)

**ABOUT US**
**(../../ABOUT/INDEX)**

**ACADEMICS**
**(../../ACADEMICS/INDEX)**

**ADMISSIONS &**
**FINANCIAL AID**
**(../../ADMISSIONS/INDEX)**

**CAREER-READY**
**(../../CAREERREADY/INDEX)**

**STUDENT LIFE**
**(../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply**
**(../../apply)**

**Request Info**
**(../../Admissions/Request-Info-Form)**

**A-Z Quicklinks**
**(../../Quicklinks)**

**My Point Park**
**(../../myPointPark/index)**

🗩 **Contact Us**
**(../../contact)**

No University employee shall discriminate on the basis of race, color, national origin, sex, age, religion, ancestry, disability, veteran, sexual orientation, genetic information, marital, caregiver status, familial status, or any other characteristic protected by applicable federal, state, or local law, in its administration of educational programs or activities, or with respect to admissions or employment in accordance with State and Federal laws. University employees shall take reasonable measures to ensure that all contractors and suppliers of materials or services to the University comply with applicable antidiscrimination laws so long as such third parties are engaged in a business relationship with the University.

**Use of University Resources**

University resources must be reserved for purposes of the University and used in furtherance of the University mission. They may not be used for personal gain, and may not be used personally at all except in a manner that is incidental and reasonable in light of the University employee's duties. University employees shall act as custodians of University property and shall take steps to see that the necessary maintenance is performed to ensure the integrity of University property for future generations of employees.

**Reporting Suspected Violations**

1. Reporting



← **Employment Listings (index)**

# Code of Conduct

(../../index)

**ABOUT US**
**(../../ABOUT/INDEX)**

**ACADEMICS**
**(../../ACADEMICS/INDEX)**

**ADMISSIONS &**
**FINANCIAL AID**
**(../../ADMISSIONS/INDEX)**

**CAREER-READY**
**(../../CAREERREADY/INDEX)**

**STUDENT LIFE**
**(../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply**
**(../../apply)**

**Request Info**
**(../../Admissions/Request-Info-Form)**

**A-Z Quicklinks**
**(../../Quicklinks)**

**My Point Park**
**(../../myPointPark/index)**

💬 **Contact Us**
**(../../contact)**

Those acting on behalf of the University shall seek appropriate guidance when faced with ethical dilemmas. Please contact the University's Assistant Vice President of Human Resources for guidance or to report a suspected violation of this Code, except as set forth below. In the event that a suspected violation arises out of conduct by an individual or individuals in the human resources department, such potential violations should be directed to the University President's office. In the event that a suspected violation arises out of conduct by an individual or individuals in the President's office, such potential violations should be directed to the Chairman of the Board of Trustees.

2. Confidentiality

Reports of suspected violations of this Code will be handled with discretion, and shared only on a need to know basis. Reports may be made anonymously.

3. No Retaliation

Retaliation against anyone for reporting an actual or suspected violation of this policy is prohibited and will not be tolerated.

4. Cooperation

All University employees are expected to cooperate fully in the investigation of any alleged violation of this Code

5. Discipline



← **Employment Listings (index)**

# Code of Conduct

(../../index)

**ABOUT US
(../../ABOUT/INDEX)**

**ACADEMICS
(../../ACADEMICS/INDEX)**

**ADMISSIONS &
FINANCIAL AID
(../../ADMISSIONS/INDEX)**

**CAREER-READY
(../../CAREERREADY/INDEX)**

**STUDENT LIFE
(../../STUDENTLIFE/INDEX)**

Search 🔍

**Apply
(../../apply)**

**Request Info
(../../Admissions/Request-
Info-Form)**

**A-Z Quicklinks
(../../Quicklinks)**

**My Point Park
(../../myPointPark/index)**

💬 **Contact Us
(../../contact)**

Failure to comply with the University's Code and policies could result in disciplinary action, up to and including termination. The severity of the discipline depends on the nature of the violation.

**Conclusion**

This Code, while it does not provide exhaustively specific detail of what one should and should not do, is intended to communicate the University's overall expectations of proper conduct and what professional conduct the University values from its employees. The Code is intended to reinforce the principle that each and every one of us, including University officials and the Board of Trustees, has a responsibility to help ensure that Point Park University conducts its business and pursues its mission in a legal and highly ethical manner.

COLLECTIVE BARGAINING AGREEMENT

BETWEEN

POINT PARK UNIVERSITY ("UNIVERSITY")

AND

NEWSPAPER GUILD OF PITTSBURGH / COMMUNICATION WORKERS OF
AMERICA, LOCAL 38061, AFL-CIO, CLC ("UNION")

AUGUST 28, 2017 – JUNE 30, 2021

applicable law; or,

f) when a third party is paying an employee and the University does not retain control over the payment of wages.

Notwithstanding the foregoing language, nothing in this Section 7 shall be construed as to relieve the University from making dues deduction or paying arrears when the University is paying an employee, but receives funding for an employee's paycheck from an external source.   The University will resume dues deduction if a faculty member on layoff status or on an agreed leave of absence returns to work, however, the University shall be relieved from paying arrears arising from an absence covered by Section 7(a)-(f) above. If a terminated faculty member is rehired, Union membership dues or agency fee deduction will recommence only upon execution of a new authorization for deduction.

Section 8      The University assumes no obligation, financial or otherwise, as a result of complying with the terms of this Article and the Union agrees that it will indemnify and hold the University, its Board of Trustees and agents harmless from any claim, action, omission or proceeding by any faculty member arising from deductions made by the University under this Article.  Once the funds are transmitted to the Union, their disposition thereafter shall be the sole and exclusive obligation and responsibility of the Union.

## ARTICLE 7 - ACADEMIC FREEDOM

Section 1      Faculty members are entitled to full freedom in research and in the publication of the results, subject to the adequate performance of their other academic duties.  A faculty member's freedom to engage in research and publication of the results, as reflected in this section, shall not be interpreted as automatic satisfaction of any conditions necessary for advancement in academic rank.

10

Section 2     Faculty members also are entitled to freedom in the classroom or analogous studio or workshop in discussing their subject, but they should be careful not to introduce into their teaching material that does not reasonably promote learning of the subject matter.  In exercising academic freedom, faculty members are expected to exercise appropriate discretion and good judgment.  Faculty members are entitled to select materials to be utilized in the presentation of the subject, determine the approach to the subject, make assignments, and assess student performance with respect to academic activities for which faculty members are individually responsible to teach.  Nothing in this Article shall be interpreted to preclude the University from adopting reasonable policies and curriculum requirements that are not inconsistent with the provisions of this Article.  Additionally, nothing in this section shall be interpreted as allowing a faculty member to alter the University-determined modality of the course.

Section 3     When faculty members speak or write outside the classroom and the University, they should be free from institutional censorship or discipline, but their special position in the community imposes special obligations.  Faculty members should remember that the public may judge their profession and the University by their utterances.  Therefore, they should at all times be accurate and should exercise appropriate restraint.  Additionally, when speaking and/or writing outside of the classroom, faculty members shall not attribute their personal views as those of the University unless expressly authorized to do so. If circumstances arise where it is not clear whether a faculty member is speaking in her/his personal capacity or on behalf of the University, the faculty member has an affirmative obligation to clarify that s/he is not speaking for the University, unless expressly authorized to do so.  The University assumes no responsibility for the extramural statements of faculty members.

11



# Adjunct Faculty Handbook

**Edited by the Office of Academic and Student Affairs**

**Updated February 2013**

Sanctions that will be imposed by Point Park University for employees and students found to be in violation of Point Park's policy on the unlawful possession, use, or distribution of illicit drugs and alcohol may include immediate termination of employment and referral for prosecution.

Finally, Point Park University is concerned about the well-being of its employees and encourages any employee with a drug or alcohol problem to seek prompt treatment. Point Park offers a free Employee Assistance Program (EAP), a service that assists with a wide variety of life challenges. To consult with an EAP counselor or to make an appointment, call 412-647-3698 or visit the website at www.eapsolutions.com.

**4.8 Non-Smoking Policy**
Effective August 1, 2008, smoking of any materials is prohibited in all University facilities, at all locations, including all enclosed locations in buildings. All sidewalks adjacent to all University buildings are smoke-free except in the designated smoking area located behind the West Penn Building (corner of First Avenue and Wood Street).

**4.9    Academic Freedom**

*4.9.1   Academic Research and Publication*
The primary purpose of education is the search for truth and its free exposition. Every faculty member has the right and the duty to participate freely in searching after and communicating truth. The faculty member is entitled to full freedom in research and in the publication of the results, subject to the adequate performance of his/her other academic duties. The faculty member is entitled to freedom in the classroom in discussing his/her subject.

*4.9.2 Boundaries to Academic Freedom*
Every faculty member must be free to adapt individual methods to the conditions under which he/she works, to the faculty member's personality, and the talents and characters of the students. His/her choice of doctrine must be determined for him/her by its truth and not by public opinion or political policy, nor by the personal whims of university founders, administrators, or benefactors, nor by tyranny of any group. Truth and intellectual progress demand freedom for original research and the communication of its results.

However, academic freedom, as with all freedom, implies order, and order implies boundaries or limits. Among these limits are, first, the impassable barrier of positive fact and, second, a recognition that personal sincerity or even subjective conviction is not a guarantee against error. The faculty member can and should present to the students newly discovered facts and laws, new developments or new application of old knowledge, new theories that may be advanced in explanation of known physical, political, or social data. But he/she cannot and should not teach as true what he/she knows to be false or teach as a fact or as a universal law what is yet but hypothesis or theory. If the faculty member wishes to communicate personal opinions, he/she has an obligation to label them as opinions and not as facts.

*4.9.3 Academic Freedom and Adjunct Faculty*
Academic freedom will be accorded not only to faculty members with tenure but also, during the terms of their appointments, to others with probationary or temporary status who are engaged in

teaching. Moreover, reappointment will not be denied, nor any other adverse action taken, for reasons that violate academic freedom.

### 4.9. 4 University Copyright Policy
Publications by faculty member may be classified under the following headings:
1. Publication of the results of independent research.
2. Publication of instructional materials related to University duties, such as text books, manuals, and bibliographies.
3. Publication of material resulting from a specific assignment by the University as part of regular University duties.

The rights and obligations of the faculty member under each of these categories respectively will be as follows:

1. The results of original research are the full property of the writer, unless an agreement stating otherwise has been entered upon with the University. Publications which have been subsidized through the University, however, either by released time from regular duties or by grants to or from the University, must have such subsidy acknowledged in a preface, footnote, or other appropriate location.
2. The use of textbooks and other instructional materials in the University that have been written or developed by members of the faculty is proper within the appropriate curricular areas. However, no royalties or other financial profit derived from use at Point Park may accrue to faculty members. Any royalties or profit must be assigned to the University. Royalties or other financial profit as a result of use outside the Point Park may accrue to the faculty member.
3. Unless there is written agreement to the contrary, the University will have full possession and rights of all publications resulting from a specific assignment to a faculty member. All royalties and other revenue will accrue to the University.

### 4.9.5 Faculty Members as Citizens
The university faculty member is a citizen, a member of a learned profession and an educational institution. When a faculty member speaks or writes as a citizen, he/she should be free from institutional censorship or discipline. A faculty member's expression of opinion as a citizen cannot constitute grounds for dismissal unless it clearly demonstrates the faculty member's lack of fitness for his/her position.

However, his/her special position in the university community imposes special obligations. As a man/woman of learning, he/she should remember that the public may judge a faculty member's profession and institution by his/her utterances. Hence, he/she should at all times be accurate, exercise appropriate restraint, show respect for the opinion of others, and make every effort to indicate that he/she is not an institutional spokesperson.

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

CHANNA NEWMAN,                                CIVIL DIVISION

       Plaintiff,                                GD-19-016752

       v.

POINT PARK UNIVERSITY,

       Defendant.

### CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania Case Records of Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

                                    Respectfully Submitted,

Date: Jan. 9, 2020                          s/James B. Lieber
                                          James B. Lieber
                                        Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on the 9th day of January, 2020, a true and correct copy of the foregoing was served via U.S. regular mail and electronic mail on the following:

> Catherine S. Ryan, Esq.
> David J. McAllister, Esq.
> Reed Smith, LLP
> 225 Fifth Ave., Suite 1200
> Pittsburgh, PA 15232
> Counsel for Defendant Point Park University

s/James B. Lieber