## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHANNA NEWMAN, | ) | Civil Action No. 2:20-cv-00204-MRH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| POINT PARK UNIVERSITY, | ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | Filed Electronically |

### AMENDED COMPLAINT IN CIVIL ACTION

AND NOW comes Plaintiff, Channa Newman, Ph.D. (Dr. Newman), by and through undersigned counsel, and files this Amended Complaint in Civil Action stating claims under 42 U.S.C. § 1981, Title VII (42 U.S.C. § 2000e), the Age Discrimination in Employment Act (ADEA) (29 U.S.C. § 621 et seq.), Title IX (20 U.S.C. § 1681 et seq.), the Pennsylvania Human Relations Act (PHRA) (43 P.S. §§ 951-963) and common law, stating as follows:

### I. PARTIES

1.      Dr. Newman is an adult residing in Allegheny County, Pennsylvania.

2.      Defendant Point Park University (Point Park or PPU) is a non-profit post-secondary institution with its primary place of business at 201 Wood Street, Pittsburgh, PA 15222.

### II. JURISDICTION

3.      The jurisdiction of this Court over the matters set forth in this Complaint is founded upon 42 U.S.C. § 2000e-5(f)(3), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

### III. VENUE

4.      The facts set forth this Complaint occurred in Allegheny County, Pennsylvania, therefore, jurisdiction is properly before this Court.

## IV.  ADMINISTRATIVE EXHAUSTION

5.      On February 20, 2019, Dr. Newman filed an administrative charge with the U.S. Equal Employment Opportunity Commission (EEOC) that stated claims for discrimination on the basis of race, sex, religion, national origin, and age; this charge further stated that Dr. Newman was the target of a hostile work environment.

6.      The aforementioned charge was docketed by the EEOC at 533-2019-00922.

7.      Dr. Newman dual-filed her charge with the Pennsylvania Human Relations Commission (PHRC) and now more than one year has passed enabling her to bring claims under the PHRA.

8.      On August 29, 2019, the EEOC issued a "Right to Sue" notice allowing her to bring her claims in court.

9.      On November 20, 2019, Dr. Newman through counsel dual-filed a new charge of discrimination and retaliation with the EEOC (docketed as 533-2020-00472) and the PHRC; on or about February 24, 2020, the EEOC issued a "Right to Sue" notice allowing her to bring her claims in court.

## V.  FACTS

10.     Dr. Newman is employed by Point Park University as a full Professor of French and Cultural Studies.

11.     Dr. Newman is the Chair of the Department of Humanities & Social Sciences (HSS).

12.     Dr. Newman was hired by Point Park over 55 years ago in 1964.

13.     Dr. Newman is female, born in 1942 and of Jewish ancestry and ethnicity.

2

14.    Dr. Newman holds U.S., Israeli, and Czech citizenship.

15.    Dr. Newman is the sole Israeli faculty member at Point Park.

16.    Since at least 2016 Point Park has advertised on its website the national origin of its foreign faculty members including that Dr. Newman is from Israel and the Czech Republic.

17.    Dr. Newman is one of the oldest faculty members at Point Park.

18.    Dr. Newman was instrumental in the hirings of Robert Ross, Ph.D. (Dr. Ross) and J. Dwight Hines, Ph.D. (Dr. Hines) and initially had good relations with them.

19.    Dr. Ross used his position to promote highly anti-Zionist views and activities;  Dr. Hines supported Dr. Ross in these endeavors.

20.    Dr. Ross used his position to foster the Boycott, Divestment and Sanctions (BDS) movement against Israel.

21.    The militant version of the BDS that Dr. Ross promulgated included economic as well as the academic and cultural boycott of Israel and Israelis.

22.    According to the United States Department of State and United States Department of Education (which provides funds to Point Park and its students) virulent anti-Israel activity is anti-Semitic when it deligitimizes Israel by "denying the Jewish people their right to self-determination" and "applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation."

23.    Upon information and belief, Dr. Ross with Point Park support has advanced militant and hateful views against Israel and in favor of BDS that are anti-Semitic and lead to the creation of  a hostile work environment for Dr. Newman including shunning and disrespect by student followers, and some faculty, administrators and alumni.

3

24.     Dr. Ross' tools have included teaching, speaking, social media, writing, and taking PPU students on trips including with substantial University support financially and/or with scheduling.

25.     Not long after his hiring, Dr. Ross told Dr. Newman who was his superior as the Coordinator of Global Cultural Studies (GCS) that he wanted to take students to the Palestinian refugee camps in Lebanon; Dr. Ross also asked for Point Park to hire a translator which struck Dr. Newman as strange since Dr. Ross represented at his interview that he spoke Arabic.

26.     Dr. Newman suggested that in order to give his students a fuller perspective that they should also visit Israel and Jordan.

27.     Dr. Ross declined stating that "my Hezbollah friends would disown me if I went to Israel."

28.     Hezbollah is a political, terrorist, paramilitary organization and Iran proxy dedicated to the destruction of Israel and to the preservation of Assad regime in Syria.

29.     Dr. Newman received information including reports from students and syllabi indicating that Dr. Ross was using his courses to promote a bias against Israel.

30.     Dr. Ross' course titled "Political Geography of the Middle East" actually  is largely focused on the Israel Palestine controversy and contains required reading on BDS.

31.     Dr. Ross served as social media site administrator for the Facebook page of the Israel Palestine Mission Network (IPMN) that carries anti-Semitic, racist, and extremist content including posts that Zionist Jews control America, the media, and the government; that Zionist Jews are warmongers; that European Jews are not Semitic but descended from Khazars and have no ethnic connection to Israel; that Zionism is racism; and that Israel/Zionism can be equated with Nazism

4

and/or apartheid.

32.     In his course "Political Geography of South Africa," Dr. Ross gratuitously weaves in  Palestine and presents Israel as an "apartheid" state which is false, deeply offensive, and racist.

33.     Dr. Newman asked Dr. Ross if he would also present views which she felt to be more balanced either through herself or others and less biased in teaching the Middle East, but he declined.

34.     In or about 2015, Dr. Ross suddenly tried to introduce a core course entitled "Israel: A Settler State" for *all* Point Park first year students through the department then known as Humanities and Human Sciences (HHS) and chaired by Psychology Professor Brent Robbins.

35.     Professor Robbins is sympathetic to Dr. Ross' views on the Middle East and hostile to Dr. Newman.

36.     The debate in the Department was heated since "Settler State" is a virulently anti-Zionist theme that delitigitmizes Israel, and was also seen as anti-Semitic by some faculty.

37.     The course was supported by Dr. Robbins, but Dr. Ross later apparently withdrew it.

38.     Dr. Ross and Dr. Hines successfully pushed for Dr. Newman's removal as Coordinator of Global Cultural Studies (GCS) which was against PPU rules since this was an administrative appointment.

39.     Dr. Ross also sought to start a new program in Social Justice that Provost Karen McIntyre did not approve in part because it seemed too religious.

40.     Dr. Ross supports a form of Christian theology that is anti-Zionist and opposed to the fundamental first Biblical position.

5

41.     Dr. Ross does not advocate the academic or cultural boycott of any other nation besides Israel.

42.     Dr. Ross does not recognize the legitimacy of Israel as a Jewish state.

43.     Dr. Ross does not criticize any ethnic or religious group in Israel besides Jews.

44.     Dr. Ross made efforts to expose Point Park students to anti-Zionist content including programs containing this theology.

45.     Students and faculty allied with Dr. Ross began to shun Dr. Newman, the sole Israeli on the faculty.

46.     Some students with the assent of the administration began evading required courses taught by Dr. Newman as well as avoiding having Dr. Newman as an advisor.

47.     Dr. Newman questioned whether Dr. Ross' publications were university grade academic material or whether they were activist BDS propaganda including in anti-Semitic and/or anti-Israel sources such as Mondoweiss, Electronic Initifada, and Friends of Sabeel instead of appearing in normal scholarly outlets.

48.     On November 9, 2015 at 2:40 p.m., Dr. Robbins convened a regular Departmental Meeting with an agenda item labeled "Kudos: Bob Ross Publications and Presentations."

49.     None of the other faculty members had their publications and presentations singled out or commented upon.

50.     Following the meeting on November 9, 2015 at 3:50 p.m., Dr. Robbins sent a memo to all Department faculty as a "follow-up" to "congratulate Bob Ross from (sic) his most recent publications and presentations," that appears below in pertinent part:

"From Brent Robbins:

6

Sent: Mon Nov 9, 2015 3:50 PM
To Newman, Channa; Russell, Julie;  Allen, Matthew, Bell, Kim, Fessler, Robert, Firestone, Nathan, Hines, J.Dwight,  Homayounfar, Bahman; McInerney, Robert, Meena, Edward, Olfmand, Sharna; Purcell, William; Reis, Jehnie; Ross, Robert; Schulz, Sarah
Subject: Re HHS Dept. Meeting Agenda

Dear HHS Faculty,

As a follow up to our meeting, as discussed, I would like to congratulate Bob Ross from (sic) his most recent publications and presentations, which are as follows:

Publications:

"One Year Later, Gaza Is Still in Crisis" Mondoweiss. Http://mondoweiss.net/2015/08/later-still-crisis.August 26, 2015

"An update on Gaza from IPMN's Chair of Advocacy, Bob Ross. "Israel/Palestine Mission Network of the Presbyterian Church (U.S.A.) . Http://us4.campaign-archive1.com/?u=5d6af22c768b84cc207e514bf&id=37c449c0e0&e=f8b84fc04b. August 26, 2015

"Letter to the Editor: BDS Distorted. " Pittsburgh Tribune-Review. June 23, 2015

"Letter to the editor: Criticism of Israel is not Anti-Semitism" Pittsburgh Post Gazette. April 16, 2015.

Presentations:

"Boycott, Divestment, Sanctions Workshop," with Tory Smith, Friends of Sabeel North America Pittsburgh Conference, Oct 2015.

"Building a BDS Campaign and Coalition: Lessons from the Past, Present and Future," with Sydney Levy, Nashiha Alam Amal Ali and Taher Herzallah, 2015 Gathering of the Interfaith Network for Justice in Palestine, Stony Point, NY Aug 2015.

"Understanding the Opposition: The Anti BDS Movement in the Presbyterian Church USA) and Beyond," International Conference of Critical Geography, Ramallah, Palestine, July 2015

"Academic Boycott Strategy Open Workshops" (Facilitator), International Conference of Critical Geography, Ramallah, Palestine, July 2015

"Successful Divestment Campaigns in the US Churches" Canadian Friends of Sabeel conference, Vancouver, BC, April 2015

"Critical Pedagogy in Geography: Teaching Israel/Palestine as Settler Colonialism" Annual Meeting of the Assoc. Of American Geographers, Chicago, April 2015.

Impressive!"

51.     In or about 2016, Psychology left the Humanities and Human Sciences Department to form a separate department with Dr. Brent Robbins as its Chair.

52.     The remaining department became known as Humanities and Social Sciences (HSS), a still substantial body with six degree programs: Global Cultural Studies, History, Political Science, Legal Studies, Liberal Arts, and Interdisciplinary Studies encompassing approximately sixty students who were majoring in and eligible to receive undergraduate degrees in these programs.

53.     The new HSS Department elected Dr. Newman as its chair with only Dr. Ross and Dr. Hines opposed to her leadership.

54.     Dr. Karen McIntyre was followed as Provost by Dr. John Pearson.

55.     Dr. Ross and Dr. Hines submitted a new version of the Social Justice program to Provost Pearson who backed it without consulting or informing Dr. Newman or her department (HSS).

56.     Dr. Newman went to Dr. Pearson, discussed that she was a Holocaust survivor who had seen the conflation of social activism with targeting of Jews and Israel, and said that "it's [the Social Justice program] a cover for anti-Semitism, and this is a very upsetting to me."

57.     Dr. Pearson responded, "I know. I'm sorry."

58.     Dr. Newman also protested similarly to PPU President Paul Hennigan; she had complained at other times to him of anti-Semitism and/or anti-Zionism, and he said that her concerns were serious.

8

59.     Now, she further expressed words about the fewness of Jews and/or Israelis at Point Park, stated that Social Justice Studies (SJS) would not be good for the wider Jewish community, and asked how many Jewish people were on the Board of Trustees, to which he said none but that one woman member was the wife of a deceased Jewish man.

60.     Dr. Hennigan did not refute or dispute Dr. Newman's concerns.

61.     Dr. Newman complained many times to the administration about being shunned including by students evading requirements involving her with the administration's approval.

62.     The administration allowed Dr. Ross to form Social Justice Studies (SJS) and include Dr. Hines.

63.     Dr. Ross and Dr. Hines shunned Dr. Newman.

64.     Without consulting her or the HSS faculty and against ordinary procedures, they took SJS with them and joined another department, Literary Arts, which became known as Literary Arts and Social Justice under Chair Sara Perrier, who likewise excluded Dr. Newman from the transition process as did Dr. Robbins.

65.     Dr. Newman now was the sole remaining full-time Global Cultural Studies (GCS) faculty member in HSS.

66.     The Provost treated Dr. Newman unequally relative to other Chairs, indicating that he would give her a one year contract when they received three year appointments.

67.     However, she protested (as she often must to avoid prejudicial treatment), received a three-year contract and performed well according to the Provost who was her superior and evaluator.

68.     Recently, she was reappointed for another three year term.

9

69.     The Social Justice Studies program has not yet been a success as it apparently has attracted only one major.

70.     Nevertheless, Dr. Ross was made its Director and received course release time.

71.     Dr. Newman has no Directors in the Programs in her Department, including Interdisciplinary Studies, which has about seventeen majors and is being led by an overtaxed faculty member who needs and should have release time for organizational services.

72.     Dr. Ross and Dr. Hines were permitted to have small student populations in their classes, which adversely affected the GCS program.

73.     Dr. Ross' and Dr. Hines' activism persisted into 2018 as did their animosity towards Dr. Newman.

74.     In March 2018, Dr. Ross with the consent of the administration took Point Park students "on a trip to Israel/Palestine" that, identified as a Point Park professor, he co-lead under the sponsorship of the Pittsburgh Theological Seminary.

75.      Dr. Newman had raised questions to Provost Pearson and the Dean of Students about whether such a trip was in keeping with Point Parks nonsectarian academic mission, but Dr. Pearson did not agree.

76.     The trip affected the schedule and attendance of GCS students.

77.     In April 2018, with financial support from the Point Park administration, Dr. Ross took Global Cultural Studies students to the American Association of Geographers (AAG) Conference in New Orleans where he organized and chaired a panel as a representative of Point Park University including on "what does it mean to be Christian in solidarity with people in Palestine, South Africa and elsewhere through theological and geographical limits."

78.   The other panelists included notorious Israel de-legitimizers including Hatem Bazian and Kali Rubail.

79.   In October 2018, Dr. Newman was falsely accused by a female student[1] of a Title IX violation and immediately suspended on an indefinite basis.

80.   Earlier, Dr. Newman had normal friendly relations with the female student who had taken several of her classes and regarded her teaching highly.

81.   The student also took Dr. Ross' classes on South Africa and the Middle East and became active in the BDS movement against Israel including the Academic and Cultural Boycott which attempts to exclude Israeli scholarly, academic, and artistic points of view from higher education.

82.   The student, an advisee of Dr. Hines, accused Dr. Newman of making an insensitive remark in class regarding the Me Too Movement causing the student to leave class early.

83.   The complaint was contrived, and there were no allegations (let alone any evidence) that Dr. Newman had discriminated, harassed, or stalked this student because of her gender so as to constitute a possible Title IX violation.

84.   Nevertheless, on October 16, 2018, Point Park placed Dr. Newman on indefinite suspension.

85.   This action was taken without ever discussing the matter with Dr. Newman or even bringing the complaint to her attention.

86.   No informal resolution was attempted.

---

[1]The name of the student is being withheld at this time because she is an alleged victim of rape. Point Park knows the name of this particular student who announced the rape in class.

87.     The first time she learned of this adverse action was when a student shocked Dr. Newman by showing her an email sent by Assistant Provost Jonas Prida, Ph.D., at 7:46 a.m. on October 16th informing all students in Dr. Newman's Global Cultural Studies class (GCS 175) that the class had been canceled.

88.     Point Park subsequently admitted that it should have informed Dr. Newman first of the adverse action prior to alerting her students of the class cancellation.

89.     As a consequence of the adverse action, Dr. Newman immediately was taken out of the classroom, her courses were canceled, she was stripped of teaching and Department Chair duties, told to leave campus, prohibited from returning, and her University email account became inaccessible to her.

90.     On the day of her removal, Dr. Newman asked Vice President of Human Resources Lisa Stefanko what had happened and what were the charges against her.

91.     Ms. Stefanko would say only that it was "something about Me Too" and some telephone calls.

92.     Dr. Newman told her it was a "set-up" and "you know who they are" in reference to Dr. Ross and Dr. Hines being involved as Ms. Stefanko seemed to understand.

93.     In an instant, Point Park separated Dr. Newman from her students and the work she had performed with care and dedication on behalf of the University for over five (5) decades.

94.     This unprecedented action caused Dr. Newman tremendous emotional distress, with serious physical manifestations; Dr. Newman was embarrassed and horrified to have been suspended.

95.     Plus it caused harm to her professional reputation among Point Park students, faculty,

and administrators.

96.     A week later, on October 23, 2018, Point Park for the first time sent to Dr. Newman written notification that it would conduct an investigation into an alleged Title IX complaint from a student.

97.     Under Point Park's Title IX policy an investigation should be completed within 30 days.

98.     For professional educational and reputational reasons it was vitally important to Dr. Newman to have a speedy investigation.

99.     Under the policy, if a delay is necessary, the University will notify all parties of the reason for the delay and the expected adjustment and time frames.

100.    Dr. Newman received no such notice, and the investigation lasted into December 2018.

101.    The allegations against Dr. Newman set forth in the October 23rd e-mail were vague and did not state (explicitly or otherwise) the verbal conduct attributed to Dr. Newman.

102.    For example, the email stated that on October 4, 2018 a female student "identified herself as a rape victim and [Dr. Newman's] response was to belittle her."

103.    The email added that according to the student "the conversation continued about the #MeToo movement and the comments to her were inappropriate," and that Dr. Newman "continued to engage with her on this topic."

104.    Dr. Newman categorically denied the accusations that she responded to the student by belittling her, that she ever made any inappropriate comments to the student regarding any matter, or that she engaged with her in an inappropriate manner.

13

105.    The accusations were false, inadequate, and a biased misrepresentation of actual events as might be expected given that Dr. Newman had not ever been consulted.

106.    In fact, on October 4, 2018, Dr. Newman in French Culture class mentioned the Me Too Movement, and noted that not everyone supports it fully, especially the French who see a focus on gender as less effective in bringing about social change than a focus on class.

107.    Towards the end of class, a female student spoke out and said "I disagree with you," to which Dr. Newman asked, "What do you mean?"

108.    The student responded that her hope was that the "Me Too Movement would develop, grow and be as strong as the anti-Apartheid movement in South Africa," to which Dr. Newman stated, "I don't think you can equate the two."

109.    The student then said, "I was raped" or "I'm a victim of rape," began to cry, gathered her belongings, and left class with a fellow student.

110.    After they left, Dr. Newman asked the class (to be sure she had heard correctly), "What did she say?"  The reply was that the student said she was raped, to which  Dr. Newman said, "That's terrible."

111.    Prior to October 4, 2018  the student had not participated, said anything, or turned in any assignments in French Culture.

112.    Like others in the Ross/Hines circle, she appeared to shun Dr. Newman.

113.    In previous classes with Dr. Newman the student had been normally participatory and interactive.

114.    Contrary to the allegations, Dr. Newman, never attacked, belittled or ridiculed this student.

14

115.    Dr. Newman never dismissed or discounted the student's statement that she was a victim of rape.

116.    Dr. Newman's statements which were about the Me Too movement and not about any particular student were protected under Point Park's Academic Freedom policy.

117.    Point Park's Academic Freedom policy states: (a) Teachers are entitled to full freedom in research and in the publication of the results, subject to the adequate performance of their other academic duties; but research for pecuniary return should be based upon an understanding with the authorities of the institution. (b) Teachers are entitled to freedom in the classroom in discussing their subjects, but they should be careful not to introduce into their teaching controversial matter that has no relation to their subject. Limitations of academic freedom because of religious or other aims of the institution should be clearly stated in writing at the time of the appointment. (c) College and university teachers are citizens, members of a learned profession, and officers of an educational institution. When they speak or write as citizens, they should be free from institutional censorship or discipline, but their special position in the community imposes special obligations. As scholars and educational officers, they should remember that the public may judge their profession and their institution by their utterances. Hence, they should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that they are not speaking for the institution (AAUP Red Book, 1995 Edition).

118.    As Department Chair during the relevant period, Dr. Newman was considered an academic administrator not covered by the Collective Bargaining Agreement between Point Park and the Newspaper Guild of Pittsburgh/Communication Workers of America, Local 38061, AFL-CIO, CLC.

119.    Based on the events of October 4th, Dr. Newman naturally was concerned for the student's well-being.

120.    Dr. Newman reached out by telephone to check on the student, and left a voicemail message.

121.    The student returned the call, generally spoke in a normal tone, and did not complain in anyway about Dr. Newman's conduct or speech in the class.

122.    During the call, Dr. Newman inquired as to whether the student had sought help for the trauma from her rape.

123.    The student rejected the suggestions for help telling Dr. Newman it was "nobody's business."

124.    The student volunteered that she was calling from a pharmacy where she worked and described the benefits of her job.

125.    Dr. Newman mentioned that the student had not turned in any assignments.

126.    The student said that she would bring her homework to the next class.

127.    However, the student did not attend any more classes or submit any further assignments.

128.    The allegation of a Title IX violation against a scholar is especially frightening, serious, and can lead to a career-ending discharge even against a full professor with tenure such as Dr. Newman.

129.    A Title IX accusation can result in extreme reputation damage and outcasting including stigmatizing a professor for sexual misconduct, predation, or perversity.

130.    Title IX arises under federal law (29.U.S.C.A. § 1681 et seq.) and applies to

educational institutions receiving federal funds such as Point Park which must have internal regulations in keeping with the law.

131.   Ordinarily Title IX is charged by victims of grave sexual misconduct such as rape, assault, or the creation of a sexually hostile environment.

132.   As Dr. Newman with counsel informed the Point Park administration, including Ms. Stefanko, even in such grave cases professors normally are not removed from campus unless and until proven responsible for Title IX violations; rather, the faculty member and alleged victim are separated.

133.   Point Park did not deny that less restrictive alternatives than banning Dr. Newman were available.

134.   Israeli and Jewish students and scholars have been subjected to prejudice, shunning, exclusion, and discrimination on campuses by BDS proponents in this country and abroad.

135.    As Dr. Newman informed Point Park, the October 2018 situation involving Dr. Newman marked the first known time in American history when a BDS proponent used Title IX against an Israeli and/or Jewish professor.

136.   Dr. Newman's plea for a less destructive alternative than removal fell on deaf administrative ears at Point Park which refused to consider allowing Dr. Newman to continue her duties while under investigation, but declined to explain why she could not remain in the classroom and for the benefit of other students.

137.   Banning Dr. Newman on October 16, 2018 meant that three courses with approximately fifty students suddenly had to find new teachers.

138.   Dr. Newman's replacements in the classroom likely were less experienced  than she

which diminished the educational experience.

139.    Dr. Newman's replacements likely were not Israeli and/or not Jewish.

140.    Even assuming the allegations against Dr. Newman were true, which is denied, they clearly did not constitute a violation under Point Park's Title IX Policy ("Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking").

141.    The accusations that on one occasion Dr. Newman made a belittling response to a student, that on one occasion Dr. Newman made inappropriate comments about the Me Too Movement, and that on another occasion she  "continued to engage" the student about the Me Too Movement, certainly do not constitute "Sexual Misconduct," "Relationship Violence," or "Stalking" prohibited by the Policy.

142.    Under Point Park's policy, "Sexual Misconduct" is defined as "sexual harassment, sexual assault, and any other non-consensual behavior of a sexual nature that is committed by force or intimidation, or that is otherwise unwelcome."

143.    There is no allegation of a sexual assault or behavior of a sexual nature committed by force or intimidation or otherwise was unwelcome.

144.    "Sexual harassment" is defined as (1) quid pro quo harassment and (2) sexually hostile environment.  Quid pro quo harassment is not at issue.

145.    The allegations against Dr. Newman undeniably do not rise to the level of a sexually hostile environment.

146.    There is no allegation of any physical contact between Dr. Newman and the student.

147.    The allegations against Dr. Newman of verbal conduct – the alleged belittling

18

response and alleged inappropriate Me Too comments – are not of the required "sexual nature."

148.    There is no allegation whatsoever of any sexually offensive or profane language, nor is there any allegation of name-calling or humiliating conduct based on the student's female gender.

149.    The allegations are not "sufficiently severe, persistent, or pervasive" either to limit the student's ability to participate in a Point Park education or to create a sexually hostile educational environment.

150.    The alleged verbal conduct was not pervasive but is alleged to have occurred only once in class and once on the phone when the student returned a concerned professor's call.

151.    A reasonable person in a similar situation would not have perceived Dr. Newman's alleged verbal conduct as objectively offensive.

152.    Dr. Newman contacted Molly McClelland in the Center for Student Services by telephone twice to report that a student in the French Culture class had reported rape.

153.    Dr. Newman's calls apparently were ignored.

154.    Ms. McClelland, Director of Center for Student Success, was the point of contact for the student's complaint against Dr. Newman; at a staff meeting in 2018 she gratuitously talked about her "little Jewish" college roommate who was afraid of everything; she joked with others in the office and professor Hines about Dr. Newman's suspension, that the situation with Dr. Newman was a real "sh*t show," that no one knew what was going on with Dr. Newman or if she would return.

155.    Point Park's decision to charge Dr. Newman with a Title IX violation under these circumstances was a misapplication of the law, an overreaction, an effort to target her, an insult to valid Title IX claims and claimants, and a pretext to remove her.

19

156.    The immediate removal of Dr. Newman from the workplace thereby separating her from her students, her classes, her colleagues, her administrative duties, and the work she loves was draconian and not warranted by the accusations against her.

157.    Under Point Park's Title IX policy, upon receipt of a complaint, the Title IX Coordinator, in consultation with the Deputy Title IX Coordinators, Director of Student Development, Dean of Student Life, and/or Assistant Vice-President of Public Safety, was to assess whether "any immediate risk of harm to an individual or the community exists," and to "implement any necessary interim measures to address those risks."

158.    No evidence was presented to Dr. Newman that such procedure was followed.

159.    The accusations against Dr. Newman did not involve any risk of harm to the student or the community, and were neither severe nor pervasive, nor did a rational assessment occur.

160.    Moreover, there were no allegations of any continuing effects on the student and there was little likelihood that the student would come into contact with Dr. Newman through daily activities.

161.    As a result, there was no need for Point Park to take any interim measures against Dr. Newman let alone the drastic step of complete separation from the entire campus.

162.    It is clear that Dr. Newman was not presumed innocent until proven guilty.

163.    To the contrary Point Park punished Dr. Newman without proof or even hearing her side.

164.    If it wanted to do so, Point Park certainly could have used less extreme measures than a complete ban to protect the safety of this student.

165.    As provided for in the Policy, Point Park can modify the student's class schedule so

20

she no longer has Dr. Newman as her professor, and/or allow the student to withdraw from Dr. Newman's class "without academic or financial penalty."

166.    Out of an abundance of caution, Point Park could even initiate a no contact order prohibiting in-person or phone contact with the student.

167.    As Dr. Newman made clear she had no desire or incentive to engage this student, who actually had chosen to return the professor's call.

168.    The indefinite suspension and outcasting served to prevent a department meeting scheduled for October 29, 2018 whose purpose was to explain to students the difference between Social Sciences (*i.e.*, the scientific study of human society and social relationships) and "Social Justice" (an advocacy and activism program at Point Park led by Dr. Ross).

169.    On multiple occasions, Point Park continued to mishandle the complaint against Dr. Newman.

170.    On October 25, 2018, Dr. Newman's attorney requested in writing that Point Park immediately reinstate Dr. Newman to her full position as University Professor in French and Cultural Studies and Chair of the Department of Humanities and Social Sciences, and to permit her to resume teaching all of the classes that she was leading at the time of separation.

171.    There was no rational explanation for continuing the work separation while the Title IX investigation against Dr. Newman was pending.

172.    The swift immediate reinstatement of Dr. Newman might have prevented further damage to Dr. Newman's emotional and physical well-being as well as to her professional reputation and educational efforts.

173.    Point Park refused the October 25th request to reinstate Dr. Newman and failed to

21

provide a legitimate explanation.

174. On October 30, 2018, Dr. Newman cooperated in an investigative interview conducted by an outside attorney selected by Point Park.

175. On November 2, 2018, Dr. Newman, through her attorney, renewed her request to be reinstated to her duties which request likewise was denied.

176. Dr. Newman also requested access to her Point Park office because the investigator asked questions of Dr. Newman that pertained to materials in her office which she needed in order to mount her defense and supply answers.

177. In late October or early November 2018, Professor Brent Robbins, Ph.D., was appointed by the administration to take over as interim Chair of the HSS Department without any consultation of the Department or Dr. Newman.

178. Previously while Chair of Humanities and Human Sciences, Dr. Robbins had enabled Dr. Hines and Dr. Ross to disrespect Dr. Newman and to undermine her authority.

179. While no adverse finding had been made against Dr. Newman that would continue her forced absence beyond the fall term, Dr. Robbins in his role as interim Chair in conjunction with Assistant Provost Jonas Prida permitted Dr. Ross to cancel Dr. Newman's Spring 2019 400-level course, a requirement for the degree in GCS, to substitute in its place a 100-level (lower level) course in Social Justice that was not a requirement for the degree in GCS, and to solicit the students already enrolled in Dr. Newman's spring course to sign up for Dr. Ross' section of the 100-level Social Justice course.

180. On or about November 6, 2018, Dr. Newman through counsel again requested Point Park to allow her access to her office as well as her work email.

22

181.    Point Park eventually allowed Dr. Newman access to her office.

182.    On November 15, 2018, Dr. Newman (accompanied by counsel) was allowed to go to her office but only under the watch of a uniformed security guard who then escorted her out of the building.

183.    This security measure was excessive, gave the defamatory appearance that Dr. Newman (a 50+ year employee in her mid-70's) was a safety threat on campus who had to be monitored by security, and was witnessed by Department colleagues thereby further jeopardizing Dr. Newman's professional reputation.

184.    While Dr. Newman was allowed to go to her office on November 15th, Point Park did not enable her to access her work email account as promised.

185.    On November 19, 2019, Dr. Newman through counsel alerted Point Park's outside counsel that the email account had not been turned back on which hampered Dr. Newman's efforts to defend herself.

186.    Point Park eventually allowed Dr. Newman to access her work email account.

187.    Upon finally regaining access to her email in late November 2018, Dr. Newman discovered for the first time an email from a courageous former student dated October 25, 2018 warning her that there was a Facebook group including Point Park students and former students trying to gather negative information against her and to get her in trouble.

188.    The Facebook group was initiated on October 16, 2018 (the same day Dr. Newman was suspended and informed she was under a Title IX investigation) by Lauren Gerlowski, an adult Point Park alumna who had graduated from Point Park with a GCS degree.

189.    Ms. Gerlowski had worked closely with Dr. Ross on her senior thesis, and

accompanied him to conferences and trips including to Palestine.

190.    Ms. Gerlowski and others engaged in an on-line witch hunt against Dr. Newman and fostered a fishing expedition to get any dirt on Dr. Newman.

191.    Ms. Gerlowski loathed Dr. Newman's alleged "hatred of activism" and falsely claimed that Dr. Newman had "attack[ed] a current GCS student about rape being the woman's fault" and for "going after personal experiences."

192.    Ms. Gerlowski revealed  that "[n]ow Title IX is investigating Newman beyond this particular claim and looking into her total teachings."

193.    This statement reflects a breach of confidentiality in the Title IX process to the detriment of Dr. Newman.

194.    Ms. Gerlowski implored the Facebook group (12 mostly former students) to get involved in this Title IX proceeding in order to "bear witness to these claims against Newman," and to "bear witness to ANY of Newman's teaching styles and teachings."  (Emphasis in original.)

195.    The complaining student who made the Title IX charge was part of this chat room and stressed that, "It can be an example of when she abused her power as a professor and as the head of the Department."

196.    Ms. Gerlowski falsely stated that Dr. Newman was attacking a student "in and outside the classroom about emotional traumas ... and saying they are invalid."

197.    Ms. Gerlowski falsely stated that Dr. Newman "had far crossed a line" by "saying that women need to grow up and deal with their emotional baggage (referring to rape)."

198.    Ms. Gerlowski announced to the Facebook group that the October 4th in-class event had "led to a full investigation of Dr. Newman as a professor and as head of the humanities."

199.    This statement likewise demonstrates a breach of confidentiality in the Title IX process to the detriment of Dr. Newman as well as retaliation.

200.    Some of the ex-students including Gerlowski, Dawn ("Bunny") Columbine Karger, and Samantha Lee were BDS and/or Palestine advocates.

201.    In a March 2018 blog Ms Gerlowski made plain the impact of Dr. Ross' course "Political Geography of the Middle East" upon her.

202.    She wrote: "As the course went on I learned much more about the conflicts in the Middle East. We focused most of the semester on the Israel/ Palestine conflict and the Syrian civil war.  Learning what was happening to the Palestinians was heart-wrenching."

203.    The course was entitled "Political Geography of the Middle East," and was supposed to be about the entire region.

204.    A choreographer, she went on to describe a dance she created about the Palestinians: "Imagine a place that people openly walk around with automatic weapons and use them against you and your family. Imagine a place where bombs and rockets are shot at protestors (without weapons) daily. Imagine a place where the military openly shoot at schools to the point where the schools have to put cement blocks over their windows. Imagine a place under extreme military occupation where people cannot live their daily lives without fear. Because this place exists and needs to be known."

205.    Ms. Gerlowski previously had been in Dr. Newman's class on Central European history which dealt with the Holocaust.

206.    Ms. Gerlowski had smirked and showed no concern when that class addressed material regarding the round up of the Jews in Prague by the Gestapo.

207.    In modern anti-Semitism Jews and Israelis are seen as oppressors but not as victims.

208.     Ms. Gerlowski also made clear that the student rape victim was making a list of current and former students who would be willing to give *any evidence* against Dr. Newman for the "Title IX person."

209.     In the same Facebook group, Samantha J. Lee, another adult former Point Park student who worked on BDS matters, falsely accused Dr. Newman of not believing a rape survivor.

210.     Ms. Lee disfavored the views of Dr. Newman claiming "she's got  some f**ked up politics and has been very controlling in terms of GCS as a program."

211.     Ms. Karger, an adult former Point Park student, falsely claimed to the Facebook group that Dr. Newman was inappropriate in class, seemed confused, and that current and former Point Park students needed to believe the female student who claimed that Dr. Newman acted inappropriately.

212.     This group chat further revealed the bogus and thin nature of the allegations against Dr. Newman such that the complaining student and her graduated BDS allies in order to assist the Administration were reaching out to other current and former students on Facebook to try and drum up additional complaints against Dr. Newman that went beyond October 4, 2018 French Culture Class and Title IX student's complaint.

213.     The students and ex-students in short were being used to broaden the complaints and charges against Dr. Newman with no guidelines or limits.

214.     Dr. Newman immediately brought this Facebook group chat to Point Park's attention.

215.     The former Point Park students aided and abetted in the discrimination and retaliation against Dr. Newman, and in the effort to remove her.

216.     On November 26, 2018, Point Park provided Dr. Newman with redacted Findings of

26

Fact from the investigation.

217.    The Findings revealed that the female student actually had consulted with both Dr. Ross and Dr. Hines on October 9, and 10, 2018 before filing a "Title IX" complaint five days after October 4th incident.

218.    Dr. Ross and Dr. Hines assisted this student in bringing forth a complaint as part of their discriminatory and retaliatory campaign to discredit Dr. Newman and to remove her from the University.

219.    The University readily complied by suddenly removing Dr. Newman from the campus after fifty-five years of service.

220.    In violation of Title IX procedure which permits faculty to notify only the Title IX coordinator with student permission, Dr. Ross and Dr. Hines immediately publicized the student's false allegations against Dr. Newman to top Administrators including University Provost and Senior Vice President for Academic Affairs John H. Pearson, Associate Provost James H. Thomas (who would serve as the ultimate Adjudicator of Title IX claims), and Assistant Provost Jonas Prida.

221.    Dr. Hines relayed the student's complaint to Vice President of Human Resources and Interim Title IX Coordinator Lisa Stefanko, Provost Pearson, and Associate Provost Thomas via email on October 9, 2018.

222.    On October 10, 2018, Dr. Ross sent an email to Ms. Stefanko, Provost Pearson, and Assistant Provost Prida relaying the student's complaint against Dr. Newman, and also claimed that the evening before the student's academic advisor had been switched from Dr. Hines to Dr. Newman.

223.    Dr. Ross' accusation of an advising switch insinuated that Dr. Newman had done

27

something wrong or targeted the student, which was false.

224.    Because Dr. Ross and Dr. Hines had left the Department, Dr. Newman was the sole remaining Cultural Studies professor, and all of the Global Cultural Studies majors automatically became her advisees, although actual advising was done in the Center for Student Success by Catherine Houghton.

225.    Dr. Newman took absolutely no deliberate action to reassign the student as an advisee from Dr. Hines to herself, and any allegation that she did is completely false.

226.    For an urban northern university Point Park has extremely few Jewish faculty and students.

227.    Condoned by the Point Park Administration, the hateful attacks on Israel involve accusing it of apartheid, ethnic cleansing and crimes.

228.    The anti-Israel, anti-Zionist speech and actions of Dr. Ross and others with whom he associates fall within the U.S. Department of State's definition of "anti-Semitism."

229.    Anti-Semitism is defined as a "certain perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of anti-Semitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."

230.    Anti-Semitism may include "the targeting of the state of Israel, conceived as a Jewish collectivity."

231.    Contemporary examples of anti-Semitism in public life, the media, schools, the workplace, and in the religious sphere may include "[d]enying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor," and

28

"[d]rawing comparisons of contemporary Israeli policy to that of the Nazis."

232.     As the only Israeli, Dr. Newman feels frightened, alone and attacked at the school.

233.     The unique bombshell of the Title IX removal and investigation heightened her sense of fear and isolation.

234.     During the investigation, Dr. Newman complained to Point Park as she had before that she had been subjected to a hostile environment and discriminated against by Dr. Ross and Dr. Hines and some of their students because of her religion and national origin.

235.     For example, by letter dated December 3, 2018, Dr. Newman through counsel complained that she had been subjected to a discriminatory hostile work environment because she is an Israeli citizen and Jewish.

236.     In addition, in a verified statement of Dr. Newman provided in connection with the investigation, Dr. Newman raised discrimination including that current and former students aligned with Dr. Ross and anti-Israel (including the Title IX complainant) had shown antagonism towards her and shunned her, and that both Dr. Ross and Dr. Hines were involved in the bogus Title IX complaint against her.

237.     While Dr. Newman still was out on indefinite leave and under investigation,  Dr. Ross and Point Park maneuvered to damage her further and take away her GCS students.

238.     On December 5, 2018, Dr. Ross sent out the cancellation email to Point Park students enrolled in Dr. Newman's Spring 2019 class, – GCS 402 Wealthy White Males, that concerned at least nine students.

239.     Dr. Ross and the administrators prematurely assumed and hoped that Dr. Newman was not coming back even though there had not yet been an adjudication.

240.     No one ever discussed the cancellation of her course with Dr. Newman; if anyone had, she would have objected as the particular 400-level course was a necessary requirement for students seeking to graduate with a degree in GCS.

241.     In addition to being a GCS requirement, Wealthy White Males is a well-regarded upper-level sociology course (analyzing America's top economic bloc) that President Hennigan admired, and that both his wife and administrative assistant had taken and liked.

242.     Dr. Ross then notified the students that in place of GCS 402 Wealthy White Males he was offering "a version of SJS 101 Foundations of Social Justice Studies."

243.     Dr. Ross stimulated the students to enroll in the particular section of SJS 101 that he would be teaching by writing that: "We encourage you to enroll in SJS 101 DB MW 1-2:30 (if DB doesn't fit for you, SJS 101 DA is acceptable as well), which I will be teaching, if you can fit it into your schedule."

244.     When Dr. Newman learned of the cancellation, she immediately objected to it in writing including through counsel, but her objection was ignored by Point Park administrators.

245.     As a result of the behind-the-scenes maneuvers by Dr. Ross and others, Dr. Newman's upper-level 400-level course was canceled.

246.     Dr. Newman's indefinite suspension, cancellation of her Spring 2019 course, and removal as Department Chair exceeded reasonable disciplinary procedures, went beyond an employee's normal exposure to disciplinary policies, suggested possible termination, caused Dr. Newman to suffer tremendous embarrassment and emotional distress, and thereby changed the terms and conditions of her employment.

247.     Similarly situated individuals outside of Dr. Newman's protected classes who

30

were accused of Title IX violations were not suspended pending investigation, did not have any duties removed from them, did not have any of their classes cancelled, nor received such mistreatment as Dr. Newman.

248.    By way of example, on December 21, 2017, Dr. Newman was subjected to a bullying incident by psychology Professor A., Ph.D. (Male/non-Jewish/30's/U.S. born) who burst into her office, displayed explosive anger , threatened to take her  office and caused her distress and fear.

249.    Dr. Newman, a small woman, was seated.

250.    Dr. A, a male, towered over her and raged that she must give up her office to him and would "lose" academic power and responsibility.

251.    Dr. Newman believed that Dr. A was out of control and physically menacing.

252.    Dr. Newman immediately contacted President Hennigan who advised her to file a Title IX complaint against Dr. A, which she did, and assured her that it would be taken seriously.

253.    Point Park did not take Dr. Newman's complaint seriously.

254.    In contrast to Dr. Newman, Point Park did not suspend Dr. A. pending any investigation, cancel any of his classes, remove any of his duties, or subject him to similar mistreatment.

255.    Psychology professor M, Ph.D. (Male/non-Jewish/30's/U.S. born) was accused by female students of personal, sexist, and inappropriate comments and actions that made them feel uncomfortable.

256.    For example, he repeatedly told one undergraduate female to get rid of her boyfriend since she would find higher caliber males in graduate school.

257.    He commented on another female undergraduate's small physique.

258.    In front of class, he termed another female undergraduate a "hot" woman.

259.    Despite being married he held hands publically with a female senior at the University; a very strong student, she left Point Park only two classes short of graduation and moved out of town.

260.    Students and faculty complained to the Administration about Professor M.

261.    Unlike with Dr. Newman Point Park did not suspend him from campus or the classroom pending any investigation, did not cancel any of his courses or remove any of his duties, or subject him to similar mistreatment.

262.    Instead Dr. M only was assigned to be counseled by his colleague in the Psychology Department, William Purcell, Ph.D.

263.    Dr. M was not yet tenured and could have been discharged.

264.    Of Dr. M's behavior and specifically in regard to the senior with whom he held hands and who suddenly left school before graduation, Dr. Purcell said: "We got off easy on this. This could have been a big deal." (Or words to that effect).

265.    Now retired from Point Park Dr. Purcell was in a group with Dr. Robbins, Dr. Hines and Dr. Ross that also treated Dr. Newman with hostility.

266.    In a discussion about academic affairs attended by all males except for Dr. Newman and the department secretary, Dr. Newman tried to express her views.

267.    Dr. Purcell raged at her: "We don't give a shit about what you think."

268.    On information and belief Dr. Purcell would not have said this to a man and the atmosphere was gendered and sexually hostile.

269.     Criminal Justice and Intelligence Studies professor R, J.D. (Male/non-Jewish/sufficiently younger/U.S. born) was accused by a female student of repeated inappropriate and sexist comments; Point Park acknowledged that professor R. was a problem but unlike with Dr. Newman it did not suspend him from campus or the classroom pending any investigation, did not cancel any of his courses or remove any of his duties, or subject him to similar mistreatment.

270.     Then vice president and dean of the faculty, S., (Male/non-Jewish/sufficiently younger/U.S. born), was accused of making female students feel uncomfortable by asking them to go flying with him in his plane; but unlike with Dr. Newman it did not suspend him from campus or the classroom pending any investigation, did not cancel any of his assignments or remove any of his duties, or subject him to similar mistreatment.

271.     During a faculty search in or about 2014 Dr. Hines (Male/non-Jewish/sufficiently younger/U.S. born) used inappropriate sexist language about which Dr. Newman complained to the administration; and after which Dr. Hines was hostile to Dr. Newman.  Unlike with Dr. Newman, Point Park did not suspend Dr. Hines from campus or the classroom pending any investigation, did not cancel any of his courses or remove any of his duties, or subject him to similar mistreatment.

272.     On December 7, 2018, just two days after canceling Dr. Newman's Spring 2019 course, Point Park Associate Provost James Thomas adjudicated that Dr. Newman was not guilty of any Title IX violation.

273.     There was no evidence whatsoever of sexual harassment or stalking under Title IX.

274.     The charge was odd, thin, and questionable from the outset.

275.     The great pain, reputation loss, and dislocation caused to Dr. Newman was entirely

unnecessary.

276.    The position and statements of a non-Jewish, non-Zionist undergraduate in her twenties had been credited over those of an Israeli Jewish professor with 55 years of meritorious service who was well known at Point Park.

277.    As stated above, during the investigation, Dr. Newman complained to Point Park that she had been subjected to a hostile environment and discriminated against by Dr. Ross and Dr. Hines because of her religion and national origin.

278.    By letter dated December 10, 2018, Ms. Stefanko informed Dr. Newman that "the University will be conducting an investigation into the allegations brought forth in your response to the findings of fact, including the discrimination and hostile work environment based on religion and national origin."

279.    Ms. Stefanko further indicated that "[a]n outcome as to this investigation will be provided to you in compliance with the terms of the University's anti-discrimination and equal opportunity policies."

280.    No timely investigation was conducted.

281.    In April 2019, Dr. Newman complained that Point Park failed to follow up on the promise it made in December 2018 to investigate her complaints of national origin and religious discrimination.

282.    More than six months after the initial complaint, Point Park hired an outside defense employment law firm to conduct an investigation.

283.    Dr. Newman was not even interviewed until September 2019 by which time the complaining student had graduated as had others in the BDS circle who no longer were under the

control of the University.

284.    On November 21, 2019, Dr. Newman received a short letter lacking any proof or evidence from that firm informing her that her complaints could not be substantiated.

285.    Charging, removing, banning, and punishing Dr. Newman under the Title IX Policy reflects inadequacy and negligence in training and administration regarding Title IX, and forms of inequality and discrimination to which she was and is subjected including anti-Semitism, anti- Israel national origin discrimination and sex and/or age discrimination.

286.    Dr. Newman's reputation suffered grievously as a result of following the sanction and ban.

287.    For example, an anonymous student from one of her canceled classes posted a racist and sexist Rate My Professor message that falsely stated that Dr. Newman "showed videos calling Muslims savages who are destroying western civilization in a language class to educate us."

288.    The administration took no steps to repair or protect the reputation of Dr. Newman but aggravated the situation including by not timely telling students that she had been re-instated and cleared, and by continuing to speak against her.

289.    On January 8, 2019, *The Globe* (Point Park's student newspaper) ran an article highly critical of Dr. Newman citing an unnamed student who complained falsely that Dr. Newman had promoted her own personal beliefs and agenda in class.

290.    The student  gave an inaccurate description of the event giving rise to the "Title IX" complaint.

291.    The article, entitled "Professor Reinstated Following Closed Title IX Investigation," also quoted Assistant Provost Prida who gave credence to the false allegations against Dr. Newman,

including that after the complaint the University had no idea when Dr. Newman was going to return after she was put on leave and, as a result, canceled her Spring 2019 required GCS course.

292.    Dr. Prida offered no justification for notifying students before notifying Dr. Newman of the course stoppage. In the article, Dr. Prida addressed Dr. Newman only as "Newman" without providing her title as "professor" or "doctor." According to Dr. Prida, "I was asked to cover the courses to the best of my ability when she was put on leave."

293.    The substitutes likely were less qualified than Dr. Newman, and neither they nor Dr Prida contacted much less consulted her about handling her classes in mid-stream or providing continuity.

294.    In the article Dr. Newman was blamed and scapegoated for the adverse educational experience.

295.    The anonymous students also complained about being cheated financially, a charge echoed by Dr. Prida that a jury may find to be an anti-Semitic trope.

296.    After Dr. Newman returned to campus, Dr. Ross and Dr. Hines absorbed responsibilities for advising students enrolled in the GCS program.

297.    Dr. Newman has become isolated within the well-regarded GCS program that she created in 2003.

298.    On January 9, 2019, Point Park per Ms. Stefanko informed Dr. Newman that the student complainant appealed the decision of no violation of Title IX and that Dr. Newman would be notified when the appellate process was complete.

299.    The appeal was not processed timely under University policy in that the students's appeal was received beyond the ten days allotted from the determination date, and the University did

not complete the review within the next fifteen business days (on or about January 31, 2019) but apparently on or by February 11, 2019.

300.    By email dated February 11, 2019, Point Park's then outside attorney stated that Dr. Newman had been copied on the outcome letter indicating that there was not a change in the decision; however, neither Dr. Newman nor her counsel received a copy of that letter.

301.    On February 19, 2019, Dr. Newman amazingly received news that she was falsely accused of a new Title IX-type violation.

302.    According to an email sent to Dr. Newman by new Title IX Coordinator Vanessa Love, Esq., with a copy to Ms. Stefanko, "students have come forward alleging that you may have violated, Point Park University's Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking.  These allegations will be investigated by an outside investigator, Lindsey Kennedy, Esquire.  You will be hearing from Ms. Kennedy as she will request an interview with you."

303.    Faculty and staff who have known Dr. Newman for decades understand that she does not commit sexual misconduct, relationship violence, or stalking.

304.    Contrary to Ms. Love's representation, neither Ms. Kennedy nor anyone else ever contacted Dr. Newman for an interview; nor did Point Park ever provide notice to Dr. Newman of the student allegations or any opportunity to respond.

305.    Ms. Love told Dr. Newman that "three or four students" had complained but incredibly said that she did not know their names.

306.    Subsequently, Dr. Newman learned through communications with yet another outside counsel that the February charges actually might not involve Title IX but some statements that Dr. Newman made in class which suggests that Dr. Newman does not have the same academic

37

freedom as other professors and/or that she is under excessive scrutiny which seems highly discriminatory and reflective of targeting.

307.    Plus, at Point Park students are expected to go to their professors with complaints to see if they can be resolved informally before official investigations commence.

308.    To Dr. Newman's knowledge no students came to her with such complaints.

309.    To Dr. Newman's knowledge Ms. Love's Title IX charge never was withdrawn.

310.    These repeated vague accusations of sexual wrongdoing and constant misconduct investigations are terrifying to Dr. Newman as they would be to anyone in her position.

311.    Title IX is being repeatedly distorted, misapplied, and misused against her.

312.    The repeated false allegations together with the other mistreatment Dr. Newman has endured have created a hostile working environment, including excessive scrutiny apparently designed to make her leave her job.

313.    Individuals outside of Dr. Newman's protected classes have been able to attack her and misapply Title IX with impunity.

314.    Also following Dr. Newman's complaints of religious and national origin discrimination, she has suffered materially adverse actions including having her class canceled, removal from the classroom, displacement as Chair, stripping of duties, being isolated and shunned within the workplace, enduring interference with a scheduled department meeting, the curtailing of access to her office and email account, being escorted to and from her office by a security guard, and falsely accused yet again of a Title IX violation but never being provided the names of the accusers nor any details of the allegations against her.

315.    Dr. Newman has been targeted for adverse treatment on account of Jewish religion,

ancestry, and ethnicity and Israeli national origin.

316.    When Dr. Newman became Chair, Provost Pearson expressed concern that the young faculty including Professors Ross, Hines, and Jehnie Burns would not be paid attention by her.

317.    During a faculty search in or about 2014 Dr. Hines used some inappropriate sexist language about which Dr. Newman complained to the administration; and after which Dr. Hines was hostile to Dr. Newman.

318.    Dr. Newman also was treated less favorably on account of her gender and age.

319.    Dr. Newman also was singled out for retaliatory treatment because she previously raised discrimination on the part of Dr. Ross and Dr. Hines as well as complained recently of a hostile work environment and discrimination based on her religion and national origin, and because she exercised her protected right to defend against baseless Title IX charges.

320.    Point Park administrators were aware of Dr. Newman's complaints regarding gender, racial, and anti-Semitic discrimination, including her complaints against Dr. Ross and Dr. Hines.

321.    On February 20, 2019, Dr. Newman filed a charge of discrimination and retaliation with the EEOC and the PHRC.

322.    After Dr. Newman's return to her position as Chair she continues to be undermined by the Administration and shunned by some students and faculty.

323.    She now has lost control over the majoring students in her Department, and her scheduling and the direction of the curriculum continue to be undermined.

324.    In April 2019, Dr. Newman sent a letter to Assistant Provost Prida reiterating a number of issues including that faculty improperly had gone around her as Department Chair to have substitutions approved for required courses, that GCS students associated with the Social Justice

program of Dr. Ross and Dr. Hines have exhibited shunning behavior towards her, which appears coordinated, including that they have avoided taking her classes or were rude and disrespectful during her reinstated Spring 2019 Wealthy White Males course.

325.    As Dr. Newman complained in a June 2019 letter to Point Park, the reinstated class had  fewer students than initially registered and was compromised as a result of Dr. Newman's suspension and course cancellation, and as a result of Defendant's discriminatory and retaliatory actions, the number of students enrolling in Dr. Newman's course(s) has decreased dramatically and negatively impacted Dr. Newman.

326.    Dr. Newman stated: "The same biases expressed on the social media and in the Globe article operated in this classroom. In my fifty years of teaching, and never in this course, have I observed such inappropriate behavior on the part of students.  The most disrespectful and mockingly insolent of students were frequently absent without notice or excuse and routinely late with their work. They appear to know, at least tacitly, that they have the institutional backing to file as many varied complaints as their hate group identity might manufacture. It is difficult to believe that such uniform reactions on the part of students, could be the results of coincidence."

327.    Since the October 2018 suspension, removal as Chair, and course cancellation, both faculty and majors have shunned Dr. Newman, gone around her as the Chair of the Department to others in Administration and other faculty for issues she as Chair is to handle,  and treated her with disrespect.  As an example, in 2019, GCS majors were allowed to graduate without fulfilling the departmental requirements and without anyone seeking Dr. Newman's approval for whatever substitutions were allowed, and Point Park insisted that Associate Provost Thomas participate in a routine meeting about independent study between Dr. Newman and a student of Dr. Ross and Dr.

Hines which was unusual and humiliating.

328.    The hostile behavior continues and seems coupled with activism.

329.    For instance the student who raised the Title IX violation related to the October 4, 2018 class participated in a BDS demonstration on or about October 25, 2018 in downtown Pittsburgh carrying a sign for USACBI (United States Academic and Cultural Boycott of Israel).

330.    She was accompanied by another Point Park student hostile to Dr. Newman.

331.    Photographs of the demonstration were posted on social media.

332.    Dr. Newman also asked Dr. Pearson to call a meeting where the students who may have been encouraged to act against her would have an opportunity to explain, without fear of any sort of retaliation, their acts and attitudes.

333.    She sought to have an open discussion about the students' concerns and how best to resolve them.

334.    On August 23, 2019, Associate Provost Thomas visited Dr. Newman and informed her that Provost Pearson would allow a particular GCS major to have all scheduling and course substitutions go through the Provost's office rather than through Dr. Newman as the Department Chair.

335.    Associate Provost Thomas stated he did not know the reason why the student wanted to go around Dr. Newman.

336.    Dr. Newman objected because it was inappropriate academically, and demeaning to her personally.

337.    The student shunning Dr. Newman is close to Dr. Hines, and that student like all students must fulfill GCS requirements in order to obtain the degree or otherwise change her major.

338.   Associate Provost Thomas seemed sympathetic and said he would take Dr. Newman's concerns to Provost Pearson.

339.   Within minutes, Provost Pearson came to Dr. Newman's office, where she repeated her objections to permitting the student to go around her to complete the degree, and she requested a meeting with the student to discuss the issue.

340.   The Provost told her that he wanted to help, that he does not know what to do, and that he had "wanted to quit over all this" or words to that effect.

341.   Dr. Newman brought up the fact that last December Dr. Ross had canceled her required course before the outcome of the Title IX investigation and that four students who were enrolled (including the student they had been discussing who wanted to go around Dr. Newman for scheduling and course substitution) did not take her 400 level after it was reinstated.

342.   Dr. Newman asked the Provost if he realized what pain all this has caused her.

343.   Dr. Newman said that Dr. Ross was a missionary with a cause (BDS) who does not believe in dialogue.

344.   Provost Pearson nodded in assent to that statement, and he added "no compromise" meaning that Dr. Ross does not compromise; the Provost then said to Dr. Newman, "I am sorry."

345.   During the Spring and Summer of 2019, Dr. Newman and Point Park University entered into a private mediation process to resolve their differences and hopefully to provide a safe, protected work situation for Dr. Newman that would be beneficial to both parties.

346.   This process involved engaging a private mediator which was costly to both parties who also were represented by their attorneys.

347.   At the final session on September 25, 2019, Point Park failed to mediate, then

42

disclosed the fact that Dr. Newman now was under yet a third new investigation though nothing about it was defined or revealed to Dr. Newman against whom a second vague, undefined investigation had been started in the February 2019 time period.

348.    The cessation of the mediation session under the circumstances was retaliatory, and the reliance on the purported new investigation is a pretext.

349.    Dr. Newman has been under investigations constantly since the unsustained charges under Title IX were levied against her in October, 2018.

350.    Being subjected to constant investigations constitutes discrimination and further retaliation.

351.    Dr. Newman does not know the nature of the investigation against her.

352.    Recently, Dr. Newman learned circumstantially that a new investigation possibly related to the cessation of the negotiations was stimulated in whole or in part by an allegation of Dr. Ross.

353.    Dr. Ross, who has been prominent in the faculty union, filed a grievance against Dr. Newman because of course allocation (as a chair Dr. Newman is in management).

354.    Dr. Ross via the faculty union apparently claimed that Dr. Newman violated the collective bargaining agreement when she failed to assign him to teach a 100-level Sociology course.

355.    Any wrongdoing or contract violation is disputed by Dr. Newman who properly assigned the 100-level Sociology course to qualified adjunct faculty who had the required master's degree in sociology.

356.    The master's degree requirement is in keeping with long-standing department practice, utilized at peer institutions, and based on common sense.

43

357.     Dr. Ross does not have the required master's degree in sociology to teach this 100-level course; moreover, the course resides the HSS Department of which Dr. Ross is not a member.

358.     Plus Dr. Newman offered him the opportunity to teach courses within his own discipline, geography, but he apparently refused.

359.     Based on information and belief, Dr. Ross's grievance was brought in bad faith and in order to further harass Dr. Newman.

360.     Dr. Newman received an email from Ms. Stefanko on November 11, 2019 informing her of Point Park's response to the grievance.

361.     Incredibly, Point Park simply sided with the Grievant (Dr. Ross) and against Dr. Newman in her managerial role as Department Chair.

362.     Ms. Stefanko falsely accused Dr. Newman of announcing new "modified instructor qualifications" in violation of the collective bargaining agreement.

363.     Dr. Newman never announced anything let alone any new "modified instructor qualifications;" rather, in keeping with long-standing Department procedure and her prior experiences, she simply assigned the faculty member who had a master's degree in sociology to teach the 100-level sociology course as she had in previous semesters without incident.

364.     Dr. Newman is properly concerned that the adjunct faculty union would prevail on a grievance if she displaced its teachers in favor of less well-qualified faculty lacking an advanced degree.

365.     According to Ms. Stefanko, Point Park and the faculty union met and "agreed that the University will take into account a full-time faculty member's successful teaching of courses in previous academic years."

44

366.    As a result, Ms. Stefanko continued, "the modified instructor qualifications that you announced will no longer be in effect, as it does not give consideration to the teaching history of full-time faculty members."

367.    Ms. Stefanko concluded with a veiled threat to Dr. Newman that "[her] cooperation is expected and will be appreciated."

368.    Dr. Newman will comply but her academic freedom has been reduced.

369.    Article 32 of the collective bargaining agreement entitled "MANAGEMENT RIGHTS" states in Section 1 that the "Union recognizes the right of the University to operate and manage the University."

370.    Those rights provide management with the flexibility, among other things, to determine "policy regarding the conduct of courses and the maintenance of academic standards," to determine "the composition and qualifications of faculty," and to designate "the number and assignment of faculty."

371.    Section 2 specifically states that "[d]ecisions regarding. . . who does the teaching . . . shall be made at the sole discretion of the University."

372.    Thus, decisions regarding who teaches courses (whether in Sociology, History, Political Science, etc.) lie within the "sole discretion of the University" and are not subject to challenge via the grievance procedure.

373.    As a result of Point Park's reservation of rights to decide who does the teaching, the University's agreement in favor of Dr. Ross as the Grievant and against Dr. Newman as Department Chair was contrary to the terms of the collective bargaining agreement and normal operations.

374.    Based on information and belief, Point Park's actions in this matter were

discriminatory and/or retaliatory against Dr. Newman as well complicit with Dr. Ross and his ideological mission and pattern of attempts to diminish Dr. Newman's role at Point Park.

375.    Dr. Newman made a reasonable judgement that the choice to continue with the degreed experienced adjunct instructor was better for students and educational quality.

376.    Dr. Newman believes that Dr. Ross' courses had low enrollments.

377.    Dr. Newman offered Dr. Ross a course for which he was qualified but declined.

378.    Dr. Newman offered Dr. Hines a course for which he was qualified and accepted.

379.    Dr. Newman informed President Hennigan that the administration's concession of the grievance to Dr. Ross was questionable, wrongful, and asked him to take it to final arbitration.

380.    Dr. Hennigan did not reply.

381.    Point Park effectively forced Dr. Newman for the foreseeable future to assign Dr. Ross, an alleged harasser of Dr. Newman located in another department, to teach a course outside his area of expertise in her Department even though he lacks the minimum degree required (a Masters) in the field.  Both Dr. Ross' "grievance" against Dr. Newman and Point Park's illogical and unsupported decision were motivated by a retaliatory or discriminatory animus, took away Dr. Newman's autonomy in assigning courses, and have affected the terms and conditions of Dr. Newman's employment as Department Chair and might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

382.    Dr. Newman raised to Dr. Hennigan that she is the only professor on campus who has been under investigation for a year which he did not refute.

383.    By way of summary: on October 10, 2018, Dr. Newman was accused of a Title IX violation; on October 16, 2018, she was suspended indefinitely yet still not informed of the

allegations; on December 8, 2018, Point Park determined Dr. Newman had not violated Title IX and the complainant appealed; on February 11, 2019, the appeal was denied; a week or so later on February 19, 2019, Dr. Newman was informed that she had been accused again of a Title IX violation which charge has never been withdrawn; on September 25, 2019, Point Park disclosed that Dr. Newman again was under investigation though nothing about it was defined or revealed to her and the complaint has not been withdrawn, and; on November 11, 2019, Point Park resolved Dr. Ross' grievance against Dr. Newman requiring her to assign Dr. Ross to teach a class in her Department outside his area of expertise instead of more qualified faculty.

384.    To outside counsel Dr Newman's counsel asked in 2019 if she was safe from further career damage at Point Park.

385.    Outside counsel said yes, but this was inaccurate.

386.    Dr. Newman remains prey to unsubstantiated charges, endless investigations, career damage, degradation of her faculty and chair roles, excessive scrutiny, and attacks on her academic freedom.

387.    As Point Park understands this situation began following the rise of a virulent professor-led BDS movement condoned by management and targeted against her, but the University will do nothing about it.

388.    The shunning persists with BDS-oriented students being able to evade GCS requirements including Dr. Newman's courses, and graduate, all with administrative assent.

389.    In 2018, the Jewish Federation of Pittsburgh severed ties with the Pittsburgh Theological Seminary (PTS) for a time over the latter's invitation to bring the head of Sabeel, Reverend Naim Ateek, to speak in Pittsburgh.

390.    Reverend Ateek uses anti-Semitic language in his anti-Zionism such as calling Israelis modern Herods and likening the treatment of Palestinians to crucifixions.

391.    Dr. Ross championed Reverend Ateek and posted about criticism of the Sabeel leader as "the libelous smears from the Jewish Federation."

392.    In 2019, Dr. Newman attempted to introduce a new course entitled "Prejudice: Women, Jews, Blacks" that would include the three historically highly victimized groups internationally.

393.    The administration told her that she would have to change the title to eliminate the names of the groups or the course would be cancelled.

394.    Provost Pearson said he had received a complaint about the title but would not reveal the source.

395.    He alluded to the term "Blacks" being offensive.

396.    But that was pretextual considering the course was dealing with a global problem not simply one in this country.

397.    Further, Point Park has a Black Student Union, and uses the term Black in employment applications.

398.    The term "Women" likewise would not be offensive at Point Park since it is used widely including in another course that Dr. Newman teaches called "Women in Global Perspective."

399.    Circumstantially, it appears that the word "Jews" was problematic at Point Park, particularly in a current context where Jews must not be seen as historical victims rather than oppressors.

400.    In 2019, Point Park was preparing to present the musical "Parade" a play about the

trials and 1913 lynching of Leo Frank, a Jewish Georgia factory manager falsely accused of raping and murdering a thirteen year old girl.

401.    Point Park had engaged distinguished alumnus Rob Ashford, a Tony and Emmy award winning Broadway director-choreographer, to present the play.

402.    In an astonishing piece of artistic cowardice, Point Park announced that it "postponed indefinitely" the play, allegedly because it made some students uncomfortable.

403.    In or about 2009, Point Park presented "Parade" at its Playhouse Theatre.

404.    Before BDS and Social Justice Studies took hold on campus, Point Park presented "Parade".

405.    At Point Park, in the current context of anti-Semitism and anti-Zionism it is not possible to present a Jew as the victim.

406.    Point Park readily presented Lauren Gerlowski's dance performance of "Shock and Awe" dramatizing Palestinians being victimized by Israelis.

407.    The Frank case was perhaps the most horrific act of anti-Jewish violence in America before the recent spate of shootings and slashings of Jews beginning in 2018 at Tree of Life in Pittsburgh.

408.    Such acts also previously have occurred in Europe, Asia and South America causing Jews to see the necessity for the Jewish state of Israel.

409.    Elements at Point Park with the assent of the administration have sought to delegitimatize Israel which constitutes anti-Semitism as the federal government repeatedly has indicated.

410.    There appears to be no training at Point Park against anti-Semitism and anti-Zionism.

49

411.    Regrettably members of the faculty and Administration appear unwilling to take action against these forms of discrimination.

412.    As a result of Defendants' actions, Dr. Newman has suffered damages including, but not limited to, serious emotional distress, physical manifestations of emotional distress, reputation harm, and out of pocket costs.  Dr. Newman seeks all remedies and damages permitted under federal and state law.

413.    Plaintiff requests a jury trial.

## VI.  COUNTS

### COUNT I: RETALIATION
### Plaintiff v. Point Park University
### Violation of 42 U.S.C. § 1981, Title VII, 42 U.S.C. § 2000e et seq., and PHRA

414.    The preceding paragraphs are incorporated as if set forth at length herein.

415.    Dr. Newman engaged in activity protected under Title VII, 42 U.S.C. § 1981, and the PHRA.

416.    In the recent past, Dr. Newman raised complaints to the Administration against two faculty members – Dr. Ross and Dr. Hines.

417.    Dr. Newman complained to Point Park that Dr. Ross' teaching scholarship are improper including, but not limited to, those that are anti-Israel and anti-Semitic.

418.    Dr. Newman also complained that Dr. Hines made sexist remarks to students, and she filed a Title IX complaint of sex discrimination against Dr. A.

419.    Dr. Newman complained to Point Park that she was the victim of national origin and religious discrimination including in the work environment which became hostile.

420.    Dr. Newman dual-filed a charge of discrimination on the basis of race, sex, religion,

national origin, and age and retaliation with the EEOC and PHRC.

421.    Following these activities, Point Park took materially adverse actions against her.

422.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or any opportunity to respond.

423.    The materially adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled department meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper justification, subjected her to repeated workplace investigations and increased scrutiny, failed to conduct a timely investigation of her discrimination complaints even though it promised to do so, and decreased her autonomy as Chair when it effectively forced Dr. Newman for the foreseeable future to assign Dr. Ross, an alleged harasser of Dr. Newman located in another department, to teach a course outside his area of expertise in her Department even though he lacks the minimum degree required (a Masters) in the field.

424.    A causal connection exists between the protected activity and the adverse action.

425.    The causal connection is based on the close temporal proximity between the protected activities and the adverse actions, the intervening period of antagonism against Dr. Newman, and the pretextual nature of the justifications offered for these actions.

426.    As a result of Point Park's retaliation, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

427.    Dr. Newman seeks all remedies and damages permitted under Title VII, Section 1981, and the PHRA including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

### COUNT II: DISCRIMINATION ON THE BASIS OF RACE/NATIONAL ORIGIN
### Plaintiff v. Point Park University
### Violation of 42 U.S.C. § 1981, Title VII, 42 U.S.C. § 2000e et seq., and PHRA

428.    The preceding paragraphs are incorporated as if set forth at length herein.

429.    Dr. Newman is of Israeli and Czech national origin, Jewish, and of Jewish ancestry or ethnicity; as such, she is a member of a protected class.

430.    Dr. Newman is qualified for her position at Point Park.

431.    Dr. Newman suffered adverse employment actions.

432.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or an opportunity to respond.

433.    The adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled department meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper

justification, subjected her to repeated workplace investigations and increased scrutiny, failed to conduct a timely investigation of her discrimination complaints even though it promised to do so, abruptly ended negotiations in bad faith based on some undisclosed complaint against Dr. Newman, and decreased her autonomy as Chair when it effectively forced Dr. Newman for the foreseeable future to assign Dr. Ross, an alleged harasser of Dr. Newman located in another department, to teach a course outside his area of expertise in her Department even though he lacks the minimum degree required (a Masters) in the field.

434.    There is an inference of discrimination.

435.    For example, Point Park treated more favorably individuals outside of her protected class.

436.    Point Park favored Dr. Ross' religion and theology including to her detriment.

437.    Point Park's justifications for the adverse actions are pretextual.

438.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

439.    Dr. Newman seeks all remedies and damages permitted under Title VII, Section 1981, and the PHRA including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

**COUNT III: HOSTILE WORK ENVIRONMENT**
**ON THE BASIS OF RACE/NATIONAL ORIGIN**
**Plaintiff v. Point Park University**
**Violation of 42 U.S.C. § 1981, Title VII, 42 U.S.C. § 2000e et seq., and PHRA**

440.    The preceding paragraphs are incorporated as if set forth at length herein.

441.    Dr. Newman was subjected to a hostile work environment at Point Park.

442.    Dr. Newman is a member of a protected class.

443.    Dr. Newman was subject to unwelcome harassment.

444.    The harassment was based on her race and/or national origin.

445.    The harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

446.    Point Park knew or should have known of the harassment and failed to take prompt, effective remedial action.

447.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

448.    Dr. Newman seeks all remedies and damages permitted under Title VII, Section 1981, and the PHRA including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

**COUNT IV: DISCRIMINATION ON THE BASIS OF SEX**
**Plaintiff v. Point Park University**
**Violation of Title VII, 42 U.S.C. § 2000e et seq., and PHRA**

449.    The preceding paragraphs are incorporated as if set forth at length herein.

450.    Dr. Newman is female and a member of a protected class.

451.    Dr. Newman is qualified for her position at Point Park.

452.    Dr. Newman suffered adverse employment actions.

453.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or any opportunity to respond.

454.    The adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS

54

Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled department meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper justification, subjecting her to repeated workplace investigations and increased scrutiny, failed to conduct a timely investigation of her discrimination complaints even though it promised to do so, abruptly ended negotiations in bad faith based on some undisclosed complaint against Dr. Newman, and decreased her autonomy as Chair when it effectively forced Dr. Newman for the foreseeable future to assign Dr. Ross, an alleged harasser of Dr. Newman located in another department, to teach a course outside his area of expertise in her Department even though he lacks the minimum degree required (a Masters) in the field.

455.    There is an inference of discrimination.

456.    For example, Point Park treated more favorably individuals outside of her protected class.

457.    Point Park's justifications for the adverse actions are pretextual.

458.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

459.    Dr. Newman seeks all remedies and damages permitted under Title VII and the PHRA including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

**COUNT V: HOSTILE WORK ENVIRONMENT
ON THE BASIS OF SEX
Plaintiff v. Point Park University
Violation of Title VII, 42 U.S.C. § 2000e et seq., and PHRA**

460.    The preceding paragraphs are incorporated as if set forth at length herein.

461.    Dr. Newman was subjected to a hostile work environment at Point Park.

462.    Dr. Newman is a member of a protected class.

463.    Dr. Newman was subject to unwelcome harassment.

464.    The harassment was based on her sex.

465.    The harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

466.    Point Park knew or should have known of the harassment and failed to take prompt, effective remedial action.

467.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

468.    Dr. Newman seeks all remedies and damages permitted under Title VII and the PHRA including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

**COUNT VI: DISCRIMINATION ON THE BASIS OF RELIGION
Plaintiff v. Point Park University
Violation of Title VII, 42 U.S.C. § 2000e et seq. and PHRA**

469.    The preceding paragraphs are incorporated as if set forth at length herein.

470.    Dr. Newman is Jewish and a member of a protected class.

471.    Dr. Newman is qualified for her position at Point Park.

472.     Dr. Newman suffered adverse employment actions.

473.     For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or any opportunity to respond.

474.     The adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled department meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper justification, subjecting her to repeated workplace investigations and increased scrutiny, failed to conduct a timely investigation of her discrimination complaints even though it promised to do so, abruptly ended negotiations in bad faith based on some undisclosed complaint against Dr. Newman, and decreased her autonomy as Chair when it effectively forced Dr. Newman for the foreseeable future to assign Dr. Ross, an alleged harasser of Dr. Newman located in another department, to teach a course outside his area of expertise in her Department even though he lacks the minimum degree required (a Masters) in the field.

475.     There is an inference of discrimination.

476.     For example, Point Park treated more favorably individuals outside of her protected class.

477.     Point Park favored Dr. Ross' religion and theology including to her detriment.

478.    Point Park's justifications for the adverse actions are pretextual.

479.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

480.    Dr. Newman seeks all remedies and damages permitted under Title VII and the PHRA including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

### COUNT VII: HOSTILE WORK ENVIRONMENT
### ON THE BASIS OF RELIGION
### Plaintiff v. Point Park University
### Violation of Title VII, 42 U.S.C. § 2000e et seq., and PHRA

481.    The preceding paragraphs are incorporated as if set forth at length herein.

482.    Dr. Newman was subjected to a hostile work environment at Point Park.

483.    Dr. Newman is a member of a protected class.

484.    Dr. Newman was subject to unwelcome harassment.

485.    The harassment was based on her religion.

486.    The harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

487.    Point Park knew or should have known of the harassment and failed to take prompt, effective remedial action.

488.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

489.    Dr. Newman seeks all remedies and damages permitted under Title VII and the PHRA including, but not limited to, back pay, front pay, emotional distress and reputation harm damages,

punitive damages, attorney's fees, costs, and interest.

## COUNT VIII: DISCRIMINATION ON THE BASIS OF SEX
### Plaintiff Channa Newman v. Defendant Point Park University
### Violation of Title IX, 20 U.S.C. § 1681 et eq.

490.    The preceding paragraphs are incorporated as if set forth at length herein.

491.    Dr. Newman is a woman and, as such, is a member of a protected class.

492.    Dr. Newman is qualified for her position at Point Park.

493.    Title IX prohibits sex discrimination in educational institutions that receive funding from the federal government.

494.    Point Park is an educational institution that receives funding from the federal government.

495.    Dr. Newman suffered adverse actions.

496.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or any opportunity to respond.

497.    The adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled department meeting to address the perils of advocacy and activism at the University under the guise of social justice, ordered surveillance by a security guard when she was permitted on one occasion to return to her office to retrieve materials for her defense, accused her of multiple Title IX violations without proper justification, subjecting her to repeated workplace investigations and increased scrutiny, failed to

conduct a timely investigation of her discrimination complaints even though it promised to do so, abruptly ended negotiations in bad faith based on some undisclosed complaint against Dr. Newman, and decreased her autonomy as Chair when it effectively forced Dr. Newman for the foreseeable future to assign Dr. Ross, an alleged harasser of Dr. Newman located in another department, to teach a course outside his area of expertise in her Department  even though he lacks the minimum degree required (a Masters) in the field.

498.    Point Park misused the Title IX investigation policy and procedure against Dr. Newman because of her gender.

499.    Point Park erroneously suspended Dr. Newman, removed her as Department Chair, and cancelled her Spring 2019 course without a valid justification and contrary to its Title IX policies and procedures.

500.    Point Park engaged in selective enforcement of Title IX.

501.    Point Park mistreated Dr. Newman because of her female gender.

502.    When similarly situated males were accused of Title IX violations, they were not suspended pending investigation, did not have any of their classes cancelled, were not removed from any administrative duties, and were allowed to remain in their positions and continue working on campus.

503.    Similarly situated males were treated more favorably.

504.    Point Park administrators were aware of the discriminatory conduct taken against Dr. Newman.

505.    Point Park's justifications for the adverse actions are pretextual.

506.    As a result of Point Park's discrimination, Dr. Newman suffered damages including,

but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

507.    Dr. Newman seeks all remedies and damages permitted under Title IX including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

### COUNT IX: HOSTILE WORK ENVIRONMENT ON THE BASIS OF SEX
### Plaintiff Channa Newman v. Defendant Point Park University
### Violation of Title IX, 20 U.S.C. § 1681 et seq.

508.    The preceding paragraphs are incorporated as if set forth at length herein.

509.    Dr. Newman was subjected to a hostile work environment at Point Park.

510.    Dr. Newman is a member of a protected class.

511.    Dr. Newman was subject to unwelcome harassment.

512.    The harassment was based on her gender.

513.    The harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

514.    Point Park knew or should have known of the harassment and failed to take prompt, effective remedial action.

515.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

516.    Dr. Newman seeks all remedies and damages permitted under Title IX including, but not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive damages, attorney's fees, costs, and interest.

**COUNT X: RETALIATION**
**Plaintiff Channa Newman v. Defendant Point Park University**
**Violation of Title IX, 20 U.S.C. § 1681 et seq.**

517.    The preceding paragraphs are incorporated as if set forth at length herein.

518.    Title IX prohibits sex discrimination in educational institutions that receive funding from the federal government.

519.    Point Park is an educational institution that receives funding from the federal government.

520.    Dr. Newman engaged in activity protected under Title IX

521.    Dr. Newman complained that Dr. Hines made sexist remarks in an educational setting and she filed a Title IX complaint of sex discrimination against Dr. A.

522.    Dr. Newman dual-filed a charge of discrimination on the basis of sex with the EEOC and PHRC.

523.    Point Park University falsely and inaccurately charged and processed charges under Title IX against her.

524.    Following these activities, Point Park took materially adverse actions against her.

525.    For example, Dr. Newman was suspended indefinitely by the University including without receiving prior notice of the charges against her or any opportunity to respond.

526.    The materially adverse actions include, but are not limited to, that Dr. Newman was removed from teaching her classes in the middle of the semester, she was removed as Chair of the HSS Department and replaced by a male who did not engage in protected activity, Point Park canceled her Spring 2019 400-level course, barred her from her office, disabled her access to email, interfered with her assignment of courses in the Department, preempted a scheduled department

meeting to address the perils of advocacy and activism at the University under the guise of social

justice, ordered surveillance by a security guard when she was permitted on one occasion to return

to her office to retrieve materials for her defense, accused her of multiple Title IX violations without

proper justification, subjecting her to repeated workplace investigations and increased scrutiny, failed

to conduct a timely investigation of her discrimination complaints even though it promised to do so,

abruptly ended negotiations in bad faith based on some undisclosed complaint against Dr. Newman,

and decreased her autonomy as Chair when it effectively forced Dr. Newman for the foreseeable

future to assign Dr. Ross, an alleged harasser of Dr. Newman located in another department, to teach

a course outside his area of expertise in her Department even though he lacks the minimum degree

required (a Masters) in the field.

     527.    A causal connection exists between the protected activity and the adverse action.

     528.    The causal connection is based on the close temporal proximity between the

protected activities and the adverse actions, the intervening period of antagonism against Dr.

Newman, and the pretextual nature of the justifications offered for these actions.

     529.    As a result of Point Park's retaliation, Dr. Newman suffered damages including, but

not limited to, emotional distress, reputational harm, and out-of-pocket costs.

     530.    Dr. Newman seeks all remedies and damages permitted under Title IX including, but

not limited to, back pay, front pay, emotional distress and reputation harm damages, punitive

damages, attorney's fees, costs, and interest.

### COUNT XI: DISCRIMINATION ON THE BASIS OF AGE
### Plaintiff Channa Newman v. Defendant Point Park University
### Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 and PHRA

     531.    The preceding paragraphs are incorporated as if set forth at length herein.

532.     Dr. Newman is over forty years of age and, as such, is a member of a class protected by the ADEA and the PHRA.

533.     Dr. Newman is qualified for her position at Point Park.

534.     Dr. Newman suffered adverse employment actions including, but not limited to, a spurious investigation, indefinite suspension from her position, a forced lock-out from her office, removal as Department Chair, and the cancellation of one of her classes.

535.     There was no justification for the actions taken against her, and any justification provided for these actions are pretext for discrimination.

536.     Colleagues of Dr. Newman who were significantly younger than she were not subjected to similar treatment.

537.     Because her aforementioned colleagues were not subjected to similar treatment, an inference arises that Dr. Newman was subjected to discrimination on the basis of her race/national origin.

538.     As a result of the aforementioned discrimination, Dr. Newman suffered damages, including reputational harm and emotional distress.

539.     Dr. Newman seeks all remedies and damages permitted under the ADEA and the PHRA including, but not limited to, back pay, front pay, liquidated damages, attorney's fees, costs, and interest.

**COUNT XII: HOSTILE WORK ENVIRONMENT ON THE BASIS OF AGE**
**Plaintiff Channa Newman v. Defendant Point Park University**
**Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 and PHRA**

540.     The preceding paragraphs are incorporated as if set forth at length herein.

541.     Dr. Newman was subjected to a hostile work environment at Point Park.

542.    Dr. Newman is a member of a protected class.

543.    Dr. Newman was subject to unwelcome harassment.

544.    The harassment was based on her age.

545.    The harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

546.    Point Park knew or should have known of the harassment and failed to take prompt, effective remedial action.

547.    As a result of Point Park's discrimination, Dr. Newman suffered damages including, but not limited to, emotional distress, reputational harm, and out-of-pocket costs.

548.    Dr. Newman seeks all remedies and damages permitted under the ADEA and the PHRA including, but not limited to, back pay, front pay, liquidated damages, attorney's fees, costs, and interest.

## COUNT XIII: BREACH OF CONTRACT
### Plaintiff Channa Newman v. Defendant Point Park University

549.    The preceding paragraphs are incorporated as if set forth at length herein.

550.    Under Pennsylvania law, provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties.

551.    In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms.

552.    In this case, Point Park communicated to Dr. Newman certain rights, policies, and procedures which she accepted by continuing performance of her duties.

553.    Among those rights, policies, and procedures was Point Park's Title IX policy.

554.    Both Dr. Newman and Point Park agreed that Point Park would follow the Title IX policy.

555.    Dr. Newman was entitled to the protections and procedures set forth in the Title IX policy.

556.    Point Park breached its contract with Dr. Newman when it failed to follow various portions of the Title IX policy.

557.    Point Park's breaches include, but are not limited to, that the allegations against Dr. Newman did not constitute a Title IX violation under Point Park's policy as Point Park knew, the allegations were false and misleading, Dr. Newman did not receive adequate notice and was not provided an opportunity to respond before Point Park separated her from the work site, Point Park breached confidentiality during the process and afterwards including in statements to the student newspaper, there was no evaluation of whether Newman posed a risk of harm to students, Dr. Ross and Dr. Hines breached the policy by publicizing the complaint beyond the individuals with a need to know listed in the policy, the draconian "interim" measures (including complete separation, cancellation of her class, interference with her Department Chair duties, etc.) were unwarranted and impermissible under the policy and reflect a lack of good faith and fair dealing, and Point Park failed to inform Dr. Newman of the nature of the allegations against her or the identity of the complainant in the February 2019 Title IX complaint against her, and time limits were not observed.

558.    As a result of Point Park's breach of contract, Dr. Newman suffered damages including, but not limited to, out of pocket losses and expenses.

559.    Dr. Newman seek all damages available under Pennsylvania law in excess of $75,000.

## COUNT XIV: BREACH OF CONTRACT
### Plaintiff Channa Newman v. Defendant Point Park University

560. The preceding paragraphs are incorporated as if set forth at length herein.

561. Under Pennsylvania law, provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties.

562. In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms.

563. In this case, Point Park communicated to Dr. Newman certain rights, policies, and procedures which she accepted by continuing performance of her duties.

564. Among those rights, policies, and procedures was Point Park's Academic Freedom policy.

565. Both Dr. Newman and Point Park agreed that Point Park would follow the Academic Freedom policy.

566. Dr. Newman was entitled to the protections and procedures set forth in the Academic Freedom policy.

567. Point Park breached its contract with Dr. Newman when it failed to follow various portions of the Academic Freedom policy.

568. Point Park's breaches include, but are not limited to, its discipline and sanction of Dr. Newman based on statements she made in class including, but not limited to, about the Me Too Movement, and on statements she made outside the class including, but not limited to, the conversation she had on one occasion with the complainant, and based on her statements that Dr.

Ross' teaching and scholarship constituted improper advocacy, was not scholarly, and was anti-Israel and anti-Semitic.

569.     Point Park unduly interfered with Dr. Newman's ability to educate, advise, credential and follow and observe standards.

570.     As a result of Point Park's breach of contract, Dr. Newman suffered damages including, but not limited to, out of pocket losses and expenses.

571.     Dr. Newman seek all damages available under Pennsylvania law in excess of $75,000.

## COUNT XV: BREACH OF CONTRACT
### Plaintiff Channa Newman v. Defendant Point Park University

572.     The preceding paragraphs are incorporated as if set forth at length herein.

573.     Under Pennsylvania law, provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties.

574.     In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms.

575.     In this case, Point Park communicated to Dr. Newman certain rights, policies, and procedures which she accepted by continuing performance of her duties.

576.     Among those rights, policies, and procedures was Point Park's due process policy and its anti-discriminatory policy.

577.     Both Dr. Newman and Point Park agreed that Point Park would follow the due process policy and anti-discrimination policy.

578.     Dr. Newman was entitled to the protections and procedures set forth in those policies.

579.     Point Park breached its contract with Dr. Newman when it failed to follow various portions of the due process policy.

580.     Point Park's breaches include, but are not limited to, failure to timely notify Dr. Newman of the charges against her and failure to conduct the investigation in a confidential manner as demonstrated by the knowledge of the investigation against Dr. Newman circulated by the former students on Facebook and subsequent comments made by the Administration to the student newspaper, and a failure to timely or adequately investigate her discrimination claims and protect her from further discrimination and retaliation.

581.     As a result of Point Park's breach of contract, Dr. Newman suffered damages including, but not limited to, out of pocket losses and expenses.

582.     Dr. Newman seek all damages available under Pennsylvania law in excess of $75,000.

### COUNT XVI: BREACH OF CONTRACT
### Plaintiff Channa Newman v. Defendant Point Park University

583.     The preceding paragraphs are incorporated as if set forth at length herein.

584.     At Point Park, complaints regarding investigations into Title IX sexual harassment complaints are governed by the University's *Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking*.

585.     Under the aforementioned policy, all investigations must be completed within thirty days, and all appeals of any determination must be taken within ten business days of the date of the determination, with the resolution of the appeal being rendered within fifteen business days of the date of the appeal.

586.     Furthermore, the respondent to any investigation has "[t]he right to be fully informed

69

of the nature, rules and procedures of the investigation and resolution process."

587.    Even though the student made her complaint October 9, 2019, the subsequent investigation was not concluded until December 7, 2018; the investigation thus took approximately twice as long to complete than the time period prescribed by the regulations.

588.    Moreover, the appeal was  filed by the complaining students was unresolved as of until or about  February 11, 2019, which was more than fifteen business days after the date Dr. Newman received notice of the appeal (January 9, 2019).

589.    Dr. Newman would later learn that there were multiple Title IX complaints filed against her; however, she did not receive any information regarding the substance of these complaints.

590.    By failing to resolve the investigation and appeal process in a timely fashion, Point Park violated the terms of its own policy, thereby breaching its contract with Dr. Newman.

591.    Moreover, by failing to provide Dr. Newman with substantive information regarding the pending Title IX complaints, Point Park violated the terms of its own policy, thereby breaching its contract with Dr. Newman.

592.    The damages suffered by Dr. Newman arose from Point Park's failure to adhere to its own internal policies.

WHEREFORE, Dr. Newman seeks all damages available under  Pennsylvania law in excess of $75,000.

## COUNT XVII: BREACH OF CONTRACT
### Plaintiff Channa Newman v. Point Park University

593.    The proceeding paragraphs are incorporated as if set forth therein.

594.     The Parties entered into an Agreement to Mediate on May 24, 2019.

595.     The parties specifically "agreed to participate in a Mediation  ("Mediation") with Carole Katz as mediator (the "Mediator")."

596.     Point Park breached a duty imposed by the Agreement to Mediate.

597.     On September 25, 2019 at the third scheduled mediation session attended by Dr. Newman and her counsel at Defendant's law firm Point Park failed to participate in the Mediation.

598.     Dr. Newman and her counsel sat in Point Park's lawyer's offices for several hours while Point Park declined to participate.

599.     Several hours in, Point Park announced that it stopped participating in the Mediation due to a new undefined investigation of Dr. Newman.

600.     Point Park did not offer any information about how or why some alleged but undefined new investigation would allow it to breach and not perform.

601.     As a result of Point Park's failure to mediate Dr. Newman suffered extensive damages including approximately $4,200 to pay the Mediator and substantial attorney's fees related to the multiple appearances at Reed Smith, the preparation for same, and the numerous negotiations with defense counsel between May and September, 2019.

602.     Dr. Newman seeks all remedies and damages under law for Point Park's sudden costly and wasteful breach of the Agreement to Mediate.

## COUNT XVIII: NEGLIGENT SUPERVISION
### Plaintiff Channa Newman v. Defendant Point Park University

The preceding paragraphs are incorporated as if set forth at length herein.

603.     Point Park failed to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his or her employment.

71

604.    The harm was committed on Point Park's premises.

605.    Point Park knew or had to reason to know of the necessity and ability to control the employee.

606.    Dr. Newman notified her supervisors of the misconduct of other employees which were outside the scope of their employment.

607.    Point Park failed to act to prevent further negative treatment.

608.    All negative actions taken against her occurred on Point Park's premises.

609.    Point Park was notified of the negative actions taken against Dr. Newman by Point Park employees, but Point Park failed to take any disciplinary action against them.

610.    The negative actions against Dr. Newman continued.

611.    Misconduct included, but is not limited to, Point Park's refusal to reinstate Dr. Newman pending the investigation despite repeated requests, Point Park's failure to investigate that Dr. Ross and/or Dr. Hines were behind the October 2018 Title IX complaint as Dr. Newman had alerted, faculty members improperly going around and intentionally avoiding Dr. Newman as Department Chair and undermining her authority, and Point Park's failure to intervene in the actions of Dr. Ross and Hines and their use of students to file multiple bogus Title IX claims against Dr. Newman.

612.    Shortly after the student announced the rape in her class Dr. Newman called the Center for Student Success and specifically its Director Molly McClelland to report the matter and left a message requesting to be called back.

613.    Neither Ms. McClelland nor OSS returned the call.

614.    On or about October 15, 2018 Dr. Newman called CSS again and Molly

72

McClelland picked up.

615.    Dr. Newman explained that the student in her class had reported a rape.

616.    Ms. McClelland showed no interest in investigating the alleged rape although it was Point Park's obligation to determine if the act occurred on campus and/or whether the perpetrator was affiliated with the University, and if so to report to it to the Federal Government and pursue it under Title IX.

617.    Dr. Newman did the right thing by reporting the rape.

618.    Molly McClelland, CSS, and the Title IX apparatus at Point Park were and are negligently supervised.

619.    In fact, in regard to rape reporting Point Park actually punished the messenger, Dr. Newman.

620.    There is no indication that Point Park, Molly McClelland and/or CSS or any other Title IX office ever actually cared about the victim and/or investigated the rape.

621.     Dr. Newman suffered harm as a result including, but not limited to, harm to her reputation, emotional distress, and out-of-pocket costs.

622.    Dr. Newman seeks all remedies and damages permitted under law.

**COUNT XIX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Plaintiff Channa Newman v. Defendant Point Park University**

623.    The preceding paragraphs are incorporated as if set forth at length herein.

624.    Point Park acted intentionally or recklessly.

625.    Point Park's actions taken against Dr. Newman under the circumstances were extreme and outrageous.

626.    Dr. Newman suffered severe emotional distress including, but not limited to,

fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry.

627.   Dr. Newman's severe emotional distress was a result of Point Park's conduct.

628.   Dr. Newman seeks all remedies and damages permitted under law.

Respectfully Submitted,

LIEBER HAMMER HUBER & PAUL, P.C.


s/James B. Lieber
James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
1722 Murray Ave., 2nd Floor
Pittsburgh, PA 15217
(412) 687-2231 (telephone)
(412) 687-3140 (fax)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 6, 2020, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send notification of such filing to the following:


Catherine S. Ryan (PA 78603)
cryan@reedsmith.com
David J. McAllister (PA 36729)
dmcallister@reedsmith.com
Mariah H. McGrogan (PA 318488)
mmcgrogan@reedsmith.com
Reed Smith LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Counsel for Defendant


s/James B. Lieber
James B. Lieber
Counsel for Plaintiff