**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHANNA NEWMAN, | ) | Civil Action No. 2:20-cv-00204-MRH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| POINT PARK UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | Filed Electronically |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT IN ITS ENTIRETY**

James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
LIEBER HAMMER HUBER & PAUL, P.C.
1722 Murray Avenue, 2nd Floor
Pittsburgh, PA 15217
(412) 687-2231 (telephone)
(412) 687-3140 (fax)
Counsel for Plaintiff Channa Newman

**TABLE OF CONTENTS**

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.   Dr. Newman Adequately Pled Claims For Discrimination
        And Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        1.   Dr. Newman's Indefinite Suspension Constitutes
            An Adverse Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        2.   Point Park's Failure To Timely Investigate Dr. Newman's
            Discrimination Complaints Constitutes An Adverse Action . . . . . . . . . . 11

        3.   Multiple Investigations Of Dr. Newman, Adverse Grievance
            Resolution, And Failure to Participate in Mediation Constitute
            Adverse Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        4.   Dr. Newman Alleged Facts That Could Support A Reasonable
            Inference of A Causal Connection Between Her Protected
            Activity And Suspension . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.   Dr. Newman Pled A Viable Hostile Work Environment Claim. . . . . . . . . . . . . 18

    C.   Dr. Newman Pled A Claim For Breach of Academic Freedom Policy. . . . . . . . 22

    D.   Dr. Newman's Breach Of Contract Claims Are Not Preempted By
        The PHRA And Plaintiff Pled The Existence Of A Contract. . . . . . . . . . . . . . 25

    E.   Dr. Newman Pled a Cognizable Claim For Breach Of Mediation
        Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    F.   Plaintiff Pled Negligent Supervision Claim Which Is Not Preempted
        By PHRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    G.   Plaintiff's Intentional Infliction Claim Is Subject To The Personal
        Animus Exception And Harassment Allegations Rise To The Level
        Of Outrageous Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF SERVICE

## **TABLE OF AUTHORITIES**

**CASES**                                                                                      **Page**

*Abatena v. Norfolk State Univ.*, 2014 WL 1819665 (E.D. Va. May 7, 2014) . . . . . . . . . . . . . . 23

*Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265 (3d Cir. 2001) . . . . . . . . . . . . . 19, 22

*Alers v. City of Philadelphia*, 919 F. Supp. 2d 528 (E.D. Pa. 2013) . . . . . . . . . . . . . . . . . . . . 30

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . 20, 22

*Andrekovich v. Borough of Punxsutawney*, 2018 WL 5442441 (W.D. Pa. Oct. 29, 2018) . . . . . 10

*Andrews v. City of Phila.*, 895 F.2d 1469 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Batoff v. Charbonneau*, 130 F. Supp. 3d 957 (E.D. Pa. 2015) . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Belverena v. Cent. Parking Sys., Inc.*, 2005 WL 2850343
(E.D. Pa. Oct. 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Bethlehem Area Sch. Dist. v. Zhou*, 2012 WL 930998 (E.D. Pa. Mar. 20, 2012). . . . . . . . . 27, 28

*Blakney v. City of Philadelphia*, 559 Fed.Appx. 183 (3d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . 18

*Bogart v. N.Y.C. Law Dep't*, 2001 WL 1631986 (S.D.N.Y. Dec. 20, 2001) . . . . . . . . . . . . . . . 22

*Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875 (Pa. Super. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 26

*Brennan v. National Telephone Directory Corp.*, 850 F.Supp. 331 (E.D. Pa. 1994) . . . . . . . 25, 26

*Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) . . . . . . . . . . . . . . . . . . . 7, 14, 16

*Byrd v. Elwyn*, 2016 WL 5661713 (E.D. Pa. Sept. 30, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Colgan v. Fischer Scientific*, 935 F.2d 1407 (3d Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Congregation v. Cobb,* 481 U.S. 615 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Connelly v. Lane Const. Corp.*, 809 F.3d 780 (3d Cir. 2016). . . . . . . . . . . . . . . . . . . 7, 15, 16, 18

*Demaio v. Connecticut Dep't of Correction*, 2012 WL 892933
(D. Conn. Mar. 15, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Dempsey v. Walso Bureau*, 431 Pa. 562, 246 A.2d 418 (Pa. 1968) . . . . . . . . . . . . . . . . . . . . . 28

*Deramo v. Consolidated Rail Corp.*, 607 F.Supp. 100 (E.D. Pa. 1985). . . . . . . . . . . . . . . . 25, 26

*DiFlorio v. Nabisco Biscuit Co.*, 1995 WL 355580 (E.D. Pa. Jun. 9, 1995) . . . . . . . . . . . . . . 30

*Durham Life Ins. Co. v. Evans*, 166 F.3d 139 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . 19, 20

*EEOC v. Wyeth*, 302 F.Supp.2d 1041 (N.D. Iowa 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Enslin v. Coca-Cola*, 2017 WL 1190979 (E.D. Pa. Mar. 31, 2017) . . . . . . . . . . . . . . . . . . . . . . 24

*Frankhouser v. Clearfield Cty. Career & Tech. Ctr.*, 2019 WL 1259570
(W.D. Pa. Mar. 19, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 34

*Freeman v. Inter-Media Mktg.*, 2018 Pa. Super. Unpub. LEXIS 1059
(Pa. Super. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Harris v. Forklift Sys, Inc.*, 510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Holt v. Pennsylvania*, 683 F. App'x 151 (3d Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hughes v. Allegheny Cty. Airport Auth.*, 2017 WL 2880875
(W.D. Pa. July 6, 2017), *aff'd*, 728 F. App'x 140 (3d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . 10

*Ingrassia Constr. Co. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478
(Pa. Super. Ct. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Jew v. University of Iowa*, 749 F.Supp. 946 (S.D. Iowa 1990). . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jones v. SEPTA*,796 F.3d 323 (3d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Joseph v. Leavitt*, 465 F.3d 87 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Killen v. Northwestern Human Servs., Inc.*, 2007 WL 2684541
(E.D.Pa. Sept.7, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kuhn v. United Airlines*, 63 F. Supp. 3d 796 (N.D. Ill. 2014),

aff'd, 640 F. App'x 534 (7th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lipschultz v. Holy Family Univ.*, 2017 U.S. Dist. LEXIS 23476
(E.D. Pa. Feb. 17, 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Marra v. Phila. Hous. Auth.*, 497 F.3d 286 (3d Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McAdams v. Marquette Univ.*, 914 N.W.2d 708 (Wis. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . 23

*McFalls v. BrightView Landscapes, LLC*, 2020 WL 1922828 (E.D. Pa.
Apr. 21, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone
Middleman, P.C.*, 137 A.3d 1247 (Pa. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Michael v. Quaker Valley Sch. Dist.*, 2017 WL 639374 (W.D. Pa. Feb. 16, 2017) . . . . . . . . . . . 7

*Mullen v. Topper's Salon and Health Spa, Inc.*, 99 F.Supp.2d 553 (E.D.Pa. 2000). . . . . . . 28, 29

*Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418 (Pa. 2001). . . . . . . . . . . . . . . . . 22

*Odyssey Contracting, Corp. v. Hercules Painting Co., Inc.*, 2019 WL 7629228
(W.D. Pa. Mar. 28, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Powell v. Indep. Blue Cross, Inc.*, 1997 WL 137198 (E.D. Pa. Mar. 26, 1997). . . . . . . . . . . . . 19

*Prettyman v. LTF Club Operations Co.*, 2018 WL 5980512
(E.D. Va. Nov. 13, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

*Price v. Philadelphia Elec. Co.*, 790 F.Supp. 97 (E.D.Pa. 1992) . . . . . . . . . . . . . . . . . . . . . 30, 34

*Prise v. Alderwoods Grp., Inc.*, 2011 WL 3047629 (W.D. Pa. July 25, 2011). . . . . . . . . . . . . . 11

*Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115 (Pa. Super. Ct. 2004) . . . . . . . . . . . . . . . 30

*Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892 (3d Cir.1993). . . . . . . . . . . . . . . . . . . . . . . . . 16

*Scott v. Sunoco Logistics Partners, LP*, 918 F. Supp. 2d 344 (E.D. Pa. 2013) . . . . . . . . . . 12, 13

*Sinai v. New England Tel. & Tel.*, 3 F.3d 471 (1ˢᵗ Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Spain v. Gallegos*, 26 F.3d 439 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Steele v. Schafer*, 535 F.3d 689 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Swanson v. Livingston Cty.*, 270 F. Supp. 2d 887 (E.D. Mich. 2003),
aff'd, 121 F. App'x 80 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332 (S.D.N.Y. 2014). . . . . . . . . . . . . . . . . . . 19

*Thourot v. Monroe Career & Tech. Inst.*, 2016 U.S. Dist. LEXIS 142962
(M.D.Pa. Oct. 17, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*Vay v. Huston*, No. CV 14-769, 2016 WL 7324596 (W.D. Pa. Dec. 16, 2016) . . . . . . . . . . . 8, 10

*Waggaman v. Villanova Univ.*, 2008 WL 4091015 (E.D. Pa. Sept. 4, 2008) . . . . . . . . . . . . . . . 22

*Wasseff v. NIH*, 2017 U.S. Dist. LEXIS 17221 (E.D. Pa. Feb. 6, 2017). . . . . . . . . . . . . . . . 28, 29

*Watkins v. Rite Aid Corp.*, 2006 WL 2085992 (M.D.Pa. July 25, 2006) . . . . . . . . . . . . . . . . . . 29

*West v. Henderson*, 2000 WL 35635902 (D. D.C. Nov. 3, 2000) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Williams v. U.S. Airways, Inc.*, 2007 WL 2667981 (E.D. Pa. Sept. 5, 2007) . . . . . . . . . . 30, 31, 34

## STATUTES

29 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## OTHER AUTHORITIES

Andrew Pessin and Doron Ben-Atar: <u>Anti-Zionism on Campus: the University, Free Speech, and
BDS,</u> Indiana University Press (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

"He Was Accused of Enabling Abuse.  Then Came a Downward Spiral"
(*The New York Times*, 1/4/2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Kenneth L. Marcus: <u>The Definition of Anti-Semitism,</u> Oxford University Press (2015). . . . . . . . 5

Paul Hennigan, *Pittsburgh Jewish Chronicle*, "Anti-Semitism  in all forms
including BDS, has no place at Point Park" (April 10, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## I.  INTRODUCTION

In support of its full-scale Motion to Dismiss, Defendant has offered a small selection of the facts in the Amended Complaint and drawn inferences in its favor which is not appropriate at this juncture.  Plaintiff respectfully submits that the asserted facts and inferences when viewed in her favor in conjunction with operative law support progressing to discovery and the public trial that the Defendant wishes to evade.

## II.  STATEMENT OF FACTS

Jewish and holding Israeli citizenship (as well as American and Czech), Channa Newman, 77, is well-qualified having taught at Point Park University (PPU) for over fifty-five years.  She attained full professorship and became a department chair.  Amended Complaint (Compl.) ¶¶ 10-17.  After the hiring of Robert Ross she endured a hostile work environment.  *Id.*, ¶¶ 19-65, 73-79.  With PPU's support, Dr. Ross, Dr. J. Dwight Hines and others advanced anti-Zionist and anti-Semitic views as well as a pro-Boycott Divestment and Sanctions (BDS) agenda that led to hostility including shunning by students, disrespect by faculty, administrators and alumni, diminishment of her academic roles, program, and authority, a cruel ban from campus, and unceasing investigations.  *See id.*, ¶¶ 156-165, 179, 212-213.  PPU supported and enabled Dr. Ross and his allies by letting students evade Dr. Newman as a teacher and advisor by not taking required courses in the Global Cultural Studies (GCS) major that she developed, and by allowing him to propagandize in his syllabus, publications, and through events and student trips that he led.  *Id.*, ¶¶ 45-50, 76-77.

Dr. Ross and Dr. Hines founded a new Social Justice Studies (SJS) program.  Dr. Newman complained to the administration of resulting anti-Semitism and anti-Zionism.  The Provost knew that this was the case.  The President conceded her concerns.  Compl. ¶¶ 51-73.  Despite her complaints, PPU did nothing to protect her and allowed the erosion of her position, stature, and

shunning all of which would be seen by a Jury as retaliatory and discriminatory as was an incident involving a female student on October 4, 2018 in her French Culture Class and its handling by Defendant.  Compl. ¶¶ 119-138.  The student previously had taken Dr. Newman's courses and regarded her highly.  *Id.*, ¶¶ 79-80.  However, she came under the influence of Drs. Ross and Hines, and grew active in the BDS movement.  *Id.*, ¶¶ 81-2.

According to PPU, the student "accused Plaintiff of making inappropriate comments during a class session, causing the student to leave the class in tears."  ECF 19, p. 2 (citing "*Amended Complaint* ¶¶ 106-100").  The Amended Complaint contains no inappropriate comments and nothing violative of Title IX.  Compl. ¶¶ 106-110.  According to PPU: "After the class, Plaintiff called the student and questioned her about the details of her sexual assault and then proceeded to prod her to turn in past due assignments." ECF 19, p. 2-3.  This was an inaccurate characterization or inference better left to the fact-finder.  Plaintiff did not question about details of the sexual assault.  Rather, she simply tried to be helpful asking "whether the student had sought help for the trauma from her rape."  Compl. ¶ 122.  There was no negative "prodding," an inference that PPU seeks the Court to draw.  The student had not turned in assignments and simply agreed to do so.  *Id.*, ¶¶ 125-127.  She stated that she would return to class.  *Id.*, ¶ 126.

Dr. Newman called Molly McClelland, Director of the Center for Student Success, to report the rape but was ignored.  During the  same period, Ms. McClelland made an anti-Semitic slur to staff, mocked Dr. Newman including to Professor Hines, and joked about the Plaintiff's removal from campus. Compl. ¶¶ 152-154.  There is no evidence that anyone besides Dr. Newman expressed concern to the victim or reported the rape.  *Id.*, ¶¶ 612-20.  The student did not return to class or turn in work.  After speaking to Drs. Ross and Hines, she made a Title IX Complaint.  *Id.*, ¶¶ 217-222.

2

Without due process or evidentiary basis, PPU punished Dr. Newman severely, unnecessarily banned her from campus, classes, email, her chair, and duties. The Title IX policy was not followed. Compl. ¶¶ 128-172, 182-183. As PPU did not deny, this was the first time nationally that BDS used a Title IX sexual harassment charge against a Jewish and/or Israeli professor. *Id.*, ¶¶ 134-135. PPU did not dispute that less severe alternatives were available and normally used. *Id.*, ¶¶ 130-136.

Removal was made as painful as possible. Amazingly, students were informed that class was cancelled before Dr. Newman, who was shocked to learn of it second-hand, a misstep that even PPU recognizes. Compl., ¶¶ 87-89. Other students and recent alumni supporters of BDS were weaponized to assist in the probe of Dr. Newman by "looking into her total teachings" since the "Title IX [office] is investigating Dr. Newman beyond this particular claim." This tactic constituted a "breach of confidentiality in the Title IX process." *Id.*, ¶¶ 187-195. The Facebook group was led by an alumna former acolyte of Dr. Ross and included other BDS partisans. It engaged in defamation, character assassination, and reputation destruction, even falsely asserting that Dr. Newman was soft on rape. *Id.*, ¶¶195-215.

In December 2018, before adjudication, Dr. Ross with administration support, including Assistant Provost Jonas Prida and Dr. Brent Robbins who replaced Dr. Newman as Chair, cancelled Plaintiff's spring course: GCS 402 Wealthy White Males, and funneled students into Dr. Ross's own introductory course SJS 101: "Foundations of Social Justice Studies." Compl. ¶¶ 238-246. Male faculty alleged to have acted in violation of Title IX were not removed from campus before adjudication or treated as harshly. *Id.*, ¶¶ 246-271. The men were not in her other protected classes including religion and national origin. *Id.* One, Dr. Hines, about whom Dr. Newman complained in 2014, has been hostile and retaliating against her since then. *Id.*, ¶ 271.

Dr. Newman was cleared of the Title IX charge for which there was no evidence of sexual harassment or stalking on December 7, 2018.  Compl. ¶¶ 272-277.  Retaliation and a hostile environment persisted.  On January 8, 2019, *The Globe*, PPU's student newspaper, published an article critical of  Dr. Newman citing unnamed student sources and Assistant Provost Prida "who gave credence to the false allegation against Dr. Newman." *Id.*, ¶¶ 289-291.  *The Globe* blamed Dr. Newman for the educational deficit resulting from her removal although she was innocent of causing it. *Id.*, ¶¶ 291-295.  Anonymous students in the *Globe* piece and Dr. Prida said they felt financially cheated which a Jury may find to be an anti-Semitic trope. *Id.*, ¶ 295.

In February 2019, Dr. Newman amazingly was accused of a new Title IX violation although she had done nothing wrong.  Compl. ¶¶ 301-313.  Title IX Coordinator Vanessa Love said "three or four students" complained but maintained that she (Love) did not know their names. *Id.*, ¶¶ 305-313.  Here, PPU states that "only one student lodged a complaint" against Plaintiff, (ECF 19, p. 3), causing Dr. Newman to be investigated again without being confronted which creates a factual dispute.  Three or four students bringing an empty charge is more serious than one, as is the unaddressed and continuing reputation damage from multiple questionable sources.  Also, were these students subjected to Ross-Hines/BDS animus resulting in a second investigation?  It is suspicious that the administration did not disclose names or details.  Certainly, Dr. Newman should be permitted to take discovery.

BDS includes anti-Zionist as well as anti-Semitic aspects under which Dr. Newman has suffered.  Compl. ¶ 23.  The government has recognized the anti-Semitic and virulently anti-Israel aspects of BDS. *Id.*, ¶¶ 22-25, 228-231, 409.  Dr. Newman complained of extensive damage to her career caused by PPU's condonation of BDS. *Id.*, ¶¶ 232-247, 312-314.  PPU now admits that BDS

4

is anti-Semitic.  *See*, guest column by PPU President Paul Hennigan in the *Pittsburgh Jewish Chronicle*, April 10, 2020: "Anti-Semitism in all forms including BDS, has no place at Point Park." https://jewishchronicle.timesofisrael.com/anti-semitism-in-all-forms-including-bds-has-no-place-at-point-park.  He writes: "All forms of anti-Semitism which includes support for the BDS movement, generally defined as Palestinian-led campaign promoting various forms of boycott against Israel, has no place at Point Park University."  As in PPU's Brief, Dr. Hennigan denies that Dr. Newman has been discriminated against, which forms the essential factual dispute in this case best left to a Jury.  Dr. Newman has been able to assemble plausible evidence of discrimination, hostility, harassment, and retaliation that should lead to discovery.

It may be noted that Dr. Newman never tried to shut down the Ross/BDS pedagogy at PPU. She advocated for the presentation of more balance in teaching the Middle East which was declined. Compl., ¶¶ 29-33.  To the contrary, BDS, and specifically its "academic and cultural boycott" favor excluding Israeli and Zionist voices from higher education.  *Id.*, ¶¶ 21, 134.[1]  "Academic boycott" would seem to be a contradiction in terms.  Certainly, it violates the PPU academic freedom policy. *Id.*, ¶117; Defendant's Ex. 1, Collective Bargaining Agreement, Article 17 (Academic Freedom).

As a Jury may find, pro-BDS/academic boycott participants and allies including faculty, administrators, alumni and the student complainant who actually demonstrated in October 2018 in favor of the US Academic and Cultural Boycott of Israel (USACBI) (¶¶ 329-330) succeeded in removing one Israeli voice from campus in a draconian, unequal and irregular fashion.  Compl. ¶¶

---

[1]The repugnant intimidation and silencing of Zionists, Jews, and Israelis in higher education during more than a decade is described in Andrew Pessin and Doron Ben-Atar: <u>Anti-Zionism on Campus: the University, Free Speech, and BDS,</u> Indiana University Press (2018). *See also* Kenneth L. Marcus: <u>The Definition of Anti-Semitism,</u> Oxford University Press (2015) pp. 202-214.  Marcus currently serves as Assistant Secretary of Education for Civil Rights.

128-170.  Although they failed to eliminate her permanently, they continued to shun her, and PPU limited and undermined her academic role, authority, and eviscerated requirements associated with her.  *Id.*, ¶¶ 322-329, 333-344.

Nevertheless in the spring and summer of 2019, Plaintiff who had filed EEOC/PHRC Charges, entered into a costly private mediation process with PPU in order to resolve their differences and provide a protected work environment.  Compl. ¶¶ 345-346.  Mediation failed.  PPU implies a factual reason: "An employer has every right to defend and not acquiesce to an employee's demands."  ECF 19, p. 11.  There is no allegation or inference in the Amended Complaint of a demand to which the employer was asked to acquiesce; nor did one exist that caused PPU to rupture the mediation in its third session which ended under circumstances that were retaliatory.  Compl. ¶¶ 347-351.  PPU's stated justification was that another investigation was started against her, the third since October, 2018.  The charge never was defined.  *Id.*  Dr. Newman is the only professor who has been under investigation for a year.  *Id.*, ¶ 382.

The real tragedy of the mediation's cessation (in which she played no part) is that she remains subjected to (a) reduction in academic freedom in which Dr. Ross played a role (¶¶ 352-381) and another unusual limitation which the administration foisted on her based on an anonymous complaint (¶¶ 392-399)[2], (b) prey to unsubstantiated charges, (c) degradation of her faculty and chair roles, (d) excessive scrutiny, and (e) shunning (¶¶ 386-388), as well as (f) a hostile work environment that the administration condones.  Nor has PPU trained against the anti-Semitism and anti-Zionism that have caused Plaintiff so much damage and distress.  *Id.*, ¶¶ 409-412.

---

[2]As a Jury may find, the Administration found the word "Jews" problematic in the title of the proposed course and forced her to change it or cancel.  Compl. ¶¶ 392-399.

### III.  ARGUMENT

**A.**     **Dr. Newman Adequately Pled Claims For Discrimination And Retaliation.**

A plaintiff does not have to plead facts establishing a prima facie case under McDonnell Douglas to survive a motion to dismiss. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). That framework defines the evidentiary burden at trial (or summary judgment) of a case on circumstantial proofs; it does not establish any special pleading requirements for discrimination. *Id.* At the motion to dismiss, a plaintiff need only "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).  The Amended Complaint meets this standard.  *See* ECF15.

**1.**     **Dr. Newman's Indefinite Suspension Constitutes An Adverse Action.**

Contrary to PPU's position, the term "adverse employment action" does not apply equally to discrimination and retaliation claims. *See Michael v. Quaker Valley Sch. Dist.*, 2017 WL 639374, at *6 (W.D. Pa. Feb. 16, 2017).  In discrimination, an adverse employment action involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  In retaliation, an adverse action is one that "a reasonable employee would have found ... materially adverse, 'which ... might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Plaintiff pled sufficiently that her paid suspension is both an adverse employment action and a materially adverse one.  In holding that a paid suspension "without more" could not be an adverse employment action, *Jones v. SEPTA*, 796 F.3d 323, 32-26 (3d Cir. 2015), left the door open to certain

circumstances where a paid suspension plus additional evidence can be an adverse employment action. *Thourot v. Monroe Career & Tech. Inst.*, 2016 U.S. Dist. LEXIS 142962, at *14-15 (M.D.Pa. Oct. 17, 2016).

In *Thourot*, the plaintiff pled an adverse action involving paid suspension. *See id.* (distinguishing *Jones*). Plaintiff alleged "she was required to undergo a medical evaluation, in addition to the suspension, while other male employees were not. In addition, she alleges that she was required to sign a PIP without a union representative while others were not. Lastly, unlike *Jones*, the plaintiff's suspension was not followed by alleged wrongdoing on her part, but possible wrongdoing committed by others that prompted further investigation by [the employer]." *Id.*, 2016 U.S. Dist. LEXIS 142962, at *14-15. In *Vay v. Huston*, No. CV 14-769, 2016 WL 7324596, at *12–13 (W.D. Pa. Dec. 16, 2016), the Court found a genuine issue of material fact whether the employer's placement of the plaintiff on paid administrative leave pending investigation without accusing her of wrongdoing constituted an adverse employment action. The relevant question is "whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment." *Id.* (quoting *Joseph v. Leavitt*, 465 F.3d 87, 91-92 (2d Cir. 2006)). "Paid suspension during an investigation could thus potentially be adverse if the employer takes actions beyond an employee's normal exposure to disciplinary policies." *Id.*

As in *Vay* and *Thourot*, this Court should find that Dr. Newman's indefinite paid suspension pending investigation is an adverse employment action. First, Plaintiff's suspension exceeded reasonable disciplinary procedures thereby changing the terms and conditions of her employment. Compl. ¶ 246. PPU accused Dr. Newman of a Title IX violation – which can result in extreme

reputation damage including stigmatizing a professor for sexual misconduct, predation, or perversity. But, there were no allegations that Dr. Newman had discriminated against, harassed, or stalked the complainant because of her gender as required for a Title IX charge. *Id.*, ¶¶ 79, 83, 129, 131, 155. PPU implemented an interim measure (indefinite suspension) in violation of its own Title IX policy as she posed no immediate risk of harm to any individual or the community as a 75 year old female professor who had taught for over 50 years. *Id.*, ¶¶ 84, 157-61.  PPU could have selected less draconian measures than indefinite suspension and complete ban including modification of the student's class schedule, withdrawal from Dr. Newman's class without penalty, or a no-contact order. *Id.*, ¶¶ 133, 164-67.  Dr. Newman repeatedly requested to be reinstated under less drastic interim measures pending investigation but PPU refused. *Id.*, ¶¶ 136, 170-75.

Second, four similarly situated faculty and an administrator outside of Dr. Newman's protected classes accused of sexual harassment were not suspended pending investigation.  Compl. ¶ 247.  They included male/non-Jewish/U.S. born/sufficiently younger individuals. *Id.*, ¶¶ 248- 271.

Third, suspension was for an undetermined period, and PPU replaced Dr. Newman as Chair (with Brent Robbins) and cancelled her Spring 2019 course thereby suggesting possible termination. Compl. ¶¶ 79, 84, 177, 246.  It publicized the cancellation of Dr. Newman's Spring 2019 400-level course which is a requirement for a GCS degree. *Id.*, ¶ 179, 237-38, 245.  Ms. McClelland, the point of contact for the rape report by Plaintiff, gratuitously talked about her "little Jewish" college roommate who was afraid of everything, joked with Dr. Hines and others about Dr. Newman's suspension calling it a real "sh*t show" and about if Plaintiff would return. *Id.*, ¶ 154.  PPU "prematurely assumed and hoped that Dr. Newman was not coming back even though there had not yet been an adjudication." *Id*, ¶ 239.

9

Fourth, as in *Thourot* and in contrast to *Jones*, the investigation was not followed by alleged wrongdoing on Dr. Newman's part, but possible wrongdoing committed by Drs. Ross and Hines that prompted further investigation.  Compl. ¶¶ 277-79.  Plaintiff was embarrassed and horrified to have been suspended under a cloud of suspicion which caused tremendous emotional distress and reputation damage.  *Id.*, ¶¶ 94, 95, 129, 233, 246, 286.  Based on these allegations, this Court should find that Dr. Newman pled circumstances allowing a Jury to find that her paid suspension was an adverse employment action for purposes of her discrimination claims.  *See Vay*, 2016 WL 7324596, at *12–13; *Thourot*, 2016 U.S. Dist. LEXIS 142962, at *14-15.

PPU inappositely cites *Andrekovich v. Borough of Punxsutawney*, 2018 WL 5442441 (W.D. Pa. Oct. 29, 2018), which was decided on summary judgment and not on a motion to dismiss.  There was no evidence that the employer exceeded reasonable disciplinary procedures or of disparate treatment.  *Id.*, at *8.  *Andrekovich* held "important for this Court's analysis, there was no 'presumption of termination, by the Borough at any point, [...], and he returned to the position of detective" three weeks later.  *Id.*  In contrast to this case, the *Andrekovich* employer investigated and substantiated allegations that plaintiff was a "ticking time bomb" *prior to* placing him on paid administrative leave pending a fitness for duty exam.  *Id.*  Likewise, *Hughes v. Allegheny Cty. Airport Auth.*, 2017 WL 2880875, at *7 (W.D. Pa. July 6, 2017), *aff'd*, 728 F. App'x 140 (3d Cir. 2018), was decided on summary judgment.  Plaintiff became irate after being notified of selection for random drug testing prompting the employer to contact the police; as a result, he was put on a short paid leave pending a fitness for duty exam.  *Id.*  In contrast to this case, there was no evidence that the employer exceeded reasonable disciplinary procedures or disparate treatment suggesting discrimination.  *See id.*

10

This Court also should find that Dr. Newman pled circumstances allowing a Jury to view her paid suspension as a materially adverse action for her retaliation claims. *See Prise v. Alderwoods Grp., Inc.*, 2011 WL 3047629, at *8–10 (W.D. Pa. July 25, 2011); *Killen v. Northwestern Human Servs., Inc.*, 2007 WL 2684541, at *7 (E.D.Pa. Sept.7, 2007). *Killen* held it retaliatory to place an employee on paid administrative leave while the employer conducts an investigation. *Killen*, 2007 WL 2684541, at *7. Relying on *Killen*, the Court in *Prise* upheld a Jury finding that the plaintiff's paid suspension constituted a materially adverse action for a retaliation claim where the period of suspension was for an undetermined amount of time and during which plaintiff lost the opportunity to earn commissions. *Prise*, 2011 WL 3047629, at *8–10.

As in *Prise* and *Killen*, Dr. Newman was placed on an indefinite leave pending investigation. In addition, she was removed from the classroom in the middle of the semester, replaced as Chair, and had her Spring 2019 class cancelled. A reasonable juror could conclude that a college professor's indefinite suspension, removal from the classroom, replacement as Chair, and the cancellation of her capstone course the following semester could dissuade an employee from engaging in protected activity and, therefore, constitute an adverse action. *See Prise*, 2011 WL 3047629, at *8–10; *Killen*, 2007 WL 2684541, at *7.

### 2. Point Park's Failure To Timely Investigate Dr. Newman's Discrimination Complaints Constitutes An Adverse Action.

The Third Circuit "appears to leave open the possibility of bringing a discrimination claim on the basis of an employer's inadequate investigation" if it "'effect[ed] a material change in the terms or conditions of [the plaintiff's] employment.'" *McFalls v. BrightView Landscapes, LLC*, 2020 WL 1922828, at *7 (E.D. Pa. Apr. 21, 2020 (citing *Hare v. Potter*, 220 F. App'x 120, 134 (3d

11

Cir. 2007)).  "[T]he issue complained of, if left uncorrected, must "'be of enough significance to qualify as an adverse action.'" *Id.* (citing *Kuhn v. United Airlines*, 63 F. Supp. 3d 796, 803 (N.D. Ill. 2014), aff'd, 640 F. App'x 534 (7th Cir. 2016)); *see also Scott v. Sunoco Logistics Partners, LP*, 918 F. Supp. 2d 344, 356 (E.D. Pa. 2013) (deficient investigation may constitute an adverse action where there is demonstrable harm).

Dr. Newman alleged that PPU's untimely investigation impacted a material change in the terms and conditions of her employment.  On December 3, 2018, she complained of being discriminated against and harassed by Drs. Ross and Hines, and their student followers because of race and national origin.  Compl. ¶¶ 23, 234-36, 277.  On December 10, 2018, PPU promised to conduct an investigation and inform Dr. Newman of the outcome in compliance with the "University's anti-discrimination and equal opportunity policies." *Id.*, ¶¶ 278-79.  No timely or adequate investigation was conducted.  *Id.*, ¶ 280.

In the interim, the student newspaper ran an article on January 8, 2019 highly critical of Dr. Newman citing an unnamed student who falsely claimed that she promoted her own personal beliefs and agenda in class, and unnamed students who complained about being cheated financially by her. Compl. ¶¶ 289-95.  An anonymous student posted a racist online message falsely claiming that Dr. Newman "showed videos calling Muslims savages who are destroying western civilization in a language class to educate us." *Id.*, ¶ 287.  When Dr. Newman returned to campus, Dr. Ross and Dr. Hines had absorbed responsibilities for advising students in GCS and she became isolated in that program.  *Id.*, ¶¶ 296-97.  Students were disruptive and acted inappropriately in her class for discriminatory reasons. *Id.*, ¶ 326.  On February 19, 2019, PPU stated that several students had come forward accusing her of Title IX violations which would be investigated by an outside investigator.

*Id.*, ¶¶ 301-305.  PPU repeatedly distorted and misapplied Title IX against Dr. Newman.  *Id.*, ¶ 311.

In April 2019, Dr. Newman complained that it had failed to investigate her discrimination complaint.  Compl., ¶ 281.  She was undermined as Chair by the Administration and shunned by students and faculty which appeared coordinated for discriminatory and retaliatory reasons.  *Id.*, ¶¶ 322-23.  Faculty went around her as Chair to have substitutions approved for required courses.  *Id.*, ¶ 324.  GCS majors were allowed to graduate without fulfilling degree requirements without Dr. Newman's knowledge or consent, and PPU insisted that Associate Provost James Thomas attend a routine meeting between Dr. Newman and a student of Drs. Ross and Hines, which was humiliating for Plaintiff.  *Id.*, ¶ 327.  In August 2019, PPU decided over Dr. Newman's objection that all scheduling and course substitutions for a student of Dr. Hines would be handled by the Provost's office and not by her in the normal course.  *Id.*, ¶¶ 334-337.

On September 25, 2019, PPU informed Dr. Newman that she again was under investigation but did not reveal the charges against her.  *Id.*, ¶ 383.  On November 11, 2019, PPU resolved Dr. Ross' grievance against Plaintiff requiring her to assign him to teach a class in her Department outside his area of expertise instead of more qualified faculty.  *Id.*, ¶¶ 353-81.  Almost a year after filing the formal December 3, 2018 discrimination complaint, Dr. Newman received a perfunctory letter dated November 21, 2019 that her complaints could not be substantiated.  *Id.*, ¶ 284.

Based on the foregoing, this Court should find that Point Park's failure to investigate Dr. Newman's complaint led to "demonstrable harm" and "effect[ed] a material change in the terms or conditions of [the plaintiff's] employment," thus, constituting an adverse action.  *See McFalls*, 2020 WL 1922828, at *7;  *Scott*, 918 F. Supp. 2d at 356.

**3.      Multiple Investigations Of Dr. Newman, Adverse Grievance Resolution, And Failure to Participate in Mediation Constitute Adverse Actions.**

Dr. Newman alleged as adverse actions that she was accused of *multiple* Title IX violations without proper justification and subjected to *repeated* workplace investigations and increased scrutiny.  Compl. ¶¶ 383, 423, 454, 474.  She has been under investigations constantly since the unsustained charges under Title IX were levied in October 2018.  *Id.*, ¶ 349.  She raised to President Hennigan that she is the only professor who has been under investigation for a year which he did not refute.  *Id.*, ¶ 382.  Repeated vague accusations of sexual wrongdoing and constant misconduct investigations are terrifying to Dr. Newman as they would be to anyone in her position.  *Id.*, ¶ 310.[3]

Defendant asks the Court to weigh the second Title IX charge against Plaintiff in February 2019 in which multiple students came forward.  ECF 19, p. 9.  Dr. Newman does not allege that this investigation alone is an adverse action; rather, it is the repeated nature of the bogus investigations that impacted the terms and conditions of her employment and/or would deter a reasonable employee from engaging in protected activity.  *See Burlington N. & Santa Fe R. Co.*, 548 U.S. at 61–67; *Demaio v. Connecticut Dep't of Correction*, 2012 WL 892933, at \*9 (D. Conn. Mar. 15, 2012) ("By subsequently investigating and disciplining the Plaintiff, the DOC subjected the Plaintiff to employment actions that, viewed in the light most favorable to the Plaintiff, were sufficiently adverse because they might dissuade a reasonable employee from engaging in protected activity.").  The vague investigations likewise constitute evidence of ongoing retaliatory animus against Dr. Newman. *See Holt v. Pennsylvania*, 683 F. App'x 151, 158 (3d Cir. 2017) (permitting investigation to continue

---

[3]In December 2018, Dr. Newman showed Point Park the student Facebook group that targeted her, stated that "Title IX is investigating Newman beyond this particular claim and looking into her total teachings," and implored others to "bear witness to these claims against Newman" or "to ANY of Newman's teaching styles and teachings." *Id.*, ¶¶ 187-199, 214.

despite lacking reasonable basis constituted evidence of ongoing antagonism).

In Fall 2019, Dr. Ross (whom Plaintiff had accused of discrimination and retaliation) filed a harassing grievance against Dr. Newman when she exercised her management right not to assign him a course.  He lacked the requisite Sociology degree and was offered another course by Dr. Newman in his field (Geography) but declined.  Compl., ¶¶ 353, 357-58, 377.  The CBA gave Plaintiff as Chair and Management representative the sole discretion to decide "who does the teaching."  *Id.*, ¶¶ 372-73.  On November 11, 2019, Lisa Stefanko informed Dr. Newman that PPU acquiesced to Dr. Ross's grievance on pretextual grounds, falsely accused Plaintiff of announcing "modified instructor qualifications," and made the veiled threat that her cooperation in assigning this course to Dr. Ross was "expected."  *Id.*, ¶¶ 360-67, 381.  A Jury would find that PPU's pretextual acquiescence to Dr. Ross and curtailment of Dr. Newman's managerial rights and academic freedom clearly impacted the terms and conditions of her employment and/or might dissuade a reasonable worker from making a charge of discrimination.  *See Connelly*, 809 F.3d at 789 (plaintiff need only plead "sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims").

Similarly, this Court should find that PPU's failure to participate in the mediation session on September 25, 2019 constitutes an adverse action.  Plaintiff, her counsel, and the Mediator showed up at PPU's lawyer's offices, sat around for hours as unbeknownst to them PPU had decided not to participate in mediation, and PPU finally announced that mediation was over citing yet another undefined charge against Plaintiff.  Compl. ¶¶ 596-601.  The failure to participate caused Plaintiff to sustain damages for attorney and mediator fees.  *Id.*  Such mistreatment clearly would dissuade a reasonable employee from engaging in such reasonable protected activity and, therefore, constitutes

15

a materially adverse action.  *See Burlington N. & Santa Fe R. Co.*, 548 U.S. at 61–67.[4]

### 4.      Dr. Newman Alleged Facts That Could Support A Reasonable Inference of A Causal Connection Between Her Protected Activity And Suspension.

On a motion to dismiss, "no showing of proof is necessary" and "even if the record ultimately produced no evidence of temporal proximity suggestive of retaliation, that would not necessarily be fatal to [a plaintiff's] claim."  *Connelly*, 809 F.3d at 792 n.11 (citing *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir.1993)) ("The mere passage of time is not legally conclusive proof against retaliation.").  "Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole."  *Id.* (citing *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)).

*Connelly* reversed the grant of a motion to dismiss of a retaliation claim.  Plaintiff, a seasonal truck driver who complained of harassment in May 2010, was laid off in October 2010, and not rehired in March 2011 due to purported lack of work although plaintiff alleged while drivers with less seniority were recalled.  Hence, "one could reasonably draw the inference that [defendant] gave [plaintiff] inconsistent and false reasons for declining to rehire her."  *Connelly*, 809 F.3d at 792 n.11.

---

[4]Defendants' reliance on *West v. Henderson*, 2000 WL 35635902, *6-7 (D. D.C. Nov. 3, 2000), is misplaced because it was decided on summary judgment and relied on *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999).  *Brody* applied the discrimination "adverse action" standard to retaliation claims and no longer is good law in light of the "materially adverse" standard announced in *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68.  *See Steele v. Schafer*, 535 F.3d 689, 695–96 (D.C. Cir. 2008).

Plaintiff further asserted that after she complained her relationship with supervisors and co-workers became "increasingly strained."  She "alleged facts that could support a reasonable inference of a causal connection between her protected activity in May 2010 and the gradual deterioration of her relationship with her employer until she was laid off in October 2010."  *Id.*, 809 F.3d at 792–93 ("[E]ven if one believed it 'unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits,' ... it must still be said that [plaintiff]—under a favorable standard of review—has raised a reasonable inference that discovery will reveal evidence of the elements necessary to establish her claims").

Dr. Newman engaged in protected activity prior to her October 2018 suspension when she complained to Point Park of the anti-Semitic activities of Drs. Ross and Hines and the SJS program, Dr. A's harassment of her for which she filed a Title IX charge in December 2017, and Dr. Hines' sexist behavior in 2014.  Compl. ¶¶ 56-59, 248-252, 271, 317, 319, 320.  A Jury could find that following Dr. Newman's Title IX complaint the first opportunity Point Park had to retaliate against her was when it received a complaint in October 2018.  *See Lipschultz v. Holy Family Univ.*, 2017 U.S. Dist. LEXIS 23476, *21-24(E.D. Pa. Feb. 17, 2017) (finding employer waited until the first opportunity it had to retaliate against plaintiff 14 months later when it fulfilled its requirements under a settlement agreement).

After Dr. Newman's complaints, Dr. Ross and Hines were antagonistic to her including having her removed as GCS Coordinator, opposed her as Chair, and their hostility persisted into 2018. Compl. ¶¶ 38, 73.  In addition, the October 2018 student complainant – Dr. Hines' advisee and Dr. Ross' colleague in the BDS movement – was encouraged to file a Title IX charge against Dr. Newman by Drs. Ross and Hines who improperly publicized the confidential charge to others

in the Administration. *Id.*, ¶¶ 82, 217-18, 220-22, 329-31. At the time, Dr. Newman informed Ms. Stefanko that the empty Title IX charge was a "set-up" by Drs. Ross and Hines. *Id.*, ¶ 90-92. Such ongoing antagonism supports Plaintiff's causal connection. *See Connelly*, 809 F.3d at 792.

Evidence of pretext likewise supports the causal inference. In suspending Dr. Newman, PPU exceeded reasonable disciplinary procedures and misapplied Title IX when there was no allegation that she had harassed or discriminated against the student because of gender. In contrast, similarly situated men outside of Dr. Newman's protected classes accused of Title IX violations were not suspended pending investigation nor received such severe mistreatment. PPU implied that Dr. Newman would be terminated when it indefinitely suspended her, replaced her as Chair with a male professor, and publicized the cancellation of her Spring 2019 400-level course encouraging students to take Dr. Ross' 100-level course instead. Compl. ¶¶ 79, 84, 177. This Court should find that Plaintiff's evidence of temporal proximity, ongoing antagonism, and pretext "has raised a reasonable inference that discovery will reveal evidence of the elements necessary to establish her claims." *See Connelly*, 809 F.3d at 792-93; *Lipschultz*, 2017 WL 1331731, at *9–10 (timing and pretext sufficient to establish causation); *Byrd v. Elwyn*, 2016 WL 5661713, at *5–6 (E.D. Pa. Sept. 30, 2016) (same).[5]

**B.    Dr. Newman Pled A Viable Hostile Work Environment Claim.**

Plaintiff was subjected to a hostile work environment based on Jewish race, religion, and Israeli national origin. *Congregation v. Cobb,* 481 U.S. 615, 617-18 (1987) (Jews are "considered to be [a] distinct race"); *Powell v. Indep. Blue Cross, Inc.*, 1997 WL 137198, at *7 (E.D. Pa. Mar.

---

[5]Defendant's reliance on the unpublished case of *Blakney v. City of Philadelphia*, 559 Fed.Appx. 183 (3d Cir. 2014), is misplaced because it was decided prior to the Third Circuit's 2016 published decision in *Connelly* and, in contrast to the instant case, there were no allegations of ongoing antagonism or pretext.

26, 1997) (discrimination based on Jewish ancestry is cognizable).  "[C]ourts have regularly found that anti-Semitic harassment and discrimination amount to racial discrimination."  *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 354 (S.D.N.Y. 2014).  An employer can discriminate on the basis of Jewish race "by disparaging Israel."  *Sinai v. New England Tel. & Tel.*, 3 F.3d 471 (1ˢᵗ Cir. 1993).  "Much of this historical antipathy towards Jews was grounded in economic antisemitism, which makes comments about 'Jewish money' all the more objectionable and offensive."  *Prettyman v. LTF Club Operations Co.*, 2018 WL 5980512, at *6–7 (E.D. Va. Nov. 13, 2018).

For hostile work environment claims, a plaintiff must plead (1) that she suffered intentional discrimination because of her race/religion/national origin, (2) that the discrimination was severe or pervasive, (3) it detrimentally affected her; (4) that it would detrimentally affect a reasonable person in like circumstances, and (5) that a basis for employer liability is present. *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001).  Whether harassment is "severe or pervasive" is "a fact-intensive inquiry and is determined by 'looking at all the circumstances.'"  *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 23 (1993)).

*Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265 (3d Cir. 2001), reversed the grant of summary judgment on a hostile work environment claim brought by a Jewish professor.  260 F.3d at 279–80.  A "jury could find that the harassment was pervasive" as the "events alleged occurred over a period of two years and could be found to have infected [Plaintiff's] work experience."  260 F.3d at 279-80.  Further, "[n]o one event alone stands out from the rest, but all of the events could be found to aggregate to create an environment hostile to a person of [plaintiff's] religion."  *Id.* (citing *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999) ("[I]t is settled law that courts should not consider each incident of harassment in isolation. Rather, a court must evaluate

19

the sum total of abuse over time").  The Court concluded that "[t]aken as a whole, all the events alleged indicate that the harassment rose to the level of pervasiveness required to withstand summary judgment."  *Id.*; *see also Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (reversing summary judgment); *Durham Life Ins. Co.*, 166 F.3d at 155.

With PPU's support, Drs. Ross and Hines advocate militant, hateful, and anti-Semitic/anti-Israel views inside and outside the classroom including the economic, academic, and cultural boycott and the racist claim that Israel is an apartheid state.  Compl. ¶¶ 19-23, 29-32, 42-44, 47, 228-230. Plaintiff repeatedly expressed her opposition to these teachings.  *Id.*, ¶¶ 56, 58, 178, 343-44.  Drs. Ross and Hines have boycotted Dr. Newman having her removed as GCS Coordinator, ¶ 38, opposed her Chair candidacy, ¶ 53, and placed the Social Justice program in a different department.  *Id.*, ¶ 64. In October 2018, a student under the influence of Drs. Ross and Hines and involved in the BDS movement falsely accused Dr. Newman of a Title IX violation.  *Id.*, ¶¶ 79, 82, 83, 326.  Immediately prior to filing the charge, the student consulted with both Drs. Ross and Hines who improperly publicized the charge.  *Id.*, ¶¶ 217-18.  This was the first time nationally that BDS had used a Title IX sexual harassment charge against a Jewish and/or Israeli professor.  *Id.*, ¶¶ 134-135.  Without notice, PPU immediately suspended and banned Dr. Newman although the University knew less drastic measures were available.  *Id.*, ¶¶ 164, 170-75.

On October 16, 2018, the day Dr. Newman was suspended, current and former students including the complainant conducted an electronic witch hunt to implore others to "bear witness" against her.  Compl. ¶¶ 188-202.  Ms. McClelland ignored Dr. Newman's report of the rape, made an anti-Semitic remark to staff, and joked with Dr. Hines and others about Dr. Newman's suspension. *Id.*, ¶ 154.  Prior to the adjudication clearing Dr. Newman, PPU replaced her as Chair

20

(with Robbins a promoter of Ross), cancelled her Spring 2019 course – a requirement for the GCS major – and funneled her students to Dr. Ross's 100-level social justice course.

In early December 2018, Dr. Newman made a complaint of race and national origin discrimination. PPU pledged to conduct an investigation in accordance with anti-discrimination policies but it failed to do so. Compl. ¶ 288. In January 2019, the student newspaper published an article critical of Dr. Newman in which an assistant provost gave credence to the Title IX accusation against her,[6] blamed her for the effect on students from her removal, and claimed this cheated them financially – an anti-Semitic trope. *Id.*, ¶ 289-91. In February 2019, three or four students filed another Title IX charge against her. *Id.*, ¶¶ 304-05. PPU refused to provide any details about that charge which to date has not been withdrawn. *Id.*

Students have shunned Dr. Newman by evading her as a teacher and advisor. Some who took the Spring 2019 course acted disrespectfully. With PPU's consent some were allowed to graduate without taking her required course.[7] *Id.*, ¶¶ 322-26. PPU had an associate provost attend a routine meeting with a student and Dr. Newman. Faculty disrespected Dr. Newman by going around her as Chair for sabbaticals and course assignments. In September 2019, PPU abruptly ended participation in the mediation attended by Plaintiff and her counsel because she was under yet another investigation. *Id.*, ¶¶ 594-97. In November 2019, PPU settled a grievance initiated by Dr. Ross

---

[6]A "failure to quell rumors may be a factor to be considered in determining whether a hostile work environment exists." *Swanson v. Livingston Cty.*, 270 F. Supp. 2d 887, 895 (E.D. Mich. 2003), aff'd, 121 F. App'x 80 (6th Cir. 2005) (citing *Spain v. Gallegos*, 26 F.3d 439 (3d Cir. 1994), and *Jew v. University of Iowa*, 749 F.Supp. 946 (S.D. Iowa 1990)).

[7]Shunning and ostracism can support a hostile work environment claim where as here it impacted the terms and conditions of employment. *See EEOC v. Wyeth*, 302 F.Supp.2d 1041, 1070-1 (N.D. Iowa 2004) (shunning of employee forced to work alone, thereby increasing workload, led to factual issue whether she suffered an adverse employment action).

against Dr. Newman undermining her authority to choose qualified instructors.[8] The Administration found the word "Jews" problematic in the title of the proposed course and forced her to change it or cancel. *Id.*, ¶¶ 392-399. The number enrolling in her courses has decreased dramatically, she has lost control over the majoring students in the Department, and her scheduling and the direction of the curriculum continue to be undermined. *Id.*, ¶¶ 323-26.

Based on allegations in the Amended Complaint and inferences drawn in Plaintiff's favor, this Court as in *Abramson* should find that the events occurred over more than a 2 year period and adversely impacted Dr. Newman's work experience. *Abramson*, 260 F.3d at 279–80. As a result, the alleged harassment is sufficiently severe or pervasive to state a hostile work environment claim. *See Abramson*, 260 F.3d at 279–80; *Aman*, 85 F.3d at 1082; *Prettyman*, 2018 WL 5980512, at *6–7 (denying summary judgment on Jewish hostile work environment claim); *Bogart v. N.Y.C. Law Dep't*, 2001 WL 1631986, at *5 (S.D.N.Y. Dec. 20, 2001) (sustaining allegations of hostile work environment based on anti-Semitic comments).

**C.**   **Dr. Newman Pled A Claim For Breach Of Academic Freedom Policy.**

A breach of contract claim includes (1) the existence of a contract, (2) a breach and, (3) resultant damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). Courts recognize breaches between private colleges and faculty. *See Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 428-9 (Pa. 2001) (university's internal regulations give rise to a contract and should be executed in good faith); *Waggaman v. Villanova Univ.*, 2008 WL 4091015, at *20 (E.D. Pa. Sept. 4, 2008) ("[b]reach of a

---

[8]The Jury may find PPU's acquiescence to Dr. Ross against Plaintiff, its manager, went against standard practice and point to an inference of discrimination. *Colgan v. Fischer Scientific*, 935 F.2d 1407, 1422-23 (3d Cir. 1991).

tenure contract can consist of failure by the institution to comply with the procedures established"). In *McAdams v. Marquette Univ.*, 914 N.W.2d 708, 713–14 (Wis. 2018), the university breached its academic freedom policy when it suspended a professor and banned him from campus based on his blog. *Id.*; *see also Abatena v. Norfolk State Univ.*, 2014 WL 1819665, at *7 (E.D. Va. May 7, 2014) (academic freedom breach survived motion to dismiss).

The Academic Freedom policy found in the PPU Faculty Handbook states:  (b) "Teachers are entitled to freedom in the classroom in discussing their subjects," and (c) "When they speak or write as citizens, they should be free from institutional censorship or discipline." *Id.* ¶¶ 117, 565-66 (citing AAUP Red Book, 1995 Edition).  PPU breached when it suspended Dr. Newman in the middle of the semester, removed her as Chair, and banned her based on a remark regarding the Me Too Movement and/or a follow-up call when she asked the student whether she had sought help for rape trauma disclosed in class.  Compl. ¶¶ 82, 84-88, 567-68.  Ms. Stefanko told Dr. Newman the charges involved "something about Me Too" and some telephone calls. *Id.*, ¶¶ 90-91.  As a jury may find, Plaintiff's statements were protected under the Academic Freedom policy. *Id.*, ¶¶ 96-97, 101-110, 116-117, 120-7.  As a result of the breach, Plaintiff suffered damages including being stripped of teaching and Chair duties, banned from campus, denied access to email and had to engage counsel with obviously attendant expense. *Id.*, ¶¶ 89, 132, 175, 180-2, 185, 345-48, 570, 597-601.  Based on the foregoing, a jury could find that Dr. Newman pled a cognizable claim of breach of the Academic Freedom policy. *See McAdams*, 914 N.W.2d at 713–14; *Abatena*, 2014 WL 1819665, at *7.

Defendant's arguments regarding federal preemption and failure to exhaust contractual remedies are misplaced.  As a Chair, Dr. Newman is considered an academic administrator and not

23

a member of the bargaining unit.  Compl. ¶ 118; ECF 18-1 (p. 65 of 88) ("In the event a full time faculty member leaves the bargaining unit to assume an academic administrator position (i.e., Chair, Provost), ...").  By accepting an administrative position but still functioning as a professor Dr. Newman did not forfeit academic freedom protection.

Plaintiff submits as a jury may find that the CBA reinforced a long understanding between PPU and Dr. Newman that she possesses academic freedom.  A substantively similar policy to that in the handbook exists at CBA Article 7.  It pertains to Professors per Article 17.  The CBA is not her remedy because she is not in the bargaining unit, (¶ 118), as Defendant agrees.  Motion to Dismiss, p. 19.

Plaintiff can enforce a contract for academic freedom outside of the CBA. In *Odyssey Contracting, Corp. v. Hercules Painting Co., Inc.*, 2019 WL 7629228, at *3 (W.D. Pa. Mar. 28, 2019), Judge Cercone held that "where the facts are in dispute, the question of whether a contract was formed is for the jury to decide." *Id.* (citing *Ingrassia Constr. Co. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478, 482 (Pa. Super. Ct. 1984)).").  In *Ingrassia*, whether there was a contract between a general contractor and subcontractor was a question of fact where there was ample evidence from which a reasonable jury could conclude that either an oral contract existed based on the telephone conversations between a general contractor's agent and subcontractor or that a contract implied in fact arose evidenced by the course of events and the parties' behavior over the period of time from the subcontractor's bid to the subcontractor's refusal to perform.  In *Enslin v. Coca-Cola*, 2017 WL 1190979, at *6 (E.D. Pa. Mar. 31, 2017) the Court ultimately held that Coca Cola did not have a duty to protect a former employee's personal information.  However, the former employee's breach of contract claim went forward to the merits even though it was based on  a 1990's code of conduct and

24

in the early 2000's Coca Cola and its employees entered into a CBA.  Judge Leeson held that it was the defendant's burden to prove that the  CBA superseded all prior agreements with the employees. It was not a part of the plaintiff's case in chief.  Also, as was asserted, the plaintiff's claims grew out of individual employment contracts to which the CBA's grievance procedure did not apply.

Plaintiff submits that under Pennsylvania law she has an implied in fact contract for academic freedom.  Defendant has not met its burden to prove otherwise or shown that she relinquished that right.  The case should go forward on this claim which is well within Pennsylvania's four-year statute of limitations.

**D.     Breach Of Contract Claims Are Not Preempted By The PHRA And Plaintiff Pled The Existence Of A Contract.**

Plaintiff asserts that PPU breached specific provisions of its Title IX Policy (Count XIII) and Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking (Count XVI).  Contrary to Defendant's argument, those claims are not preempted by the PHRA.  Courts have "recognized that where a claim for breach of contract is grounded on conduct other than the alleged discriminatory conduct, that claim is not barred by the PHRA."  *Belverena v. Cent. Parking Sys., Inc.*, 2005 WL 2850343, at \*2 (E.D. Pa. Oct. 31, 2005) (citing *Brennan v. National Telephone Directory Corp.*, 850 F.Supp. 331, 344-45 (E.D. Pa. 1994); *Deramo v. Consolidated Rail Corp.*, 607 F.Supp. 100 (E.D. Pa. 1985) (in age discrimination plaintiff's breach of contract claim was not preempted by the PHRA)).

Counts XIII and XVI are grounded other than on discriminatory conduct, namely, PPU's failure to follow specific policy provisions.  Point Park's breaches include that the allegations against Plaintiff did not constitute a Title IX violation; she did not receive adequate notice, and was not

provided an opportunity to respond before being banned.  Plus, PPU breached confidentiality during the process; there was no evaluation of whether she posed a risk of harm to students; Dr. Ross and Dr. Hines breached policy by publicizing the complaint beyond the individuals with a need to know; draconian "interim" measures were unwarranted and impermissible under the policy and reflect a lack of good faith and fair dealing.  PPU failed to inform Dr. Newman of the nature of the allegations against her or the identity of the complainants in the February 2019 Title IX, and failed to complete its investigation within the required 30 days.  Compl. ¶¶ 557, 585-91.

Because the breaches in Counts XIII and XVI are grounded on violations of specific provisions of policies and not solely on discriminatory conduct, Plaintiff's claims are not preempted. *See Belverena*, 2005 WL 2850343, at *2 (breach of contract claim not preempted where based on implied contract to provide warning prior to termination); *Brennan*, 850 F.Supp. at 344-45 (breach of contract claim not preempted by PHRA where based on "defendants' acts of firing plaintiff without following their own established procedures and policies"); *Deramo*, 607 F.Supp. at 102 (breach of contract claim not preempted by the PHRA to the extent it was predicated on a detrimental reliance theory).

Contrary to Defendant's argument, Plaintiff pled that the Title IX Policy and the Policy Prohibiting Sexual Misconduct applied to her and constituted a valid contract.  Compl. ¶¶ 551-54, 584.  Under Pennsylvania law, the provisions of an employee handbook setting forth specific workplace procedures give rise to a unilateral contract between the employer and the employee. *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 939 (Pa. Super. 2011).  Failure to adhere to personnel policies constitutes a viable breach.  *Braun*, 24 A.3d at 958-9.  Dr. Newman alleged that Point Park communicated to her certain rights and procedures in the policies at issue under which she performed

her duties, and thereby making an enforceable contract. *Id.* PPU's failure to follow those policies, in turn, gives rise to her breach of contract claims. *See id.*

**E.      Dr. Newman Pled A Cognizable Claim For Breach Of Mediation Agreement.**

Pennsylvania recognizes a cause of action for breach of an agreement to mediate. *See Batoff v. Charbonneau*, 130 F. Supp. 3d 957, 965–67 (E.D. Pa. 2015); *Bethlehem Area Sch. Dist. v. Zhou*, 2012 WL 930998, at *1-3 (E.D. Pa. Mar. 20, 2012). The *Batoff* Court denied a motion to dismiss finding that plaintiff set forth a claim for breach of a mediation agreement. *Id.* The parties agreed to mediate their underlying dispute and "the mediation would be held without the participation and assistance of counsel at the mediation and/or in the drafting of any settlement agreement reached at the mediation." *Id.* Plaintiff alleged that defendants breached by contacting their attorney during the mediation, and that as a result, he suffered damages. *Id.* In *Zhou*, the Court awarded summary judgment to counterclaim plaintiff. In violation of the confidentiality provision in a mediation agreement, the school district amended its complaint alleging that defendant "advised the Mediator that the [sic] she was engaging in due process procedures to drive up costs for the District so that the District would agree to pay for M.Z. and J.Z. to go to private school," and identified the mediator as a trial witness. Hence, "the District breached its agreement with Zhou to maintain the confidentiality of discussions that took place during the course of mediation and to not call the mediator at future legal proceedings." *Zhou*, 2012 WL 930998, at *3.

On May 24, 2019, the Parties entered into an Agreement to Mediate and "agreed to participate in a Mediation ('Mediation') with Carole Katz as mediator." Compl. ¶¶ 594-95. Point Park breached a duty imposed by the Agreement to Mediate at the third scheduled session when it declined to participate. *Id.* ¶¶ 596-97. Dr. Newman and her counsel sat in Point Park's lawyer's

27

offices for hours. *Id.*, ¶ 598. Later, PPU announced that it stopped participating due to a new undefined investigation of Dr. Newman. *Id.*, ¶¶ 599-600. As a result of the breach, Dr. Newman suffered damages including payment for mediator fees and attorney's fees. *Id.*, ¶ 601. Plaintiff has stated a plausible claim for breach of the Agreement to Mediate. *See Batoff*, 130 F. Supp. 3d at 965–67; *Zhou*, 2012 WL 930998, at *3.

**F.     Plaintiff Pled Negligent Supervision Claim Which Is Not Preempted By PHRA.**

Liability for negligent supervision of an employee exists where an employer fails to exercise ordinary care to prevent an intentional harm to a third-party that 1) is committed on the premises by an employee acting outside the scope of his employment and 2) is reasonably foreseeable. *Mullen v. Topper's Salon and Health Spa, Inc.*, 99 F.Supp.2d 553, 556 (E.D.Pa. 2000) (citing *Dempsey v. Walso Bureau*, 431 Pa. 562, 246 A.2d 418, 419–22 (Pa. 1968)). Once an employee informs an employer of harassment by another employee, the persistence of that harm becomes reasonably foreseeable. *Id.* at 556–57. In *Mullen*, plaintiff pled that she informed her employer about harassment which was reasonably foreseeable and thus survived a motion to dismiss. *Id.* at 557; *see also Wasseff v. NIH*, 2017 U.S. Dist. LEXIS 17221, *36-39 (E.D. Pa. Feb. 6, 2017) (employee's negligent supervision claim survived motion to dismiss); *Freeman v. Inter-Media Mktg.*, 2018 Pa. Super. Unpub. LEXIS 1059, *2 (Pa. Super. 2018) (appeals court overturned dismissal on preliminary objections of employee's negligent supervision claim).

Dr. Newman pled that she notified her supervisors of misconduct of employees outside the scope of their employment but PPU failed to prevent further misconduct. Compl. ¶¶ 606-10. Misconduct included "Point Park's refusal to reinstate Dr. Newman pending the investigation despite repeated requests, Point Park's failure to investigate that Dr. Ross and/or Dr. Hines were behind the

October 2018 Title IX complaint as Dr. Newman had raised, faculty members improperly going around and intentionally avoiding Dr. Newman as Department Chair and undermining her authority, and Point Park's failure to intervene in the actions of Dr. Ross and Hines and their use of students to file multiple bogus Title IX claims against Dr. Newman."  *Id.*, ¶ 611.

Plaintiff further alleged that shortly after the student announced the rape in class she contacted Ms. McClelland to report it left a message but no one returned her call.  Compl. ¶¶ 612-13. On October 15, 2018, Dr. Newman called again and spoke to Ms. McClelland about the incident but "Ms. McClelland showed no interest in investigating the alleged rape although it was Point Park's obligation to determine if the act occurred on campus and/or whether the perpetrator was affiliated with the University, and if so to report to it to the Federal Government and pursue it under Title IX."[9] *Id.*, ¶¶614-16.  Dr. Newman did the right thing by reporting the rape.[10]  Ms. McClelland, CSS, and the Title IX apparatus at Point Park were negligently supervised, failed to investigate the rape, and punished Dr. Newman as the messenger. *Id.*, ¶¶617-21.  Based on these allegations, Plaintiff alleged a claim for negligent supervision.  *See Mullen*, 99 F.Supp.2d at 556; *Wasseff*, 2017 U.S. Dist. LEXIS 17221, *36-39; *Freeman*, 2018 Pa. Super. Unpub. LEXIS 1059, *2.

The PHRA preempts negligent supervision claims if a plaintiff relies on "the same set of facts" to support both claims.  *Watkins v. Rite Aid Corp.*, 2006 WL 2085992, at *4 (M.D.Pa. July 25, 2006).  Plaintiff does not rely on the same set of facts.  For the PHRA claims, she does not rely

---

[9]The Clery Act requires universities to implement procedures regarding the investigation of sexual assault that occur on or near campus. 29 U.S.C. § 1092(f)(8)(B)(iv)(I) (aa).

[10]Under Point Park's Title IX policy, Dr. Newman as a faculty member had the responsibility to report the rape allegations.  Policy Prohibiting Sexual Misconduct, ECF 18-3, p. 13.

on Point Park's failure to respond and act appropriately on her rape report for which she was punished; she does not rely on Point Park's failure to investigate if Dr. Ross and/or Dr. Hines were behind the October 2018 Title IX complaint as Dr. Newman raised; or Point Park's failure to intervene in the actions of Dr. Ross and Hines to use students to file multiple bogus Title IX claims. Plaintiff's negligent supervision claim is not preempted. *See DiFlorio v. Nabisco Biscuit Co.*, 1995 WL 355580 (E.D. Pa. Jun. 9, 1995) (claim alleging that management failed to stop employee from harassing not preempted by PHRA).

## G.   Plaintiff's Intentional Infliction Claim Is Subject To The Personal Animus Exception And Harassment Allegations Rise To The Level Of Outrageous Conduct.

Claims for intentional infliction of emotional distress based on racial or sexual harassment are not barred by Worker's Compensation Act under the personal animus exception. *Alers v. City of Philadelphia*, 919 F. Supp. 2d 528, 561 (E.D. Pa. 2013);*Williams v. U.S. Airways, Inc.*, No. CIV.A. 06-4797, 2007 WL 2667981, at *2 (E.D. Pa. Sept. 5, 2007)*; Price v. Philadelphia Elec. Co.*, 790 F.Supp. 97 (E.D.Pa. 1992). Here, Plaintiff alleges intentional infliction of emotional distress because she has been targeted for adverse treatment by faculty, students, and Point Park on account of her Jewish religion, ancestry, and ethnicity and Israeli national origin as well as for retaliatory reasons. Compl. ¶¶ 13-15, 315.

In order to prevail, a plaintiff must "demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff." *Frankhouser v. Clearfield Cty. Career & Tech. Ctr.*, 2019 WL 1259570, at *15 (W.D. Pa. Mar. 19, 2019) (quoting *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122-23 (Pa. Super. Ct. 2004)). "[F]or allegations of sexual harassment to rise to the level of extreme and outrageous conduct, courts have often required

both sexual harassment and retaliation against the harassed employee." *Id.*, at \*17 (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1487 (3d Cir. 1990)). *Frankhouser* found plaintiff sufficiently alleged extreme and outrageous conduct to survive a motion to dismiss based on allegations that plaintiff's supervisor "repeatedly made sexual comments to her and stared at her in a sexual manner," and retaliated against her "in the form of enhanced job scrutiny and generally negative and unfavorable behavior" when she reported his harassment. *Id.* (citing *Williams*, 2007 WL 2667981, at \*3 allowing an IIED claim to survive a motion to dismiss when the plaintiff alleged that the defendant turned a blind eye to sexual harassment and retaliated against her for complaining about the harassment).

Contrary to Defendant's argument, Plaintiff alleged circumstances showing that Defendant's discriminatory and retaliatory conduct constitutes "outrageous or extreme conduct." Dr. Ross with Dr. Hines' support advocates militant, hateful, and anti-Semitic/anti-Israel views inside and outside the classroom including the economic, academic, and cultural boycott of Israel, the demonization and deligitimization of that nation and racist claim that Israel is an apartheid state. Compl. ¶¶ 19-23, 29-32, 42-44, 47, 228-230. Dr. Newman, who is of Jewish ancestry, ethnicity, religion and Israeli national origin as well as a Holocaust survivor, approached Dr. Ross about presenting a broader less biased version of the Middle East but was refused. *Id.*, ¶ 33. Drs. Ross and Hines have boycotted Dr. Newman by having her removed as GCS Coordinator, ¶ 38, opposed her Chair candidacy, ¶ 53, placed their Social Justice program in a different department away from Dr. Newman, ¶ 64, and students and faculty mobilized by Dr. Ross have shunned, disrespected, and undermined Dr. Newman as Chair. *Id.*, ¶¶ 23, 45-46. Dr. Newman complained to Point Park that she had seen the conflation of social activism with targeting of Jews and Israel, and that the Social Justice program

31

was a cover for anti-Semitism and very upsetting to her.  *Id.*, ¶ 56, 58.  She also complained that Dr. Ross' teachings are anti-Semitic and had caused his students and other faculty to shun and disrespect her.  *Id.*, ¶¶ 178, 332-34.

In October 2018, a female student involved with Drs. Ross, Hines, and BDS who had shunned Dr. Newman falsely accused her of a Title IX sexual misconduct violation leading to her immediate suspension without any prior notice nor opportunity to respond.  Compl. ¶¶ 79, 82, 83, 326.  Prior to filing the complaint, the student consulted with Drs. Ross and Hines who then "used the complaint as part of their discriminatory and retaliatory campaign to discredit Dr. Newman and to remove her from the University."  *Id.*, ¶¶ 217-218.  Dr. Newman broached to Ms. Stefanko that the complaint was a set-up by Drs. Ross and Hines.  *Id.*, ¶ 92.  Drs. Ross and Hines improperly publicized the student's confidential charge beyond the Title IX coordinator to upper level administrators to predispose them to find against Dr. Newman.  *Id.*, ¶¶ 220-223.  Dr. Ross falsely claimed that Dr. Newman inserted herself as the student's advisor for retaliation purposes.  *Id.*, ¶¶ 222-25. Dr. Ross, with Point Park's permission, cancelled Dr. Newman's 400-level Spring 2019 course required for a GCS degree and encouraged students enrolled in that course instead to enroll in his 100-level course in Social Justice.  *Id.*, ¶¶ 242-45.  "As Dr. Newman informed Point Park, the October 2018 situation involving Dr. Newman marked the first known time in American history when a  BDS proponent used Title IX against an Israeli and/or Jewish professor."  *Id.*, ¶ 135.[11]

The allegation of a Title IX sexual misconduct charge is enormously frightening in a

---

[11]On October 16, 2018, a former Point Park student and acolyte of Dr. Ross who accompanied him to trips to Palestine started a Facebook group of current and former students revealing that Title IX is doing a full-scale investigation of Dr. Newman and imploring the group to "bear witness" against Dr. Newman in any way they could.  Compl. ¶¶ 188-202.

university[12] as it can lead to a career-ending discharge even for a tenured full professor like Dr. Newman, ¶¶ 128-36, 302-4, plus stigmatization, isolation, professional erosion, a reputation for anti-feminism, softness on rape and constant scrutiny and investigation within a background of anti-Semitism and anti-Israel animus.

Plaintiff additionally was shocked and humiliated when PPU told her students first that class was cancelled (¶ 87). During the ban, PPU allowed the investigation to drag on painfully (¶ 100). She was not allowed to return to her office for evidence except with a uniformed security guard who escorted her out of the building where she had loyally worked for so long (¶ 182).

In Fall 2018, Dr. Newman formally complained of discrimination. However, Point Park failed to investigate and took no steps to protect her from further discrimination. Compl. ¶ 288. Drs. Ross and Hines absorbed responsibilities for advising students in the GCS program and Dr. Newman became isolated within that program she created. *Id.*, ¶¶ 296-97. In January 2019, the student newspaper ran an article highly critical of Dr. Newman and an Administrator blamed her for the student impact felt by her mid-semester removal. *Id.*, ¶ 289.[13] In February 2019, students filed another Title IX complaint against Dr. Newman. Id., ¶¶ 301-05. However, Point Park never

---

[12]The emotional and physical harm caused to a college or university professor accused of a Title IX violation can be devastating. Recently, a Dartmouth tenured professor and administrator whose name was mentioned in a Title IX complaint, but was not one of the alleged violators, committed suicide because of the related emotional and physical distress. See, "He Was Accused of Enabling Abuse. Then Came a Downward Spiral" (*The New York Times*, 1/4/2020). Unlike Dr. Newman, he was not also banned, under constant investigation, subjected to public disgrace, exposed to a student/alumni witch hunt, branded as soft on rape, or diminished academically or isolated by his university.

[13]A student from one of her canceled classes posted a racist and sexist Rate My Professor message that falsely stated that Dr. Newman "showed videos calling Muslims savages who are destroying western civilization in a language class to educate us." Compl. ¶ 287.

provided Dr. Newman with notice of the allegations nor an opportunity to respond. *Id.*, ¶ 304. After Dr. Newman's return to her position as Chair she continues to be undermined by the Administration and shunned by students and faculty. *Id.*, ¶ 322. In April 2019, Dr. Newman sent a letter to Assistant Provost Prida reiterating issues including that faculty improperly had gone around her as Department Chair to have substitutions approved for required courses, that GCS students associated with the Social Justice program exhibited coordinated shunning behavior and have avoided taking her classes or were disrespectful during her Spring 2019 course. *Id.*, ¶ 324. In September 2019, Dr. Newman was suddenly charged with an undefined infraction that pretextually PPU used to stop the mediation session. Dr. Newman is the only faculty member who has been under constant investigations. *Id.*, ¶ 382. As a result of Defendant's discriminatory and retaliatory actions, the number of students enrolling in Dr. Newman's course(s) has decreased dramatically, she has lost control over the majoring students in her Department, and her scheduling and the direction of the curriculum continue to be undermined. *Id.*, ¶¶ 323-26.

Because Dr. Newman alleged unending invidious harassment and retaliation against her, her allegations of racial, national origin, and religious harassment rise to the level of extreme and outrageous conduct. *See Frankhouser v. Clearfield Cty. Career & Tech. Ctr.*, 2019 WL 1259570, at *17; *Williams*, 2007 WL 2667981, at *3; *Price*, 790 F.Supp at 100; *EEOC v. Federal Express*, 537 F. Supp. 2d 700 (M.D. Pa. 2005) (evidence of hostile work environment and employer's failure to remedy supported jury verdict in plaintiff's favor on intentional infliction of emotional distress claim). Jurors allowed to assess the constellation of shocking facts in the context of the university environmental may find that the scenario goes for beyond the mere "cold shoulder" argued by Defendant.

**IV.  CONCLUSION**

With few Jewish students, faculty administrators, and trustees, PPU was ripe for BDS to set up shop.  As at so many other universities, it went on the attack.  With PPU complicity, Channa Newman, who had made an outstanding record during over a half century of service, became a plausible target - the only target - of discrimination.  It is respectfully submitted that this case calls for discovery and the dismissal of Defendant's premature dispositive motion.

Respectfully Submitted,

LIEBER HAMMER HUBER & PAUL, P.C.

s/James B. Lieber
James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
1722 Murray Ave., 2nd Floor
Pittsburgh, PA 15217
(412) 687-2231 (telephone)
(412) 687-3140 (fax)

35

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 18, 2020, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will send notification of such filing to the following:


        Catherine S. Ryan (PA 78603)
        cryan@reedsmith.com
        David J. McAllister (PA 36729)
        dmcallister@reedsmith.com
        Mariah H. McGrogan (PA 318488)
        mmcgrogan@reedsmith.com
        Reed Smith LLP
        225 Fifth Avenue, Suite 1200
        Pittsburgh, PA 15222
        Counsel for Defendant


                                        s/James B. Lieber
                                        James B. Lieber
                                        Counsel for Plaintiff