IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHANNA NEWMAN, | ) | Civil Action No. 2:20-cv-00204-MRH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| POINT PARK UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | Filed Electronically |

**PLAINTIFF'S MORE DEFINITE STATEMENT**

Pursuant to Order of the Court entered on July 1, 2020, Plaintiff furnishes the following statement showing more definitely the particulars of the Amended Complaint as required by such order: "On or before 7/10/2020, Plaintiff shall file a more definite statement as to Counts 13, 14, 15, 16, and 19." ECF 37.

COUNT XIII: BREACH OF CONTRACT
Plaintiff Channa Newman v. Defendant Point Park University

1. The preceding paragraphs are incorporated as if set forth at length herein.

2. Point Park maintains a Title IX policy that incorporates its "Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking" (hereinafter "Title IX policy"). The Title IX Notice of Nondiscrimination and incorporated Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking is attached as Exhibit 1.

3. Point Park's distribution, publication, and/or communication of the Title IX policy to its students, faculty, employees, and administrators constituted a unilateral offer that Plaintiff accepted by continuing her employment and the performance of her duties thereby creating a binding contract.

4. The relationship between Point Park and Plaintiff as a tenured professor and Department Chair is contractual.

5. The Title IX policy prohibits "sexual misconduct," which encompasses "sexual harassment, sexual assault, and any other non-consensual behavior of a sexual nature that is committed by force or intimidation, or that is otherwise unwelcome."

6. The Title IX Policy includes substantive rules governing prohibited misconduct and procedures that outline the process for investigating and adjudicating alleged violations of the Policy.

7. The Title IX policy promises the Complainant and the Respondent a "fair and equitable" process for resolving complaints of sexual misconduct, although neither "fair" nor "equitable" is defined in the policy.

8. Among the promised rights are the "right to prompt investigation and appropriate resolution of all credible complaints of sexual misconduct," the "right to be treated with respect by University officials," the "right to be fully informed of the nature, rules and procedures of the investigation and resolution process, and to timely written notice of the alleged violations within the complaint, including the nature of the violations."

9. When the University receives an incident report that includes allegations of sex discrimination, the Title IX Coordinator will determine (a) whether the reported conduct, if true, would constitute a violation of the policy, and (b) whether there exists "any immediate risk of harm to an individual or the community" and, if so, "will implement any necessary interim measures to address those risks."

10. Interim measures for student complainants include modifying class schedules, withdrawal from a class without academic or financial penalty, a no contact order, alteration of the Respondent's work schedule, and interim suspension for a student-Respondent but there is no provision for an interim suspension for a faculty-Respondent.

11. Point Park promises that information in the incident report "will be shared with only those people necessary to carry out a thorough, reliable and impartial investigation."

12. The Title IX policy promises that investigations are to be completed "within thirty (30) days," and that if "a delay is necessary, the University will notify all parties of the reasons for the delay and the expected adjustment in timeframes."

13. According to the Title IX policy, "the University commits to providing all parties with a prompt, fair and impartial process from the initial investigation to the final result. This includes receiving timely notice, equal opportunities to be heard, and equal opportunities to respond to the reported behavior."

14. The Title IX policy provides that an "appeal must be filed within ten (10) business days of the date of the Outcome Letter."

15. Point Park breached duties imposed by its Title IX policy.

16. Plaintiff was not treated fairly, equitably, or impartially as promised under the Title IX policy.

17. Point Park made a determination in bad faith that the conduct as reported, if true, would constitute a violation of the Title IX policy despite the fact that the conduct as reported did not constitute "sexual misconduct" or sex discrimination under the Policy.

18. The accusations that on one occasion Plaintiff made a belittling response to a student and inappropriate comments about the Me Too Movement, and that on another occasion she "continued to engage" the student about the Me Too Movement do not (even if true) constitute "sexual misconduct" or sex discrimination.

19. Point Park promised Plaintiff timely notice of the charges against her and the equal opportunity to be heard and to respond to the reported behavior, but breached this promise when

it indefinitely suspended her and cancelled Dr. Newman's classes without first informing her of the charges against her or providing her any opportunity to respond.

20.     The first time she learned of this adverse action was when a student shocked her by showing her an email sent by Assistant Provost Prida on October 16th informing all students that Plaintiff's class had been cancelled.

21.     While Point Park promised a prompt investigation within 30 days (if longer, the parties were to receive notice), it breached that promise when its investigation lasted more than 40 days without any notice which was particularly damaging to Plaintiff who was removed in the middle of the semester, and following acquittal was unable to resume her duties until the following semester.

22.     Point Park determined absurdly and in bad faith that there was an immediate risk of harm to the student-complainant, and implemented an indefinite suspension of Plaintiff as an "interim measure."

23.     As Plaintiff repeatedly informed Point Park, the allegations against her did not support any interim measures, let alone a complete ban from campus, that halted her teaching and Chair duties which is among the severest form of sanction for an academic, inflicted ignominy upon her, and interfered with her ability to respond to the allegations against her.

24.     In violation of the Policy, Point Park indefinitely suspended Plaintiff, cancelled her classes, disabled her access to her email account, banned her from campus including her office, later cancelled her Spring 2019 course, and replaced her as Department Chair.

25.     Where, as here, the reported behavior could not constitute a crime, "[m]embers of the Point Park community may choose an Informal […] Resolution process for resolving complaints."

26. In violation of this provision, no Informal Resolution was offered to Plaintiff to resolve the complaint against her.

27. All faculty at Point Park University are required to report incidents of sexual misconduct to the University.

28. When Plaintiff contacted the University to report that a student revealed in class that she had been raped, Plaintiff's efforts were ignored, she was not taken seriously and, thereafter, she was mistreated, discriminated against, and/or retaliated against by the University under the guise of the Title IX policy.

29. Since Dr. Newman now was not regarded as a valid and welcomed reporter of rape, a critical term, condition and responsibility of her employment was removed from her.

30. Point Park promised to treat Plaintiff with respect during the investigation process which it breached on November 15, 2018 when Dr. Newman (accompanied by counsel) was allowed to go to her office but only under the watch of a uniformed security guard who then escorted her out of the building.

31. This security measure was excessive, gave the defamatory appearance that Plaintiff (an over 50 year employee) who had become a safety threat on campus needing to be monitored by security, who was witnessed under guard by Department colleagues thereby further harming her professional reputation.

32. In violation of the Title IX policy's confidentiality provision and in an effort to prejudice Plaintiff, the accusations against her were shared beyond people necessary to carry out a thorough, reliable, and impartial investigation including University Provost and Senior Vice President for Academic Affairs Pearson, Associate Provost Thomas (who would serve as the ultimate Adjudicator of Title IX claims following the investigation), Assistant Provost Prida, and

current and former students via a Facebook group initiated, on October 16, 2018 by Lauren Gerlowski, an adult Point Park alumna and Dr. Ross protégé, who falsely wrote that Dr. Newman had "attack[ed] a current GCS student about rape being the woman's fault" and revealed that "[n]ow Title IX is investigating Newman beyond this particular claim and looking into her total teachings."

33.  The Complainant's appeal of the December 7, 2018 outcome letter in favor of Plaintiff was not processed timely under University policy in that the appeal was received beyond the ten days allotted from the determination date, and the University did not complete the review within the next fifteen business days (on or about January 31, 2019) but apparently on February 11, 2019.

34.  According to an email sent to Dr. Newman by new Title IX Coordinator Vanessa Love, Esq. on February 19, 2019, "students have come forward alleging that you may have violated, Point Park University's Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking.  These allegations will be investigated by an outside investigator, Lindsey Kennedy, Esquire. You will be hearing from Ms. Kennedy as she will request an interview with you."

35.  In violation of the Title IX policy, Plaintiff never was provided timely written notice of the alleged violations within the complaint, including the nature of the violations, and to this day is unaware of the nature of these students' complaints against her.

36.  No one including Ms. Kennedy ever requested an interview with Plaintiff regarding these complaints and Plaintiff has not been provided any opportunity to respond to them.

37.  As a result of Point Park's breach of contract, Dr. Newman suffered damages including, but not limited to, indefinite suspension and out of pocket losses and expenses.

38. Dr. Newman seeks all damages available under Pennsylvania law in excess of $75,000.

## COUNT XIV: BREACH OF CONTRACT
Plaintiff Channa Newman v. Defendant Point Park University

39. The preceding paragraphs are incorporated as if set forth at length herein.

40. Point Park maintains an Academic Freedom policy that protects a faculty member's freedom to express ideas without risk of official interference or professional disadvantage that it distributes, publicizes, and/or communicates to its faculty and administrators.

41. Point Park distributed and communicated the Academic Freedom policy in the Faculty Handbook dated September 1, 2000 which states that, "Faculty, in performing its professional duties, is governed by the current Faculty Handbook. The Handbook is, by reference, included as part of the annual contract between Faculty members and Point Park College. Faculty members are bound by contract to fulfill their duties in accordance with the policies and practices established herein. All full-time faculty contracts, initial and annual, will contain a statement referring to this Handbook." A copy of the Faculty Handbook is attached as Exhibit 2.

42. Point Park's distribution, publication, and/or communication of the Academic Freedom policy constituted a unilateral offer which Plaintiff accepted by continuing her employment and the performance of her duties thereby creating a binding contract.

43. According to the Faculty Handbook: "Academic freedom in its teaching aspect is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning," and it "carries with it duties correlative with rights."

44. The Academic Freedom policy states in pertinent part: "Teachers are entitled to freedom in the classroom in discussing their subjects, but they should be careful not to introduce

into their teaching controversial matter that has no relation to their subject," and "[w]hen they speak or write as citizens, they should be free from institutional censorship or discipline."

45. According to the Academic Freedom policy: "neither reappointment nor promotion to tenure status will be denied, *nor any other adverse action taken, for reasons that violate academic freedom*." (emphasis added).

46. In addition, "Due process will be accorded not only to Faculty members with tenure but also, during their appointments, to others with probationary or temporary Faculty status. Dismissal or *other adverse action prior to the expiration of a term appointment requires the same procedures as does the dismissal of a Faculty member with tenure*." (emphasis added).

47. Under the Faculty Handbook, dismissal of a Faculty member with tenure or other adverse action "must follow academic due process" and in "cases where the facts are in dispute, the Faculty member will be informed in writing at least 45 days before the hearing of the charges against him/her and will have the opportunity to be heard in his/her own defense by all parties who pass judgment upon his/her case."

48. Point Park breached a duty imposed by its Academic Freedom policy.

49. Point Park promised not to take any adverse action against a faculty member for reasons that violate academic freedom.

50. In violation of this promise, Point Park indefinitely suspended Dr. Newman for reasons that violated academic freedom, in particular, comments that she made in the classroom in discussing her subject regarding the #MeToo Movement which allegedly upset a student and/or a subsequent telephone call between Dr. Newman and the student discussing what had occurred in class.

51. When Dr. Newman asked Vice President of Human Resources Stefanko what were the charges against her, she would say only that it was "something about Me Too" and some telephone calls.

52. A week or so after the suspension, Point Park provided Dr. Newman vague notice of the charges against her that implicated academic freedom, namely, a student complained about an in-class conversation about the #MeToo movement and alleged "inappropriate" comments made by Dr. Newman, and that outside of class Dr. Newman "continued to engage with her on this topic."

53. Point Park also promised to provide a faculty member with the same due process protections for any adverse action afforded when moving to dismiss a faculty member including, but not limited to, advance notice of the charges against her, the opportunity to be heard, and a due process hearing prior to any adverse action.

54. In violation of Point Park's promise to provide due process, including advance notice of the charges, the opportunity to be heard, and a due process hearing prior to any adverse action, Point Park failed to provide Dr. Newman with advance notice of the charges against her, any opportunity to be heard, or any due process hearing prior to indefinitely suspending Dr. Newman.

55. As a result of Point Park's breach of contract, Dr. Newman suffered damages including, but not limited to, indefinite suspension and out of pocket losses and expenses.

56. Dr. Newman seek all damages available under Pennsylvania law in excess of $75,000.

[COUNTS XV and XVI – Withdrawn/merged with Counts XIII and XIV]

## COUNT XIX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
Plaintiff Channa Newman v. Defendant Point Park University

57. The preceding paragraphs are incorporated as if set forth at length herein.

58. Point Park acted intentionally or recklessly.

59. Point Park's actions taken against Dr. Newman under the circumstances were extreme and outrageous.

60. Plaintiff was subjected to sexual harassment because of her female gender and/or race/national origin/religious harassment because of her Jewish ethnicity and religion and Israeli national origin; she complained of harassment and Point Park failed to remedy the situation, and thereafter she was subjected to additional discrimination and/or retaliation.

61. The administration condoned and enabled Dr. Ross' and Dr. Hines' support of militant, hateful, and anti-Semitic/anti-Israel views inside and outside the classroom including the economic, academic, and cultural boycott of Israel, the demonization and deligitimization of that nation and the racist claim that Israel is an apartheid state.

62. Dr. Newman, who is Jewish and of Israeli national origin as well as a Holocaust survivor, was deeply offended by these views, which permeated a hostile environment.

63. Drs. Ross and Hines with administration support boycotted, discriminated and retaliated against Dr. Newman by having her removed as GCS Coordinator, placed the Social Justice program in a different department away from Dr. Newman, plus students and faculty mobilized by Dr. Ross shunned, disrespected, and undermined her as a professor and Chair.

64. Dr. Newman complained to Point Park about the hostile environment which allowed it to continue.

65. In December 2017, Plaintiff filed a Title IX complaint against Professor A. who had burst into her office, displayed explosive anger, threatened to take over her office, and caused her distress and fear.

66. Previously, Plaintiff had complained to Point Park that Dr. Hines had made inappropriate sexist comments in the workplace.

67. In October 2018, a female student involved with Drs. Ross and Hines as well as the Boycott, Divestment, and Sanctions (BDS) movement against Israel baselessly accused Dr. Newman of a Title IX sexual misconduct violation.

68. Prior to filing the complaint, the student consulted with Drs. Ross and Hines who then used the complaint with University support as part of their discriminatory and retaliatory campaign to discredit Dr. Newman and to remove her from the University.

69. Point Park immediately suspended and cut off Dr. Newman without any prior notice or opportunity to respond in violation of its Title IX and Academic Freedom policies.

70. In an instant, Point Park separated Dr. Newman from her students and the work she had performed with care and dedication on behalf of the University for over five (5) decades.

71. Point Park's sudden false, baseless, unnecessary, and highly public charge of sexual misconduct against Dr. Newman, a dignified, private and moral person then 75 years old, was outrageous, humiliating, sickening, and calculated to make her a pariah in the University community.

72. Academic suspension even with pay is a severe sanction second only to dismissal because it involves the removal of a faculty member from teaching, inflicts ignominy upon the teacher, and is destructive to the morale of the academic community, and interferes with the teacher's ability to defend herself against charges.

73. In this moment and subsequently Point Park hurt Dr. Newman as badly as it could under the circumstances even though ordinarily less harsh remedies were available and had been applied to accused men, non-Jews, and non-Israelis.

74. Males outside of Dr. Newman's protected classes accused of Title IX violations including sexual misconduct were not suspended from campus pending investigation.

75. Dr. Newman's repeated requests to be reinstated pending investigation and resolution of the complaint were rejected out of hand by Point Park.

76. Over a month into suspension, Point Park finally allowed Plaintiff access to her office but required her to be escorted and watched by a uniformed security guard which security measure was excessive, gave the defamatory appearance that Plaintiff (a loyal 50+ year employee in her mid-70's) was a safety threat on campus who needed to be monitored by security, as was witnessed by Department colleagues thereby further harming her professional reputation.

77. Thereafter, Point Park finally allowed Plaintiff access to her email, and she saw for the first time an email from a former student warning her that current and former students had formed a Facebook group in an effort to drum up negative information against her as part of the ongoing Title IX investigation.

78. Dr. Newman was crushed to learn that the University's investigation was unlimited, and that it had weaponized students to inform against her on every aspect of her career.

79. Further, Dr. Newman had reasons to be scared of a concerted attack designed to destroy her since the complainant was a BDS advocate; those who had advised this student on the formal charge not coincidentally were faculty partisans of BDS; and the hostile head of the

social media chat group was Dr. Ross's acolyte working to advance broad Title IX office goals to scrutinize Dr. Newman beyond the known charge.

80. During suspension, Point Park replaced Dr. Newman in her classes with less qualified instructors, replaced her as Department Chair with Brent Robbins, a supporter of Drs. Ross and Hines who was antagonistic to Plaintiff, and cancelled her Spring 2019 400-level course and encouraged her students to take Dr. Ross' 100-level Social Justice course instead.

81. Dr. Newman reasonably believed and feared that BDS with backing from within the Administration wanted her not to return to the University and to break her career.

82. As a result of Point Park's conduct, Dr. Newman suffered severe emotional distress that also caused physical harm.

83. For example, Plaintiff could not sleep and had to go to a physician who prescribed sleeping pills; her blood pressure systolic number spiked from 130 or lower to 190; she had extreme gastric distress including nausea and diarrhea for several months, she suffered new serious headaches in the back of her head that lasted 3 to 4 hours a day over the course of about two months, she became extremely depressed and expressed suicidal ideation for the first time in her life; she experienced flashbacks of her family in Czechoslovakia being liquidated under Nazi occupation; and she suffered from anxiety and was prescribed medication to treat it.

84. Plaintiff told Point Park Administrators about her ongoing emotional distress caused by the mistreatment, including the false charges of sexual misconduct against her, and the ongoing demonizing of Israel (which was her refuge and that of her surviving family following the Holocaust).

85. On December 3, 2018, Dr. Newman complained to Point Park that she had been subjected to a discriminatory hostile work environment as she is an Israeli citizen and Jewish.

86. Following Plaintiff's acquittal on the Title IX charge on December 7, 2018, Point Park promised Plaintiff on December 10, 2018 that it would conduct an investigation into her hostile work environment allegations and that she would be provided the outcome of the investigation in compliance with the terms of the University's anti-discrimination and equal opportunity policies.

87. No timely investigation ever occurred and Plaintiff complained to Point Park including in April 2019 (4 months later) about the failure to conduct an investigation.

88. In the interim, Plaintiff was targeted in January 2019 by the student newspaper which ran an article highly critical of her citing an unnamed student who complained falsely that Dr. Newman had promoted her own personal beliefs and agenda in class, and asserted a false version of events in class leading to the Title IX complaint against her. Anonymous students also complained about being cheated financially, a charge echoed by Assistant Provost Prida that Dr. Newman found anti-Semitic and deeply hurtful.

89. An anonymous student posted a racist and sexist Rate My Professor message that falsely stated that Dr. Newman "showed videos calling Muslims savages who are destroying western civilization in a language class to educate us."

90. Plaintiff again was targeted in February 2019 when she received an email from new Title IX Coordinator Vanessa Love, Esq. telling her that "students have come forward alleging that you may have violated, Point Park University's Policy Prohibiting Sexual Misconduct, Relationship Violence and Stalking," and the "allegations will be investigated by an outside investigator."

91. Plaintiff never was provided notice of the allegations against her nor any opportunity to respond, and to Plaintiff's knowledge, the complaint never was withdrawn by the students or dismissed by Point Park.

92. As Plaintiff informed Point Park, which did nothing, the hostile environment persisted: faculty improperly went around her as Department Chair to have substitutions approved for required courses, a faculty member in her Department was given a sabbatical without her knowledge or required approval, GCS students associated with the Social Justice Program were disrespectful to her in class and mockingly insolent, which appeared to be a coordinated effort against her with the tacit approval of Point Park, GCS majors were allowed to graduate without fulfilling the departmental requirements and without anyone seeking Dr. Newman's approval for substitutions which were allowed, Point Park insisted that Associate Provost Thomas participate in a routine meeting about independent study between Dr. Newman and a student of Dr. Ross and Dr. Hines which was unusual and humiliating, and Provost Pearson allowed a particular GCS major close to Dr. Hines to have all scheduling and course substitutions go through the Provost's office rather than through Dr. Newman as the Department Chair.

93. Though Dr. Newman had done nothing wrong and continued to perform satisfactorily, she felt shackled and reduced to second class status without explanation from the University.

94. On May 24, 2019, the Parties entered into an Agreement to Mediate and "agreed to participate in a Mediation."

95. Point Park breached a duty imposed by the Agreement to Mediate at the third scheduled session in September 2019 when it declined to participate. The Agreement required Point Park to participate in good faith and that subsequent sessions would be held only if the Parties

agreed that they "are reasonably likely to be productive and successful." Also, the "Parties attending the mediation will have proper authority to settle the disputes," which PPU lacked on September 25, 2019.

96. Dr. Newman and her counsel sat in Point Park's lawyer's offices for hours. Afterwards, PPU announced that it stopped participating due to yet another undefined investigation of Dr. Newman.

97. Suspiciously and in bad faith, Point Park University indicated that it had learned of a new matter under investigation that very morning or else it claimed it could have cancelled the mediation; it refused to define the matter, but indicated that it was so serious that it could not participate in mediation.

98. Stunned and in the presence of Point Park University's lawyer who announced the cessation, Dr. Newman began wondering aloud and in a manner more appropriate to attorney-client communications about what the new investigation could be about (until stopped by her attorney). She was devastated and extremely frightened to learn that she was under yet another unlimited undefined investigation.

99. Dr. Newman had come to the third mediation session to reasonably resolve, settle and move forward, only to find that Point Park would surprise her with harsh and frightening treatment rather than seek resolution with her, an outcast, whom it wanted to quit or break and almost did.

100. Dr. Newman was not told the nature of the investigation and/or if it had concluded.

101. In November 2019, Point Park reprimanded Plaintiff in her role as Department Chair when she assigned faculty with the required degree to teach a Sociology course as she and her Chair predecessors had done many times before. Point Park informed Plaintiff that it had

sustained a grievance against her regarding scheduling even though under the CBA Point Park retains complete discretion to decide who does the teaching.

102. Point Park scored Plaintiff for not assigning the sociology course to Dr. Ross (whose doctorate is in geography and not sociology), and going forward she would be forced to assign him that course when he requested to teach it. Point Park sided with Plaintiff's alleged harasser, Dr. Ross, and against Plaintiff and her academic judgment.

103. Plaintiff's new course "Prejudice: Women, Jews, Blacks" was apparently attacked anonymously because of the inclusion of "Jews" in the title, and Provost Pearson threatened to cancel the course unless the name was changed, which was another undue, painful and anti-Semitic slight and intrusion on normal academic freedom.

104. Dr. Newman has suffered severe emotional distress including fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry that caused her physical harm including, but not limited to, hypertension, sleeplessness, digestive disorders, anxiety, extreme depression, and severe headaches.

105. Dr. Newman lives in a state of worry and fear due to the constant improper, unlimited, and/or undefined investigations to which no other faculty member is subjected at Point Park.

106. Dr. Newman's severe emotional distress was a result of Point Park's conduct and is cumulative.

107. Dr. Newman seeks all remedies and damages permitted under law.

Respectfully submitted,


s/James B. Lieber
James B. Lieber
Pa. I.D. No. 21748
Thomas M. Huber
Pa. I.D. No. 83053
LIEBER HAMMER HUBER & PAUL, P.C.
1722 Murray Avenue, 2nd Floor
Pittsburgh, PA 15217
(412) 687-2231 (telephone)
(412) 687-3140 (fax)
Counsel for Plaintiff Channa Newman

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

>Catherine S. Ryan (PA 78603)
>cryan@reedsmith.com
>David J. McAllister (PA 36729)
>dmcallister@reedsmith.com
>Mariah H. McGrogan (PA 318488)
>mmcgrogan@reedsmith.com
>Reed Smith LLP
>225 Fifth Avenue, Suite 1200
>Pittsburgh, PA 15222
>Counsel for Defendant

>s/James B. Lieber
>James B. Lieber
>Counsel for Plaintiff