IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHANNA NEWMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:20-cv-00204 |
| | ) | |
| POINT PARK UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Plaintiff Channa Newman is a Jewish, Israeli, and Czech woman born in 1942 who is employed as a professor by Defendant, Point Park University, a post-secondary education institution located in downtown Pittsburgh. Plaintiff has worked at Point Park as a professor and at times as a Department Chair since 1964. Plaintiff's Amended Complaint (ECF No. 15, hereinafter cited as "AC") consists of 19 counts encompassing 628 paragraphs over 75 pages and asserts an array of statutory discrimination, retaliation, and hostile work environment claims against Defendant, alleging that Defendant discriminated, retaliated, and harassed Plaintiff on the basis of her religion, race/national origin, sex, and age.

The overall dispute between Plaintiff and Defendant originated in what appears to have been at times a heated set of academic and philosophical contentions between Plaintiff and other faculty members at the University—and Plaintiff broadly alleges that this dispute has infiltrated Defendant's administration, the administration's decision making, and the student body. In addition to her statutory claims, Plaintiff's Amended Complaint raises supplemental state common law claims against Defendant: breach of contract, negligent supervision, and intentional infliction of emotional distress.

1

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant moves to dismiss almost all claims asserted in Plaintiff's Amended Complaint on the grounds that each fails to state a claim upon which relief can be granted. (*See* ECF Nos. 18 and 19.) The Court groups the claims Defendant seeks to dismiss into five categories: (1) Plaintiff's statutory substantive discrimination claims; (2) Plaintiff's statutory retaliation claims; (3) Plaintiff's statutory hostile work environment claims; (4) Plaintiff's state common law breach of contract claim; and (5) Plaintiff's state common law tort claims. With that framework in mind, Defendant seeks to dismiss in full each of the following counts for failure to state a claim upon which relief can be granted:

(1) *Plaintiff's Statutory Substantive Discrimination Claims* (Counts, 2, 4, 6, 8, and 11): Defendant moves to dismiss Plaintiff's claims of discrimination on the basis of her race/national origin brought under (a) 42 U.S.C. § 1981, (b) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and (c) the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. and Cons. Stat. §§ 951–963 (West 2022) (Count 2); Plaintiff's claims of discrimination on the basis of her religion and sex in violation of Title VII and the PHRA (Counts 4 and 6); Plaintiff's claim of discrimination on the basis of sex brought under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX") (Count 8); and Plaintiff's claim of age discrimination brought under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* (Count 11).

(2) *Plaintiff's Statutory Retaliation Claims* (Counts 1 and 10): Defendant moves to dismiss Plaintiff's claim of retaliation in violation of § 1981, Title VII, and the PHRA (Count 1) as well as Plaintiff's claim of retaliation in violation of Title IX (Count 10).

(3) *Plaintiff's Statutory Hostile Work Environment Claims* (Counts 3, 5, 7, and 9): Defendant moves to dismiss Plaintiff's claim of hostile work environment on the basis of race/national

origin in violation of § 1981, Title VII, and the PHRA (Count 3); Plaintiff's claims of hostile work environment on the basis of sex and religion in violation of Title VII and the PHRA (Counts 5 and 7); and Plaintiff's claim of hostile work environment on the basis of sex in violation of Title IX (Count 9).

(4) *Plaintiff's State Common Law Breach of Contract Claim* (Count 17): As for Plaintiff's supplemental state common law claims, Defendant moves to dismiss Plaintiff's breach of contract claim based on Defendant's alleged breach of a duty imposed by the parties' Agreement to Mediate (Count 17).

(5) *Plaintiff's State Common Law Tort Claims* (Counts 18 and 19): Finally, Defendant moves to dismiss Plaintiff's negligent supervision claim (Count 18) and Plaintiff's intentional infliction of emotional distress claim (Count 19).[1]

For the reasons that follow, the Court denies Defendant's Motion to Dismiss as to Plaintiff's statutory substantive discrimination claims (Counts 2, 4, 6, 8, and 11) and as to Plaintiff's statutory retaliation claims (Counts 1 and 10). The Court concludes that Plaintiff has facially stated a claim for relief as to the statutory substantive discrimination claims because the Amended Complaint plausibly alleges that Defendant subjected Plaintiff to an adverse employment action and that the alleged circumstances give rise to a plausible inference of discriminatory intent. Plaintiff has also stated a claim for relief as to her statutory retaliation claims by plausibly alleging that she engaged in protected activity, that Defendant engaged in a materially

---

[1] As for Count 12, 13, 14, 15, and 16 of Plaintiff's Amended Complaint, the Court deemed Count 12—alleging a hostile work environment on the basis of age—withdrawn following oral argument on the Motion to Dismiss. (ECF No. 37.) In Plaintiff's More Definite Statement (ECF No. 38), Plaintiff withdrew her other state common law breach of contract claims at Counts 15 and 16, merging them with her breach of contract claims at Counts 13 and 14. Following Plaintiff's More Definite Statement, Defendants no longer seek to dismiss Counts 13 and 14 (now encompassing Counts 15 and 16), noting that "as modified by Plaintiff's More Definite Statement, Point Park is of the view that said Counts should be addressed, following discovery, through a Motion for Summary Judgment." (ECF No. 39.) Accordingly, Counts 12, 13, 14, 15, and 16 are not before the Court on this Motion to Dismiss.

adverse employment action, and that the adverse action was causally connected to Plaintiff's protected activity.

The Court grants Defendant's Motion to Dismiss as to Plaintiff's hostile work environment claims (Counts 3, 5, 7, and 9) because Plaintiff has failed to plausibly allege that she was subject to objectively severe and pervasive discrimination in the workplace, an element necessary to facially show that relief might be warranted. For the reasons stated below, Plaintiff's hostile work environment claims at these counts are dismissed with prejudice. The Court also grants Defendant's Motion to Dismiss as to Plaintiff's breach of contract claim at Count 17 because Plaintiff has failed to plausibly allege that Defendant had a contractual duty to more extensively participate in mediation. Dismissal of Count 17 is likewise with prejudice. Finally, the Court grants Defendant's Motion to Dismiss as to Plaintiff's negligent supervision claim (Count 18) and Plaintiff's intentional infliction of emotional distress claim (Count 19). The Court concludes that the PHRA preempts Plaintiff's negligent supervision claim because her allegations of negligent supervision are woven from the same fabric as her statutory discrimination, retaliation, and hostile work environment claims. Meanwhile, Plaintiff's intentional infliction of emotional distress claim is preempted by Pennsylvania's workers' compensation statute. Dismissal of such state law tort claims is with prejudice. Finally, the Court denies Plaintiff's request at ECF No. 33 to convert Defendant's Motion to Dismiss into one for summary judgment.

## I.      PROCEDURAL BAKGROUND

Plaintiff's Amended Complaint (ECF No. 15) is the operative Complaint in this action. Defendant moved to dismiss all counts of Plaintiff's Amended Complaint. (ECF Nos. 18 and 19.)[2] Plaintiff opposed the Motion (*see* ECF Nos. 24 and 25), and Defendant replied (*see* ECF No. 28). With leave of Court, Plaintiff filed a Surreply and further requested that this Court convert the Motion to Dismiss into one for summary judgment. (ECF No 33.) Defendant opposed Plaintiff's request to convert the present Motion into a motion for summary judgment. (ECF No. 34.)

The Court held oral argument on the Motion to Dismiss. (ECF No. 36.) Following argument, the Court deemed Count 12 as withdrawn by Plaintiff, and the Court ordered Plaintiff to file a More Definite Statement as to Counts 13, 14, 15, 16, and 19. (ECF No 37.) Plaintiff filed her More Definite Statement as ordered, in which she represented that she had withdrawn Counts 15 and 16 and merged them with Counts 13 and 14. (ECF No. 38, at 10.) Defendant then represented that it no longer sought dismissal of Counts 13 or 14 (and by extension, no longer sought to dismiss Counts 15 and 16, as they had been merged with Counts 13 and 14). (ECF No. 39.) With that, these matters are now ripe for disposition.

---

[2] As explained below, Defendant later notified the Court that it no longer sought dismissal of Count 13 (breach of contract based on Defendant's Title IX policy) or Count 14 (breach of contract based on Defendant's Academic Freedom Policy). (ECF No. 39.)

## II.   FACUAL BACKGROUND[3]

Plaintiff Channa Newman is a Jewish woman born in 1942 who holds United States, Israeli, and Czech citizenships and has been a professor at Point Park University since 1964—most recently as a Department Chair ("Chair"). (AC ¶¶ 10–16.) She alleges that she is the "sole Israeli faculty member" and "one of the oldest faculty members" at Point Park. (*Id*. ¶¶ 15, 17.)

The alleged events giving rise to Plaintiff's claims began in the course of an academic and philosophical dispute between Plaintiff and two other Point Park faculty members, Professors Robert Ross ("Dr. Ross") and J. Dwight Hines ("Dr. Hines"), both of whom Plaintiff allegedly helped hire and with whom Plaintiff initially had good relations. (*Id*. ¶¶ 18–24.) Eventually, Dr. Ross and Plaintiff began having disagreements regarding how class content about the longstanding Israel-Palestine conflict should be taught, and their professional relationship grew tense. (*Id*. ¶¶ 25–37.) Dr. Ross supports Palestine in that conflict, while Plaintiff views Dr. Ross's scholarship as "anti-Semitic and/or anti-Israel." (*Id*. ¶¶ 40–44, 47.) According to Plaintiff, Dr. Hines has sided with Dr. Ross in this dispute. (*Id*. ¶ 19.) Plaintiff alleges that this internal conflict led Dr. Ross and Dr. Hines to successfully push for Plaintiff's removal as the Coordinator of the Global Cultural Studies ("GCS") program and to oppose her election as Chair of the Humanities and Social Sciences ("HSS") Department. (*Id*. ¶¶ 38, 53.) Plaintiff was nonetheless elected to the Chair position over Drs. Ross and Hines's opposition. (*Id*. ¶ 53.) Plaintiff alleges that the Point Park administration also permitted Dr. Ross and Dr. Hines to create a Social Justice Program within the GCS program. (*Id*. ¶ 55.) Plaintiff opposed the formation of the Social Justice Program envisioned by Dr. Ross and Dr. Hines, viewing it as a "cover for anti-Semitism." (*Id*. ¶¶ 55–59.) Dr. Ross and

---

[3] These facts are taken from the allegations of the Amended Complaint, which, as set forth below, the Court must generally accept as true for purposes of ruling on the pending Motion to Dismiss. *Blanyar v. Genova Products, Inc.*, 861 F.3d 426, 431 (3d Cir. 2017).

Dr Hines ultimately moved the Social Justice Program to a different academic department. (*Id*. ¶¶ 62, 64.)

In October 2018, a female student (who self-identified as a sexual assault survivor) lodged a Title IX complaint with Defendant, claiming that Plaintiff made inappropriate comments during a class session. (*Id*. ¶¶ 79–83.) Following the classroom incident, Plaintiff allegedly called the student and "inquired as to whether the student has sought help for the trauma from her rape." (*Id*. ¶¶ 106–10, 119–22.) During that phone call, Plaintiff also mentioned to the student that the student had not turned in any homework assignments. (*Id*. ¶¶ 125–27.) After receiving the student's Title IX complaint, Defendant temporarily suspended Plaintiff with pay pending an investigation. (*Id*. ¶ 84.)[4] As part of the suspension pending investigation, Defendant took Plaintiff out of the classroom, cancelled Plaintiff's Spring 2019 course, removed Plaintiff from her role as Chair, barred Plaintiff from campus, and prohibited Plaintiff from returning to campus or accessing her University email account. (AC ¶¶ 87–89.) Plaintiff approached the school about implementing less restrictive conditions during the course of the Title IX investigation (*id*. ¶ 136), and Plaintiff's attorney later requested, on two separate occasions, that Defendant "immediately reinstate" Plaintiff and "permit her to resume teaching all of the classes that she was leading at the time of separation." (*Id*. ¶¶ 170, 175.) Defendant declined these requests. (*Id*. ¶¶ 136, 173, 175.) On one occasion, on November 15, 2019, Defendant permitted Plaintiff to access her office "under the watch of a uniformed security guard"; Defendant eventually permitted Plaintiff to access her University email. (*Id*. ¶¶ 182, 186.)

Plaintiff alleges that "similarly situated individuals outside [of her] protected classes who were accused of Title IX violations were not suspended pending investigation, did not have any

---

[4] The Amended Complaint does not state whether Plaintiff's suspension was a paid suspension, but Defendant's Motion to Dismiss asserts that Plaintiff was suspended with pay. (ECF No. 19, at 3.). The Court will treat it as such.

duties removed from them, did not have any of their classes cancelled, nor [did they] receive[] [the same] mistreatment" as Plaintiff. (*Id*. ¶ 247.) As support, Plaintiff's Amended Complaint points to several instances where four professors and one administrator—all of whom were male, white, non-Jewish, younger than Plaintiff, and born in the United States—were accused of Title IX violations but were not subject to the same restrictive conditions that Defendant imposed on Plaintiff. (*Id*. ¶¶ 248–71.) For example, Plaintiff alleges that (1) in or about 2014, she complained to the administration about "inappropriate sexist language" Dr. Hines had used during a faculty search (*id*. ¶ 271), and (2) following an incident that occurred on December 21, 2017, when "Professor A [a psychology professor] . . . burst into [Plaintiff's] office, displayed explosive anger, [and] threatened to take her office," Plaintiff lodged a Title IX complaint against that professor (*id*. ¶¶ 248–51)—and neither of these professors were subject to the same investigatory procedures as Plaintiff experienced (*id*. ¶¶ 252–54, 271). Plaintiff also alleges that other professors and the Vice President and Dean of Faculty at Point Park had been accused of making inappropriate comments to students but were never investigated in the same way as Plaintiff. (*Id*. ¶¶ 255–62, 269–70.)

On November 26, 2018, Defendant provided Plaintiff with the Title IX investigation's "Findings of Fact." (*Id*. ¶ 216.) Plaintiff says that she then learned that the student who had lodged the Title IX complaint had consulted with Dr. Ross and Dr. Hines just days prior to filing her complaint—and, on this basis, Plaintiff alleges that the Title IX accusation was part of Dr. Ross and Dr. Hines's plan to launch a discriminatory and retaliatory campaign against Plaintiff that would result in Plaintiff's removal from the University. (*Id*. ¶¶ 217–18.) On December 7, 2018, Defendant informed Plaintiff that it found no Title IX violation. (*Id*. ¶ 272.) At that point, Plaintiff's paid suspension ended, and she was reinstated to her positions as a professor and Chair

of the HHS Department. (*See id*. ¶¶ 10–11.) Since her reinstatement, however, Plaintiff alleges that she has been isolated, shunned, and undermined by the administration, faculty, and students. (AC ¶ 322.)

By way of example, Plaintiff alleges that a student-run newspaper published a critical article about Plaintiff following her reinstatement as Chair, in which an assistant provost "gave credence to the false [Title IX] allegations" against her and which Plaintiff says echoed students' complaints that Plaintiff "cheated [the students] financially" following the cancellation of her Spring 2019 course (resulting from the Title IX investigation). (*Id*. ¶¶ 289–95.)[5] She contends that students now evade her and that the number of students enrolling in her courses has dramatically decreased. (*Id*. ¶¶ 322, 325.) Further, Plaintiff alleges that Defendant forced her to change the name of a proposed course title that included the words "Women," "Jews," and "Blacks," (*id*. ¶¶ 392–95), and that the faculty and administration have undermined her authority as Chair by going around her "to have substitutions approved for required courses" (*id*. ¶ 324). Plaintiff also asserts that she "contacted Molly McClelland[, the Director of the Center for Student Success,] by telephone twice to report that a student in the French Culture class had reported rape," but those "calls apparently were ignored." (*Id*. ¶¶ 152–54.) Ms. McClelland "was the point of contact for th[at] student's complaint against" Plaintiff, and Plaintiff further alleges that "at a staff meeting in 2018[, Ms. McClelland] gratuitously talked about [McClelland's] 'little Jewish' college roommate who was afraid of everything [, and] and joked with others in the office about [Plaintiff's] suspension," calling it a "real 'sh*t show.'" (*Id*. ¶ 154.)

In December 2018, Plaintiff complained to Defendant that "she had been subjected to a hostile environment and discriminated against by Dr. Ross and Dr. Hines because of her religion

---

[5] Plaintiff has not provided the Court with the article she references in the Amended Complaint.

and national origin." (*Id*. ¶¶ 277, 281.) When Defendant had not yet commenced an investigation into those complaints in April 2019, Plaintiff complained again. (*Id*. ¶ 281) Six months after Plaintiff's initial complaint, Defendant hired an outside employment law firm to investigate. (*Id*. ¶ 282.) On November 21, 2019, the employment law firm informed Plaintiff that "her complaints could not be substantiated." (*Id*. ¶ 284.)

At some point early in the Spring 2019 semester, a second student made a complaint against Plaintiff about statements Plaintiff allegedly made during her classes. (*Id*. ¶¶ 301–02.) On February 19, 2019, Defendant notified Plaintiff that it was undertaking an investigation into this second student complaint against her. (*Id*.) Contemporaneously with the new Title IX accusation and investigation, Plaintiff and Defendant were engaged in private mediation following a charge Plaintiff filed against Defendant with the Equal Employment Opportunity Commission ("EEOC"). (*Id*. ¶¶ 5, 345–47.) During the third mediation session, on September 25, 2019, after learning about another complaint filed against Plaintiff, Defendant refused to continue that mediation session. (*Id*. ¶ 347.)

Finally, Plaintiff describes an incident related to a grievance that Dr. Ross filed via the Defendant's contract covering his collective bargaining unit, represented by the Newspaper Guild of Pittsburgh/Communications Workers of America, Local 38061, AFL-CIO, CLC (the "Union"), of which many Point Park faculty members are members. (*Id*. ¶ 118, 353–73.) In the fall of 2019, Dr. Ross filed a grievance via the Union alleging that Plaintiff had "violated the collective bargaining agreement [CBA] when she failed to assign [Dr. Ross] to teach a 100-level Sociology course." (*Id*. ¶¶ 353–54.) On November 11, 2019 Defendant's Vice President of Human Resources, Lisa Stefanko, informed Plaintiff by email of the grievance and the school's resolution of it. (*Id*. ¶¶ 360–67.) In resolving the grievance, Defendant and the Union "agreed that the University [is to] take into account a full-time faculty member's successful teaching of courses in previous

academic years" when determining whether that full-time faculty member is qualified to teach a course (*id*. ¶ 365), which Plaintiff did not consider when "announc[ed] new 'modified instructor qualifications'" and declined to assign Dr. Ross to teach the course (*id*. ¶¶ 362, 366). In that email, Ms. Stefanko also wrote that Plaintiff's cooperation with the resolution reached between the University and the Union was "expected and [would] be appreciated." (*Id*. ¶ 367.)

Based on the foregoing allegations, Plaintiff brings five statutory claims of substantive discrimination by Defendant on the basis of her race/national origin, sex, religion, and age. She raises two counts of statutory retaliation and four counts of hostile work environment on the basis of her race/national origin, sex, and religion. Plaintiff also alleges a variety of breach of contract claims, but Defendant only seeks to dismiss Plaintiff's claim for an alleged breach of the parties' Agreement to Mediate. Finally, Plaintiff's Amended Complaint contains one count of negligent supervision and one count of intentional infliction of emotional distress, each under state law.

### III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." The Supreme Court held in *Ashcroft v. Iqbal* that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not enough to survive a Rule 12(b)(6) motion. 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, a plaintiff's factual allegations must "raise a right to relief above the speculative level" and state a plausible claim for relief. *Twombly*, 550 U.S. at 555. In reading the complaint, the court should "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under a reasonable reading of the complaint, the plaintiff may be entitled to relief." *Blanyar v.*

11

*Genova Prods. Inc.*, 861 F.3d 426, 431 (3d Cir. 2017) (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).

The Third Circuit further guides lower courts to utilize a three-part framework in analyzing a 12(b)(6) motion. First, the court "identif[ies] the elements of the claim." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). Second, the court "review[s] the complaint to strike conclusory allegations." *Id*. Third, the court "look[s] at the well-pleaded components of the complaint and evaluat[es] whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Id*. If the facts alleged in the complaint "show" that the plaintiff is entitled to relief, the court should deny the motion to dismiss. *See Fowler*, 578 F.3d at 210–11. Finally, in ruling on a motion to dismiss, "a court may consider only the complaint, attached exhibits, matters of public record, and undisputedly authentic documents not attached to the complaint if the complainant's claims are based on those documents." *Panthera Rail Car LLC v. Kasgro Rail Corp*., 985 F. Supp. 2d 677, 683 (W.D. Pa. 2013) (citing *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010)).

## IV.   DISCUSSION

### A.   Plaintiff's Substantive Discrimination Claims (Counts 2, 4, 6, 8, and 11)

Defendant moves to dismiss Plaintiff's five claims of unlawful discrimination against it on the grounds that she has failed to state a claim. Plaintiff alleges that Defendant violated Title VII, 42 U.S.C. § 1981, and the PHRA by discriminating against her on the basis of her race/national origin, her sex, and her religion (Counts 2, 4, and 6, respectively). She also alleges that Defendant engaged in sex discrimination in violation of Title IX (Count 8). Finally, she alleges that Defendant discriminated against Plaintiff on the basis of her age in violation of the ADEA (Count 11).

Defendant argues that for the purposes of Plaintiff's substantive discrimination claims, Plaintiff has failed to plausibly allege that Defendant subjected her to an adverse employment

action because none of the "litany of perceived wrongs and slights" she alleges show that she experienced a "significant change in employment status" as a Title VII discrimination claim requires. (ECF No. 19, at 6.) In opposition, Plaintiff argues that she has sufficiently pleaded a series of allegations showing that she experienced "a significant change in employment status." (*See* ECF No. 24, at 13–24.)

The dispute over whether Defendant took an adverse employment action against Plaintiff is relevant for the analysis under Title VII as well as that under § 1981, the ADEA, and the PHRA because the requirements for a plaintiff to state a discrimination claim under these four statutes are nearly identical. Further, due to the nearly identical nature of the elements of claims under those statutes, the Court will assess these claims using the Title VII standard.[6]

Under Title VII, employers may not "discharge any individual, or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "To defeat a motion to dismiss [in a Title VII action], it is sufficient to allege a prima facie case" under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) (citing *Castleberry v. STI Grp.*, 863 F.3d 259, 266 (3d Cir. 2017)). However, making out the prima facie case "is not necessary." *Id.* (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) ("This Court has

---

[6] To state an age discrimination claim under the ADEA, the first three elements are identical to those required to state a Title VII claim. As for the fourth element of an ADEA claim, a plaintiff must facially show that her employer replaced her with someone "sufficiently younger to support an inference of discriminatory animus." *Smith v. City of Allentown,* 589 F.3d 684, 689–90 (3d Cir. 2009) (citing *Potence v. Hazleton Area Sch. Dist.,* 357 F.3d 366, 370 (3d Cir. 2004)). As for the Court's analysis under § 1981, "the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim." *Schurr v. Resorts Int'l Hotel, Inc*., 196 F.3d 486, 499 (3d Cir. 1999) (internal quotation marks omitted). Finally, the "same standards" govern Title VII and PHRA claims, so the Court treats that analysis as identical to a Title VII analysis as well. *See McNeill v. Greyhound Lines, Inc*., 628 F. App'x 101, 103 n.1 (3d Cir. 2015) (citing *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 409 (3d Cir. 1999)).

never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss.")). Accordingly, Plaintiff's Amended Complaint "need only allege enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Fowler*, 578 F.3d at 213).

The issue before this Court, then, is whether taking the facts (and not the conclusions) alleged in Plaintiff's Amended Complaint as true, Plaintiff plausibly shows she could be entitled to relief based on the substantive discrimination claims she advances under § 1981, Title VII, Title IX, the ADEA, and the PHRA. The Court will address these counts of claimed unlawful discrimination in turn.

### 1.   Counts 2, 4, 6, 11: Discrimination on the Basis of Race/National Origin, Sex, Religion, and Age Under § 1981, Title VII, the ADEA, and the PHRA

To state a Title VII discrimination claim, a plaintiff must allege facts that plausibly show: (1) she is a member of a protected class; (2) she is qualified for the position in question; (3) she suffered an adverse employment action; and (4) circumstances exist that give rise to an inference of discriminatory action. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). There is no dispute on the record before the Court that Plaintiff has plausibly alleged that she is (1) a member of a protected class (actually, several) and (2) qualified for the position in question. Regarding Plaintiff's discrimination claims, the core dispute is primarily whether Plaintiff has plausibly alleged that she suffered an adverse employment action. If the Court concludes that Plaintiff has plausibly alleged that she suffered an adverse employment action, then it must also consider whether circumstances exist that give rise to an inference of unlawfully discriminatory action.

### a.   Whether Plaintiff Plausibly Alleges an Adverse Employment Action

Plaintiff makes a series of allegations that she argues plausibly establish that she suffered an adverse employment action. The Court addresses each grouping of allegations in turn.

### i.   Plaintiff's "Indefinite Paid Suspension" as Adverse Employment Action

Defendant argues that Plaintiff's paid suspension pending the resolution of the first Title IX complaint against her does not constitute an adverse employment action. Specifically, Defendant contends that Plaintiff's suspension with pay and Defendant's implementation of the suspension did not alter the terms and conditions of Plaintiff's employment. (ECF No. 19, at 6–7.) In response, Plaintiff argues that she has sufficiently pleaded that her "paid suspension" is an adverse employment action because she has alleged "additional evidence" plausibly showing that Defendant took actions that were beyond an employee's normal exposure to disciplinary procedures. (ECF No. 24, at 13–17.)

The Third Circuit has made plain that a paid suspension pending an investigation of misconduct, without more, is not an adverse employment action for Title VII purposes. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (citing *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)); *see Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) (explaining that "circuits have reasoned that the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances"). In *Jones*, the Third Circuit held that without evidence that the employee's "suspension with pay was atypical in any way," an "indefinite suspension" with pay did not constitute an "adverse employment action" within the meaning of Title VII. 796 F.3d at 327.

The Third Circuit's decision in *Jones* left open the possibility that a plaintiff could present a set of factual allegations arising out of a paid suspension that may give rise to a discrimination

claim. For example, some district courts applying *Jones* have held that where a plaintiff alleges an unreasonable or atypical application of disciplinary procedures or disparate application of suspension procedures, the plaintiff had plausibly alleged an adverse action. *See, e.g.*, *Vay v. Huston*, No. 14-00769, 2016 WL 7324596, at *12–13 (W.D. Pa. Dec. 16, 2016) (motion for summary judgment stage); *Thourot v. Monroe Career & Tech. Inst.*, No. 14-01779, 2016 U.S. Dist. LEXIS 142962, at *14 (M.D. Pa. Oct. 17, 2016) (motion to dismiss stage). The test is whether "the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms of condition of employment. Paid suspension during an investigation could *thus potentially be adverse if the employer takes actions beyond an employee's normal exposure to disciplinary policies*." *Vay*, 2016 WL 7324596, at *12 (emphasis added) (quoting *Joseph*, 465 F.3d at 92). However, where "the employer merely enforces its preexisting disciplinary policies in a reasonable manner," there is no actionable adverse employment action. *Joseph*, 465 F.3d at 93 n.1.

Thus, the question here is whether Plaintiff's Amended Complaint has alleged more than just a suspension with pay pursuant to Defendant's typical disciplinary procedures and has plausibly alleged "actions beyond an employee's normal exposure to disciplinary policies." *Vay*, 2016 WL 7324596, at *12.

The Court summarizes Defendant's material alleged "actions," which Plaintiff points to as cumulative evidence establishing an adverse employment action, as follows: (1) Defendant accused Plaintiff of a Title IX violation that, in and of itself, creates an atypical disciplinary environment because a Title IX accusation is a stigmatizing charge (AC ¶ 129); (2) Defendant moved outside the bounds of a "normal exposure to disciplinary policies" because it "could have selected less draconian measures" than indefinite paid suspension, given that Plaintiff "posed no

immediate risk of harm to any individual or the community as a 75 year old female professor who had taught for over 50 years," and thus, paid suspension contravened Defendant's Title IX policy (ECF No. 24, at 15 (citing AC ¶¶ 84, 133, 157–67)); (3) four similarly situated faculty members and one administrator accused of sexual harassment were not suspended pending investigation (AC ¶¶ 247–71); (4) during Plaintiff's indefinite suspension, Defendant cancelled her Spring 2019 course, publicized that cancellation, appointed a Department Chair replacement, and banned Plaintiff from the classroom and from access to her University email (*id*. ¶¶ 84, 89, 177, 179, 237–38, 245, 246); (5) the investigation found that Plaintiff "was not guilty of any Title IX violation" and Plaintiff was informed that the University would be conducting an investigation into possible wrongdoing committed by Drs. Ross and Hines that Plaintiff had reported (*id*. ¶¶ 272–79); and (6) another employee of Defendant, who was the point of contact for a rape report Plaintiff made after a student shared a personal experience in class—the same student who later lodged a Title IX accusation against Plaintiff—talked in a belittling manner about a Jewish person and referred to Plaintiff's suspension as a "real 'sh*t show.'" (*Id*. ¶ 154.)

The Court concludes that the decision in *Thourot*, a case on which Plaintiff relies, is particularly instructive here.[7] In *Thourot*, the court concluded that the plaintiff sufficiently alleged an adverse action because she alleged that she was suspended with pay, and further, "that she was required to

---

[7] Plaintiff also relies on *Vay*, in which the court concluded that "[a] genuine issue of material fact exist[ed] as to whether the [employer's] placement of Ms. Vay on indefinite paid administrative leave without providing her a reason constitute[d] an adverse employment action." 2016 WL 7324596, at *13. Unlike *Vay*, here, Defendant provided Plaintiff with a reason why she was being placed on suspension with pay: the Title IX allegation prompting an investigation. Thus, the Court concludes that *Vay* is distinguishable from the case now before the Court.

Defendant relies on *Andrekovich v. Borough of Punxsutawney*, No. 17-01041, 2018 WL 5442441, at *9 (W.D. Pa. Oct 29, 2018) and *Hughes v. Allegheny County Airport Authority*, No.15-00221, 2017 WL 2880875, at *7–8 (W.D. Pa. July 6, 2017) as support for its position that a paid suspension, like Plaintiff has alleged here, cannot constitute an adverse employment action. The Court concludes that these cases are also distinguishable. In neither case did the plaintiff include for the courts' consideration other facts suggesting that an unreasonable or disparate application of administrative leave or suspension procedures was at play, as alleged by Plaintiff in this case.

undergo a medical evaluation, in addition to the suspension, while other male employees were not"; that she "was required to sign a [personal improvement plan] without a union representative while others were not"; and finally, that "the plaintiff's suspension was not followed by [an] alleg[ation] [of] wrongdoing on her part, but possible wrongdoing committed by others that prompted further investigation by [the employer]." *Thourot*, 2016 U.S. Dist. LEXIS 142962, at \*14.

While Defendant's placement of Plaintiff on paid suspension pending a Title IX investigation does not on its own constitute an adverse employment action under prevailing Third Circuit law, the Court concludes that Plaintiff's Amended Complaint does allege sufficient additional evidence plausibly showing an adverse employment action by Defendant, at least sufficient to move past the motion to dismiss stage. *Jones*, 796 F.3d at 326 (explaining that where the plaintiff "fail[s] to marshal evidence that her suspension with pay was atypical in any way," the plaintiff's adverse-action argument fails). Like the employee in *Thourot*, Plaintiff alleges that several other male, non-Jewish, non-Czech, and sufficiently younger employees—four professors and the Vice President and Dean of Faculty—were accused of behavior likely falling under Title IX's purview. (AC ¶¶ 248–71.) Defendant, however, did not "suspend [them] from campus or the classroom pending any investigation, did not cancel any of [their] courses or remove any of [their] duties, or subject [them] to similar mistreatment."[8] (*Id.*) In addition, when considering the full breadth of the actions taken here, well beyond simply the paid suspension, the Court concludes

---

[8] The Court expressly does not rely on Plaintiff's assertion that a paid suspension to investigate a Title IX complaint is so stigmatizing in and of itself so as to constitute an adverse employment action. Nor does it rely on Plaintiff's assertion that because Plaintiff believes that less "draconian" measures were available, she has cleared the bar to overcome a motion to dismiss. In the Court's estimation, neither would be sufficient to meet the mark. After all, a Title IX investigation in a college or university setting is simply not an "out of the ordinary" situation, no matter that an alleged Title IX violation is a serious matter. Second, analyzing Plaintiff's subjective disagreement with the fact that the Defendant took a particular approach in its investigation when it could have selected a different approach from an array of lawful actions would place the Court in a role it does not fill—HR manager. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998).

that a jury could plausibly conclude that the full picture was so over and above only a paid suspension that it would meet the "adverse employment action" test.

Based on the foregoing, the Court concludes that Plaintiff has plausibly alleged "actions beyond an employee's normal exposure to disciplinary policies" such that she has plausibly alleged an adverse employment action under § 1981, Title VII, the PHRA, and the ADEA sufficient to move to the next stage of analysis: whether Plaintiff has plausibly alleged an inference of discriminatory intent. But first, the Court addresses Plaintiff's other alleged adverse employment actions.

> **ii.  Defendant's Alleged Failure to Timely Investigate Plaintiff's Race/National Origin Discrimination and Harassment Complaints as Adverse Employment Action**

Plaintiff further alleges that Defendant's "untimely investigation" of Plaintiff's discrimination and harassment complaints was an adverse action. She argues that Defendant's untimeliness caused "a material change in the terms and conditions of her employment" such that it can be considered an adverse action. (ECF No. 24, at 17.) Defendant contends that these allegations do not establish an adverse employment action as a matter of law. (ECF No. 19, at 8.)

Specifically, Plaintiff alleges that on December 3, 2018, "she complained of being discriminated against and harassed by Drs. Ross and Hines[] and their student followers because of race and national origin." (ECF No. 24, at 18 (citing AC ¶¶ 23, 234–36, 277).) On December 10, 2018, Defendant promised to "conduct[] an investigation" and inform Plaintiff of the outcome "in compliance with the University's anti-discrimination and equal opportunity policies." (AC ¶¶ 278–79.) Plaintiff complained again to Defendant in April 2019, this time about the asserted untimeliness of Defendant's investigation. (*Id.* ¶ 281.) According to Plaintiff, time marched on, and she did not hear from Defendant on this matter until November 2019. (*Id.* ¶ 284.)

Plaintiff also points to a series of events that she says occurred between the time she first so complained of discrimination/harassment and the conclusion of the investigation. She argues that the following events and circumstances plausibly show a material change in the terms and conditions of Plaintiff's employment due to Defendant's failure to timely investigate: (1) a student-run publication released an article that was "highly critical of [Plaintiff] citing an unnamed student who complained falsely that [Plaintiff] had promoted her own personal beliefs and agenda in class" and mentioned "anonymous students [who] complained about being cheated financially" by her (*id.* ¶¶ 289–95); (2) an anonymous student posted an allegedly "racist and sexist Rate My Professor message" about Plaintiff (*id.* ¶ 287); (3) students acted disruptively during Plaintiff's class (*id.* ¶ 324); (4) Dr. Ross and Dr. Hines "absorbed responsibilities" in Plaintiff's Department, causing Plaintiff to become isolated in the program (*id.* ¶¶ 296–97); (5) faculty went "around [Plaintiff] as Department Chair to have substitutions approved for required courses" (*id.* ¶ 324); (6) Defendant insisted that Associate Provost James Thomas attend one of Plaintiff's routine meetings with Dr. Ross and Dr Hines, humiliating Plaintiff (*id.* ¶ 327); and (7) Defendant, over Plaintiff's objection, determined that the Provost would handle all scheduling and course substitutions for one of Dr. Hines's students (*id.* ¶¶ 334–337).

"The Third Circuit appears to [have] le[ft] open the possibility of bringing a discrimination claim on the basis of an employer's inadequate investigation if the plaintiff can show that the allegedly deficient investigation effected a material change in the terms or conditions of the plaintiff's employment." *McFalls v. BrightView Landscapes, LLC*, No. 18-2871, 2020 WL 1922828, at *7 (E.D. Pa. Apr. 21, 2020) (internal quotation marks and alterations omitted) (citing *Hare v. Potter*, 220 F. App'x 120, 134 (3d Cir. 2007)). As an example, "the issue complained of, if left uncorrected, must 'be of enough significance to qualify as an adverse action.'" *McFalls*,

2020 WL 1922828, at *7 (quoting *Kuhn v. United Airlines*, 63 F. Supp. 3d 796, 803 (N.D. Ill. 2014), *aff'd*, 640 F. App'x 534 (7th Cir. 2016)). However, "an employee should not be able to pursue a discrimination claim on the basis of an employer's allegedly inadequate investigation when the employer has engaged in a good-faith investigation." *Id.* (citing *Clemmer v. Office of Chief Judge*, No. 06-03361, 2008 WL 5100859, at *15 (N.D. Ill. Dec. 2, 2008)).

Here, even taking the facts pleaded as true and drawing all reasonable inferences from Plaintiff's Amended Complaint in her favor, the Court concludes that Defendant's allegedly untimely investigation, alongside the series of events that Plaintiff alleges occurred in the interim, does not constitute an adverse action by Defendant as a matter of law. In actuality, Defendant "did conduct an investigation into [Plaintiff's] complaint and [] communicated its conclusions to her." *Scott v. Sunoco Logistics Partners, LP*, 918 F. Supp. 2d 344, 356 (E.D. Pa. 2013). The pleadings reflect that Defendant hired an outside law firm to conduct the investigation, which included interviewing Plaintiff. (AC ¶¶ 282–83.) Defendant ultimately reviewed her complaints and informed Plaintiff that it could not substantiate her reports. (*Id.* ¶ 284.)

It is apparent from the pleadings now before the Court that Plaintiff is "displeased with the result of a workplace investigation," but it does not follow that her displeasure with Defendant's handling of the investigation or its ultimate conclusion creates a "cognizable discrimination claim." *McFalls*, 2020 WL 1922828, at *7. Moreover, the interim events Plaintiff cites as affecting her employment—which the Court observes may have affected Plaintiff's assessment of her day-to-day experience as a professor—do not plausibly show that Defendant's alleged failure to timely investigate caused "a *material change* in the terms or conditions of [Plaintiff's] employment." *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001), *overruled on other grounds*, 548 U.S. 53

(2006) (emphasis added); *see McFalls*, 2020 WL 1922828, at *7 (explaining that the issue complained of, left uncorrected, must be significant enough to establish an adverse action).

Like the plaintiff in *Weston*, Plaintiff was not "demoted in title, did not have [her] work schedule changed, was not reassigned to a different position or location . . . , did not have [her] hours or work changed or altered in any way, and . . . was not denied any pay raise or promotion." 251 F.3d at 431. While some of Plaintiff's responsibilities and her day-to-day experience may have shifted during her suspension and upon her reinstatement, the shift in responsibilities does not reflect a material change causing "demonstrable harm." *See, e.g.*, *Scott*, 918 F. Supp. 2d at 356. Finally, the student-related actions toward Plaintiff do not carry the day. Those students do not have control over the material terms and conditions of Plaintiff's employment as contemplated by the Third Circuit in *Weston*, despite the students' alleged disrespect toward Plaintiff through their taking of positions or publication of statements which Plaintiff considers out of bounds.

Accordingly, the Court concludes as a matter of law that Plaintiff has not plausibly shown that Defendant's alleged failure to timely investigate Plaintiff's discrimination and harassment claims constitutes an adverse action for the purpose of her statutory substantive discrimination claims.

### iii.   The Remaining Alleged Adverse Employment Actions: The Title IX Investigations of Plaintiff, Union Grievance Resolution, and Failure to Further Mediate as Adverse Employment Actions

As a third possible adverse action, Plaintiff argues that the second Title IX complaint filed against her illustrates a "repeated nature of [] bogus investigations [] impact[ing] the terms and conditions of her employment." (ECF No. 24, at 20.) In essence, she argues that the collective effect of these investigations constitutes an adverse employment action. In making this argument, Plaintiff relies on the Third Circuit's decision in *Holt v. Pennsylvania*, 683 F. App'x 151 (3d Cir.

2017). Defendant contends that these actions did not result in any sort of formal disciplinary action against Plaintiff following the investigations and therefore show an adverse employment action. (ECF No. 19, at 9–11.)

The Court concludes that these allegations by Plaintiff do not plausibly establish that she suffered an adverse employment action. In *Holt*, the Third Circuit held that in the context of a *retaliation claim*, the plaintiff had shown a pattern of ongoing antagonism sufficient to establish a causal link between the employee's protected activity and the adverse employment action. 683 F. App'x at 157–58. The adverse action in that case was an internal investigation of the plaintiff that continued without a reasonable basis and which ultimately resulted in discipline of the plaintiff. *Id.* at 154, 158.

Regardless of Plaintiff's allegations that the Title IX investigations were based on unsubstantiated accusations, Defendant's first and second investigation into Plaintiff's conduct were the result of two separate Title IX complaints filed against her by students, not by Defendant—and they were complaints that Defendant was duty-bound by Title IX to consider and, as necessary, investigate. Moreover, the second investigation occurred without any paid suspension or other adverse conditions that Plaintiff alleged occurred during the first investigation. Plaintiff does not allege that Defendant disciplined her in any way at the conclusion of the second investigation, unlike the situation in *Holt*. Plaintiff thus fails to plausibly allege that the Title IX complaints filed against her and Defendant's subsequent investigations collectively constitute an adverse employment action. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885–86 (7th Cir. 2012) ("[The plaintiff] has no evidence that the investigation was anything other than a legitimate attempt to discover whether [the plaintiff] had [committed misconduct]. More importantly, no adverse action of any kind was taken against [the plaintiff] as a result of the investigation and *the investigation itself was not an*

*adverse action*." (emphasis added)); *see, e.g.*, *Jones*, 796 F.3d at 326 (holding that "the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances" (quoting *Joseph*, 465 F.3d at 91)).

Next, Plaintiff alleges and argues that Defendant's resolution of a labor contract grievance filed against Plaintiff in favor of Dr. Ross constituted an adverse action because it curtailed Plaintiff's "managerial rights and academic freedom," thus impacting "the terms and conditions of her employment." (ECF No. 24, at 21 (citing AC ¶¶ 353, 357–58, 360–67, 377, 381).) After Plaintiff refused to assign Dr. Ross to teach a 100-level Sociology course, citing his lack of a master's degree, Dr. Ross filed a grievance pursuant to the CBA, alleging that Plaintiff had "violated the [CBA]." (AC ¶¶ 356–62.) The University resolved the labor agreement grievance in favor of Dr. Ross, concluding that Plaintiff had engaged in "modif[ying] instructor qualifications" because she did not consider "a full-time faculty member's successful teaching of courses in previous academic years." (*Id.* ¶¶ 362–65.) The Court understands the crux of Plaintiff's argument to be as follows: that Defendant's resolution of a union grievance in favor of a subordinate negatively affected a term of Plaintiff's employment by curtailing her managerial duties in her role as Chair. This argument does not persuade the Court.

As explained earlier in this discussion, to show that an employer has taken an adverse action, the Third Circuit requires that the plaintiff plausibly allege that there has been "a *material* change in the terms or conditions of [Plaintiff's] employment." *Weston*, 251 F.3d at 431 (emphasis added). Said another way, an adverse employment action is an "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones*, 796 F.3d at 326 (quoting *Storey*, 390 F.3d at 764).

24

Though not binding, *West v. Henderson*, No. 99-01975, 2000 WL 35635902, at *6–7 (D.D.C. Nov. 3, 2000), provides useful guidance for the Court. In *Henderso*n, the plaintiff-employee alleged that her "supervisor's settlement of one of her subordinate's grievances" constituted an adverse employment action. 2000 WL 35635902, at *7. The court held that the plaintiff-employee's "unsupported assertion that her authority was undermined" in that instance "simply fail[ed] to amount to a significant change in benefits." *Id*. The allegations before the court in *Henderson* are similar to those presented in this case.

When Plaintiff unilaterally decided Dr. Ross could not teach a Sociology course, Dr. Ross utilized the faculty union grievance process to challenge that decision, alleging that Plaintiff had "violated the [CBA]." (AC ¶¶ 353–58.) In its review of the situation, the University concluded that "it [is to] take into account a full-time faculty member's successful teaching of course in previous years" when assigning professors to teach classes, a factor which Plaintiff had allegedly not considered. (*Id*. ¶ 365.) Plaintiff contends that Defendant falsely accused Plaintiff of announcing modified instructor qualifications, and by undoing her decision to not assign Dr. Ross to teach a 100-level Sociology course, Defendant materially changed the terms and conditions of Plaintiff's employment. (*See id.* ¶¶ 359, 368.)

In the Court's estimation, these allegations, even liberally construed in Plaintiff's favor, show that a grievance adverse to Plaintiff was resolved in the subordinate's favor—as was the case before the court in *Henderson*. The Court concludes that while the grievance resolution may have in theory modestly impacted Plaintiff's managerial duties, such an impact is simply insufficient as a matter of law to constitute an adverse employment action. In fact, the outcome was a direct result of the University's negotiated grievance process via the faculty union contract.[9] Such cannot be

---

[9] Plaintiff argues that (1) as a Department Chair, she is not subject to the CBA (AC ¶ 118) and (2) Dr. Ross's complaint was not appropriately adjudicated through the faculty union grievance procedure (*id*. ¶ 372). As the basis for her

the basis for an adverse employment action as a matter of law. *Cf. Jones*, 796 F.3d at 326–27 (explaining that the mere application of typical workplace procedures cannot constitute an adverse employment action). Moreover, even construing Plaintiff's allegations in her favor, the Amended Complaint does not facially show how these events and the ultimate decision to resolve a discrete grievance in Dr. Ross's favor affected Plaintiff's rights under the Academic Freedom Policy (AC ¶ 117). As a matter of law, Plaintiff's allegations in that regard cannot plausibly establish that her terms or conditions of employment were materially affected. *See Howell v. Millersville Univ. of Pa.*, 283 F. Supp. 3d 309, 339 (E.D. Pa. 2017) ("[T]he [educational] institution, not the [individual] teacher, has control over the 'four essential freedoms' that comprise academic freedom: the right of an institution to choose 'who may teach, what may be taught, how it shall be taught, and who may be admitted to study.'. . . Courts have made quite clear that a teacher has no right to act in contravention of [her] institution's in-class policies in the name of academic freedom.") (quoting *Edwards v. Cal. Univ. of Pa.,* 156 F.3d 488, 492 (3d Cir. 1998)).

---

argument, Plaintiff points to Article 32 of the CBA, which states that "decisions regarding . . . who does the teaching . . . shall be made at the sole discretion of the University." (*Id.* ¶¶ 369–71 (alterations in original).) The Court finds Plaintiff's argument unpersuasive and circular.

First, Plaintiff has not alleged how her status as a Department Chair somehow means a professor—here, Dr. Ross—who *is* covered by the CBA, cannot raise a union grievance against Plaintiff due to her alleged academic administrator status, when her decisions directly infringed on the University's managerial discretion to decide who teaches what courses, a discretion expressly contemplated by the CBA.

Second, in accord with the faculty union grievance process, the University exercised its management rights, within the discretion identified by the CBA, and concluded that when making faculty placements, the University "will take into account a full-time faculty member's successful teaching of courses in previous academic years." (*Id.* ¶ 365.) Further exercising its discretion in accordance with its management rights as recognized by the CBA, the University concluded that Plaintiff did not adequately consider Dr. Ross's teaching history when she declined to assign him to teach a 100-level Sociology course.

Because the Court concludes that the process taken was within the scope of the University's management rights, Plaintiff cannot facially establish that she suffered a material or substantial change in the terms or conditions of *her* employment when the University exercised its discretionary decision power in the course of a faculty union grievance commenced by Dr. Ross. *See Henderson*, 2000 WL 35635902, at *6–7 (explaining that a grievance resolution in favor of the plaintiff's subordinate cannot constitute an adverse action for purposes of a Title VII discrimination or retaliation claim). The Court thus does not accord weight to Plaintiff's arguments in these regards.

Finally, the Court concludes that Defendant's alleged failure to continue mediating with Plaintiff at the September 25, 2019 session (AC ¶ 347) does not plausibly show that Plaintiff was subject to an adverse employment action. Mediation is not "a requirement" Defendant must follow any time it responds to an EEOC charge of discrimination. Defendant's "alleged refusal to mediate . . . is, therefore, equally unrelated to the terms and conditions of [] Plaintiff's employment at [Point Park], and does not constitute an adverse employment action." *Bickerstaff v. Vassar College*, 354 F. Supp. 2d 276, 281 (S.D.N.Y. 2004).

The Court thus concludes as a matter of law that Plaintiff has not plausibly alleged that she suffered a sufficiently weighty alteration to the benefits, terms, or privileges of her employment due to Defendant's investigations of Title IX complaints; the resolution of a grievance in favor of Dr. Ross and adverse to Plaintiff; or Defendant's alleged failure to mediate at a third mediation session.

As to the factual allegations that Plaintiff asserts as grounds that facially establish an adverse action and that the Court addresses in subsections a.ii and a.iii above, the Court does not permit Plaintiff leave to amend because the situations from which Plaintiff draws her allegations fail to plausibly establish an adverse employment action as a matter of law. Any further amendment of the allegations on these grounds would thus be futile. Further amendment would also permit Plaintiff a third bite at the apple in contravention of the Third Circuit's disapproval of a "wait-and-see" approach to pleading, especially when, as here, Plaintiff has already had the opportunity to cure deficiencies in the face of a motion to dismiss and has already set out her assertions, twice, in hundreds of paragraphs of allegations. *See Arthur v. Maersk*, 434 F.3d 196, 204 (3d Cir. 2006) ("When a party fails to take advantage of previous opportunities to amend, without adequate explanation, leave to amend is properly denied."); *see, e.g.*, *Jang v. Boston Sci. Scimed, Inc*., 729

F.3d 357, 368 (3d Cir. 2013) ("This court has declined to reward a wait-and-see approach to pleading." (citing *Arthur*, 434 F.3d at 204)).[10]

### b. Whether Plaintiff Plausibly Alleges Circumstances that Give Rise to an Inference of Discriminatory Intent

Having concluded that Plaintiff has alleged some facts sufficient to show she suffered an adverse employment action—based on the Amended Complaint's allegations that Defendant disparately implemented a paid suspension following a Title IX complaint, during which Plaintiff was allegedly subject to suspension conditions that Defendant did not impose on similarly situated employees engaging in allegedly similar misconduct—the Court must next determine whether Plaintiff's Amended Complaint plausibly alleges circumstances that give rise to an inference that Defendant had unlawful discriminatory intent. *See Sarullo*, 352 F.3d at 797. The "central focus" of the Court's inquiry under this prong is whether the employer is treating otherwise similarly situated employees "less favorably than others because of their race, color, religion, sex, or national origin." *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999) (internal quotation marks omitted) (quoting *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977)).

The Third Circuit has "accept[ed] the standard [for what constitutes a similarly situated employee] used by other circuits that to be considered similarly situated, comparator employees must be similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881–82 (3d Cir. 2011) (first citing *Russell v. Univ. of Toledo,* 537 F.3d 596 (6th Cir. 2008); and then citing *Lee v. Kansas City S. Ry.,* 574 F.3d 253, 259–61 (5th Cir. 2009)). "In *Lee*, the Fifth Circuit held that employees are similarly situated in all relevant respects when they 'held the same job or responsibilities, shared the same supervisor or had their employment status determined by

---

[10] The Court also applies this same analysis to each matter set out in this Opinion as to which the Court denies leave to further amend, and as to each such matter, incorporates this analysis as if set out in full.

the same person, and have essentially comparable violation histories. . . . And, critically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Doe v. Apria Healthcare Grp. Inc.,* 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015) (quoting *Lee*, 574 F.3d at 260).

Plaintiff has alleged that Defendant has discriminated against her on the basis of her race/national origin, sex, religion, and age. As set forth in Plaintiff's Amended Complaint, she contends that several "similarly situated" faculty members and one "similarly situated" administrator accused of sexual harassment were not suspended pending investigation like Plaintiff. (AC ¶¶ 247–71.) Specifically, Plaintiff asserts that these similarly situated individuals, each of whom do not belong to any of Plaintiff's asserted classes (being female, Jewish, of Israeli and Czech citizenship, and over 40 years of age)—even though accused of similar misconduct (sexually harassing comments)—were not placed on paid suspension, did not have one of their classes cancelled, were not barred from their offices or locked out of their University email accounts, and were not subject to nearly as much scrutiny as Plaintiff was in the course of Defendant's Title IX investigation. (*Id*. ¶¶ 248–71, 433, 454, 474.) For example, Plaintiff alleges that (1) a similarly situated "Psychology professor . . . (Male/non-Jewish/30's/U.S. born) was accused by female students of personal, sexist, and inappropriate comments and actions that made them feel uncomfortable" but was not subject to the same type of investigation, cancellation of classes, or removal from campus and that (2) a similarly situated "Criminal Justice and Intelligence Studies professor . . . (Male/non-Jewish/sufficiently younger/U.S. born) was accused by a female student of repeated inappropriate and sexist comments" but was not subject to the same type of

investigation, cancellation of classes, or removal from campus. (*Id.* ¶¶ 255–62, 269.) She also alleges the same of one of Defendant's former administrators. (*Id.* ¶ 270.)

Based on these allegations, the Court concludes that Plaintiff has pleaded facts sufficient to plausibly show that at least some similarly situated employees engaged in sufficiently "nearly identical" misconduct of which Plaintiff was accused but were not subject to the same array of investigatory procedures and consequences that Defendant imposed on Plaintiff. *Doe,* 97 F. Supp. 3d at 645 (citation omitted). Thus, the Court concludes that Plaintiff has satisfied her burden to overcome Defendant's Motion to Dismiss as to her claims of discrimination on the basis of her sex, age, religion, and national origin, within the parameters as set forth above. Accordingly, the Court denies Defendant's Motion to Dismiss as to Counts 2, 4, 6, and 11 of Plaintiff's Amended Complaint, all without prejudice.

### 2.   Count 8: Discrimination on the Basis of Sex Under Title IX

Defendant also moves to dismiss Plaintiff's Title IX discrimination claim on the grounds that Plaintiff has not suffered an adverse action. (ECF No. 19, at 6.) Plaintiff opposes the Motion for the same reasons noted above.

"Title IX proscribes discrimination based on sex in the provision of educational programs funded by or with the assistance of the federal government." *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 295 (W.D. Pa. 2017) (citing 20 U.S.C. § 1681(a)). "The Supreme Court has held that Title IX's ban on 'discrimination' encompasses bans on sexual harassment and retaliation, and that private rights of action are implied for both forms of discrimination under the statute." *Doe v. Salisbury Univ.*, 107 F. Supp. 3d 481, 487 (D. Md. 2015) *(*citing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75–76 (1992)).

To move past the motion to dismiss stage, a plaintiff must plausibly allege "(1) that he or she was subjected to discrimination in an educational program, (2) that the program receives federal assistance, and (3) that the discrimination was on the basis of sex." *A.H. v. Minersville Area Sch. Dist.*, 408 F. Supp. 3d 536, 550 (M.D. Pa. 2019) (internal quotation marks omitted) (quoting *Evancho*, 237 F. Supp. 3d at 295). Plaintiff has plausibly alleged, and Defendant does not contest, that Defendant operates an educational program receiving federal assistance, so those elements are not at issue here.

As for applying Title IX in this context, the Third Circuit has made plain that the standard for gender discrimination claims under Titles VII and IX is the same. *See Kazar v. Slippery Rock Univ. of Pa.*, 679 F. App'x 156, 163 (3d Cir. 2017) (citing to cases from the First, Second, Fourth, Sixth, Eighth, and Tenth  Circuits); *see also Evancho*, 237 F. Supp. 3d at 296 ("[P]rohibition of discrimination based on sex [pursuant to Title IX] is generally viewed as being parallel to the similar proscriptions contained in Title VII of the Civil Rights Act of 1964, which prohibits discrimination on the basis of 'sex' in the employment context."). Accordingly, the Court refers to the same elements that a plaintiff must plausibly show to state a Title VII discrimination claim in analyzing whether Plaintiff has demonstrated she is plausibly entitled to relief under Title IX.

For the same reasons as noted above, Plaintiff has sufficiently pleaded that she suffered an adverse employment action by plausibly alleging "actions beyond an employee's normal exposure to disciplinary policies" consisting of Defendant's suspension of her with pay in conjunction with other Title IX investigatory protocols to which Defendant did not subject other similarly situated male employees. *Vay*, 2016 WL 7324596, at *12. The remaining allegations to which Plaintiff cites as plausibly alleging an adverse action fail as a matter of law for the same reasons the Court concluded in its analysis of Plaintiff's Title VII discrimination claims. Also for the same reasons

noted above, Plaintiff has plausibly alleged facts that facially show, on the record presently before the Court, that circumstances raising an inference of discriminatory intent on the basis of Plaintiff's gender in violation of Title IX exist. Accordingly, the Court denies Defendant's Motion to Dismiss as to Count 8 of Plaintiff's Amended Complaint.

B. **Plaintiff's Retaliation Claims Under § 1981, Title VII, Title IX, and the PHRA (Counts 1 and 10)**

Defendant next moves to dismiss Plaintiff's two counts of alleged statutory retaliation. (ECF No. 19, at 5.) Plaintiff's retaliation claim at Count 1 is brought pursuant to § 1981, Title VII, and the parallel provisions of the PHRA. Plaintiff's second retaliation claim at Count 10 is brought pursuant to Title IX. As a threshold matter, the Third Circuit applies the "same standard for a retaliation claim" whether raised under Title VII, Title IX, or the PHRA. *Williams v. Pennridge Sch. Dist.*, 782 F. App'x 120, 125 (3d Cir. 2019) (reviewing claims under Title VI of the Civil Rights Act of 1964, Title IX, and the PHRA, and citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997), which applies the same standard to Title VII as well). The Third Circuit also applies the same standard to § 1981 retaliation claims. *See Estate of Olivia ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 n.14 (3d Cir. 2010).

Defendant moves to dismiss Plaintiff's retaliation claims on the grounds that (1) Plaintiff has failed to allege an adverse employment action and (2) she has failed to establish a causal connection between her participation in protected activity and the alleged adverse employment action. (ECF No. 19, at 6, 12.) In response, Plaintiff argues that she has sufficiently pleaded allegations that plausibly show that Defendant engaged in an adverse employment action, and that it was material because it would dissuade a reasonable worker from engaging in protected activity. (ECF No. 24, at 13.)

Title VII's anti-retaliation provision states: "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [her] employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). To move past the motion to dismiss stage on a retaliation claim, a plaintiff must plausibly allege facts showing that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; (3) the adverse action was "materially adverse"; and (4) a causal connection exists between the employee's protected activity and the employer's adverse action. *Burlington N. & Santa Fe Ry.*, 548 U.S. at 61–67; *Hare*, 220 F. App'x at 127; *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002).

On the record now before the Court, there appears to be no dispute between the parties that Plaintiff has alleged that she engaged in some conduct that is plausibly protected activity: (1) in or about 2014, she reported that Dr. Hines allegedly used "some inappropriate sexist language" (AC ¶ 317); (2) on December 21, 2017, Plaintiff filed a Title IX complaint against psychology professor "Dr. A" (*id.* ¶¶ 248, 252); (3) on December 3, 2018, she filed a complaint of discrimination and harassment with Defendant (*id.* ¶ 235); (4) in April 2019, she followed up with Defendant, complaining that Defendant had not yet investigated her complaints of discrimination and harassment (*id.* ¶ 281); and (5) on February 20, 2019, she filed a Charge of Discrimination with the EEOC and the Pennsylvania Human Relations Commission (*id.* ¶ 321). The alleged materially adverse actions taken by Defendant are pleaded to have occurred after or contemporaneous with Plaintiff's protected activity. The issue now before the Court is whether Plaintiff has plausibly alleged that (a) Defendant took a materially adverse employment action and (b) a causal link plausibly exists between Plaintiff's protected activity and Defendant's adverse action.

### 1.  Materially Adverse Action in the Context of Plaintiff's Retaliation Claims

"Title VII's substantive provision and its antiretaliation provision are not coterminous." *Burlington N. & Santa Fe Ry.*, 548 U.S. at 67. First, "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id*. Second, the plaintiff must show that the employer's action was "materially adverse," which in the retaliation context means "it [] might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68. (internal quotation marks omitted) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). "[P]etty slights, minor annoyances, and simple lack of good manners [in the workplace] will not create such deterrence." *Id*. The "provision's standard for judging harm must be objective" (*e.g*., a reasonable person in Plaintiff's position, considering all of the circumstances). *Id*. at 69 (noting that "the significance of any given act of retaliation will often depend upon the particular circumstances"). Further, "the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." *Id*.

### a.  Defendant's Placement of Plaintiff on Paid Suspension Following First Title IX Accusation

Plaintiff alleges that after she filed a Title IX complaint against another faculty member in December 2017, Defendant engaged in retaliatory behavior (between the months of October 2018 and December 2018) by suspending Plaintiff with pay, removing her from the classroom, replacing her as Chair while she was suspended, barring her access to campus and her University email, and cancelling her Spring 2019 course. (AC ¶¶ 423, 526.) She argues that Defendant's actions "could dissuade an employee from engaging in protected activity and, therefore, constitute an adverse action." (ECF No. 24, at 17 (first citing *Prise v. Alderwoods Grp., Inc.*, No. 06-01470, 2011 WL

3047629, at *8–10 (W.D. Pa. July 25, 2011); and then citing *Killeen v. Nw. Human Servs., Inc.*, No. 06-04100, 2007 WL 2684541, at *7 (E.D. Pa. Sept. 7, 2007)).)

The Court first notes that the Third Circuit's decision in *Jones* did not "decide whether a paid suspension constitutes an adverse action in the retaliation context." *Jones*, 796 F.3d at 325. District court decisions, however, offer persuasive authority in similar factual scenarios. In *Killeen*, a case on which Plaintiff relies, the district court held that "the threat of placement on administrative leave and the threat of a formal audit could have dissuaded a reasonable employee from making a discrimination claim" or otherwise engaging in protected activity. 2007 WL 2684541, at *7. The court reasoned that the threat of being placed on leave is "potentially embarrassing" and "a reasonable employee, even one who believes she has followed proper procedures, might avoid making waves [by engaging in protected activity] if she feared a painstaking audit of her financial dealings would result." *Id.*

The pleadings show that Plaintiff filed a Title IX complaint in December 2017. Then, in October 2018 and up until December 2018, after a student filed a Title IX complaint, Plaintiff was placed on a paid suspension, removed from her role as Chair, barred from accessing her office or her University email, only permitted to visit her office once in the presence of a security officer, and finally, had her Spring 2019 capstone course cancelled. Here, the Court observes that, under *Burlington Northern & Santa Fe Railway*, it is not the Title IX accusation *itself* that would plausibly constitute an adverse action; rather, it is how Defendant implemented the Title IX investigation of Plaintiff, including the enforcement of restrictive conditions that were allegedly not imposed on other employees who were the subject of Title IX accusations. *See* 548 U.S. at 69.

Being the subject of a Title IX investigation in the enhanced manner as allegedly executed by Defendant (cancelling Plaintiff's course, removing her as Chair, banning her from campus, and

barring email access, etc.) could, in the Court's estimation, plausibly cause a reasonable employee to avoid reporting discrimination or harassment for fear of "potentially embarrassing" and reputation-damaging treatment in like investigations. *Killeen*, 2007 WL 2684541, at *7; *see also Thourot*, 2016 U.S. Dist. LEXIS 142962, at *14 (permitting the plaintiff's retaliation claims to move past the motion to dismiss stage where plaintiff had alleged "more than just a suspension without pay"—she alleged that "she was required to undergo a medical evaluation . . . while other employees were not" and "was required to sign a [performance improvement plan] without a union representative while others were not"); *Yap v. Nw. Univ.*, 119 F. Supp. 3d 841, 851 (N.D. Ill. 2015) (holding that, in the context of a graduate student's retaliation claims, "[f]ailing to graduate on time, exclusion from educational events, and reputational harm within the department, taken together," were plausibly alleged acts of Title IX retaliation).

Taking the facts as alleged in Plaintiff's Amended Complaint as true and drawing all reasonable inferences from them in her favor, the Court concludes that Plaintiff has alleged facts sufficient to plausibly show that her paid suspension, coupled with the additional conditions imposed on Plaintiff during the investigation (that allegedly were not imposed on other employees facing similar accusations), could plausibly constitute a materially adverse employment action in the retaliation context.[11]

### b. Defendant's Alleged Failure to Conduct Timely Investigation of Plaintiff's Discrimination/Harassment Complaints

Next, Plaintiff alleges that Defendant acted in a retaliatory and materially adverse way when it "failed to conduct a timely investigation of her discrimination complaints even though it

---

[11] Plaintiff also relies on *Prise*, 2011 WL 3047629, at *8–10; however, that case is distinguishable from the case before the Court. In *Prise*, the court held that a paid suspension constituted a materially adverse action in the retaliation context where the suspension was indefinite, and the plaintiff lost the opportunity to earn commissions during that time. In that case, the threat of economic harm was at play, whereas here, Plaintiff has not alleged that she suffered any economic harm as a result of her paid suspension.

promised to do so." (AC ¶¶ 423, 526.) Plaintiff appears to be referring to the way in which Defendant handled Plaintiff's discrimination and harassment complaints. (*Id*. ¶¶ 277–84.) Plaintiff complained of discrimination and harassment to Defendant in December 2018, and Defendant did not conclude its investigation into her complaints until November 2019, close to a year later. (*Id*. ¶ 284.)

As a threshold matter, "[a]n employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for filing the same discrimination complaint." *Ashton v. SCI-Fayette, Pa. Dep't of Corrs.*, No. 16-01795, 2018 WL 2966849, at *6 (W.D. Pa. June 13, 2018) (quoting *Fincher v. Depository Trust & Clearing Corp*., 604 F.3d 712, 721 (2d Cir. 2010)). Thus, Plaintiff's allegations that Defendant's failure to timely investigate her claims of discrimination/harassment was an act of retaliation "for filing the same discrimination complaint" cannot move forward as a matter of law. *Id*.

Moreover, Defendant did not fail to investigate. Although Defendant's conclusions were allegedly untimely, Plaintiff's Amended Complaint stipulates that Defendant did ultimately address Plaintiff's complaints: Defendant hired outside counsel to investigate Plaintiff's complaints (AC ¶ 282), and as part of the process, Defendant interviewed Plaintiff in September 2019 (*id*. ¶ 283). Even if these actions were considered to be deficient, "[a] deficient investigation does not constitute an adverse employment action under a Title VII retaliation claim." *Fleet v. CSX Intermodal, Inc.,* No. 17-3562, 2018 WL 3489245, at *17 (E.D. Pa. July 18, 2018) (citing *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, No. 09-6110, 2011 WL 130156, at *11 (E.D. Pa. Jan. 13, 2011)); *see Ashton*, 2018 WL 2966849, at *6 (first quoting *Fincher*, 604 F.3d at 721; then quoting *Entrekin v City of Panama City,* 376 F. App'x 987, 995 (11th Cir. 2010); and then quoting *Hare*, 220 F. App'x at 134) (explaining that in the retaliation context, "failure to investigate a plaintiff's complaint does not constitute an adverse employment action").

Accordingly, Plaintiff's allegations that Defendant's failure to conduct a timely investigation constitutes a materially adverse action as to her retaliation claims fail as a matter of law, and no leave to amend will be permitted as to the grounds asserted by these allegations as further amendment would be futile.

### c.  The Remaining Allegedly Materially Adverse Actions: Defendant's Multiple Title IX Investigations and Adverse Grievance Resolution

Plaintiff next alleges that what she says were unsupported, "bogus" Title IX accusations lodged against her by students who allegedly share the same views on the Israel-Palestine conflict as Dr. Ross and Dr. Hines, and Defendant's subsequent investigations of those complaints, constituted a materially adverse employment action in the retaliation context. (AC ¶¶ 212, 236; ECF No. 24, at 20.) She argues that "constantly" being under investigation due to unsubstantiated Title IX accusations would dissuade reasonable workers from engaging in protected activity.[12] (ECF No. 24, at 20.) However, as to the second Title IX investigation, Plaintiff does not allege that she was placed on paid suspension nor does she allege that Defendant imposed restrictions on her teaching or duties as Chair. Even assuming that the Title IX accusations lodged against Plaintiff were "bogus" as Plaintiff contends, that does not establish an adverse employment action taken by *Defendant*. Rather, *students* came forward with complaints, and Defendant, at that point, was charged with following its Title IX policy and the law to investigate those claims. Plaintiff has not alleged that she was temporarily suspended or otherwise removed from campus during the pendency of the second investigation as she was during the first Title IX investigation. Accordingly, Plaintiff's

---

[12] As support, Plaintiff cites to *Demaio v. Connecticut Department of Correction*, No. 09-02133, 2012 WL 892933, at *9 (D. Conn. Mar. 15, 2012), in which the district court held that "[b]y subsequently investigating and disciplining the [p]laintiff, the [Department of Correction] subjected the [p]laintiff to employment actions that, viewed in the light most favorable to the [p]laintiff, were sufficiently adverse because they might dissuade a reasonable employee from engaging in protected activity." The Court notes that Plaintiff does not allege that she was ever formally disciplined for the first or second Title IX investigations, so *Demaio* is not conclusive in the Court's analysis here.

Amended Complaint has failed to plausibly allege that "the subsequent [Title IX investigation, on its own or in conjunction with the first investigation, was] materially adverse in that [it] would dissuade a reasonable employee from making or supporting a claim of discrimination." *See Burton v. Pa. State Police*, 990 F. Supp. 2d 478, 513 (M.D. Pa. 2014) (holding that the employer's investigations "were simply investigations" and not retaliatory even though the plaintiff alleged that the investigations were "designed to cause embarrassment and humiliation").

Plaintiff next alleges that Defendant's labor agreement grievance resolution discussed earlier created an environment that would dissuade a reasonable worker from making a charge of discrimination. (AC ¶¶ 423, 526.) The Court disagrees. Even taking all of the facts alleged as true, they do not show that Plaintiff may be entitled relief on the basis that Defendant's resolution of the grievance was not in Plaintiff's favor. The Court is not aware of any case concluding that allegations like Plaintiff's in this regard plausibly show such a retaliation claim. Moreover, the Court concludes as a matter of law that a reasonable employee would not be dissuaded from engaging in protected activity because the employee's superiors exercised their management prerogatives in later resolving a contractual grievance under the labor agreement. The University has the authority to resolve such grievances and determine who teaches what, so a person in a similar position as Plaintiff's and faced with similar circumstances could not *reasonably* view a grievance resolution where the University exercised its managerial rights—as alleged by Plaintiff—as creating an environment that would reasonably dissuade a worker from engaging in protected activity. Thus, Plaintiff's Amended Complaint fails to plausibly allege the materiality requirement of a retaliation claim. *See Burlington N. & Santa Fe Ry.*, 548 U.S. at 68–69 ("We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable [because] [i]t avoids the uncertainties and unfair

discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."). These allegations fail as a matter of law, and therefore, no further leave to amend will be permitted as to these allegations because further amendment would be futile.

### d.  Defendant's Alleged Failure to Mediate

Finally, Plaintiff argues that Defendant's failure to continue to participate in a third, voluntary mediation session on held September 25, 2019 constitutes an adverse action in the retaliation context because it caused her to sustain damages in the form of attorney's fees and a portion of the mediator fees for that session, and that "[s]uch mistreatment would dissuade a reasonable employee from engaging in such reasonable protected activity." (ECF No. 24, at 21 (citing AC ¶¶ 596–601).) After Plaintiff filed a Charge of Discrimination with the EEOC against Defendant, Plaintiff and Defendant engaged a private mediator. (AC ¶¶ 345–46.) The parties planned to continue their settlement discussions via mediation in a third session on September 25, 2019 (*id.* ¶¶ 597–601), but after starting the third mediation session, Defendant discontinued it when Defendant learned that a new charge was lodged against Plaintiff (at that time, Defendant disclosed the pending investigation to Plaintiff as an unidentified investigation) (*id.* ¶¶ 347, 600). Plaintiff was later informed on February 19, 2019 that she had been "accused of a new Title IX-type violation." (*Id.* ¶ 301).

As Defendant notes, Plaintiff's position that discontinuing a third mediation session constitutes an adverse employment action is unsupported by law. First, even Plaintiff concedes that there were two mediation sessions held without an issue. Her complaint is that Defendant did not participate to an agreed-upon point of conclusion at the third voluntary session. And the few district courts that have addressed the issue have held that failure to mediate does *not* constitute an adverse employment action for the purposes of stating a retaliation claim. *See, e.g.*, *Celli v. Wynne*,

No. 06-00001, 2006 WL 2708359, at *5 (D. Utah Sept. 19, 2006); *Moore v. Cingular Wireless*, No. 01-02979, 2004 WL 2047554, at *7 (N.D. Ill. Sept. 13, 2004); *Bickerstaff*, 354 F. Supp. 2d at 281 (addressing the plaintiff's retaliation claim and holding that the defendant's "alleged refusal to mediate the Plaintiff's harassment claim . . . did not constitute an adverse employment action," especially considering that mediation was not a requirement under the employer's grievance process).

The Court concludes that Defendant's decision not to mediate further during the course of a third voluntary mediation session does not constitute a materially adverse employment action as a matter of law. No further leave to amend will be permitted as to these allegations as it would be a futile endeavor for the same reasons as noted for other allegations the Court has concluded fail as a matter of law.

### 2.   Causal Connection Between Plaintiff's Protected Activity and Defendant's Adverse Action

The Court must next determine whether Plaintiff has plausibly alleged that a causal connection exists between her protected activity and Defendant's adverse employment action. *Hare*, 220 F. App'x at 127. Defendant argues that "Plaintiff claims that she first engaged in protected activity in 2014 and that Point Park retaliated in 2018—*four years later*," and that her claims are thus "too remote to establish causation or retaliation." (ECF No. 19, at 13.) Moreover, Defendant asserts that Plaintiff fails to establish a pattern of antagonism sufficient to create that causal connection in light of the attenuated temporal proximity between Plaintiff's alleged protected actions and Defendant's alleged retaliatory actions. (*Id.* at 13–14.) In turn, Plaintiff argues that her allegations of "temporal proximity, ongoing antagonism, and pretext," considered together, are sufficient to move her retaliation claims forward. (ECF No. 24, at 24.)

41

First, the Court identifies the points in time that Plaintiff allegedly engaged in protected activity. Plaintiff claims that she engaged in the following protected activities that occurred *before* her paid suspension began in October 2018: (1) filing of a Title IX complaint in December 2017 (AC ¶¶ 248–52); (2) complaining about Dr. Hines's sexually inappropriate comments in 2014 (*id.* ¶ 271); and (3) in or about 2016, complaining to Defendant's administrative personnel that Drs. Ross and Hines's "Social Justice program" was anti-Semitic and anti-Zionist (*id.* ¶¶ 56–59). Plaintiff contends that Defendant's retaliatory adverse action was placing Plaintiff on paid suspension coupled with restricted access to her office and her University email, cancellation of her spring course, and temporary removal of Plaintiff as Chair between the months of October 2018 and December 2018 (such suspension and conditions constituting the only facts this Court concluded plausibly alleged an adverse action). Accordingly, the earliest-in-time protected activity was in 2014—four years before the alleged adverse action—and the closest-in-time protected activity occurred in December 2017, which is approximately ten months prior to Defendant's alleged adverse action.

"A plaintiff may establish causation by showing temporal proximity, a pattern of antagonism, inconsistent explanations for the adverse action, or other similar circumstantial evidence that could support an inference of a causal connection between the protected activity and the adverse employment action." *Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 311 (W.D. Pa. 2020) (first citing *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997); and then citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000)). "Whether a causal link exists 'must be considered with a careful eye to the specific facts and circumstances encountered.'" *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014) (quoting *Farrell*, 206 F.3d at 279 n.5).

42

Here, a minimum of ten months and maximum of four years passed between Plaintiff's alleged protected activity and Defendant's alleged adverse action. Where, as here, "the temporal proximity is not so close to be unduly suggestive," the Third Circuit has nonetheless "recognized that timing plus other evidence may be an appropriate test." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003)). The Court concludes that the alleged ten-month period, and especially the four-year-period, are too attenuated to facially show that temporal proximity, on its own, plausibly establishes that Plaintiff's suspension was causally connected to Plaintiff's protected activity. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation . . . ."). The Court thus looks to whether Plaintiff has plausibly alleged "a pattern of antagonism" or "other similar circumstantial evidence that could support an inference of causal connection." *Bronco Oilfield Servs.*, 503 F. Supp. at 311. The Court's analysis is also guided by the Third Circuit's holding in *Kachmar*, which stated that "the proffered evidence, looked at as a whole, may suffice to raise the inference" of a causal connection. *Kachmar*, 109 F.3d at 177.

Plaintiff asserts that the following events, which occurred after she engaged in protected activity as early as 2014, when taken together, plausibly show "a pattern of antagonism" sufficient to support a "causal connection": "Dr. Ross and Hines were antagonistic to her" by "having her removed as GCS Coordinator" and opposing her as Chair; "the October 2018 student complainant . . . was encouraged to file a Title IX charge against [Plaintiff] by Drs. Ross and Hines"; and Dr. Ross and Dr. Hines "improperly publicized the confidential charge to others in the

Administration." (ECF No. 24, at 23.) Plaintiff also points to evidence of what she says were Defendant's pretextal reasons for Plaintiff's suspension to support a "causal inference." (ECF No. 24, at 24.) Specifically, she alleges that Defendant, between the months of October 2018 and December 2018 "exceeded reasonable disciplinary procedures and misapplied Title IX when there was no allegation that she had harassed or discriminated against the student because of gender"; that "similarly situated [employees] outside of [Plaintiff's] protected classes accused of Title IX violations were not suspended pending investigation nor [did they] receive[] such severe mistreatment"; and that Defendant "implied that [Plaintiff] would be terminated when it indefinitely suspended her, replaced her as Chair with a male professor, and publicized the cancellation of her Spring 2019 [] course." (*Id.*)

The Court concludes that Plaintiff's Amended Complaint—specifically the allegations that Defendant's suspension of Plaintiff was based on pretext—has plausibly alleged an inference of causal connection between Plaintiff's protected activity, at least the more recent asserted episodes, and an adverse employment action for which Defendant could plausibly be responsible.[13] The Third Circuit has established that a district court may consider an employee's inconsistent reasons for implementing an adverse employment action, and the Court concludes that in assessing Plaintiff's allegations of causal connection, the Court may properly consider Defendant's alleged inconsistent application of its Title IX policy to other professors or administrators as set forth above. *See Farrell*, 206 F.3d at 281 (citing *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986)). For example, in *EEOC v. L.B. Foster Co.*, the Third Circuit explained that "given the inconsistencies in [the defendant's] testimony, the company's conduct on behalf of other employees, and the temporal proximity of the [the plaintiff's] threat and [the defendant's] refusal

---

[13] The 2014 activity is simply far too attenuated to be in the mix here.

to provide a reference, the EEOC's allegation of illegal retaliation [was] clearly not frivolous." 123 F.3d 746, 755 (3d Cir. 1997).

On the other hand, Plaintiff's assertion that increasingly tense relationships with Dr. Ross and Dr. Hines are sufficient to plausibly show a causal connection between her protected activities and Defendant's alleged retaliatory suspension of Plaintiff falls short of the mark. The facts that Plaintiff alleges as evidence of the increasing tension between her and Drs. Ross and Hines consist of actions by Drs. Ross and Hines—fellow faculty members in the same department as Plaintiff. Because there is no evidence to suggest that Dr. Ross and/or Dr. Hines supervised Plaintiff, rather than merely being her co-workers, antagonism by *them* would ordinarily be insufficient to demonstrate a pattern of antagonism by *Defendant* such that a causal connection can be inferred. Plaintiff's reliance on *Connelly v. Lane Construction Corp.* does not settle this issue; while the Third Circuit concluded in *Connelly* that an "increasingly strained" relationship between the plaintiff and "male co-workers" supported the plaintiff's allegation of a causal connection between her sexual harassment complaints and her employer's decision to terminate and not rehire her, the court drew this conclusion based also upon a deteriorating relationship between the plaintiff and "*her supervisors*." 809 F.3d 780, 792–93 (3d Cir. 2016) (emphasis added) ("Connelly alleged that, after she complained of Manning's unwanted advances, and after overcoming another supervisor's resistance to her grievance by complaining directly to the Ethics line, her relationship with *both her supervisors and male co-workers* became 'increasingly strained' throughout the year. . . . Thus, Connelly has alleged facts that could support a reasonable inference of a causal connection between her protected activity in May 2010 and the gradual deterioration of her relationship with her employer until she was laid off in October 2010." (emphasis added) (citations omitted)). Hence, Plaintiff's retaliation claims rely on allegedly antagonistic actions by *co-workers*, which, without

45

more, would not show the required causal connection between the plaintiff's protected actions and the employer's adverse employment action. *Bronco Oilfield Servs.*, 503 F. Supp. 3d at 303–06. While in theory it is possible to infer that the worsening relationship between Plaintiff and Drs. Ross and Hines was part of the calculus behind Defendant's decision to suspend Plaintiff, *see Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014) ("Absent direct evidence of antagonism, circumstantial evidence may be used to support an inference of antagonism."), Plaintiff does not clearly provide, and prevailing law does not clearly support, that theory. However, given the Court's conclusion that Plaintiff has plausibly alleged a causal connection based on Defendant's alleged inconsistent application of its Title IX policy and the alleged application of unreasonable disciplinary procedures against Plaintiff, the Court need not conclusively resolve whether antagonistic actions by Drs. Ross and Hines as alleged here would have allowed Plaintiff to meet her burden.

Regarding Plaintiff's Title IX retaliation claim, although the Third Circuit interprets Title VII and Title IX claims using the same standard, the Supreme Court provides further guidance regarding Title IX retaliation claims. In *Jackson v. Birmingham Board of Education*, the Supreme Court held that "[w]hen a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." 544 U.S. 167, 174 (2005). The Court concludes that Plaintiff has alleged that she complained of "sex discrimination" within the meaning of Title IX when she filed a Title IX complaint in December 2017. *See id*. Moreover, for the same reasons the Court explains above, Plaintiff has alleged facts sufficient to plausibly show the "causal connection" requirement. Plaintiff's Title IX retaliation claim thus may proceed past the motion to dismiss stage.

Accordingly, Defendant's Motion to Dismiss Plaintiff's claims of retaliation under Title VII (as well as § 1981 and the PHRA) and Title IX (Counts 1 and 10) is denied without prejudice, and those claims may proceed further.

### C.  Plaintiff's Hostile Work Environment Claims (Counts 3, 5, 7, and 9)

Defendant next moves to dismiss Plaintiff's four claims of "stand alone" hostile work environment discrimination, each on the grounds that Plaintiff has failed to state a claim that she was subject to the severe or pervasive level of discrimination necessary to support such claims. Defendant argues that although "[t]he exact nature of Plaintiff's hostile work environment claims is unclear," Defendant believes "they relate to Dr. Ross' teachings and beliefs regarding the Israel-Palestine conflict, which Plaintiff claims resulted in her being subjected to 'shunning and disrespect by student followers, and some faculty [including Dr. Hines], administrators and alumni.'" (ECF No. 19, at 15.) Plaintiff's assertion that Defendant's failing to "curtail Dr. Ross' teachings on the Israel-Palestine conflict" somehow attributed to a hostile work environment, Defendant argues, must fail as a matter of law because Defendant has "the right to decide what may be taught in its classrooms." (*Id.*) Second, Defendant argues that "shun[ing]" or "deliberately avoid[ing]" Plaintiff "does not give rise to an actionable claim" because such conduct is not so severe or pervasive to form the basis of a hostile work environment claim. (*Id.* (quoting *Treaster v. Conestoga Wood Specialties, Corp.,* No. 09-00632, 2010 WL 2606479, at *18 (M.D. Pa. Apr. 29, 2010) ("Title VII is not intended to cure a cold shoulder or ostracism by co-workers.")).)

Plaintiff counters that she has sufficiently pleaded that she "was subjected to a hostile work environment based on Jewish race, religion, and Israeli national origin." (ECF No. 24, at 24.) In her Response to the Motion to Dismiss, Plaintiff argues that her Amended Complaint plausibly alleges severe and pervasive discrimination based on the following aggregated series of events,

many of which repeat matters that she says support her substantive discrimination claims: (1) "Drs. Ross and Hines advocate militant, hateful, and anti-Semitic/anti-Israel views inside and outside the classroom," views that Plaintiff opposes; (2) "Drs. Ross and Hines have boycotted" Plaintiff by having her removed as GCS Coordinator, opposing her Chair candidacy, and placing the Social Justice Program in a different department; (3) the student who filed the Title IX complaint had consulted with Drs. Ross and Hines, who "improperly publicized" the charge; (4) an administrative personnel employee "ignored" Plaintiff's report of a student's rape, made what Plaintiff perceived as an anti-Semitic remark to staff, and "joked with Dr. Hines and others about [Plaintiff's] suspension"; (5) Defendant placed Plaintiff on suspension following the Title IX accusation and imposed severe restrictions on her; (6) a student-run newspaper published a critical article referencing Plaintiff; (7) students have shunned and evaded Plaintiff as a teacher; (8) the number of students enrolling in her courses has decreased dramatically; (9) Defendant forced her to change the name of a proposed course title that had included the words "Women," "Jews," and "Blacks"; (10) faculty have disrespected Plaintiff by going around her as Chair; (11) Defendant ended mediation too soon; and (12) Defendant settled a grievance initiated by Dr. Ross in favor of Dr. Ross. (*See* ECF No. 24, at 26–28.)

### 1. Counts 3 and 7: Hostile Work Environment on the Basis of Race/National Origin Under § 1981, Title VII, and the PHRA and on the Basis of Religion Under Title VII and the PHRA

To state a hostile work environment claim, a plaintiff must facially allege that (1) she suffered intentional discrimination because of her race/national origin/religion/sex, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5)

*respondeat superior* liability exists.[14] *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). The parties' arguments center around whether the above-summarized conduct and events plausibly show that Plaintiff was subjected to discrimination that was severe and/or pervasive at the hands of Defendant, the second prong of a hostile work environment claim.

A hostile work environment claim is actionable only if it is so severe or pervasive that it "alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (second alteration in original) (quotation marks omitted); *see Glanzman v. Metro. Mgmt. Corp.*, 290 F. Supp. 2d 571, 581 (E.D. Pa. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) ("[T]o be successful in such hostile environment actions, a plaintiff must demonstrate that the workplace is 'permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"). A court must consider the "totality of the circumstances," including "the frequency of [allegedly] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Bronco Oilfield Servs.*, 503 F. Supp. 3d at 298 (internal quotation marks omitted) (quoting *Miller v. Thomas Jefferson Univ. Hosp.*, 565 F. App'x 88, 93 (3d Cir. 2014)). The environment must be objectively hostile, not only hostile in the plaintiff's view. *See Harris*, 510 U.S. at 21; *Breeden*, 532 U.S. at 270–71. Finally, "[s]evere or pervasive" is

---

[14] Courts apply the same standard when analyzing Title VII, § 1981, Title IX, and PHRA hostile work environment claims; however, for a Title IX hostile work environment claim, a plaintiff must also show that the employer was deliberately indifferent to a report of discrimination (the fifth element), which "is more stringent than the negligence standard that applies under Title VII." *See Baugh v. Robert Morris Univ.*, No. 16-00430, 2018 WL 1400063, at *21 (W.D. Pa. Mar. 20, 2018) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)) (quoting *Kahan v. Slippery Rock Univ. of Pa.*, 50 F. Supp. 3d 667, 697 (W.D. Pa. 2014)); *see also Verdin v. Weeks Marine Inc.*, 124 F. App'x 92, 96 (3d Cir. 2005) ("Regarding [the plaintiff's] hostile work environment claim, the same standard used under Title VII applies under Section 1981.").

disjunctive, meaning that a sufficiently extreme but nonetheless isolated incident can create a hostile work environment. *Castleberry*, 863 F.3d at 265. The Third Circuit further guides that "the advent of more sophisticated and subtle forms of discrimination requires [the court to] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment." *Cardenas v. Massey*, 269 F.3d 251, 261 (3d Cir. 2001).

The Court first considers Plaintiff's allegations of a hostile work environment due to Dr. Ross's and Dr. Hines's viewpoints or disagreements with Plaintiff on contentious geopolitical issues in the course of their academic roles at the University, leading to what Plaintiff describes as "shunning" or "evasion" (*e.g.*, AC ¶ 13), as these allegations are a focus of Defendant's Motion. First and most importantly, notwithstanding the alleged shunning, evasion, and other events that Plaintiff contends caused her to feel isolated in her role as a professor and Department Chair, Plaintiff has also alleged that during this time, she still "performed well" in her role as Chair and was recognized as having done so by the University's Provost. (AC ¶ 67.) Severe or pervasive discrimination for the purposes of a hostile work environment claim exists only when a plaintiff demonstrates that the allegedly discriminatory conduct actually interfered with the plaintiff's work performance and would unreasonably interfere with a reasonable employee's work performance under an objective standard. *Harris*, 510 U.S. at 23 (explaining that whether an environment is "hostile" or "abusive" depends on whether "it unreasonably interferes with an employee's work performance"); *Burlington N. & Santa Fe Ry.*, 548 U.S. at 54 ("We refer to actions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective."). Plaintiff alleges the opposite here.

Even if Plaintiff had alleged that her work performance suffered when she experienced shunning and evasion, those occurrences do not "show" that Plaintiff was subjected to a hostile work environment. *Williams v. Pa. Human Relations Comm'n*, No. 14-01290, 2016 WL 6834612, at *24 (W.D. Pa. Nov. 21, 2016) ("Rude behavior and disagreement . . . do not meet the requirements to show a hostile work environment.").

Beyond Plaintiff's acknowledgment of her satisfactory performance of her work duties and the fact that Title VII does not protect employees against generalized shunning, evasion, rudeness, or disagreement, another hurdle to Plaintiff's hostile work environment claim is a lack of a showing that Drs. Ross or Hines or the student body held their viewpoints on these contentious issues to cause hostility directed toward Plaintiff or had and advocated discriminatory views to harm Plaintiff specifically. For instance, while "[r]ights of free speech and academic freedom do not immunize . . . universities from Title VII liability for a hostile work environment generated by" race-based or religion-based slander, Plaintiff has not alleged that Dr. Ross or Dr. Hines utilized any race-based or religion-based slander specifically directed toward or about Plaintiff in or outside their classrooms. *Jew v. Univ. of Iowa*, 749 F. Supp. 946, 961 (S.D. Iowa 1990) (concluding that sexual harassment consisting of spreading of rumors about and other offensive speech about the *plaintiff* specifically *within* the workplace made the workplace an extraordinarily difficult one). Instead, Plaintiff claims that Dr. Ross, in particular, held and advanced in the classroom and beyond strongly differing viewpoints from those of Plaintiff on the Israel-Palestine conflict and the responses to it, that Drs. Ross and Hines support different political movements in those regards than Plaintiff does (specifically, Plaintiff alleges that they support the "Boycott, Divestment, Sanctions" or "BDS" movement and criticize Israeli policy regarding Palestinian settlements), and that Plaintiff considers those viewpoints on those topics as anti-Semitic and therefore by definition to be targeted at her.

To the extent that Plaintiff alleges that Dr. Ross "used his position" to espouse a BDS-based or related agenda in the classroom where he taught (*see* AC ¶¶ 19–32) and created a hostile work environment for Plaintiff in doing so, the Court would observe that there are competing assessments of the basis for such views. In the eyes of some commentators and advocates, BDS activities are recognized as a movement with "the goal of bringing about political and social change," which strongly suggests that academic exploration of such ideas is not, without more, discriminatory toward those who do not also advance those ideas. Timothy Cuffman, *The State Power to Boycott a Boycott: The Thorny Constitutionality of State Anti-BDS Laws*, 57 Colum. J. Transnat'l L. 115, 138 (2018) (hereinafter "Cuffman"). And at least some BDS supporters are focused on protesting Israel's contemporary settlement policies relative to Palestinians and the West Bank. Cuffman, *supra*, at 122. But at the same time, other  commentators and critics have tied the BDS movement back to discriminatory and anti-Semitic Arab League boycotts of Jewish goods in the 1920s. *Id.* Some major commercial enterprises have seemingly advanced the BDS movement's aims through their course of dealing with (or boycotting) Israeli interests, while others have vigorously condemned those same commercial actions and advocacy as being anti-Semitic, leading several state and local governments to enact laws and ordinances opposing such BDS boycotts by, for example, prohibiting public entities from contracting with parties that engage in boycotts of Israel, thereby "boycotting the boycotters." Cuffman, *supra*, at 121–34. Despite the sensitive and important the issues these conflicting viewpoints and actions raise, as an overarching matter, such debates and commercial actions have been recognized to fall within First Amendment protections when efforts have been advanced to limit or impair such advocacy and commercial action. Cuffman, *supra*, at 139–42.

Against that backdrop, Plaintiff has not shown that Defendant has subjected her to an objectively hostile work environment by its not suppressing, or otherwise protecting Plaintiff from,

the personal views and academic interests of some of Defendant's professors and students related to these geopolitical topics. The record does not plausibly make a "showing" that *Defendant* created an objectively hostile work environment *for Plaintiff* or for a reasonable employee in Plaintiff's shoes by allowing controversial theories and ideas that directly compete with Plaintiff's own views to be discussed among professors and/or students in a classroom or academic setting or engaged with outside of the classroom. *Cf.* Cuffman, *supra*, at 129 (exploring anti-BDS laws, largely promulgated at the state level, that prohibit *public* investments and/or entities from *investing in* or *conducting business with* entities that participate in BDS-related activities).[15] Rather, Plaintiff's allegations amount to her strong and fundamental disagreement with the viewpoints and public actions that she attributes to either or both of Drs. Ross and Hines, largely manifesting in actions outside of the classroom including participating in protests and posting content on social media, and her disagreement with allegedly related views of and the speech and actions by Point Park students on those same matters. Plaintiff posits that such advancement of these ideas and concepts by Drs. Ross and Hines and by students inherently makes her an outcast given her vigorously opposing viewpoints coupled with her race and religion. But in the Court's judgment, accepting that argument would prove too much, as it would invalidate as a facial matter and on Title VII grounds an entire academic and public debate and give Plaintiff a veto over others engaging in that same debate. It would effectively compel, under the pain of Title VII liability, that any speech and viewpoints held and

---

[15] *See Bronco Oilfield Servs.*, 503 F. Supp. 3d at 303-11. Because the Court concludes as a matter of law that the Plaintiff's stand-alone "hostile work environment" claims fail on other grounds, the Court need not address Plaintiff's failure to sufficiently show that Defendant would be deemed vicariously liable for the conduct of Drs. Ross or Hines or students.

espoused by others as part of that debate and that are contrary to Plaintiff's point of view be reformulated to be consistent with Plaintiff's views on such topics.[16, 17]

_____

[16] In essence, Plaintiff contends that the way in which she was treated in the workplace was part of an overarching movement by supporters of the BDS movement to discriminate against her due to her Israeli citizenship, Jewish race and religion, and her support of Israel in the Israel-Palestine conflict. (*See, e.g.*, AC ¶¶ 135, 200–19.) Plaintiff alleges that Dr. Ross supports the BDS movement and that some students may also support the movement (given, for example, their participation in protests relative to it). As the Court has noted, these allegations taken as they are stated reflect a core disagreement between private individuals expressing differing positions on a topic of vigorous ongoing political debate.

Such disagreements on a contentious geopolitical conflict do not in and of themselves form the basis of a hostile work environment claim as Plaintiff contends. *Williams*, 2016 WL 6834612, at *24 ("[D]isagreement . . . [does] not meet the requirements to show a hostile work environment."). If such were the case, then as a practical consequence, the fair employment practice laws invoked by Plaintiff would serve as parking brake on those academic and public debates about those highly contentious topics and would put the thumb of those fair employment practice laws on the First Amendment scale, tipping it irrevocably in favor of Plaintiff's point of view on those same topics. In short, the natural and probable consequence of Plaintiff's position is that advocacy of the BDS movement (or any other criticism of the actions of the Israeli government by other faculty members or students) in an academic employment setting is *per se* unlawful discrimination on the basis of race, national origin, and/or religion, and that such, as a matter of law, generates an objectively hostile work environment. The Court is not aware of case law that would support that position.

The Court of course recognizes the contentious nature of the debate surrounding the BDS movement, including the stance of some, including Plaintiff, that BDS activities are by definition a form of anti-Semitism simply by their existence and articulation, and her contention that their very existence in her workplace necessarily constitutes unlawful "hostile environment" discrimination against her. For example, Plaintiff broadly contends that "Israeli and Jewish students and scholars have been subjected to prejudice, shunning, exclusion, and discrimination on campuses by BDS proponents in this country and abroad" (AC ¶ 134), and she cites scholarship in her Response to Defendant's Motion to Dismiss that contends that BDS, specifically any academic boycott of Israel and Zionist voices from higher education, is necessarily anti-Semitic conduct, and that it is therefore and more specifically necessarily conduct directed at her by its very existence, thereby generating Title VII liability for the Defendant (ECF No. 24, at 5 & n.1).

However, Plaintiff's effort to characterize support for these topics (or at least advocacy contrary to the position of the Israeli government) by Dr. Ross, Dr. Hines, and certain students at Point Park University, as well as the fact of academic discussion of BDS at the University, as inherently severe unlawful discrimination such that those allegations in and of themselves make out a hostile work environment claim of discrimination against her lacks legal support. The Court is aware of no cases that draw that conclusion, and the parties have advanced none. And the actions of other academics and students on other campuses is not germane to the issues presented by this asserted claim in this specific case. Thus, no matter the divisiveness of the debate surrounding the BDS movement (or other philosophical viewpoints parallel to the BDS movement's opposition to the actions of the Israeli government) nor the validation of Plaintiff's point of view by some but not all engaged in the academic debate outside of the Defendant's campus and workplace , the Court cannot conclude that association with BDS statements and principles that is not directly and specifically targeted at Plaintiff by and among Defendant's professors and students objectively could create a hostile work environment claim against Defendant.

[17] The implications of the BDS movement broadly and in the First Amendment context were explored in some detail by Judge Hanen in *A&R Engineering and Testing, Inc. v. City of Houston*, Civ. No. 4:21-CV-03577, 2022 WL 267880 (S.D. Tx. Jan. 28, 2022). In his thorough examination of these issues, Judge Hanen noted the highly contested nature of the public and academic debate surrounding these issues, the assessment of various scholars that the principles of the BDS movement are or are not anti-Semitic, and the implications of the debate on both the broader community and more specifically members of the Jewish communities in the United States, Israel and elsewhere. *Id.* at *3-4.

In the Court's judgment, the argument that the Plaintiff posits would also require the Court to abandon a core principle of the "hostile work environment" claim analysis, namely that the conduct complained of be "objectively hostile," rather than being measured by the subjective assessment of the Plaintiff.

But that said, while these allegations, standing alone, do not facially generate a hostile work environment claim, the Court will not consider these events in isolation. Rather, the Court is charged with analyzing "the aggregate effect of all [allegations] and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment." *Cardenas*, 269 F.3d at 261. The Court thus considers the above allegations as to professors and students at Point Park holding and advocating views contrary to Plaintiff's, which the Court must accept as true, in the context of Plaintiff's other assertions of severe or pervasive discrimination on the basis of her race/national origin and religion. Even if, in doing so, the Court concludes that "[n]o one event stands out alone from the rest," it must assess whether "all of the events could be found to aggregate to create an environment hostile to a person" of Plaintiff's national origin/race and religion as an Israeli, Jewish woman. *Abramson v. William Patterson College of N.J.*, 260 F.3d 265, 279 (3d Cir. 2001) (citing *Durham Life Ins. v. Evans*, 166 F.3d 139, 155 (3d Cir. 1999)). But even considering the aggregate effect of Plaintiff's allegations, the Court's conclusion remains the same: Plaintiff has not plausibly alleged a hostile work environment that is objectively abusive

---

The central issue in *A&R Engineering* was the validity of a Texas state statute that prohibited any unit of government in Texas from contracting with any company unless the contract contained written confirmation that the company did not and would not boycott Israel during the term of the contract. *Id.* at *1. Judge Hanen's Opinion granted a preliminary injunction barring the enforcement of that state statute as to the plaintiff in *A&R Engineering* on First Amendment grounds, *id.* at 16, recognizing nonetheless the varying decisions arising from similar constitutional challenges to anti-BDS contracting statutes, *id.* at *1. *See also Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1039–50 (D. Az. 2018), *vacated on other grounds*, 789 F. App'x 589 (analyzing a challenge to a similar law).

While arising in contexts distinct from those advanced here, the analyses in *A&R Engineering* and in *Jordahl* reflect the reality that this divergence of views on a matter of geopolitical debate and conflict does not, as the Plaintiff essentially posits, demonstrate as a matter of law unlawful discrimination against Plaintiff that violates Title VII.

such that it unreasonably interfered with her work performance so as to support a stand-alone hostile work environment claim.

In evaluating Plaintiff's aggregate allegations, the Court first notes that several of them do not plausibly show intentional discrimination *by Defendant* or discrimination *because of* Plaintiff's race, national origin, or religion, which a hostile work environment claim requires. *See Mandel*, 706 F.3d at 167. For example, the Court concludes that Plaintiff's allegation that Dr. Ross and Dr. Hines improperly published her Title IX accusation to upper-level employees has no bearing on her hostile work environment claim. Plaintiff's Amended Complaint does not show that this alleged fact was a targeted discriminatory act *because of* Plaintiff's protected class status, which is the first element required to state a hostile work environment claim. Moreover, Plaintiff's allegation that the student who came forward had engaged in the BDS protest as grounds to show the Title IX complaint itself was discriminatory is unavailing. A student's engagement in free speech while at the same time engaging in conduct protected by Title IX does not illustrate how Plaintiff suffered an abusive work environment at the hands of *Defendant* when considered from the required  objective standard. Similarly, Plaintiff's assertions that "the number of students enrolling in [her] course(s) has decreased dramatically and negatively affected [her]" and that faculty have disrespected Plaintiff by "go[ing] around her as Chair" neither bear on Defendant's actions nor plausibly demonstrate that such circumstances arose because of discrimination by Defendant toward Plaintiff based on her race, national origin, or religion. (AC ¶¶ 325, 327).

Plaintiff also fails to plausibly show how actions she alleges were taken by Defendant itself—such as allegedly failing to mediate at a third mediation session (*id.* ¶¶ 347–48), requiring Plaintiff to change a course name as directed by Defendant (*id.* ¶¶ 392–99), and resolving a union grievance in favor of another professor (*id.* ¶¶ 353–67)—(1) were *because of* Plaintiff's protected

classes, *see Epstein v. Pittsburgh School Dist.*, No. 10-01593, 2011 WL 4368371, at *5 (W.D. Pa. Sept. 19, 2011); and (2) from an *objective* perspective, could plausibly create an abusive work environment that would interfere with the work performance of a reasonable person in Plaintiff's role. *See Harris*, 510 U.S. at 21; *Breeden*, 532 U.S. at 270–71.

As for Plaintiff's remaining allegations that may weigh into the Court's analysis of Plaintiff's hostile work environment claim based on the totality of the circumstances, they do not alter the Court's conclusion that Plaintiff has not alleged sufficiently severe or pervasive hostility in the workplace. Plaintiff alleges that "at a staff meeting in 2018," Molly McClelland, Director of the Center for Student Success, "gratuitously talked about [McClelland's] 'little Jewish' college roommate who was afraid of everything." (AC ¶ 154.) Plaintiff further contends that a student-run newspaper published an article critical of Plaintiff "in which an assistant provost gave credence to the Title IX accusation against her" and allegedly echoed students' complaints that following the cancellation of her Spring 2019 course (resulting from the Title IX investigation), Plaintiff "cheated them financially."[18] (ECF No. 24, at 27; AC ¶¶ 291–96.) The alleged "harassment" from these remarks made on two separate occasions several months apart by different people did not occur with sufficient frequency to be considered pervasive or consistent under the relatively exacting standard for the assertion of a stand-alone "hostile work environment" claim. *See Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d Cir. 2020) (holding that greeting the plaintiff of Egyptian descent on two occasions with "Hey Arabia Nights" and "Hey, Big Egypt," making a comment regarding computers in Egypt, and referring to the plaintiff as "Mufasa" or "Mufasa Ali" were isolated incidents insufficient to support such a claim under New Jersey's parallel employment discrimination statute, which the court concluded was to be analyzed in the same

---

[18] Plaintiff pleads that this use of the word "cheated" in this specific context could plausibly be found to be an anti-Semitic trope. (AC ¶ 295.) For these purposes, the Court will treat it as such.

manner as a Title VII hostile work environment claim); *Shramban v. Aetna,* 262 F. Supp. 2d 531, 536 (E.D. Pa. 2003) (explaining that the defendant's alleged harassing behavior, such as improper personal comments and mimicking the plaintiff's accent, were neither severe nor sufficiently continuous, concerted, or prolonged to alter conditions of employment as required by a hostile work environment claim).

As for the severity of these alleged remarks, the Supreme Court has made plain that the "mere utterance of an . . . epithet which engenders offensive feelings in an employee" does not constitute an objective change in the conditions of employment. *Abramson,* 260 F. 3d at 280 (internal quotation marks omitted) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998)). *But see Bronco Oilfield Servs.*, 503 F. Supp. 3d at 299–201 (discussing cases that have recognized that the n-word is "[f]ar more than a mere offensive utterance" and concluding that "a jury could rationally find that an African-American employee being directly addressed and referred to with the n-word or a variation of it four (4) separate times by four (4) different coworkers puts him in the middle of a workplace environment where race-based workplace harassment could reasonably be found to be severe or pervasive or both" (citation and internal quotation marks omitted)). The conduct must go beyond "simple teasing, offhand comments, and [non-serious] isolated incidents." *Id*. (quoting *Faragher*, 524 U.S. at 788).

Here, the remarks that Plaintiff refers to as allegedly establishing severe discrimination do not carry the day. The Court observes that Plaintiff does not allege that Ms. McClelland's remark at a 2018 staff meeting was directed at or about Plaintiff—unlike in *Prettyman v. LTF Club Operations Co.*, where the plaintiff's co-workers directly called the plaintiff a "Jewish American Princess" and subjected her to several other derogatory comments about "Jewish Money," No. 18-00122, 2018 WL 5980512, *6 (E.D. Va. Nov. 13, 2018), or in *Bronco Oilfield Services*, where the plaintiff's co-

workers repeatedly directed the n-word at the plaintiff, in some instances when the plaintiff was alone with the co-worker who used the racial slur, 503 F. Supp. 3d at 288–96. Nor do Plaintiff's allegations plausibly allege that she faced any sort of targeted, derogatory comments over a lengthy period of time, such that it affected Plaintiff's work performance—as was the case in *Abramson*, where the Court concluded that harassing conduct over a period of two years could be interpreted by a jury as so harmful that it interfered with the plaintiff's employment conditions. 260 F.3d at 279–80 (concluding that the pervasive and severe conduct included unprecedented monitoring of the plaintiff's conferences and absences; charging the plaintiff a sick day for taking off on a Jewish holiday; criticizing the plaintiff for lack of availability during the Sabbath; and scheduling meetings during Jewish holidays).

Taking the facts alleged as true and as pleaded, the Court concludes that these remarks, which occurred on two separate occasions several months apart, are to be viewed as isolated comments by different people in different contexts that do not facially "rise to the level of severity that would alter working conditions." *Ali,* 957 F.3d at 182. Considering all of these allegations in the context of the Circuit precedent in *Ali*, Plaintiff does not and could not plausibly show that as an objective matter, the remarks that Plaintiff alleges occurred would cause a reasonable person would suffer from an abusive work environment that tangibly affected the person's ability to work.

Plaintiff also contends that circumstances related to her suspension demonstrate a hostile work environment, namely Ms. McClelland and other colleagues allegedly openly joking about her suspension, calling it a "real 'sh*t show'" (AC ¶ 154); Dr. Ross and Dr. Hines allegedly improperly publicizing her Title IX charge to upper-level administrators (*id*. ¶ 220); and finally, the fact that similarly situated individuals, each of whom do not belong to any of Plaintiff's protected classes— though accused of similar misconduct (sexually harassing comments in violation of Title IX)—were

not placed on paid suspension, did not have one of their classes cancelled, were not barred from their offices (with permission to only return once if accompanied by a security officer) or locked out of their email accounts, and were not subject to nearly as much scrutiny as Plaintiff was in the course of Defendant's Title IX investigation. (AC ¶¶ 248–71, 433, 454, 474.) Plaintiff has failed to plausibly allege how her suspension pending the Title IX investigation created an environment where Plaintiff was subjected to severe or pervasive discrimination *on the basis of* her race/national origin or religion. While these assertions about that investigation plausibly allege disparate treatment for the purposes of her substantive discrimination claims as the Court has set out above, these allegations, even taken as true, fail to plausibly allege that her suspension distinctly (or considered in the aggregate) created an objectively abusive work environment or unreasonably interfered with her work performance. *See Upshaw v. Janssen Rsch. & Dev., LLC*, No. 11-07574, 2014 WL 1244047, at *7 (E.D. Pa. Mar. 26, 2014). In sum, regarding these allegations of hostile work environment, the Court concludes that Plaintiff "improperly attempts to conflate [] disparate treatment and hostile work environment claims." *Id.*

Assessing Plaintiff's allegations in the aggregate, the Court concludes that Plaintiff fails to plausibly show that she was subjected to severe or pervasive discrimination on the basis of her religion, race, or national origin when considered from an objective perspective. Plaintiff's allegations do not involve the repeated utterance of vile racial epithets by an array of co-workers aimed directly at her over a significant period of time and attributable to the organizational defendant, as was the case in *Bronco Oilfield Services*, nor do they plausibly rise to the requisite level of severity, especially considering the force of the Third Circuit's precedential holding in *Ali* on the significant facts present in that case.

60

Plaintiff's claims at Counts 3 and 7 are dismissed with prejudice because the Court concludes that further amendment would be futile for the following reasons. First, Plaintiff has already taken an opportunity to amend her expansive Complaint and did so, yielding an even more expansive Amended Complaint. Further amendment would permit Plaintiff to contravene the Third Circuit's disapproval of a "wait-and-see" approach to pleading, as this Court explained above. *See Arthur*, 434 F.3d at 204; *see, e.g.*, *Jang*, 729 F.3d at 368; *United States ex rel Sirls v. Kindred Healthcare, Inc.*, No. 16-683, 2021 WL 1721864, at *4 (E.D. Pa. Apr. 29, 2021).

Second, the Court observes that Plaintiff's allegations supporting her alleged hostile work environment claims essentially function as a subset and are repetitive of her statutory substantive intentional discrimination claims—the allegations Plaintiff relies on for her hostile work environment claims are many of the same allegations she relies on for her discrimination claims. Indeed, the hostile work environment claim allegations may end up being relevant to the merits consideration of her substantive discrimination claims. It logically follows that the allegations Plaintiff attempts to fashion as a stand-alone hostile work environment claim are, if actionable, nonetheless subsumed in her substantive discrimination claims. *See, e.g.*, *Harris*, 510 U.S. at 21 (explaining that Title VII's phrase "terms conditions, or privileges of employment evinces a congressional intent to strike at the entire disparate treatment [of protected classes] in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment" (internal quotation marks omitted)).[19]

Third, rather than seeking leave to amend after Defendant filed its Motion to Dismiss Plaintiff's Amended Complaint (a motion on which the Court held oral argument), Plaintiff instead

---

[19] In this regard, Plaintiff's claims are circular, e.g., she was discriminated against in the nature of her work environment because she was discriminated against as set out in her substantive claims at Counts 2, 4, 6, 8, and 11. Viewed as such, they become cumulative of the specific substantive discrimination claims the Court has ruled may advance further in this case.

chose to argue in her opposition that the Amended Complaint set forth allegations sufficient to plausibly allege her hostile work environment claims. At that point in time, Plaintiff was on notice of the possible deficiencies in her Amended Complaint and plowed ahead, which is further support that amendment would be futile in this context. *See N.Y. Cent. Mut. Ins. Co. v. Edelstein*, 637 F. App'x 70, 74 n.5 (3d Cir. 2016) (citing *United States ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014)) (applying precedential Third Circuit law and affirming a district court's conclusion that amendment would be futile where the record established that "Appellants were put on notice by Appellees' Motion to Dismiss . . . that their Second Amended Complaint may fail to allege a breach of contract claim," and where Appellants "at no point . . . request[ed] leave to amend their Second Amended Complaint").

The Court further notes that Plaintiff's Original Complaint set forth 568 paragraphs of allegations across over 60 pages and her Amended Complaint set forth 628 paragraphs of allegations spanning 75 pages. This is hardly a "short and plain statement" of her claims, Fed. R. Civ. P. 8(a)(2), and it impresses the Court as being a conclusive demonstration that Plaintiff has said all that she could say. In the Court's estimation, Plaintiff's lengthy and detailed factual allegations asserted in the two prolific and factually extensive Complaints she has already filed present strong indicia that the theory of a hostile work environment claim Plaintiff attempts fashion has been fully explored, presented, and exhausted, such that further amendment would be a futile endeavor. *See Humphries v. Pa. State Univ.*, No. 4:20-cv-0064, 2021 WL 4355352, at *26 (M.D. Pa. Sept. 24, 2021).[20]

---

[20] The Court applies and incorporates these principles to each matter set out in this Opinion as to which leave to further amend is denied.

2. <u>**Counts 5 and 9: Hostile Work Environment on the Basis of Sex Under Title VII and Title IX**</u>[21]

The Court next looks to Plaintiff's Amended Complaint to determine whether she has alleged facts sufficient to state a stand-alone claim of hostile work environment on the basis of sex. The allegations that speak to Plaintiff's hostile work environment claims on the basis of sex pursuant to Title VII and Title IX are as follows: (1) Defendant imposed more severe conditions and restrictions during the course of her first Title IX investigation than were imposed on similarly situated male faculty and administrators who were also the subject of Title IX accusations (AC ¶¶ 247–71); (2) a male professor "burst into her office, displayed explosive anger, [and] threatened to take her office" (*id.* ¶¶ 248–52); (3) in an academic affairs meeting, a now-retired professor stated to Plaintiff "We don't give a sh*t about what you think" (*id.* ¶¶ 266–67); and (4) Dr. Hines "used some inappropriate sexist language" at a faculty search "in or about 2014." (*Id.* ¶ 317).

First, the Court again concludes that as to some of these allegations, Plaintiff attempts to conflate allegations that may state a disparate treatment claim with allegations that may state a hostile work environment claim. *Upshaw*, 2014 WL 1244047, at *7. In any event, the Court concludes that even taking these allegations as true, as an objective matter, a reasonable person in Plaintiff's position would not find these same situations hostile or abusive as those terms are considered in this context, especially based on how isolated they are in time. *See Harris*, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work

---

[21] In its Reply, Defendant argues that "Plaintiff has abandoned Counts V [and IX] of her Amended Complaint, where she alleged claims of hostile work environment based on sex" on the basis that "[n]owhere in her Opposition does Plaintiff suggest that she was also purportedly subjected to that sort of environment" due to her sex. (ECF No. 28, at 2.) On the record before the Court, nowhere in Defendant's Motion to Dismiss and Memorandum of Law in Support does Defendant argue specifically that Plaintiff has failed to state a claim as to the specific hostile work environment claims Plaintiff alleges on the basis of sex (Counts 5 and 9). Rather, Defendant generally asserts that Plaintiff has failed to plausibly allege that she was subjected to a hostile work environment claim on the basis of her sex. As such, Plaintiff did not abandon those claims by failing to respond to an argument that Defendant did not substantively make. The cases to which Defendant cites all deal with a plaintiff failing to address a substantive argument put forward by the defendant, which is not the case here. The Court will thus consider Plaintiff's Counts 5 and 9 in the course of addressing Defendant's Motion to Dismiss.

environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."); *Breeden*, 532 U.S. at 270–71.

As to the other allegations, the Supreme Court has made plain that the "mere utterance of an . . . epithet which engenders offensive feelings in an employee" does not constitute an objective change in the conditions of employment. *Abramson*, 260 F.3d at 280 (internal quotation marks omitted) (quoting *Faragher,* 524 U.S. at 787). The conduct must go beyond "simple teasing, offhand comments, and [non-serious] isolated incidents." *Id.* (quoting *Faraghe*r, 524 U.S. at 788). The events Plaintiff cites as creating a hostile work environment on the basis of her sex do not facially go beyond temporary, isolated incidents significantly distant in time from one another in which comments were made. As to the allegation that Dr. Hines made a sexist comment in the workplace, Plaintiff provides no specific example of what was said or the timing or context of such. Moreover, it appears that the referenced comment took place during a single and isolated incident.

Plaintiff's Amended Complaint does not support a stand-alone claim of a hostile work environment on the basis of her sex, even with its bare statement that she is a woman. *See Epstein*, 2011 WL 4368371, at *5. And even assuming that Defendant's treatment of Plaintiff during the Title IX investigation was more "severe" than it was for other similarly situated males, Plaintiff has not alleged "a pattern or practice of gender discrimination" by her employer that would create a work environment that was generally hostile to women. *See Titus v. Home Depot*, No. 08-02757, 2008 WL 4191685, at *3 (E.D. Pa. Sept. 10, 2008). The Court will therefore dismiss Plaintiff's hostile work

environment claims at Counts 5 and 9. For the same reasons the Court noted above, dismissal of Counts 5 and 9 is with prejudice.[22]

### D. **Plaintiff's Breach of Contract Claim as to Mediation (Count 17)**

At this stage, the only remaining breach of contract claim that Defendant moves to dismiss is Count 17: Plaintiff's breach of contract claim based on the Agreement to Mediate that Defendant and Plaintiff entered into after Plaintiff filed a Charge of Discrimination with the EEOC. (*See* ECF Nos. 38 and 39.)

Defendant argues that "[t]he Agreement to Mediate did not place a duty on the University to enter into a resolution with Plaintiff regarding her Charge of Discrimination," noting that the language of the agreement "recognizes the possibility that claims will not settle." (ECF No. 19, at 19.) Defendant further argues that Plaintiff's allegations, at most, show that Defendant "ended settlement negotiations without explaining itself to Plaintiff," which does not amount to a breach of any duty by Defendant. (*Id.* at 20.) In opposition, Plaintiff argues that Defendant "breached a duty imposed by the Agreement to Mediate at the third scheduled session when it declined to participate." (ECF No. 24, at 33.) Accordingly, when Defendant "announced that it stopped participating due to a new undefined investigation" of Plaintiff, Plaintiff further argues that she has sufficiently alleged that Defendant breached the contract, thereby causing Plaintiff to suffer damages. (*Id.* (citing AC ¶¶ 598–601).) Plaintiff further supplements her breach of contract argument in her Surreply, arguing that Defendant breached its Agreement to Mediate by failing to participate in good faith, noting that "[i]n Pennsylvania, the duty of good faith and fair dealing is implied in every contract." (ECF No.

---

[22] As noted above as to Plaintiff's assertions of a hostile work environment based on her race/national origin and religion, her factual assertions in these regards, if proven, may be part of the underpinning of her substantive discrimination claims.

33, at 13 (citing *Hordis v. Cabot Oil & Gas Corp.*, No. 19-00296, 2020 WL 2128968, at *4 (M.D. Pa. May 5, 2020)).)

To establish a breach of contract claim under Pennsylvania law, a plaintiff must prove (1) the existence of a contract, which requires a showing of offer, acceptance, and consideration, *see Jenkins v. Cnty. of Schuylkill*, 658 A.2d 380, 383 (Pa. Super. Ct. 1995) (citing *Schreiber v. Olan Mills*, 627 A.2d 806, 808 (Pa. Super. Ct. 1993)); (2) the breach of a duty imposed by the contract; and (3) resulting damages. *See CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).

Defendant attached a copy of the parties' Agreement to Mediate to its Motion to Dismiss at Exhibit 4 (ECF No. 18-4), which the Court may properly consider.[23] *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). The Court thus considers language of the agreement to determine whether Plaintiff has plausibly alleged a breach of contract claim. The relevant provisions of the Agreement to Mediate state:

> The Mediation process . . . is a non-binding settlement negotiation. The Mediation format is designed to give both sides an opportunity to discuss their differences and consider settlement options in a private environment, without prejudice to their claims and defenses if this case does not settle. . . . Subsequent Discussions and/or Mediation sessions will be arranged only to the extent that the Parties and the Mediator agree that they are reasonably likely to be useful and productive.

---

[23] Plaintiff argues in her Surreply that by submitting six exhibits of contracts and policies (which the Court concludes Plaintiff relies on as the basis of her breach of contract claims), Defendant has, in effect, "already moved for summary judgment without allowing Plaintiff to develop a factual record." (ECF No. 33, at 14.) Accordingly, Plaintiff requests that the Court convert Defendant's Motion to Dismiss into a Motion for Summary Judgment. (*Id*. at 15.) However, the Court may properly consider exhibits attached to a motion to dismiss, where the exhibits are documents upon which a plaintiff bases her claims. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). That is the situation presented here. In the Court's review of Plaintiff's Amended Complaint, she bases the Count 17 breach of contract claim on the Agreement to Mediate, which is one of the extrinsic documents Defendant included as an exhibit to its Motion to Dismiss. Accordingly, the Court will deny Plaintiff's request to convert Defendant's Motion to Dismiss into one for summary judgment.

(ECF No. 18-4, at 2.) The issue is whether Plaintiff has plausibly alleged that Defendant breached a duty imposed by the Agreement to Mediate.

The Court concludes that Plaintiff has alleged neither a breach of a contractual duty nor a breach of a duty to participate in good faith. Plaintiff herself alleges that the September 25, 2019 mediation session was the *third* scheduled mediation, and that Defendant did not stop participating until "several hours" into the session. (AC ¶¶ 594–99.) The plain language of the Agreement to Mediate clearly states that subsequent settlement discussions will be arranged only if "the parties . . . agree that they are reasonably likely to be useful and productive." (ECF No. 18-4, at 2.) Even taking the facts alleged as true, the Court concludes that Plaintiff's Amended Complaint has not plausibly alleged a breach of a duty to participate where the Amended Complaint has also alleged facts demonstrating that at least one party (here, Defendant) did not agree that further discussions/mediation would be useful or productive, as required by the Agreement, and where Plaintiff has also alleged that Defendant, after having participated in two mediation sessions, engaged the *third*, voluntary session for several hours before stopping. (AC ¶¶ 597, 599.) Accordingly, Plaintiff fails to plausibly demonstrate that Defendant breached a contractual duty when, after several hours of negotiation, it chose to no longer participate in the *third* scheduled mediation session.[24]

Plaintiff's breach of contract claim at Count 17 is dismissed with prejudice. The Court concludes that further amendment as to this claim would be futile because no further enhancing or combining of allegations could state a breach of contract claim as a matter of law.

---

[24] The Court also concludes that the cases to which Plaintiff cites as support for her breach of contract claim are inapplicable in this case. Instead of dealing with alleged breaches for failure to participate in mediation, the cases address alleged breaches of (1) an oral condition that "mediation would be held without the participation and assistance of counsel at the mediation," *Batoff v. Charbonneau*, 130 F. Supp. 3d 957, 965–67 (E.D. Pa. 2015), and (2) a confidentiality provision, *Bethlehem Area Sch. Dist. v. Zhou*, No. 09-034493, 2012 WL 930998, at *1–3 (E.D. Pa. Mar. 20, 2012).

### E.  **Plaintiff's Negligent Supervision Claim (Count 18)**

At Count 18, Plaintiff raises a negligent supervision claim against Defendant. Defendant moves to dismiss this claim on the grounds that Plaintiff's allegations "are preempted by the PHRA and cannot support a negligent supervision claim" because "the gravamen of [Plaintiff's] claim is based on the same purported allegations as her discrimination, hostile work environment, and retaliation claims." (ECF No. 19, at 20.) Defendant also argues that Plaintiff's additional allegation regarding Director of Point Park's Center for Student Success, Molly McClelland's failure to adequately respond to an alleged rape of a student that Plaintiff reported fails to state a claim because the harm that McClelland allegedly caused "was not reasonably foreseeable," and Plaintiff "has not alleged that McClelland committed an intentional harm while acting outside the scope of her employment." (ECF No. 19, at 21–22.)

In response to Defendant's preemption argument, Plaintiff argues that she "does not rely on the same set of facts" for her PHRA claims as she does for her negligent supervision claims. (ECF No. 24, at 35.) For example, as to her PHRA claims, Plaintiff argues she does not rely on "Point Park's failure to respond and act appropriately on her rape report for which she was punished; she does not rely on Point Park's failure to investigate if Dr. Ross and/or Dr. Hines were behind the October 2018 Title IX complaint; [nor does she rely on] Point Park's failure to intervene in the actions of Dr. Ross and Hines to use students to file multiple bogus Title IX claims." (*Id.* at 36.) Further, Plaintiff argues that she has sufficiently alleged a negligent supervision claim because she has pleaded "that she notified her supervisors of misconduct of employees outside the scope of their employment but [Defendant] failed to prevent further misconduct." (*Id.* at 34 (citing AC ¶¶ 606–10).)

The PHRA "exclude[s] any other action, civil or criminal, based on the same grievance of the complainant concerned." 43 Pa. Stat. and Cons. Stat. Ann. § 962(b). "The PHRA preempts negligence claims that allege a 'failure to train, supervise and investigate.'" *Roadman v. Select Specialty Hosp.,* No. 16-00246, 2020 WL 571058, at *6 (W.D. Pa. Feb. 5, 2020) (quoting *Swanson v. Nw. Human Servs., Inc.*, No. 05-03054, 2006 WL 3354145, at *6 (E.D. Pa. Nov. 2, 2006), *aff'd,* 276 F. App'x 195 (3d Cir. 2008)). Accordingly, "[n]egligent supervision claims arising out of employment discrimination cases in Pennsylvania must be brought under the PHRA." *Id.* (citing *Randler v. Kountry Kraft Kitchens*, No. 11-00474, 2012 WL 6561510, at *14 (M.D. Pa. Dec. 17, 2012)). Moreover, a "failure to bring a claim under the PHRA does not enable the claim to be brought as a common law tort cause of action" because it would "give the claimant an opportunity to circumvent the carefully drafted legislative procedures." *Id.* (internal quotation marks omitted) (quoting *Wolk v. Saks Fifth Ave. Inc.*, 728 F.2d 221, 224 (3d Cir. 1984)). In *Roadman*, the court held that the plaintiff's negligent supervision claim was preempted because "her allegations could be remedied under the PHRA" via her hostile work environment claim. *Id.*

Here, the Court concludes that Plaintiff's negligent supervision claim, like the plaintiff's claim in *Roadman*, is preempted by the PHRA. *Roadman*, 2020 WL 571058, at *6. Plaintiff relies on the following allegations for her negligent supervision claim: (1) Defendant's "refusal to reinstate [Plaintiff] pending the investigation despite repeated requests"; (2) Defendant's "failure to investigate that Dr. Ross and/or Dr. Hines were behind the October 2018 Title IX complaint as [Plaintiff] alerted"; (3) "faculty members improperly going around and intentionally avoiding [Plaintiff] as Department Chair"; (4) Defendant's "failure to intervene in the actions of Dr. Ross and Hines and their use of students to file multiple bogus Title IX claims against [Plaintiff]"; and

(5) Director Molly McClelland's failure to investigate an alleged rape of a student that Plaintiff reported. (AC ¶¶ 611–12, 616.)

The Court concludes that allegations (1)–(4) plainly support "the same grievance in Plaintiff's hostile work environment claim[s]" as well as Plaintiff's statutory substantive discrimination and retaliation claims. For example, as support that Plaintiff was subject to a discriminatory hostile work environment, Plaintiff alleges in her Amended Complaint that "Dr. Ross and Hines were involved in the bogus Title IX complaint against her," which Plaintiff raised in a "verified statement . . . in connection with the investigation." (AC ¶ 236.) As part of her hostile work environment and retaliation claims, Plaintiff also alleges that the administration, faculty, and students have shunned and disrespected her in her role as a professor and Chair. (*Id*. ¶¶ 23, 322.) Finally, Plaintiff points to Defendant's refusal to reinstate her pending the investigation despite repeated requests as a factor supporting Plaintiff's argument that she was subjected to an adverse action in the context of her retaliation and substantive discrimination claims. (ECF No. 24, at 14–15 (citing AC ¶¶ 133, 136, 164–67, and 170–74).)

As for allegation (5), the Court concludes that such an allegation is woven from the same fabric of Plaintiff's hostile work environment, discrimination, and retaliation claims.[25] As part of her hostile work environment claims, Plaintiff has alleged that Defendant's administration ignored, disrespected, and shunned her. (AC ¶ 236.) Moreover, allegation (5) is part and parcel of the series

---

[25] Even if the PHRA did not preempt this particular allegation, the Court concludes that Plaintiff has failed to plausibly allege that the harm Ms. McClelland allegedly caused Plaintiff was reasonably foreseeable. *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 491 (3d Cir. 2013) ("[T]he harm that the improperly supervised employee caused to the third party must [] have been reasonably foreseeable."). Here, Plaintiff contends that when Ms. McClelland allegedly failed to look into Plaintiff's report of a student's rape, it caused harm to Plaintiff's reputation, caused her emotional distress, and cost her out-of-pocket expenses. (AC ¶ 621.) The Court agrees with Defendant that Ms. McClelland's alleged conduct in these circumstances would not logically result in such harm because Plaintiff was reporting a student's experience based on a statement a student had made in class about being a sexual assault survivor. Plaintiff was not reporting harassment she was personally subject to in the workplace—unlike the plaintiff in *Mullen v. Topper's Salon & Health Spa, Inc.*, which the Plaintiff relies on for support—so Plaintiff has not plausibly alleged that harm specific to Plaintiff was reasonably foreseeable. *See* 99 F. Supp. 2d 553, 556–57 (E.D. Pa. 2000).

of allegations Plaintiff strung together in an attempt to show that Defendant engaged in an adverse action, for the purposes of her substantive discrimination and retaliation claims, when it targeted Plaintiff and investigated the Title IX accusation as a pretextual effort to remove her as Chair. (*Id.* ¶¶ 152–65.)

Based on the foregoing, the Court dismisses Plaintiff's negligent supervision claim (Count 18) with prejudice because further amendment would be futile. The Court concludes that no further amendment of the alleged facts would cure the deficiency of these allegations, as no new iteration or enhancement of the facts alleged could state a valid claim as a matter of law.

### F.  Plaintiff's Intentional Infliction of Emotional Distress Claim (Count 19)

Finally, at Count 19, Plaintiff brings an intentional infliction of emotional distress claim against Defendant on the grounds that "she has been targeted for adverse treatment by faculty, students, and [Defendant] on account of her [gender], Jewish religion, ancestry, and ethnicity and Israeli national origin as well as for retaliatory reasons." (ECF No. 24, at 36 (citing AC ¶¶ 13–15, 315).) After oral argument on the motion to dismiss, the Court ordered Plaintiff to file a More Definite Statement as to this claim. (ECF No. 37.) Plaintiff filed a More Definite Statement (ECF No. 38), and Defendant responded (ECF No. 40). In reaching its decision, the Court thus considers Plaintiff's Amended Complaint and More Definite Statement alongside Defendant's Motion to Dismiss and Response to Plaintiff's More Definite Statement.

Defendant moves to dismiss this count on the grounds that Plaintiff's intentional infliction of emotional distress claim is barred by Pennsylvania's workers' compensation statute: the Pennsylvania Workmen's Compensation Act ("WCA"). Defendant alternatively contends that even if the claim is not barred by the statute, Plaintiff fails to state a claim because "the allegations upon which it is based are not 'extreme and outrageous.'" (ECF No. 19, at 23 (quoting *Ghrist v. CBS*

*Broad., Inc.,* 40 F. Supp. 3d 623, 630 (W.D. Pa. 2014)).) In opposition, Plaintiff argues that the WCA exclusivity provision, discussed below, does not bar her intentional infliction of emotional distress claim because the "personal animus" or "third party attack" exception applies. (ECF No. 24, at 36–40.) Plaintiff asserts that because she has "alleged unending invidious harassment and retaliation against her" on the basis of her race, national origin, religion, and gender, she satisfies the personal animus exception. (*Id.* at 40.) Moreover, she argues that Defendant's behavior is sufficiently extreme and outrageous. (*Id.*)

### 1. Whether Plaintiff's Claim Is Barred by Pennsylvania's Workers' Compensation Statute

Intentional infliction of emotional distress is a state tort claim "governed by the substantive law of Pennsylvania." *Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933, 940 (3d Cir. 1997), *abrogated on other grounds*, 527 U.S. 471 (1999) (citing *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 394 (3d Cir. 1988)). In interpreting Pennsylvania law, the Third Circuit treats the Pennsylvania's workers' compensation statute as "the sole remedy 'for injuries allegedly sustained during the course of employment.'" *Id.* (quoting *Dugan v. Bell Tel. of Pa.*, 876 F. Supp. 713, 723 (W.D. Pa. 1994)). The WCA bars "even a cause of action based upon an intentional tort, including a claim for intentional infliction of emotional distress." *Dugan*, 876 F. Supp. at 724 & n.9 (collecting cases).

The WCA, however, carves out an exception—known as the "personal animus" or "third party attack" exception—permitting intentional tort claims to be brought if the alleged injury was "caused by an act of a third person intended to injure the employee because of reasons personal to him, and not directed against him as an employee or because of his employment." *Kovach v. Turner Dairy Farms, Inc*., 929 F. Supp. 2d 477, 496 (W.D. Pa. 2013) (internal quotation marks omitted) (quoting *Kohler v. McCrory Stores*, 615 A.2d 27, 30 (1992) (quoting 77 P.S. § 411(1)))

(citing *Abbott v. Anchor Glass Container Corp.*, 758 A.2d 1219, 1223–24 (Pa. Super. Ct. 2000)). Accordingly, "to set forth a valid cause of action against an employer, an employee must assert that his injuries are *not* work-related because he was injured by a co-worker for purely personal reasons." *Id.* (internal quotation marks omitted) (quoting *Kohler*, 615 A.2d at 31). If "the animosity between the third party and the injured employee is developed because of work-related disputes, the animosity is developed because of the employment." *Id.* (emphasis omitted) (quoting *Hammerstein v. Lindsay*, 655 A.2d 597, 601 (Pa. Super. Ct. 1980)). Moreover, "[i]f the third party would have attacked a different person in the same position as the injured employee, the attack falls outside the [] exception." *Id.* (alternation in original) (quoting *Hershey v. Ninety-Five Assocs.*, 604 A.2d 1068, 1072 (Pa. Super. Ct. 1992)). Finally, "Pennsylvania law makes it plain that [the] [p]laintiff's injury must be *either* work-related or for *purely* personal reasons; it cannot be both." *Id.* (citing *Kohler*, 615 A.2d at 32).

"Courts interpreting Pennsylvania law are split on the propriety of allowing this type of claim for on-the-job harassment and discrimination." *Huggins v. Coatesville Area Sch. Dist.*, No. 07-04917, 2008 WL 4072801, at *12 (E.D. Pa. Aug. 27, 2008) (citing *Durham Life Ins. Co.*, 166 F.3d at 160, which "compar[ed] cases where courts have permitted claims where the injury arose from harassment 'personal in nature and not part of the proper employer-employee relationship,' with cases where courts held that the WCA preempted the claims"). Although Pennsylvania law does not set forth any bright line test, "the relevant inquiry for determining whether the exception is applicable centers on the motivation or intent of the third party," *Price v. Phila. Elec. Co.*, 790 F. Supp. 97, 100 (E.D. Pa. 1992), and whether the "attack was motivated by personal reasons, as opposed to general contempt or hatred, and was sufficiently unrelated to the work situation so as not to arise out of the employment relationship." *Overall v. Univ. of Pa.*, No. 02-01628, 2003 WL

23095953, at *9 (E.D. Pa. Dec. 19, 2003), *reversed in part on other grounds*, 412 F.3d 492 (3d Cir. 2005).

In analyzing Plaintiff's claims, the Court "acknowledges that the alleged harasser's intent is inherently fact intensive, and that if an intentional infliction of emotional distress claim is properly pleaded, the issue of intent should be reserved for the trier of fact." *Id*. However, as noted in *Huggins*—a case which this Court finds instructive—where the plaintiff's allegations describe "bad behavior that [is] related to workplace issues," the pleadings cannot fit within the "personal animus" exception. *Id*. (quoting *McInerney v. Moyer Lumber & Hardware, Inc*., 244 F. Supp. 2d 393, 401 (E.D. Pa. Dec. 31, 2002)).

Plaintiff sets forth a litany of allegations to illustrate that third parties—namely Dr. Ross, Dr. Hines, members of Defendant's administration, and students—engaged in what she says was discriminatory and harassing behavior to attack Plaintiff for what she contends are purely personal reasons that are not work related. The Court has considered all of the allegations before it and provides a summary of these alleged attacks that captures the crux of Plaintiff's claim. Plaintiff alleges that Defendant condoned Dr. Ross's and Dr. Hines's "support of militant and hateful views against Israel . . . that are anti-Semitic" (AC ¶¶ 21, 23), fueling their animosity toward Plaintiff, by: forcing her to change her course name; immediately suspending Plaintiff following a baseless Title IX accusation filed by a female student supportive of Dr. Ross and Dr. Hines as well as the BDS movement; failing to timely investigate Plaintiff's complaints of discrimination and hostile work environment on the basis of her race and national origin; failing to participate fully in mediation; and resolving a union grievance in favor of Dr. Ross. (ECF No. 38, at 10–17.) She also points to an episode that occurred in December 2017 when an unnamed professor "burst into her office, displayed explosive anger, [and] threatened to take over her office," as well as an incident in or about 2014, in

which Dr. Hines had made inappropriate sexual comments, without identifying any specific comments. (ECF No. 38, at 11.)

Plaintiff next asserts that the animosity exhibited by Dr. Ross and Dr. Hines was personal toward Plaintiff based on the following: Drs. Ross and Hines pushing to have Plaintiff removed as GCS Coordinator; placing the Social Justice Program in a different department; and mobilizing students and faculty to undermine Plaintiff as Chair. (ECF No. 24, at 37.) Plaintiff also alleges that a Title IX accusation is "an enormously frightening" and "career-ending" accusation, so Defendant's handling of the Title IX investigation—including cancelling Plaintiff's Spring 2019 course and other restrictive conditions, such as barring her from campus and removing her as Chair (conditions that were not imposed on other similarly situated individuals outside her protected classes)—further exacerbated the stigma Plaintiff feared and thus supports a conclusion of personal animus toward her. (*Id*. at 38–39.) Finally, Plaintiff points to a variety of students' actions against Plaintiff as allegations of personal animosity against her: (1) students created a Facebook group of current and former students collecting information to use against Plaintiff for further Title IX accusations (AC ¶ 31); (2) a student from one of Plaintiff's cancelled classes posted a "racist and sexist Rate My Professor message" about Plaintiff (*id*. ¶ 287); (3) the student-run newspaper published an article highly critical of Plaintiff after she was reinstated as Chair (ECF No. 38, at 14); and (4) students acted disrespectfully during class (*id.* at 15).

Even taking all of the facts alleged by Plaintiff's Amended Complaint and More Definite Statement as true and drawing all reasonable inferences from them in her favor, the Court concludes that the alleged facts do not come within the purview of the personal animus exception. The Court concludes that (1) each of the alleged disputes or mistreatment logically arises directly from Plaintiff's employment, and (2) the allegations that Plaintiff herself makes, even taken as

true, assert that they were motivated by animus directed at her protected classes generally. Neither of these grounds present a basis for this Court to apply the *personal* animus exception.

In sum, while Plaintiff's allegations may possibly allege discriminatory interactions, the allegations all arise directly out of Plaintiff's employment. In *Huggins*, the Eastern District of Pennsylvania concluded that "Mr. Huggins did not allege that Dr. Walker [his supervisor] acted out of personal animosity, that any such animosity developed from non-work-related events, that any pertinent events occurred outside the employer-employee relationship, or that any events occurred away from school grounds." 2008 WL 4072801, at *12 (emphasis omitted). Rather, all that Mr. Huggins alleged was that his supervisor "manufactured harassment allegations against him, and used the machinery of the School District to investigate him." *Id*. The court concluded that those pleadings did not "permit the inference that Dr. Walker's actions were personal in nature." *Id*.

Here, the Court observes that although Plaintiff alleges a laundry list of possibly discriminatory or retaliatory behavior, these allegations in Plaintiff's Amended Complaint consist entirely of claims that Defendant or its employees harassed Plaintiff based on matters that are directly related to her employment. She does not allege that Defendant or its employees acted to injure Plaintiff for reasons outside the scope of her employment or "away from school grounds." *Id*.; *see also Kovach*, 929 F. Supp. 2d at 496 (explaining that the plaintiff had barely pleaded the personal animus exception applied by alleging that the defendant "acted in whole or in part to injure [the] [P]laintiff because of reasons personal to him, and not directed against him as an employee or because of his employment" and that the defendant's reactions to the plaintiff "reflect[ed] a pre-existing animosity towards" the plaintiff).

In fact, all of the alleged mistreatment Plaintiff describes—Title IX accusations and subsequent investigations; frustrations with changes in department structure or course names;

disagreement with colleagues as to how to teach matters touching on the Israel-Palestine conflict; disagreements with viewpoints held by students or faculty that align with the BDS movement; isolated, nonspecific comments made by co-workers; a heated, but isolated interaction with a male professor in Plaintiff's office where he threatened to take over her office; grievances raised via the faculty union; and day-to-day interactions, frustrations, or decisions connected to the courses Plaintiff teaches or decisions she makes as a Chair—all logically derive directly from Plaintiff's work in the world of academia and post-secondary administration as a longtime professor and Chair at the University—they are all directly tied to her work and the workplace. Moreover, these allegations do not rise to the level of harassment, specifically, sexual harassment, that the Pennsylvania Superior Court has required for an intentional infliction of emotional distress claim in the context of employment disputes to proceed. *See Schweitzer v. Rockwell Int'l*, 586 A.2d 383, 385, 391 (Pa. Super. Ct. 1990) (holding that the personal animus exception applied where the plaintiff showed that her supervisor "touched her breasts, demanded a sexual relationship, and made lewd comments about her body characteristics," interactions which the court held "were not part of the proper employer/employee relationship"). As for the student-related allegations, these allegedly harassing behaviors are grounded in the courses Plaintiff offers, how she teaches them, and how she interacts with students in the classroom, which are all related to Plaintiff's professorial duties.

Separately, in the Court's estimation, Plaintiff's overarching allegation advancing her intentional infliction of emotional distress claim is that faculty members, the administration, and students acted with animosity toward her due to Plaintiff's protected classes because of animosity toward members of those classes (Israeli citizenship, Jewish, and female) and not "purely personally" as to Plaintiff as an individual. Accordingly, the Court concludes that the personal animus exception to the WCA does not apply as a matter of law, and thus concludes that the WCA

bars Plaintiff's intentional infliction of emotional distress claim. Accordingly, Plaintiff's intentional infliction of emotional distress claim fails as a matter of law.

### 2. __Whether Plaintiff Plausibly Alleges Sufficiently Extreme and Outrageous Conduct__

"Even absent the statute," Plaintiff's claim does not rise to the level necessary for a plausible showing of intentional infliction of emotional distress. *Matczak*, 136 F.3d at 940. To state a claim of intentional infliction of emotional distress, a plaintiff must show that the employer's conduct was of "an extreme or outrageous type." *Id.* (internal quotation marks omitted) (quoting *Cox*, 861 F.2d at 395). "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox*, 861 F.2d at 395 (citing *Rinehimer v. Luzerne Cnty. Cmty. College*, 539 A.2d 1298, 1305 (Pa. Super. Ct. 1988)). "Liability for intentional infliction of emotional distress 'has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Ghrist*, 40 F. Supp. 3d at 630 (quoting *Reedy v. Evanson*, 615 F.3d 197, 231–32 (3d Cir. 2010)). And "the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee." *Cox*, 861 F.2d at 395.

Plaintiff's long list of disputes and alleged misconduct on behalf of Defendant do not "constitute the type of unconscionable abuse or outrageous behavior for which tort law provides a remedy," especially in the employment context. *See Visconti v. Consol. Rail Corp.*, 801 F. Supp. 1200, 1213 (S.D.N.Y. 1995) ("Disagreements regarding the collective bargaining agreement, disputes over the propriety of invoking formal disciplinary procedures, personality conflicts between managers and employees and even outright manifestations of personal distaste for an employee do

not constitute the type of unconscionable abuse or outrageous behavior for which tort law provides

a remedy."). Under Pennsylvania law, "liability clearly does not extend to mere insults, indignities,

threats, annoyances, petty oppressions, or other trivialities." *Hunger v. Grand Cent. Sanitation*, 670

A.2d 173, 177 (Pa. Super. Ct. 1996) (quoting Restatement (Second) of Torts § 46, cmt. d). Here,

Plaintiff's litany of allegations do not sufficiently allege more than strong disagreements and disputes

over a collective bargaining agreement, disagreements with Defendant's implementation of Title IX

investigations, differences of opinion and ideology between Plaintiff and her colleagues on

classroom instruction and controversial geopolitical issues, an isolated threat made by another

unidentified professor to "take Plaintiff's office," a series of indignities stemming from other Title

IX accusations and Plaintiff's concerns for how she is being treated as a professor and Chair, as

well as asserted oppressions over disagreements stemming from Plaintiff's world view on critical

issues related to the State of Israel versus the ways in which her colleagues view the world in that

regard.

      Moreover, Plaintiff has not plausibly alleged forms of sexual or racial harassment and

retaliation that Pennsylvania courts have found to be so outrageous, persistent, and substantial as

to move past the motion to dismiss stage. Plaintiff cites to several cases for the proposition that

allegations of "unending invidious harassment and retaliation against her . . . rise to the level of

extreme and outrageous conduct." (ECF No. 24, at 40.) The cases to which Plaintiff cites, however,

deal with alleged facts that are "utterly intolerable in civilized society," unlike the workplace

experiences Plaintiff describes. Plaintiff has not alleged repeated sexual harassment in the form of

sexual comments or sexual glaring, as the plaintiff in *Frankhouser v. Clearfield County Career &*

*Technology Center* had alleged, nor has Plaintiff claimed she experienced a co-employee's sexual

fixation followed by retaliation for declining overt sexual advances like the plaintiff in *Williams*

*v. U.S. Airways, Inc. Frankhouser*, No. 18-00180, 2019 WL 1259570, at *17 (W.D. Pa. Mar. 19, 2019) (permitting an intentional infliction of emotional distress claim to move past the motion to dismiss stage where the plaintiff alleged that her employer "repeatedly made sexual comments to her and stared at her in a sexual manner" and then retaliated against the plaintiff "in the form of enhanced job scrutiny and generally negative and unfavorable behavior when she reported the harassment" (internal quotation marks omitted)); *Williams*, No. 06-04797, 2007 WL 2667981, at *1–2 (E.D. Pa. Sept. 5, 2007) (permitting claim where the plaintiff alleged that the defendant's employee sexually fixated on the plaintiff by showing her "sexually explicit images," making "explicit sexual comments and references," simulating "sexual acts in her presence," and touching "her in ways she found offensive," followed by alleged retaliation after she complained about the harassment).

Likewise, Plaintiff has not alleged the same type of misconduct that the plaintiff alleged in *Price*. 790 F. Supp. at 100 (permitting claim to move past motion to dismiss on the basis of racial harassment where the plaintiff alleged that "racial epithets were used in Mr. Price's presence, that an employee threatened 'to bury his hammer' in Mr. Price's head[,] [] that another employee told Mr. Price he could have him wiped out . . . [, that] white workers deliberately discussed deer hunting and killing deer in Mr. Price's presence[, and that] following such an episode, Mr. Price found a deer's head tied to the hood of his car"). Finally, Plaintiff cites to *EEOC v. Federal Express Corp.*, 537 F. Supp. 2d 700 (M.D. Pa. 2005) as support for her claim; however, in that case, the court concluded that the jury had been "presented with evidence by which it could have found Intervenor was regularly subjected to rude and offensive language and displays of physical vulgarity motivated by sex," such as co-workers speaking about having sex with her and advising her "that women should remain barefoot and pregnant." *Id.* at 713–14. When the plaintiff in

*Federal Express* reported the harassment, management permitted the conduct to continue and worsen. *Id*. at 714.

Plaintiff's allegations, even taken as true and drawing all reasonable inferences from them, do not plausibly establish that Plaintiff was subjected to the same type of "utterly intolerable," outrageous, and persistent conduct in the workplace. Her statutory intentional discrimination and retaliation claims will move forward as noted above, but they are not sufficiently of a kind or degree making them amenable to the extraordinary level of outrage necessary to support an intentional infliction of emotional distress claim under state law.

Based on the foregoing, the Court concludes that Plaintiff has not plausibly alleged conduct that is sufficiently outrageous to sustain a claim of intentional infliction of emotional distress as a matter of law. Accordingly, the Court dismisses Plaintiff's claim at Count 19 with prejudice because further amendment would be a futile endeavor.

## V.     <u>**CONCLUSION**</u>

In sum, the Court grants in part and denies in part Defendant's Motion to Dismiss. (ECF No. 18.) The Court denies the Motion to Dismiss to the extent it seeks dismissal of (1) Plaintiff's statutory substantive discrimination claims (Counts 2, 4, 6, 8, and 11) and (2) Plaintiff's statutory retaliation claims (Counts 1 and 10). The Court grants Defendant's Motion to Dismiss as to (3) Plaintiff's statutory hostile work environment claims (Counts 3, 5, 7, and 9), (4) Plaintiff's state law breach of contract claim (Count 17), and (5) Plaintiff's state law tort claims: negligent supervision (Count 18) and intentional infliction of emotional distress (Count 19). The Court's dismissal of these claims at Counts 3, 5, 7, 9, 17, 18, and 19 is with prejudice, as further amendment would be futile.

An appropriate Order will issue.

 s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: March 31, 2022
cc:     All counsel of record